**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

------------------------------------------------ x

In re:                                          :       Chapter 11

:

AIG FINANCIAL PRODUCTS CORP.,                   :

:       Case No. 22-11309 (MFW)

:

Debtor.[1]                                      :

:

------------------------------------------------ :

:

AIG FINANCIAL PRODUCTS CORP.,                   :

:

Plaintiff,                             :

:

v.                                     :

:       Adv. Pro. No. 23-50110 (MFW)

:

LEE ARTHURS; DAVID ACKERT;                      :
MITCHELL BELL; ERIK BENGTSON;                   :
PAUL BRADSHAW; THOMAS BUTTKE;                   :
JOHN CAPPETTA; DAVID CHANG;                     :
ROBERT CHANG; JASON DESANTIS;                   :
RICHARD FABBRO; KENNETH FARRAR;                 :
JONATHAN FRAADE; CARL GIESLER                   :
JR.; JAMES HAAS; CHARLES HSIEH;                 :
THOMAS KALB; THOMAS KUSHNER;                    :
ROBERT LEARY; JONATHAN                          :
LIEBERGALL; NATHANIEL LITWAK;                   :
BRENDAN LYNCH; ALFRED MEDIOLI;                  :
MATTHEW MIHALY; JOANN PALAZZO;                  :
EUGENE PARK; ANDREW PARTNER;                    :
CARL PETERSON; STEVEN PIKE;                     :
THOMAS PLAGEMANN; ROBERT                        :
POWELL; DANIEL RAAB; ANN REED;                  :
PAUL SCHREINER; DMITRY                          :
SATANOVSKY; MARY HEATHER                        :
SINGER; KEITH STEIN; FRANK                      :
STROHM; TIMOTHY SULLIVAN JR.;                   :

---

[1] The Debtor in this case, along with the last four digits of the Debtor's federal tax identification number, is: AIG Financial Products Corp. (9410).  The Debtor's address is 50 Danbury Road, Wilton, Connecticut 06897.

CHRISTIAN TOFT; JOE TOM; RYAN :
VETTER; STEVEN WAGAR; THOMAS :
WARD; MARTIN WAYNE; JAMES WOLF. :
                                    :
            Defendants.             :    **Ref. Docket Nos. 1 & 2**
------------------------------------- x

## NOTICE OF FILING OF PROPOSED REDACTED
## VERSION OF COMPLAINT FOR DECLARATORY RELIEF

**PLEASE TAKE NOTICE** that, on February 17, 2023, AIG Financial Products Corp.

("**Plaintiff**" or the "**Debtor**"), by and through its undersigned counsel, filed, under seal, the

*Complaint for Declaratory Relief* [Docket Nos. 1 & 2] (the "**Complaint**").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Del. Bankr. L.R. 9018-1(d)(ii),

the Plaintiff hereby files the proposed redacted version of the Complaint (the "**Proposed Redacted**

**Document**"),[2] attached hereto as **Exhibit A**.

[*Signature Page Follows*]

---

[2] The only redaction is a revised version of Exhibit D to the Complaint.

Dated: February 28, 2023
      Wilmington, Delaware

Respectfully Submitted,

*/s/ Kara Hammond Coyle*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Shane M. Reil (No. 6195)
Catherine C. Lyons (No. 6854)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  mnestor@ycst.com
      kcoyle@ycst.com
      sreil@ycst.com
      clyons@ycst.com

-and-

George A. Davis (admitted *pro hac vice*)
Keith A. Simon (admitted *pro hac vice*)
David Hammerman (admitted *pro hac vice*)
Annemarie V. Reilly (admitted *pro hac vice*)
Madeleine C. Parish (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
Email: george.davis@lw.com
      keith.simon@lw.com
      david.hammerman@lw.com
      annemarie.reilly@lw.com
      madeleine.parish@lw.com

*Counsel for Debtor and Debtor in Possession*

# Exhibit A

**Proposed Redacted Document**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

In re:                                    :        Chapter 11
                                          :
AIG FINANCIAL PRODUCTS CORP.,             :        Case No. 22-11309 (MFW)
                                          :
        Debtor.[1]                        :
                                          :
                                          :
------------------------------------------------------- :
                                          :
AIG FINANCIAL PRODUCTS CORP.,             :
                                          :
                Plaintiff,                :
                                          :
        v.                                :
                                          :        Adv. Pro. No. 23-_____ (___)
                                          :
                                          :
LEE  ARTHURS;  DAVID  ACKERT;             :
MITCHELL  BELL;  ERIK  BENGTSON;          :
PAUL BRADSHAW; THOMAS BUTTKE;             :
JOHN  CAPPETTA;  DAVID  CHANG;            :
ROBERT CHANG; JASON DESANTIS;             :
RICHARD FABBRO; KENNETH FARRAR;           :
JONATHAN FRAADE; CARL GIESLER             :
JR.; JAMES HAAS; CHARLES HSIEH;           :
THOMAS  KALB;  THOMAS  KUSHNER;           :
ROBERT    LEARY;    JONATHAN              :
LIEBERGALL;  NATHANIEL  LITWAK;           :
BRENDAN LYNCH; ALFRED MEDIOLI;            :
MATTHEW MIHALY; JOANN PALAZZO;            :
EUGENE PARK; ANDREW PARTNER;              :
CARL  PETERSON;  STEVEN  PIKE;            :
THOMAS    PLAGEMANN;    ROBERT            :
POWELL; DANIEL RAAB; ANN REED;            :
PAUL    SCHREINER;    DMITRY              :
SATANOVSKY;   MARY   HEATHER              :
SINGER;  KEITH  STEIN;  FRANK             :
STROHM;  TIMOTHY  SULLIVAN  JR.;          :
CHRISTIAN  TOFT;  JOE  TOM;  RYAN         :

---

[1] The Debtor in this case, along with the last four digits of the Debtor's federal tax identification number, is: AIG Financial Products Corp. (9410). The Debtor's address is 50 Danbury Road, Wilton, Connecticut 06897.

VETTER; STEVEN WAGAR; THOMAS
WARD; MARTIN WAYNE; JAMES WOLF.

Defendants.

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff AIG Financial Products Corp. ("**Plaintiff**", the "**Debtor**", or "**AIG FP**"), through its undersigned counsel, as and for its complaint (the "**Complaint**") against Lee Arthurs, David Ackert, Mitchell Bell, Erik Bengtson, Paul Bradshaw, Thomas Buttke, John Cappetta, David Chang, Robert Chang, Jason Desantis, Richard Fabbro, Kenneth Farrar, Jonathan Fraade, Carl Giesler Jr., James Haas, Charles Hsieh, Thomas Kalb, Thomas Kushner, Robert Leary, Jonathan Liebergall, Nathaniel Litwak, Brendan Lynch, Alfred Medioli, Matthew Mihaly, Joann Palazzo, Eugene Park, Andrew Partner, Carl Peterson, Steven Pike, Thomas Plagemann, Robert Powell, Daniel Raab, Ann Reed, Paul Schreiner, Dmitry Satanovsky, Mary Heather Singer, Keith Stein, Frank Strohm, Timothy Sullivan Jr., Christian Toft, Joe Tom, Ryan Vetter, Steven Wagar, Thomas Ward, Martin Wayne, and James Wolf (collectively, the "**Defendants**"), alleges as follows:

## NATURE OF THIS ACTION

1.      This is an action pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure, sections 105, 502, and 510 of title 11 of the United States Code (the "**Bankruptcy Code**"), and the Declaratory Judgment Act (28 U.S.C. § 2201).

2.      In connection with the Chapter 11 Case (as defined herein), the Plaintiff seeks declaratory relief to bring to an end any doubt as to the nature and priority of the debt it incurred at the height of the 2008–2009 financial crisis (the "**Financial Crisis**"), when its unhedged positions on credit default swaps that had initially produced gains swiftly turned into significant losses.  Facing the collapse of the entire AIG corporate family and risk to the global financial system, AIG FP's parent company, American International Group, Inc. ("**AIG Inc.**" or the "**Parent**"), obtained a $85 billion taxpayer-funded rescue loan from the government, $65 billion of which it allocated to a line of credit to provide AIG FP with desperately needed liquidity.

1

The taxpayer-funded loan averted catastrophe, as AIG FP satisfied its obligations and avoided default. In the wake of the crisis, AIG FP started unwinding its trading portfolio, never recouped its losses, and has survived despite its continuing losses only by accessing the line of credit from its Parent.

3.     The Defendants are all former executives of AIG FP who participated in AIG FP's deferred compensation plans, which were implemented at a time when AIG FP's risky financial positions were still producing gains prior to the ultimate collapse and significant losses associated with these financial positions. Those deferred compensation plan balances were wiped out during the crisis, from which AIG FP never recovered. The Defendants nonetheless commenced litigation in 2019 against AIG FP seeking to recover in excess of $185 million in pre-collapse plan balances as though the events of 2008 had never happened.

4.     The Defendants repeatedly argued that AIG FP could have replenished their plan accounts by borrowing more money from its Parent under the $65 billion line of credit. Based on their arguments in the Chapter 11 Case, however, the Defendants now intend to challenge the characterization of the AIG FP Revolver (as defined here) as debt in an effort to evade the subordination clause that governs their deferred compensation plans. The Defendants have no valid basis to do so. AIG FP's independent directors have thoroughly investigated the AIG FP Revolver and concluded that the loans extended thereunder are true debt obligations, and that even if the AIG FP Revolver had never been documented, AIG Inc. would hold a subrogation claim against AIG FP that would rank senior to any claim under the deferred compensation plans. And the terms of the deferred compensation plans are clear: if AIG FP were to file for bankruptcy (as it did), the Defendants' right to payment under the deferred compensation plans would be subordinated and junior in right of payment to all of AIG FP's obligations. This includes AIG

2

FP's obligations under the AIG FP Revolver to its Parent.  The Defendants are, therefore, expressly subordinated.

5.      Moreover, the Defendants do not hold claims against or debt in AIG FP.  To the contrary, the deferred compensation plans only provided them with equity interests in AIG FP. But even assuming the Defendants hold unsecured claims, they were insiders of the Debtor when those claims accrued under the deferred compensation plans.  As insiders and pursuant to section 502(b)(4) of the Bankruptcy Code, the burden is on the Defendants to show that their asserted $640 million claim is the objectively reasonable value of the services provided to the Debtor, which they cannot satisfy here based on, among other things, the excessive compensation they have already received from the Debtor.  Accordingly, the alleged claims of the Defendants should be disallowed in their entirety.[2]

## JURISDICTION AND VENUE

6.      On December 14, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**"), captioned under the case name *In re AIG Financial Products Corp.* (Case No. 22-11309 (MFW)) (the "**Chapter 11 Case**").[3]  On the Petition Date, the Debtor filed the *Declaration of William C. Kosturos, Chief Restructuring Officer of the Debtor, in Support of Chapter 11 Petition and First Day Pleading* [Main Docket No. 2] (the "**First Day Declaration**"), which is incorporated herein by reference.[4]

---

[2] As described more fully below, at least eight Defendants have previously executed releases that waived any claims against AIG FP with respect to the Compensation Plans.  Thus, the Debtor is seeking to disallow their alleged claims on that basis as a separate count.

[3] Citations to the docket in this Complaint are citations to the main docket of the Debtor's Chapter 11 Case.

[4] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the First Day Declaration.

3

7.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (K) and (O), and, pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Rules**"), the Debtor consents to the entry of a final order by the Court in connection with this Complaint to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.     This adversary proceeding is commenced pursuant to (i) Rule 7001(2) of the Bankruptcy Rules, which allows for a proceeding "to determine the validity, priority, or extent of [an] interest in property;" (ii) Rule 7001(7) of the Bankruptcy Rules, which allows for a proceeding "to obtain an injunction or other equitable relief;" (iii) Rule 7001(8) of the Bankruptcy Rules which allows for a proceeding to "subordinate any allowed claim or interest;" (iv) Rule 7001(9) of the Bankruptcy Rules, which allows for a proceeding to obtain a declaratory judgment relating to the foregoing; and (v) section 105(a) of the Bankruptcy Code.  Declaratory relief is appropriate pursuant to Rule 7001 of the Bankruptcy Rule and 28 U.S.C. § 2201.  As set forth below, an actual legal controversy exists with respect to the counts brought herein.

## PARTIES

9.     Plaintiff AIG FP is a wholly-owned, direct subsidiary of AIG Inc.  AIG FP was founded in 1987 for the purpose of trading in the capital markets and offering corporate finance, investment, and financial risk management products, including complex derivatives transactions.

30132276.1

US-DOCS\139579253

AIG FP is a Delaware corporation, with its principal place of business located at 50 Danbury Road, Wilton, Connecticut, 06897.

10.     The Defendants are all former executives of AIG FP and were beneficiaries of AIG FP's deferred compensation plans.

11.     Defendant Lee Arthurs, upon information and belief, is a resident of New York.

12.     Defendant David Ackert, upon information and belief, is a resident of Nevada.

13.     Defendant Mitchell Bell, upon information and belief, is a resident of Connecticut.

14.     Defendant Erik Bengston, upon information and belief, is a resident of New York.

15.     Defendant Paul Bradshaw, upon information and belief, is a resident of Connecticut.

16.     Defendant Thomas Buttke, upon information and belief, is a resident of Connecticut.

17.     Defendant John Cappeta, upon information and belief, is a resident of California.

18.     Defendant David Chang, upon information and belief, is a resident of Connecticut.

19.     Defendant Robert Chang, upon information and belief, is a resident of Connecticut.

20.     Defendant Jason DeSantis, upon information and belief, is a resident of Connecticut.

21.     Defendant Richard Fabbro, upon information and belief, is a resident of New York.

22.     Defendant Kenneth Farrar, upon information and belief, is a resident of Connecticut.

23.     Defendant Jonathan Fraade, upon information and belief, is a resident of Connecticut.

24.     Defendant Carl Giesler Jr, upon information and belief, is a resident of Texas.

5

25.     Defendant James Haas, upon information and belief, is a resident of Florida.

26.     Defendant Charles Hsieh, upon information and belief, is a resident of Connecticut.

27.     Defendant Thomas Kalb, upon information and belief, is a resident of Texas.

28.     Defendant Thomas Kushner, upon information and belief, is a resident of Connecticut.

29.     Defendant Robert Leary, upon information and belief, is a resident of Florida.

30.     Defendant Jonathan Liebergall, upon information and belief, is a resident of South Carolina.

31.     Defendant Nathaniel Litwak, upon information and belief, is a resident of New York.

32.     Defendant Brendan Lynch, upon information and belief, is a resident of Connecticut.

33.     Defendant Alfred Medioli, upon information and belief, is a resident of New Jersey.

34.     Defendant Matthew Mihaly, upon information and belief, is a resident of Connecticut.

35.     Defendant JoAnn Palazzo, upon information and belief, is a resident of Connecticut.

36.     Defendant Eugene Park, upon information and belief, is a resident of Connecticut.

37.     Defendant Andrew Partner, upon information and belief, is a resident of Connecticut.

38.     Defendant Carl Peterson, upon information and belief, is a resident of Texas.

39.     Defendant Steven Pike, upon information and belief, is a resident of Colorado.

30132276.1

US-DOCS\139579253

40.     Defendant Thomas Plagemann, upon information and belief, is a resident of New York.

41.     Defendant Robert Powell, upon information and belief, is a resident of Connecticut.

42.     Defendant Daniel Raad, upon information and belief, is a resident of New Jersey.

43.     Defendant Ann Reed, upon information and belief, is a resident of Connecticut.

44.     Defendant Dmitri Satanovsky, upon information and belief, is a resident of Connecticut.

45.     Defendant Paul Schreiner, upon information and belief, is a resident of Connecticut.

46.     Defendant Mary Heather Singer, upon information and belief, is a resident of Connecticut.

47.     Defendant Keith Stein, upon information and belief, is a resident of Connecticut.

48.     Defendant Frank Strohm, upon information and belief, is a resident of Texas.

49.     Defendant Timothy Sullivan, Jr, upon information and belief, is a resident of Texas.

50.     Defendant Christian Toft, upon information and belief, is a resident of Connecticut.

51.     Defendant Joe Tom, upon information and belief, is a resident of New Jersey.

52.     Defendant Ryan Vetter, upon information and belief, is a resident of New York.

53.     Defendant Steven Wagar, upon information and belief, is a resident of Connecticut.

54.     Defendant Thomas Ward, upon information and belief, is a resident of Connecticut.

55.     Defendant Martin Wayne, upon information and belief, is a resident of New York.

56.     Defendant James Wolf, upon information and belief, is a resident of Texas.

30132276.1

US-DOCS\139579253

# FACTUAL BACKGROUND

A.    **AIG FP's Deferred Compensation Plans**

1.    **The Deferred Compensation Plan and Relevant Provisions**

57.    AIG FP maintained a deferred compensation system for rewarding top executives while aligning the incentives of the company and of management.  AIG FP was initially characterized as a "joint venture" and historically AIG FP profits were split on a 70/30 basis, with 70% going to AIG Inc. and the remaining 30% going to AIG FP executives.  Beginning in or around 1995, AIG FP better aligned incentives for long-term growth over short-term profits and increased the capital of FP, by adopting a compensation system pursuant to which a portion of these profits should not paid out immediately to AIG Inc. and the executives, but rather would be deferred, to be paid in the future, subject to various adjustments and conditions.

58.    This arrangement was reflected in the AIG FP Deferred Compensation Plan, dated December 1, 1995 (as amended and modified, the "**DCP**").[5]  The DCP established AIG Inc. and the executives of AIG FP collectively as the "**Plan Participants**" (the former AIG FP executives who participated in the DCP are referred to hereafter as the "**Former Executive Plan Participants**").  A copy of the DCP is attached hereto as Exhibit A.

59.    The DCP's objectives were:

1.    To promote the formation of capital in AIG FP;

2.    To ensure that the interests of [Former Executive Plan Participants] and AIG [Inc.] are aligned to promote the long term success of AIG FP;

3.    To focus AIG FP on success measured not only by revenue growth but also by return on capital, quality of earnings, and

---

[5]  Although initially adopted on December 1, 1995, the DCP has been subsequently amended, with the last amendment occurring on December 22, 2010.

30132276.1

US-DOCS\139579253

enhancement of the AIG name and reputation in financial services;

4.     To serve as an investment opportunity that will attract the most talented people to AIG FP and retain those already here; and

5.     To be simple, straightforward, and efficient.[6]

60.     Under the DCP, at the end of each year, "Distributable Income" (defined as AIG FP's "revenues, less expenses and credit and market reserves taken for that year", as determined by the board of AIG FP from time to time),[7] would be calculated and apportioned 70% to AIG Inc. and 30% to Former Executive Plan Participants, with a portion of those amounts credited to both AIG Inc.'s and to the Former Executive Plan Participants' Deferred Compensation Accounts (the "**Plan Accounts**").

61.     Absent any losses exceeding the outstanding market and credit reserves and current year income of AIG FP, such Plan Account balances were subsequently to be paid to AIG Inc. and the Former Executive Plan Participants annually in arrears beginning in October of each year in equal *pro rata* installments corresponding to the approximate average life of AIG FP's swap transaction portfolio, on a schedule determined by the board of AIG FP.[8]

62.     However, in the event AIG FP suffered losses in a given year, the DCP provided for AIG FP to reduce the outstanding balance credited to the Plan Account of each participant (the "**Reduction Provision**").[9]  Under the DCP, and for the purposes of reducing plan balances,

---

[6]  DCP Preamble.

[7]  DCP §1.08.

[8]  DCP §3.05(b).

[9]  DCP §4.01(b).

9

losses were defined as those losses that "in the aggregate exceed the outstanding market and credit reserves and current year income of AIG FP."[10]

63.    The DCP also included a mechanism for AIG FP to subsequently restore the reduced Plan Account balances (the "**Restoration Provision**").[11]  In 2008, the DCP was amended to provide that "to the extent amounts have not been restored by December 31, 2013, all restoration rights shall permanently lapse."[12]

64.    The DCP also explicitly provided that benefits payable under the DCP would not have the benefit of any guarantee by AIG Inc.  Accordingly, the Former Executive Plan Participants could not rely on the General Guarantee Agreement, dated as of December 4, 1995, by and between AIG Inc. and AIG FP (the "**Parent Guarantee**"), pursuant to which AIG Inc. had guaranteed the prompt payment when due of all obligations of AIG FP.  A copy of the Parent Guarantee is attached hereto as <u>Exhibit B</u>.

65.    Most importantly, the DCP also contained several bankruptcy-related provisions. In particular, the DCP made clear that, in the event AIG FP filed for bankruptcy, all obligations under the DCP would be subordinated and junior in right of payment to all of AIG FP's other obligations, unless payment of any such other obligations was expressly made subordinate to or *pari passu* with AIG FP's payment obligations under the DCP:

> ***If AIG [FP] shall become the subject of any bankruptcy or insolvency case or proceeding***, or shall make an assignment for the benefit of creditors, or shall become the subject of a reorganization whether or not pursuant to bankruptcy laws, or if any other relief shall be granted to AIG Financial Products Corp. generally from the rights    of    creditors,    then    in    any    such    event

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

(a "Bankruptcy/Insolvency Event") the obligations under this Deferred Compensation Plan to [Former Executive Plan] Participants and their Beneficiaries and to AIG [Inc.] *shall be subordinate and junior in right of payment and otherwise, to the prior payment in full of all of the other obligations of AIG [FP], whether now existing or hereafter incurred*, except to the extent payment of any such obligations is *expressly* made subordinate to or *pari passu* with the payment obligations hereunder.[13]

66.     None of AIG FP's obligations have been made expressly subordinate to or *pari passu* with the DCP claims.[14]

67.     As such, even if AIG FP were now obligated to restore the Plan Account balances (it is not), any claim by a Former Executive Plan Participant would be subordinated to all other AIG FP obligations (including claims of the Parent) in this Chapter 11 Case.

## 2.        The Special Incentive Plan and Relevant Provisions

68.     In the Defendants' prepetition litigation, they brought claims against AIG FP under another deferred compensation plan as well.  In response to unrealized losses from AIG FP's credit derivative business in 2007, AIG FP capped the bonuses awarded pursuant to the DCP, and introduced the 2007 Special Incentive Plan, effective as of December 1, 2007 (as amended and modified, the "**SIP**" and together with the DCP, the "**Compensation Plans**").  A copy of the SIP is attached hereto as Exhibit C.

69.     The SIP mitigated the shortfall created by the cap on DCP bonuses by crediting to new SIP accounts, sums equivalent to the difference between the amounts that would have been

---

[13]  DCP §4.01(a) (emphasis added).

[14]  For the avoidance of doubt, the Debtor's description or classification in this Complaint of any obligations arising under or related to the Compensation Plans (as defined above) as "claims" is being used for convenience only, and should not be construed as an admission that such obligations are debt.  As set forth in Count Three below, the Debtor submits that the Defendants' interests arising under the Compensation Plans are equity interests.

30132276.1

awarded under the DCP absent the cap on DCP bonuses and the amount of bonuses actually awarded under the DCP.

70.     The amounts credited to the SIP accounts were to be paid at a future time, with the SIP expressly stating that its purposes included building capital to ensure "that amounts are available to absorb losses in the event that AIG FP realizes losses on super senior credit derivatives that would have an impact on AIG FP's capital structure."[15]

71.     The SIP contained substantially similar reduction and restoration provisions as those contained in the DCP (including the December 31, 2013 lapse provision), so that if any losses were incurred in excess of reserves and current year income, SIP credits would be reduced.[16] The SIP also included identical language providing that AIG Inc. did not guarantee any obligation under the SIP plan.[17]

72.     Finally, just like claims arising under the DCP, the SIP also expressly subordinated any claim under the SIP to all of AIG FP's other obligations in bankruptcy:

> *If AIG [FP] shall become the subject of any bankruptcy or insolvency case or proceeding*, or shall make an assignment for the benefit of creditors, or shall become the subject of a reorganization whether or not pursuant to bankruptcy laws, or if any other relief shall be granted to AIG [FP] generally from the rights of creditors, then in any such event (a "Bankruptcy/Insolvency Event") the obligations hereunder to Covered Executives and their Beneficiaries and to AIG [Inc.] *shall be subordinate and junior in right of payment and otherwise, to the prior payment in full of all of the other obligations of AIG [FP], whether now existing or hereafter incurred*, except to the extent payment of any such obligations is

---

[15]  SIP Preamble.

[16]  SIP § 4.01(b).

[17]  SIP § 4.01(a).

***expressly*** made subordinate to or *pari passu* with the payment obligations hereunder.[18]

73. None of AIG FP's obligations have been made expressly subordinate to or *pari passu* with the SIP claims.

74. Accordingly, in this Chapter 11 Case, the Defendants' right to payment (if any) arising under the SIP will be subordinated and junior in right of payment to all of AIG FP's other obligations without regarding to when such obligations were incurred (including claims of the Parent).

75. As shown above, the language in the Compensation Plans is clear and unambiguous: alleged claims arising thereunder are subordinated and junior in right of payment to all of AIG FP's other obligations, with the lone exception for claims that are expressly made subordinate to or *pari passu* with AIG FP's obligations under the Compensation Plans. If the documentation governing the other obligations is silent as to priority, then the plain language of the Compensation Plans means such obligations are senior to the claims arising under the Compensation Plans.

### 3. The 2008 Employee Retention Plan

76. By early 2008, because both the broader market and AIG Inc. and its subsidiaries were coming under increased pressure, AIG FP introduced the Employee Retention Plan (the "**ERP**"), effective from December 1, 2007, which provided for guaranteed retention awards. Unlike the payments under the Compensation Plans, the ERP awards were determined without regard to AIG FP's 2008 or 2009 financial performance. The ERP further provided for a portion of those awards to be paid no later than March 15 of the calendar year following the relevant

---

[18] *Id.* (emphasis added).

13

compensation year, with payment guaranteed by AIG Inc. Pursuant to the ERP, the remainder of the ERP awards were deferred into the Plan Accounts, where they would be subject to Reduction and Restoration Provisions and would not be subject to the Parent Guarantee.  AIG FP fully paid the guaranteed amounts.

### 4.    Total Amounts Paid to the Defendants

77.     The Defendants have already been paid substantial amounts by the Debtor based on, among other things, their salaries, the Compensation Plans, and the ERP.  Specifically, and as shown on Exhibit D attached hereto, these forty-six Defendants have already received more than $751 million in cash in the aggregate from the Debtor for the years 2002 through 2009. Of that amount, approximately $47 million was paid to the eight Defendants that previously executed releases waiving any claims against AIG FP related to the Compensation Plans (the "**Releasing Defendants**").[19]

78.     Furthermore, as shown on such Exhibit, 99.3% of such payments (a total of $746,068,357) were made to forty-three Defendants (each of whom received at least $2,000,000 from the Debtor).  These highly-compensated insiders of the Debtor reaped tremendous financial benefits from AIG FP's trades, yet now seek to avoid the impact of AIG FP's massive financial crisis losses which wiped out account balances under the express terms of the Compensation Plans. Not a single Defendant was paid less than $1,500,000 by the Debtor.

---

[19] The Debtor understands that the Releasing Defendants are:  David Chang, Brendan Lynch, Matthew Mihaly, Dmitry Satanovsky, Christian Toft, Joe Tom, Steven Wagar and Thomas Ward.

30132276.1

US-DOCS\139579253

### B. THE 2008 FINANCIAL CRISIS RESULTED IN AIG FP INCURRING DEBT UNDER THE AIG FP REVOLVING CREDIT AGREEMENT

79.     AIG FP became a central figure of the Financial Crisis when its unhedged positions on credit default swaps ("**CDSs**") that had initially produced gains started unravelling.  For years prior, AIG FP had been writing credit protection through CDSs on pools of mortgage-backed securities tied to subprime mortgage markets.  AIG FP's position required the posting of collateral in the event the market value of the underlying mortgage-backed securities declined.  By the spring of 2005, the unhedged exposure on these CDS contracts had increased to $40 billion.  In light of growing market risks, AIG FP tried to reduce risk and decided to stop writing new mortgage-backed CDSs in 2006.  Despite this decision, AIG FP's CDS portfolio was approximately $533 billion in total notional amount by 2007.

80.     In September 2008, as the value of underlying securities fell, AIG FP experienced unrealized losses on its portfolio and owed tens of billions of dollars of collateral postings, with no liquidity to pay them.  Those demands triggered a liquidity crisis at AIG FP and AIG Inc. because AIG Inc. had guaranteed AIG FP's monetary liabilities to those counterparties.[20] As is standard and customary in guarantee agreements, the Parent Guarantee also provided that AIG Inc. would be subrogated to the right of any guaranteed party against AIG FP with respect to any and all payment made by AIG Inc. on account of AIG FP's obligations.[21]

81.     On the morning of Monday, September 15, 2008—the same day that Lehman Brothers filed for chapter 11 protection—AIG Inc. met with representatives of certain financial institutions and the Federal Reserve Bank of New York (the "**Federal Reserve**").  Given the size,

---

[20]  Parent Guarantee §§ 1 and 2.

[21]  *Id.* § 5.

name, franchise, and market presence of AIG Inc. and its subsidiaries, the Federal Reserve cautioned of a potential worldwide contagion should AIG Inc. become further impaired.[22]

82.     On the night of September 16, 2008, AIG Inc.'s Board of Directors approved borrowing from the Federal Reserve based on a term sheet that set forth the terms of a secured credit agreement and related equity participation, resulting in the extension of a $14 billion line of credit to AIG Inc.  Less than a week later, the Federal Reserve and AIG Inc. finalized the terms of that certain Credit Agreement, dated as of September 22, 2008 (the loan provided thereunder, the "**Fed Loan**"), providing for an $85 billion revolving line of credit to ensure that AIG Inc. and its subsidiaries could meet their immediate obligations.

83.     As a result of and simultaneous with AIG Inc.'s receipt of the Fed Loan, AIG Inc. entered into that certain Revolving Credit Agreement, dated as of September 22, 2008, with its affiliate AIG Funding, Inc. ("**AIG Funding**"), whereby it extended $85 billion to AIG Funding to finance additional intercompany loans to direct and indirect subsidiaries of AIG Inc. (the "**AIG Funding Revolving Credit Agreement**").

84.     Concurrently therewith, AIG Funding entered into a separate Revolving Credit Agreement, dated as of September 22, 2008, with AIG FP (the "**AIG FP Revolving Credit Agreement**" and the loan extended thereunder, the "**AIG FP Revolver**") whereby it extended a $65 billion revolving credit line to AIG FP. A copy of the AIG FP Revolving Credit Agreement is attached hereto as Exhibit E.

---

[22] *See* Financial Crisis Inquiry Commission, The Financial Crisis Inquiry Report: Final Report of the National Commission on the Cause of the Financial and Economic Crisis in the United States (2011), https://www.govinfo.gov/content/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf, p. 349.

85.     AIG FP borrowed from AIG Inc. (via AIG Funding), which itself borrowed from the Federal Reserve, and used the proceeds of those borrowings to satisfy its Parent-guaranteed obligations and collateral calls, avoid a default, and thus avoid the collapse of AIG Inc. and broader financial contagion.[23]

86.     The AIG FP Revolving Credit Agreement does not expressly provide that the Parent's right of payment thereunder is subordinated to or *pari passu* with AIG FP's obligations under the Compensation Plans.  As such, pursuant to the plain language of the Compensation Plans, the Parent's claims arising under the AIG FP Revolving Credit Agreement are senior to the Defendants' claims arising in connection with the Compensation Plans.

### C.     AIG FP USES THE AIG FP REVOLVER TO PAY COLLATERAL CALLS AND TO START UNWINDING ITS PORTFOLIO

87.     In October 2008, a steering committee made up of executives from AIG FP and AIG Inc., and other advisors, was established to oversee AIG FP's unwinding of its portfolio. Due in part to the long-dated nature of the transactions on AIG FP's books, the unwinding could not (and was neither meant nor anticipated to) be completed quickly.  Rather, in order to unwind its trading portfolio business without inflicting more losses, it was understood that AIG FP would need to find replacement counterparties for its complex derivatives, a process that ultimately was complicated by the continued market downturn, a global recession, and decreased risk appetites.

88.     Initially, the loans under the AIG FP Revolver enabled AIG FP to close out its most problematic open derivatives positions that carried the largest potential for additional sustained losses to AIG FP.  Then, in order to stabilize their financial positions and eliminate the ongoing

---

[23]  The AIG FP Revolving Credit Agreement was ultimately assumed by AIG Inc. in connection with its merger with AIG Funding in December 2015, pursuant to which AIG Inc. assumed all of AIG Funding's liabilities.

30132276.1

US-DOCS\139579253

collateral calls, AIG Inc. and AIG FP realized a substantial portion of the previously unrealized losses of AIG FP's CDS transactions in a series of transactions referred to as "Maiden Lane III."[24] As a result, certain complex financial contracts were terminated, which allowed counterparties to retain collateral posted by AIG FP, leading to realized losses of approximately $25.8 billion in November 2008 and $8.1 billion in December 2008.

89.     Despite incurring these losses, AIG FP continued operating during its unwinding and delayed the initiation of any reorganization or liquidation proceedings, as those proceedings would have triggered defaults on its derivatives and other financial positions, resulting in additional significant losses to AIG FP.  From AIG FP's perspective, it still had valuable assets in its portfolio, including in the form of derivatives transactions that individually could continue to generate value for years to come, and which AIG FP planned on using to repay the AIG FP Revolver.  AIG FP thus used the funds available under the AIG FP Revolver to maximize value and minimize losses by completing its unwinding gradually over time.

90.     Since entry into the AIG FP Revolving Credit Agreement, which provided for up to $65 billion in aggregate principal amount at any one time, AIG FP has made numerous draws and repayments.  In total, AIG FP has drawn over $92 billion under the AIG FP Revolver and repaid over $59 billion.  As shown on the chart attached hereto as <u>Exhibit F</u>, the Debtor has paid and re-borrowed extensively on the AIG FP Revolver over the last fourteen years, with its last draw thereunder occurring in May 2021.

---

[24] As described more fully in paragraph 19 of the First Day Declaration, the Maiden Lane transactions refer to the Federal Reserve's agreement during the Financial Crisis to purchase certain troubled assets from financial institutions in order to remove such assets from the firms' books and transfer them to new entities that came to be known as Maiden Lane LLCs (named for a street alongside the Federal Reserve).

91.     The largest draws occurred in 2008, starting with AIG FP's initial draw of over $26 billion on September 22, 2008.  By the end of September 2008, AIG FP had drawn almost $40 billion and by the end of December, that number was over $50 billion.  AIG FP made the first repayment on the AIG FP Revolver on October 24, 2008.  From then on, AIG FP has continued to borrow and repay periodically throughout the life of the AIG FP Revolver, using money AIG FP brought in through asset sales and releases of posted collateral for the repayments.

92.     From 2008 until 2010, AIG FP made over 100 draws and even more repayments. From 2010 until 2021, AIG FP made roughly 25 draws on the AIG FP Revolver and several more repayments.

93.     In addition to making repayments on the loans, AIG FP paid over $6 billion in cash interest.  From September 2008 through May 2011, AIG FP paid interest on the AIG FP Revolver on a monthly basis as required under the AIG FP Revolving Credit Agreement, which totaled just over $6 billion.  In June 2011, interest started being capitalized (at the rate of one-month LIBOR plus 20 basis points) instead of paid in cash.  The total amount of capitalized interest since June 2011 is approximately $4.2 billion.  In November 2022 (the last full month prior to the Petition Date), AIG FP accrued $133 million in interest on the AIG FP Revolver (*i.e.*, an annualized amount of $1.6 billion).

94.     Ultimately, AIG FP was not able to recoup the losses it suffered as a result of the Financial Crisis.  As of the Petition Date, AIG FP had drawn over $92 billion under the AIG FP Revolver to satisfy its obligations, and repaid over $59 billion,[25] leaving a balance of

---

[25]  This amount excludes the capitalized interest paid since June 2011 in the approximate amount of $4.2 billion, as discussed in more detail above.

30132276.1

US-DOCS\139579253

approximately $37.4 billion outstanding under the AIG FP Revolver.  Accordingly, AIG Inc. has a claim against AIG FP for this amount in the Chapter 11 Case.

### D.    THE FORMER EXECUTIVE PLAN PARTICIPANTS BRING SUITS AGAINST AIG FP

95.    AIG FP's substantial losses during the Financial Crisis had direct consequences on the Compensation Plans.  Once such losses were applied to the Former Executive Plan Participants' Plan Accounts, their balances were wiped out.  Moreover, as noted above, the Compensation Plans provided, in relevant part, that to the extent amounts were not restored by December 31, 2013, all restoration rights would permanently lapse. [26]

96.    AIG FP's unwinding process, the absence of Distributable Income, and the fact it never recouped the enormous losses it suffered as a result of the Financial Crisis, meant that AIG FP never restored the Plan Account balances under the Compensation Plans (nor was it required to).  And ultimately, in July 2014, AIG FP sent a letter informing Plan Participants that "no restorations have been possible given the magnitude of losses sustained by AIG FP" and that AIG FP's "restoration obligation lapsed as of December 31, 2013" (the "**Lapse Letter**"). A copy of the Lapse Letter is attached hereto as Exhibit G.

### 1.    AIG FP Prevails in Litigation in the U.K.

97.    On October 8, 2014, a group of London-based Plan Participants sued AIG FP in an English trial court seeking payments on account of deferred compensation allegedly owed to them under the Compensation Plans (the "**UK Litigation**").  Specifically, the English plaintiffs asserted that AIG FP failed to restore the account balances or adopt any plan to do so by December 2013, in breach of their obligations under the Compensation Plans.  It is the Debtor's understanding that

---

[26] Compensation Plans § 4.01(b).

the English plaintiffs were financed by a third party litigation funder.  The English plaintiffs also named AIG Inc. as a defendant and brought a separate tort claim against AIG Inc.

98.    After a bench trial, on November 9, 2018, the trial court dismissed the tort claim against AIG Inc.  With respect to AIG FP, the trial court found that AIG FP had an unqualified obligation to restore the account balances and breached the Compensation Plans when it failed to do so.  AIG FP promptly appealed.

99.    On January 24, 2020, a three-judge panel of the English Court of Appeal unanimously reversed the trial court decision, holding as a matter of Connecticut law that AIG FP had not breached the Compensation Plans and determining that AIG FP had promised to restore the account balances only if it has Distributable Income from which to make a restoration.  Because AIG FP never had Distributable Income from which to make a restoration, the restoration obligation was never triggered before it lapsed on December 31, 2013.  The English Court of Appeal further found that a contrary reading would be impermissibly circular, because an obligation to restore account balances would simply create a new debt and further losses that, absent profits, would lead to further deductions.

100.    On August 6, 2020, the UK Supreme Court denied leave to appeal, making the English Court of Appeal's decision the final decision.  Thus, after nearly six years, AIG FP was able to successfully defend the UK Litigation, but only after spending millions in legal fees and related costs.

## 2.    Stayed Litigation in Connecticut

101.    On December 6, 2019, after the English trial court found in favor of the Plan Participants, but before the English Court of Appeal ruled in favor of AIG FP, the Defendants filed a complaint against only AIG FP in the Connecticut Superior Court (the "**Connecticut**

21

**Litigation**," and such court, the "**Connecticut Court**").  A copy of such complaint is attached hereto as Exhibit H.  AIG Inc. is not (and never has been) a defendant in the Connecticut Litigation.[27]

102.     The Defendants commenced the Connecticut Litigation on the eve of the applicable statute of limitations, including the Releasing Defendants that had previously executed releases waiving any claims against AIG FP related to the Compensation Plans. In total, the Defendants represent only a small fraction (approximately 15%) of the Plan Participants that were formerly covered by the Compensation Plans.  The vast majority of Plan Participants have not challenged the Lapse Letter or commenced litigation under the Compensation Plans.

103.     The Defendants brought claims all premised on the same breach-of-contract theory that was rejected in the UK Litigation: that AIG FP was contractually obligated to restore the account balances notwithstanding its continued losses.  They also asserted a wage-and-hour claim that could potentially double damages against AIG FP.

104.     For years, in both the UK Litigation and the Connecticut Litigation, Former Executive Plan Participants argued that AIG Inc. extended loans (and not equity contributions) to AIG FP under the AIG FP Revolver.  In particular, the Defendants made the following statements:

- "AIG FP could have restored . . . the [DCP] and SIP account balances, and repaid the [Defendants] … ***by borrowing funds from AIG [Inc.] under the bailout facility*** that was in place between AIG [Inc.] and AIG FP."[28]

- "[C]ould AIG FP ***borrowed . . . against its credit facility*** to facilitate the dividend? Maybe that was one way they could've met their obligation."[29]

---

[27] *Arthurs, et al. v. AIG Fin. Prod. Corp.*, Case No. X08-FST-CV-19-6046057-S (Conn. Super. Ct. Dec. 6, 2019).

[28] Connecticut Complaint, ¶ 123 (emphasis added).

[29] *Oral Argument Transcript on Motion to Strike* at 96:3–7 (emphasis added). A copy of the relevant pages is attached hereto as Exhibit I.

22

- "AIG [Inc.] . . . issued AIGFP a ***revolving credit facility*** of $65 billion."[30]

- "Here, AIG FP has access to 'general funds' whether in the forms of assets it could sell, the resumption of business activities, ***or in the form of the bail-out facility it obtained from AIG*** for all of its legitimate business needs (as also highlighted by the English Trial Court)."[31]

105.    Notwithstanding these prior statements and admissions, the Defendants now have raised contentions that the loans under the AIG FP Revolver were disguised equity infusions.

106.    The Connecticut Litigation was stayed as a result of the Chapter 11 Case. Summary judgment motions were to have been due in January 2023, and the trial was not scheduled to commence until July 2023 at the earliest.

### E.    APPOINTMENT OF THE SPECIAL COMMITTEE

107.    As noted in paragraph 89 above, AIG FP had historically delayed the initiation of any reorganization or liquidation proceedings to avoid triggering defaults on its derivatives and other positions that would result in additional significant losses to AIG FP. But in early 2022, AIG FP determined, in light of its significant insolvency, lack of committed funding from its Parent, the status of its wind down, and the continued drain of litigation expenses, that it was prudent to evaluate whether it should pursue a reorganization, liquidation, or some other strategic transaction.

### 1.    Formation of Special Committee

108.    On January 21, 2022, Pamela Corrie and John S. Dubel were appointed as independent directors to the Board of Directors of AIG FP.  Ms. Corrie and Mr. Dubel each is a well-respected, independent director who has served in similar capacities for various other

---

[30] *Memorandum of Law in Opposition to Defendant's Motion to Strike* at 6 (emphasis added). A copy of the relevant pages is attached hereto as Exhibit J.

[31] *Id.* at 26 (emphasis added).

companies, and who has over thirty years of legal, operational, and financial restructuring experience.

109.    On January 24, 2022, the Board approved the formation of a special committee of the Board (the "**Special Committee**"), consisting of Ms. Corrie and Mr. Dubel.  The Special Committee was given the authority to, among other things, assess AIG FP's ongoing activities and assets and liabilities, evaluate and oversee potential strategic transactions, assess potential claims by or against AIG FP (including conducting an internal legal analysis into certain transactions and the viability of such claims by or against AIG FP), and take any actions in connection therewith.

110.    On January 24, 2022, the Special Committee approved the retention of (i) Alvarez & Marsal North America, LLC ("**A&M**") as financial advisor to AIG FP and (ii) Mr. William C. Kosturos, a Managing Director at A&M, as Chief Restructuring Officer (the "**CRO**") of AIG FP. On that same date, the Special Committee also approved the retention of Latham & Watkins LLP ("**Latham**") to serve as counsel to AIG FP and to assist the Special Committee with its evaluation of potential strategic transactions, related activities, and potential claims.   Following its formation and the retention of AIG FP's advisors, the Special Committee held meetings at least weekly with Latham and A&M, with over sixty meetings held by the time of the Petition Date.

2.    **Revolver Analysis**

111.    Since AIG Inc. is both the sole equity owner of AIG FP and its largest creditor pursuant to the AIG FP Revolving Credit Agreement as successor to AIG Funding, the Special Committee (with the assistance of Latham and A&M) reviewed and analyzed the terms and conditions of the AIG FP Revolver to assess AIG Inc.'s claim against AIG FP (the "**Revolver Analysis**").

30132276.1

US-DOCS\139579253

112.    Latham and A&M began their work on the Revolver Analysis in February 2022, ultimately working over one thousand hours on its analysis.  Their work encompassed extensive legal and factual research and analysis, including the review of several hundred thousand documents.  In addition, over a period of approximately four months, Latham interviewed eight current and former employees of AIG Inc. and AIG FP with personal knowledge relevant to the Revolver Analysis.  Latham and A&M met and discussed its analysis with the Special Committee on dozens of occasions.

113.    After two months of analysis, in April 2022, Latham delivered to the Special Committee its initial findings and conclusions of the Revolver Analysis, including analysis on potential claims for recharacterization, equitable subordination, subrogation, and others.  Two months later, Latham delivered its final findings and conclusions regarding the investigation to the Special Committee.

114.    Following its review of these findings and conclusions and dozens of related discussions with Latham, the Special Committee concluded that the amounts owed under the AIG FP Revolver were (and are) valid and allowable debts against AIG FP and, in a bankruptcy, senior to any alleged claims of the Former Executives arising under the Compensation Plans, which are expressly subordinated to such claims of AIG Inc. in the event of a bankruptcy proceeding.

115.    In particular, with the understanding that recharacterization is "difficult to prove,"[32] the Special Committee concluded the AIG FP Revolver was true debt because, among other things:

- ***Instrument Name***.    The AIG FP Revolving Credit Agreement is titled "Revolving Credit Agreement", and contains extensive references to terms that only apply to a debtor-creditor relationship, such as borrower, principal,

---

[32] *In re Parker School Uniforms, LLC*, 2021 WL 4553016, at *12 (Bankr. D. Del. 2021).

interest, loans, and lend.  The agreement does not contain a single reference to any term or condition that would apply to an equity investment.

- ***Promissory Note***.  A promissory note was executed by AIG FP in favor of AIG Funding, effective as of September 22, 2008.

- ***Interest Payments***.  The AIG FP Revolving Credit Agreement expressly provides for interest to be paid "at a mutually agreed rate per annum."  And consistent with such agreement, the parties actually agreed on the terms of such interest rate.  Specifically, from 2008 to 2011, AIG FP paid interest totaling approximately $6 billion in cash.  Since 2011, interest has been capitalized at the rate of one-month LIBOR plus 20 basis points, with AIG FP accruing $133 million of interest for the month of November 2022 (the last full month before the Petition Date).

- ***No Voting Rights***.  AIG Funding did not receive any equity interests or voting rights in AIG FP in connection with the AIG FP Revolver, nor did it obtain any share of profits under the Compensation Plans, all of which reflects the parties' intent that the revolver constitute debt.

- ***No Reductions or Offsets***.  AIG FP's obligation to repay the AIG FP Revolver is absolute and unconditional.  AIG FP has no ability to reduce or offset amounts owed under the AIG FP Revolver for any reason, including subsequent losses.

- ***No Subordination***.  The AIG FP Revolver does not provide that payment obligations arising thereunder are junior or subordinate to any other obligations of AIG FP.

- ***Subsequent Behavior***.  AIG Inc., AIG Funding, and AIG FP intended for the AIG FP Revolver to be a loan as shown by, among other things: (i) documents AIG Inc. filed with the Securities and Exchange Commission and sent to Congress in connection with the funding, which describe the funding as a loan, and (ii) the fact that AIG FP has repaid over $59 billion in principal and paid and accrued interest over the last fourteen years under the AIG FP Revolver as shown on <u>Exhibit F</u> attached hereto.

- ***Admission by the Former Executives***.  While not a critical factor in their analysis, the Special Committee took notice that the Former Executives referred to the AIG FP Revolver as a loan for years in the prepetition litigation.  *See* ¶ 104 above.

30132276.1

US-DOCS\139579253

### F.      AIG FP COMMENCES THE CHAPTER 11 CASE

116.      On the Petition Date, the Debtors commenced its Chapter 11 Case.  On the Petition

Date, the Debtor filed the *Plan of Reorganization of AIG Financial Products Corp. under Chapter*

*11 of the Bankruptcy Code* [Docket No. 6] (the "**Chapter 11 Plan**" or the "**Plan**") and related

disclosure statement [Docket No. 7] (the "**Disclosure Statement**").  The Plan provides for the

Parent to retain its existing equity interests in the Debtor in exchange for the full discharge and

satisfaction of the Parent's claim under the AIG FP Revolver.  With respect to the Former

Executives' subordinated claims, the Plan provides that, if the class of Former Executives votes to

accept the Plan, they would receive $1.0 million in the aggregate to be shared equally amongst

them.  If the class votes to reject the Plan, then the Former Executives would not receive any

distribution nor retain any property on account of their subordinated claims.

117.      On January 13, 2023, the Defendants filed their motion to dismiss the Chapter 11

Case [Main Docket No. 101] (the "**Dismissal Motion**").  In the Dismissal Motion, the Defendants

make clear their belief that the AIG FP Revolver was a disguised equity infusion and that they will

seek to recharacterize it as equity at some unspecified later time in this Chapter 11 Case.[33]

### G.      THE LOANS EXTENDED TO AIG FP UNDER THE AIG FP REVOLVING CREDIT AGREEMENT ARE DEBT

118.      As described in paragraphs 111 through 115 above, the Special Committee

determined, in its reasonable business judgment and in consultation with independent advisors,

that the AIG FP Revolver is debt.  The terms of the AIG FP Revolving Credit Agreement clearly

reflect an intent for the agreement to be treated as debt.  The AIG FP Revolving Credit Agreement

---

[33] *See, e.g.*, Dismissal Motion, ¶ 3 ("AIGFP's filing is *predicated on the false narrative* that the approximately $37.7 billion owed to its parent arises from an arm's length debtor-creditor arrangement. *That could not be further from the truth*.") (emphasis added); ¶¶ 3, 17, 18, and 44 (calling the AIG FP Revolver "equity").

was titled "Revolving Credit Agreement" and contains extensive references to terms that only apply to a debtor-creditor relationship, such as borrower, principal, interest, loans, and lend. The agreement does not contain a single reference to any term or condition that would apply to an equity investment. A promissory note was also executed by AIG FP in favor of AIG Funding, effective as of September 22, 2008.

119.    Moreover, all parties involved—AIG Inc., AIG FP, and AIG Funding—intended and understood the AIG Funding Revolving Credit Agreement, and ultimately the AIG FP Revolving Credit Agreement, to be debt instruments. Throughout the term of the AIG FP Revolving Credit Agreement, all parties have consistently treated the loans under the AIG FP Revolving Credit Agreement as debt. Section 1.2 of the AIG FP Revolver also expressly states that interest will accrue thereunder based on subsequent agreement of the parties, which did in fact occur. Since the Financial Crisis, AIG FP has borrowed $92 billion under the AIG FP Revolver, repaid over $59 billion, and has made over $6 billion in cash interest payments and capitalized another $4.2 billion in interest payments under the AIG FP Revolver.

120.    AIG FP made principal repayments and interest payments to AIG Inc. (through AIG Funding, prior to AIG Funding's merger into AIG Inc.) regardless of its overall profitability and, in fact, despite significant losses. AIG FP used the proceeds of the borrowings pursuant to the AIG FP Revolver to meet its contractual obligations as they came due and to facilitate its unwinding of its trading portfolio.

121.    Upon information and belief, AIG Inc., in turn, also treated the loans under the AIG FP Revolver as debt both within the AIG corporate family, as well as in its dealings with third parties. AIG Inc. recorded the loans it made to AIG FP as such in its books and records. In addition, AIG Inc. represented to the government that the funds borrowed under the Fed Credit

28

Agreement were used in part to make loans to AIG FP for collateral postings. AIG Inc. made disclosures describing the funds extended to AIG FP under the AIG FP Revolver as loans in public filings with the Securities and Exchange Commission and to Congress.

122.    AIG FP's obligation to repay the AIG FP Revolver is absolute and unconditional. Section 1.5 of the AIG FP Revolver expressly states that all payments to be made by AIG FP thereunder shall be made without set-off or counterclaim. The AIG FP Revolver does not provide that payment obligations arising thereunder are junior or subordinate to any other obligations of AIG FP. Thus, the agreement is clear and unambiguous that AIG Inc. had an expectation that it would be repaid, and that repayment obligation would exist regardless of AIG FP's own profitability.

123.    AIG FP used the loans under the AIG FP Revolver to post collateral for derivative and other investment contracts. When those contracts were ultimately unwound, the posted collateral was often returned to AIG FP, which it could then use towards repayment of the AIG FP Revolver. Despite many years of losses, AIG FP has continued to make repayments on the AIG FP Revolver as shown on the chart attached hereto as <u>Exhibit F</u>. These repayments clearly reflect an agreement that repayment to AIG Inc. of the AIG FP Revolver was not tied to the success or profitability of AIG FP.

124.    The Special Committee did take notice that the AIG FP Revolver has a two-year term that automatically renews. But given the unique context during which the emergency loan was made—an unprecedented financial crisis that threatened to destroy the entire AIG corporate enterprise—the Special Committee did not believe this one factor outweighed all the other factors in support of their conclusion that the AIG FP Revolver is debt. The fact that the parties treated the AIG FP Revolver as debt over the last fourteen years with borrowings, payments of principal

29

and interest, and re-borrowings—which is the exact nature and purpose of a revolving credit facility—proved to the Special Committee that the AIG FP Revolver was (and is) debt against AIG FP.

125.     Finally, the Special Committee took notice that the AIG FP Revolver was put in place to avoid the collapse of AIG Inc. because AIG Inc. was liable for the collateral calls of AIG FP pursuant to the Parent Guarantee.  Given the undeniable subrogation claims that the Parent otherwise would have against AIG FP pursuant to the Parent Guarantee had the Parent paid such claims directly (rather than loaning those exact same funds to AIG FP so AIG FP could pay such claims), the Special Committee believed the existence of the Parent Guarantee made recharacterization of the AIG FP Revolver as equity even more clearly improper.  The exact same claims asserted today by AIG Inc. under the AIG FP Revolver would have existed for AIG Inc. under the Parent Guarantee in the form of subrogation and there is no basis for treating AIG Inc. worse for having loaned the money instead.

126.     Any cause of action to recharacterize the debt to AIG Inc. belongs to the Debtor. The Special Committee concluded, after an independent and exhaustive investigation of the AIG FP Revolver, that the loans extended thereunder are true debt obligations.  That conclusion is entitled to all the presumptions provided by Delaware's business judgment rule.  *See Delman v. GigAcquisitions3, LLC*, 2023 WL 29325, at *12 (Del. Ch. Jan. 4, 2023) ("The business judgment rule, Delaware's default standard of review, presumes that in making a business decision, the board of directors acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company.") (quotations omitted).

30132276.1

US-DOCS\139579253

### H.    THE COMPENSATION PLANS CREATE EQUITY INTERESTS, NOT CLAIMS OR DEBT

127.    In contrast to the AIG FP Revolver, the Compensation Plans have terms and conditions that are unique to equity investments.  Specifically, the Former Executive Plan Participants held the same risk and benefit expectations as an AIG FP shareholder.  In effect, by entering into the Compensation Plans, AIG Inc., as the ultimate shareholder of AIG FP, agreed to receive only 70% of the potential upside of AIG FP's business, and to redistribute the remaining 30% of that reward to the Former Executive Plan Participants.  Both AIG Inc. and the Former Executive Plan Participants then agreed to defer a portion of that reward into their Plan Accounts, which were expressly made subject to Reduction Provisions if AIG FP suffered losses in a given compensation year.[34]  The unlimited upside potential under the Compensation Plans carried with it the risk that AIG FP could fail and the balance on their Plan Accounts could be wiped out, which is the essence of a capital investment.  *See In re Autostyle Plastics, Inc.*, 269 F.3d 726, 751 (6th Cir. 2001) ("If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of capital contribution.").  As the Defendants themselves conceded in the Connecticut Litigation, the stated purpose of the Compensation Plans was "to provide employees with equity in AIG FP so that their interests would be aligned with those of AIG FP's shareholders."[35]  Plaintiff agrees.

128.    Plaintiff equally agrees with the Defendants' statement in their Dismissal Motion that the sharing in the risks and rewards of a business is what defines an equity investment.[36]  In particular, the Defendants quoted *In re Telegroup Inc.*, 281 F.3d 133, 140 (3d Cir. 2002), for the

---

[34] Compensation Plans §4.01(b).

[35] Connecticut Complaint, ¶ 4.

[36] *See* Dismissal Motion, ¶ 59.

proposition that "an almost axiomatic principle of business law is that, because equity owners stand to gain the most when a business succeeds, they should absorb the costs of the business's collapse – up to the full amount of their investment."[37]

129.    This is the exact structure and guiding principle of the Compensation Plans. First, the stated purpose of the Compensation Plans was to have the Former Executive Plan Participants share in the "risks and rewards of AIG FP's business."[38]

130.    Second, unlike the AIG FP Revolving Credit Agreement, amounts owed to the Former Executive Plan Participants under the Compensation Plans were not absolute or unconditional.  Rather, they were based on AIG FP's future profits and expressly subject to offset and reduction by future losses pursuant to the Reduction Provisions.  The amounts owed to the Former Executive Plan Participants could increase or decrease based on profits and losses of AIG FP—exactly like an equity investment.

131.    Third, although the Special Committee took notice that the Compensation Plans state that unpaid amounts thereunder constitute "unsecured claims" in a bankruptcy of AIG FP, the Compensation Plans then expressly state that such alleged claims are subordinated to all other obligations of AIG FP in bankruptcy (including future arising claims).[39]  That express subordination further supports treating the Compensation Plans as equity investments—these subordinated "claims" do not receive any recovery until all other claims (including future arising claims) are paid in full—exactly the same result as interest holders in bankruptcy as required by the absolute priority rule.

---

[37] *Id.*

[38] Compensation Plans, Introduction.

[39] Compensation Plans, §4.01(b).

30132276.1

US-DOCS\139579253

132.    Fourth, the Compensation Plans contain none of terms one expects from a debtor-creditor relationship.  There is no "loan", "lender", or "borrower", and no promissory note.  Nor do the Compensation Plans set out a principal amount owed or include a schedule for repayment or fix a maturity date.  In fact, instead of coming to maturity, the benefit payables under the Compensation Plans lapsed on December 31, 2013, which is another basis to prove the amounts payable thereunder are neither absolute nor unconditional like a debt instrument.[40]

133.    For all these reasons, the Special Committee determined that AIG FP and the Defendants all intended the Compensation Plans to be equity interests and not debt instruments, especially when compared to the plain language of the AIG FP Revolver to create debt.

134.    AIG FP files this Complaint with a full reservation of rights, including, without limitation, to assert additional claims for relief that are not expressly described herein, or asserting any additional actions against the Defendants.  By filing this Complaint, AIG FP does not waive any of the additional claims or actions it has and/or may have against any Defendant and all rights are expressly reserved in connection therewith.

## CLAIMS FOR RELIEF

### COUNT ONE

**(DECLARATORY JUDGMENT – THE AIG FP REVOLVER IS DEBT)**

135.    The allegations set forth above are incorporated herein by reference.

136.    There is a real, substantial, and justiciable controversy regarding whether the loans extended to AIG FP under the AIG FP Revolver constitute debt, and not equity contributions.

---

[40] Compensation Plans, §4.01(b).  In this regard, the Debtor expressly reserves all rights to assert that, to the extent any claim ever accrued, any such claim permanently lapsed on December 31, 2013 and should be disallowed for that reason alone in this Chapter 11 Case.

This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2.

137.    Any cause of action to recharacterize the debt to AIG Inc. belongs to AIG FP itself. The Defendants could not obtain derivative standing to seek to recharacterize the AIG FP Revolver given, among other things, (i) the Special Committee's conclusion, after an independent and exhaustive investigation, that the loans extended under the AIG FP Revolver are true debt obligations and (ii) the express subordination provisions of the Compensation Plans.

138.    For the reasons set forth above, the AIG FP Revolver and all claims arising thereunder are debt.  Accordingly, Plaintiff is entitled to a declaratory judgment confirming that the loans extended to AIG FP under the AIG FP Revolver constitute debt, and not equity contributions.

## COUNT TWO

**(DECLARATORY JUDGMENT – THE ALLEGED UNPAID AMOUNTS ARISING UNDER THE COMPENSATION PLANS ARE SUBORDINATED)**

139.    The allegations set forth above are incorporated herein by reference.

140.    There is a real, substantial, and justiciable controversy as to whether the Defendants' alleged unpaid amounts (if any) arising under the Compensation Plans are subordinated to claims arising under the AIG FP Revolver.  This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2.

141.    The Compensation Plans each provide that, in the event of AIG FP's bankruptcy, the Defendants' right to payment thereunder will be subordinated and junior in right of payment to all of AIG FP's other obligations without regarding to when such obligations are incurred, unless payment of any such obligations is expressly made subordinate to or *pari passu* with the

payment obligations under the Compensation Plans.   Under section 510(a) of the Bankruptcy Code, the express subordination provisions of the Compensation Plans are enforceable and binding in this Chapter 11 Case and cannot be limited or altered pursuant to Section 105 of the Bankruptcy Code, whether pursuant to arguments of recharacterization or otherwise.

142.    The terms of the AIG FP Revolving Credit Agreement do not expressly provide that the Parent's right of payment thereunder is subordinated to or *pari passu* with AIG FP's obligations under the Compensation Plans.

143.    The unpaid amounts arising under the AIG FP Revolving Credit Agreement are obligations of AIG FP, regardless of whether they are deemed to result from debt or capital contributions of AIG Inc.  Any obligation under the Compensation Plans is therefore subordinated and junior to AIG FP's obligation to repay AIG Inc.

144.    Under section 105 and section 510 of the Bankruptcy Code, the obligations under the AIG FP Revolving Credit Agreement cannot be recharacterized such as to subordinate them to the obligations under the Compensation Plans.

145.    In addition, pursuant to the terms of the Compensation Plans, any claim under those plans would remain subordinated and junior to AIG FP's obligation to repay AIG Inc., even if that latter obligation could be "recharacterized."

146.    AIG FP also would have had an obligation under applicable subrogation law to repay those same amounts if AIG Inc. had paid the guaranteed obligations directly, rather than loaning the funds to AIG FP so that AIG FP could satisfy those obligations itself.  Any claim under the Compensation Plans would be and have been subordinated and junior to such a subrogation claim.

147.    Accordingly, Plaintiff is entitled to a declaratory judgment that the alleged unpaid amounts (if any) arising under the Compensation Plans are subordinated and junior in right of payment to all of AIG FP's obligations arising in connection with the AIG FP Revolving Credit Agreement.  The Plaintiff also reserves all rights to seek subordination of the Defendants' right to payment thereunder pursuant to section 510(b) of the Bankruptcy Code.

## COUNT THREE

### (DECLARATORY JUDGMENT – THE COMPENSATION PLANS CREATE EQUITY INTERESTS, NOT CLAIMS OR DEBT)

148.    The allegations set forth above are incorporated herein by reference.

149.    There is a real, substantial, and justiciable controversy as to whether the alleged unpaid amounts (if any) arising under the Compensation Plans create claims against or equity interests in AIG FP.  This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2.

150.    For the reasons set forth above, the alleged unpaid amounts (if any) arising under the Compensation Plans create equity interests in AIG FP, rather than debt or claims against AIG FP.  Accordingly, Plaintiff is entitled to a declaratory judgment confirming that the Defendants hold equity interests in, rather than claims against, AIG FP.

## COUNT FOUR

### (THE DEFENDANTS' UNPAID AMOUNTS, IF ANY, ARISING UNDER THE COMPENSATION PLANS SHOULD BE DISALLOWED IN THEIR ENTIRETY UNDER SECTION 502(B)(4) OF THE BANKRUPTCY CODE)

151.    The allegations set forth above are incorporated herein by reference.

152.    Pursuant to section 502(b)(4) of the Bankruptcy Code, claims of insiders are disallowed to the extent they exceed the reasonable value of the insiders' services.  The relevant

30132276.1

US-DOCS\139579253

time for determining the status as an "insider" under section 502(b)(4) is the time when such claims arose against, or were otherwise incurred by, the debtor.

153.    Each Defendant was an officer of the Debtor at the time his or her alleged claims accrued under the Compensation Plans.  Accordingly, each Defendant is an insider (as such term is defined by section 101(31)(B) of the Bankruptcy Code) for purposes of section 502(b)(4) of the Bankruptcy Code.

154.    Even if the Defendants hold general unsecured claims against the Debtor (which the Debtor refutes), the allowed amount of such claims would be limited by section 502(b)(4) of the Bankruptcy Code to the objectively reasonable value of the services provided by such insider Defendant.  As insiders, the burden is on the Defendants to prove that their $640 million claim is objectively reasonable, which they cannot satisfy.

155.    Based on the totality of the circumstances involved at the time the services were rendered, including the Debtor's financial ruin and near ruin of the entire AIG corporate family, this is not objectively reasonable compensation.  The Defendants have already been excessively compensated for their alleged services.  Specifically, the Defendants were already paid over $751 million in cash in the aggregate by the Debtor in the years 2002–2009, with a breakdown of the amounts paid per year to each Defendant shown on Exhibit D attached hereto.  Anything above and beyond what the Debtor has already paid to the Defendants is unreasonable compensation and should be disallowed in its entirety pursuant to section 502(b)(4) of the Bankruptcy Code.

## COUNT FIVE

### (CERTAIN DEFENDANTS HAVE ALREADY RELEASED THEIR CLAIMS)

156.    The allegations set forth above are incorporated herein by reference.

157.    Pursuant to section 502(b)(1) of the Bankruptcy Code, a claim is disallowed to the extent such claim is unenforceable against the debtor under any agreement or applicable law.

158.    Prior to the Petition Date, the Releasing Defendants executed release agreements in favor of the Debtor with respect to the Compensation Plans.  Those releases are binding and effective in this Chapter 11 Case.

159.    Accordingly, in addition to Count Four above, the alleged claims of each such Releasing Defendant under the Compensation Plans should be disallowed in its entirety pursuant to section 502(b)(1) of the Bankruptcy Code.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court enter an order:

1.  confirming through a declaratory judgment that the loans extended to AIG FP under the AIG FP Revolver constitute debt and claims against the Debtor;

2.  confirming through a declaratory judgment that Defendants' rights of payment (if any) arising under the Compensation Plans are subordinated to all of AIG FP's obligations, including obligations of AIG Inc. arising under the AIG FP Revolving Credit Agreement;

3.  confirming through a declaratory judgment that unpaid amounts (if any) arising under the Compensation Plans are equity interests in the Debtor, rather than debt or claims against the Debtor;

4.  to the extent any Defendant holds general unsecured claims arising under the Compensation Plans, disallowing such claims in their entirety under section 502(b)(4) of the Bankruptcy Code as unreasonable insider compensation;

5.  to the extent any Releasing Defendant holds general unsecured claims arising under the Compensation Plans, disallowing such claims in their entirety under section 502(b)(1) of the Bankruptcy Code; and

6.  granting such other and further relief as the Court deems just and proper.

30132276.1

US-DOCS\139579253

Dated:  February 17, 2023
        Wilmington, Delaware

Respectfully Submitted,

/s/ *Kara Hammond Coyle*
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  mnestor@ycst.com
        kcoyle@ycst.com

-and-

George A. Davis (admitted *pro hac vice*)
Keith A. Simon (admitted *pro hac vice*)
David Hammerman (admitted *pro hac vice*)
Annemarie V. Reilly (admitted *pro hac vice*)
Madeleine C. Parish (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
Email: george.davis@lw.com
       keith.simon@lw.com
       david.hammerman@lw.com
       annemarie.reilly@lw.com
       madeleine.parish@lw.com

*Counsel for Debtor and Debtor in Possession*

## Exhibit A

**Deferred Compensation Plan**

Dated as of December 29, 2008

AIG FINANCIAL PRODUCTS CORP.
DEFERRED COMPENSATION PLAN

Conformed Copy Reflecting:

Amendment No. 1 dated as of December 5, 2003,
Amendment No. 2 dated as of November 17, 2004,
Amendment No. 3 dated as of March 18, 2005,
Amendment No. 4 dated as of December 29, 2008

## AIG FINANCIAL PRODUCTS CORP.
## DEFERRED COMPENSATION PLAN

AIG Financial Products Corp. (including, where applicable, all subsidiaries thereof, and AIG Trading Group Inc. (including where applicable all subsidiaries thereof, "AIGTG") (together, "AIGFP")) establishes in this document the AIGFP Deferred Compensation Plan, as amended and restated as of the date hereof (the "Plan"). The Plan participants are the executive employees of AIGFP (the "AIGFP Executives") and American International Group, Inc. ("AIG"). The Plan provides the Plan participants a sharing of the risks and rewards of AIGFP's business and reflects the participants' commitment to the long term integrity of AIGFP.

The Plan objectives are:

1. To promote the formation of capital in AIGFP;

2. To ensure that the interests of AIGFP Executives and AIG are aligned to promote the long term success of AIGFP;

3. To focus AIGFP on success measured not only by revenue growth but also by return on capital, quality of earnings, and enhancement of the AIG name and reputation in financial services;

4. To serve as an investment opportunity that will attract the most talented people to AIGFP and to retain those already here; and

5. To be simple, straightforward and efficient.

Under the existing arrangement with AIG, Distributable Income is paid each year on the basis of 70% to AIG and 30% to AIGFP employees. Under the Plan a portion of the Distributable Income, apportioned 70% from AIG and 30% from AIGFP Executives, will not be paid currently but instead will be retained by AIGFP. Such retention will form part of the capital base of AIGFP and, absent losses which exhaust

current revenues and reserves, will be paid subsequently to participants according to a schedule tied to the duration of AIGFP's business.  The Plan will be administered so that the amounts retained under the Plan will be apportioned between AIG and AIGFP Executives on a 70%/30% basis.

SECTION 1

DEFINITIONS

For purposes of this Deferred Compensation Plan:

1.01    "Accredited Investor" shall mean an individual who meets the requirements of an "accredited investor" as that term is defined under Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended.

1.02.    "Beneficiary" shall mean such person or trustee as may be designated by a Participant pursuant to Section 3.01 of this Deferred Compensation Plan.

1.03.    "Board" shall mean the Board of Directors of AIG Financial Products Corp.

1.04    "Business Day" shall mean any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in New York City and London.

1.05.    "Committee" shall mean a committee consisting of the chief executive officer of AIG Financial Products Corp., the chief operating officer of AIG Financial Products Corp., the chief financial officer of AIG Financial Products Corp. and the secretary of AIG Financial Products Corp.

1.06.    "Deferred Compensation" shall mean, with respect to each deferral, (i) as applied to each Participant, the portion of the Participant's Notional Bonus Amount that is deferred by AIGFP pursuant to Section 3 of this Deferred Compensation Plan, including both amounts subject to automatic deferral and voluntary deferrals and (ii) as applied to AIG, the amount of annual Distributable Income of AIGFP that

-3-

is otherwise payable by AIGFP to AIG that is subject to automatic deferral pursuant to Section 3 of this Deferred Compensation Plan.

1.07.    "<u>Deferred Compensation Account</u>" shall mean the account established on AIG Financial Product Corp.'s books in the name of each Participant and of AIG in which, pursuant to Section 3 of this Deferred Compensation Plan, Deferred Compensation amounts are credited to such Participants and to AIG.

1.08.    "<u>Distributable Income</u>" shall mean, with respect to any financial year of AIGFP, revenues, less expenses and credit and market reserves taken for that year, as the same shall be determined by the Board from time to time.

1.09.    "<u>Executive</u>" shall mean an executive employee of AIGFP (excluding, at the discretion of the Committee, any employee for whom AIGFP's Tokyo office is the principal workplace) with the title of Assistant Vice President or higher who is designated by the Board to participate in or be eligible to participate in this Plan.

1.10.    "<u>LIBOR Rate</u>" shall mean the rate for an Interest Reset Date which is the rate for deposits in U.S. Dollars for a period of three (3) months which appears on the Telerate Page 3750 as of 11:00 a.m., London time, on the day that is two London Banking Days preceding that Interest Reset Date. If such rate does not appear on the Telerate Page 375O, the rate for that Interest Reset Date shall be determined in accordance with the definition of USD-LIBOR-Reference Banks.

1.11.    "<u>London Banking Day</u>" shall mean any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London.

1.12    "<u>Notional Bonus Amount</u>" shall mean, for each Participant in respect of any calendar year, the total notional bonus amount awarded to the Participant from all AIGFP companies, consisting of a cash bonus amount that is paid currently and an amount of Deferred Compensation that is credited by

AIGFP to the Participant's Deferred Compensation Account and distributed to the Participant on a deferred basis subject to and in accordance with the terms hereof.

1.13.    "Participant" shall mean an Executive who is participating in this Deferred Compensation Plan.

1.14.    "Permanent Disability" shall mean that a Participant has been found to be disabled by the U.S. Social Security Administration.  The date of such a disability will be the date on which that Social Security determination is rendered, not the earlier date as of which the disability commenced.  If the Participant is not covered by the U.S. Social Security system, the Participant shall be considered permanently disabled on the first anniversary of the commencement of his or her disability if the Committee determines before then that the Participant has satisfied the U.S. Social Security definition of disability and the Participant remains continuously disabled through that first anniversary.

1.15.    "Reference Banks" shall mean four major banks in the London interbank market.

1.16.    "USD-LIBOR-Reference Banks" shall mean that the rate for an Interest Reset Date will be determined on the basis of the rates at which deposits in U.S. Dollars are offered by the Reference Banks at approximately 11:00 a.m., London time, on the date that is two London Banking Days preceding that Interest Reset Date to prime banks in the London interbank market for a period of three (3) months commencing on that Interest Reset Date.  AIGFP will request the principal London office of each of the Reference Banks to provide a quotation of its rate.  If at least two such quotations are provided, the rate for that Interest Reset Date will be the arithmetic mean of the quotations.  If fewer than two quotations are provided as requested, the rate for that Interest Reset Date will be the arithmetic mean of the rates quoted by major banks in New York City, selected by AIGFP, at approximately 11:00 a.m., New York City time, on that Interest Reset Date for loans in U.S. Dollars to leading European banks for a period of three (3) months commencing on that Interest Reset Date.

-5-

SECTION 2

PARTICIPATION

2.01.   <u>Participation</u>.

(a)      <u>Participation by Executives</u>.   Each Executive shall be entitled to participate in this Deferred Compensation Plan provided that the Executive is an Accredited Investor as of the date Deferred Compensation would be credited to the Executive's Deferred Compensation Account in accordance with the terms hereof.   Participation by an Executive who is an Accredited Investor as of the date Deferred Compensation is credited to the Executive's Deferred Compensation Account and to whom AIGFP awards a Notional Bonus Amount in excess of the level referred to in Schedule A shall be mandatory.   An Executive's participation in this Deferred Compensation Plan shall commence as of the date the Executive elects to, or pursuant to the preceding sentence is required to, participate in this Deferred Compensation Plan.

(b)      <u>Participation by AIG</u>.   AIG's participation in the Deferred Compensation Plan shall be mandatory in an amount determined in accordance with Section 3.01(a).

SECTION 3

DEFERRED COMPENSATION

3.01.   <u>Participants' Deferred Compensation</u>.

(a)      <u>Automatic Deferrals</u>.  (i) Participants indicated on Schedule A shall have the portion of their Notional Bonus Amount indicated on Schedule A deferred automatically; and (ii) AIG shall have a portion of AIGFP's annual Distributable Income that is otherwise payable to AIG by AIGFP deferred automatically, which portion, for any year, shall be equal to: (A)(1) the aggregate amount of Deferred Compensation contributed by all Participants in respect of such year (whether as an automatic deferral pursuant to this Section 3.01(a) or a voluntary deferral pursuant to Section 3.01(b)), plus (2) the aggregate amount notionally credited to all participants in any retirement plan in which members of AIGFP's Tokyo office participate in lieu of participating in this Deferred Compensation Plan (collectively, the "Japanese Plan") in respect of such year, plus (3) the aggregate amount credited to the Deferred Compensation Accounts of all Participants (excluding Deferred Compensation contributions in respect of such year referred to in subclause (A)(1) above), plus (4) the aggregate amount notionally credited to all Japanese Plan participants (excluding amounts notionally credited in respect of such year referred to in subclause (A)(2) above) multiplied by (B) a fraction, the numerator of which is 7 and the denominator of which is 3, minus (C) the aggregate amount credited to AIG's Deferred Compensation Account as of the date of determination.

(b)      <u>Voluntary Deferrals</u>.  Except as provided below, any Participant in this Deferred Compensation Plan may elect to increase the portion of his Notional Bonus Amount that is deferred by AIGFP on the Participant's behalf as Deferred Compensation by completing the election form set forth in Appendix A hereto and delivering such form to the Chief Financial Officer of AIGFP; provided, however, that any Participant who was employed by AIGTG during 2003 shall not be permitted to make any

voluntary deferral of his Notional Bonus Amount pursuant to this Section 3.01(b) for 2003.  A Participant may elect to defer up to one hundred percent (100%) of his Notional Bonus Amount.  A Participant must submit an election form for a calendar year not later than the earlier of May 30 in such year or two (2) Business Days prior to the date the Participant is notified of his Notional Bonus Amount for the year.  Elections made during the calendar year will be honored only if (i) the Participant performs service continuously for AIGFP from the beginning of the calendar year through the date of the election and (ii) at the time of the election, it is not substantially certain that the Participant will receive a then calculable Notional Bonus Amount for the year.  To the extent, if any, permitted under Internal Revenue Code Section 409A, an otherwise valid election made during the year will be honored as to the balance of the Notional Bonus Amount, if any, that then is neither substantially certain to be paid nor calculable.  In addition, a Participant who first becomes entitled to participate in this Plan and who has not theretofore become eligible to participate in any other plans that would be aggregated with it for Internal Revenue Code Section 409A purposes, may make an election with respect to such calendar year within the first fifteen (15) Business Days after the date such Participant first became entitled to participate, but only with respect to the percentage of his Notional Bonus Amount determined by dividing the days in the calendar year following his eligibility date into the days in the calendar year following his election.  A new election form must be filled out by a Participant for each calendar year.  The failure of any Participant to fill out an election form shall result in such Participant being deemed to have elected not to defer any portion of the Participant's Notional Bonus Amount in excess of the portion that is automatically deferred as set forth in Schedule A.  A Participant for whom AIGFP's Paris office is the principal workplace shall not be permitted to make any voluntary deferral of Notional Bonus Amounts that are awarded in respect of the Participants' employment by Banque AIG.

(c)    <u>General Rules</u>.  Each Participant may also designate a Beneficiary or Beneficiaries or, if none is designated, such Beneficiary shall be the Participant's estate.  Any designation of Beneficiary made on an election form shall override any previous designation of Beneficiary made by the Participant.  The combination of the portion of a Participant's Notional Bonus Amount that is automatically deferred as set forth in Schedule A, plus any additional portion that the Participant elects to defer on the election form as set forth in (b) above, shall constitute such Participant's Deferred Compensation for the calendar year in respect of which the Notional Bonus Amount was awarded.

3.02.    <u>Determination of Benefit</u>.  AIGFP shall (i) on December 31 of the year in respect of which a Participant's Notional Bonus Amount is awarded, credit the Participant's Deferred Compensation Account with the amount of such Participant's Deferred Compensation for such year and (ii) on each date that AIG's share of AIGFP's Distributable Income in respect of each financial year is paid to AIG by AIGFP, credit AIG's Deferred Compensation Account with the amount of AIG's Deferred Compensation for such year.

3.03.    <u>Interest on Deferred Compensation</u>.  Amounts attributable to a Participant's and to AIG's Deferred Compensation Account shall earn interest, which shall be determined quarterly on the 1st day of each January, April, July and October in each year (each, an "Interest Reset Date"); provided, however, that if any Interest Reset Date would otherwise fall on a day that is not a Business Day, such Interest Reset Date will be the following day that is a Business Day.  The interest rate shall be equal to the LIBOR Rate for each Interest Reset Date.  Each such adjusted rate shall be applicable from and including the Interest Reset Date to which it relates to but not including the next succeeding Interest Reset Date or until all amounts in a Participant's or AIG's Deferred Compensation Account are distributed (each, an "Interest Period").  Interest shall be payable quarterly in arrears not later than ten (10) Business Days following the end of each Interest Period (each such date on which interest is paid, an "Interest Payment Date") on the

balance in such Deferred Compensation Account as of the Interest Reset Date on which the Interest Period commences (but after giving effect to any reduction in such balance for amounts distributed from the Deferred Compensation Account on or prior to the Interest Payment Date with respect to the preceding Interest Period); provided that the Interest Payment Date for the Interest Period beginning in October of each year shall be the date on which cash bonuses for such year are paid  if such bonus payment date falls in the subsequent Interest Period (and otherwise shall be as specified above for each other Interest Period).   All amounts of interest shall be paid net of any taxes required by law to be withheld by AIGFP.  For the avoidance of doubt, interest on Deferred Compensation shall be an expense of AIGFP and, accordingly, shall be borne by AIG and AIGFP employees on a 70%/30% basis as a reduction in Distributable Income.

3.04    Additional Return Payment to AIGFP Executives.  In addition to interest payable on Deferred Compensation in accordance with Section 3.03, the Deferred Compensation Accounts of Participants (but not AIG) may be credited as of the Interest Reset Date falling in January of each year (or, if earlier, on the Interest Payment Date for the Interest Period beginning in October of the preceding year) with such additional earnings of AIGFP (the "Additional Return Payment") as the President of AIGFP, with the approval of the Board, shall determine; provided that any Additional Return Payments (i) shall be payable only to Participants who are employees of AIGFP as of the date of payment therefor and (ii) shall be allocated among such eligible Participants' Deferred Compensation Accounts on a pro rata basis.  Additional Return Payments shall be paid to eligible Participants on each Interest Payment Date for the Interest Period beginning in October of each year based on the balance in such Participants' Deferred Compensation Accounts as of the Interest Reset Date for the Interest Period beginning in October of such year.  For the avoidance of doubt, Additional Return Payments shall be paid out of the

-10-

30% portion of annual Distributable Income that is allocable to AIGFP employees. All Additional Return Payments shall be paid net of any taxes required by law to be withheld by AIGFP.

3.05.   <u>Payment of Benefit</u>.

(a)   <u>Distribution Events</u>. Upon the earlier to occur of the Distribution Events set forth below, AIGFP shall direct that all amounts credited to a Participant's Deferred Compensation Account shall be paid in a lump sum to such Participant. The Distribution Events are:

(a)   Death of the Participant; or

(b)   Permanent Disability of the Participant.

Upon the death of a Participant prior to his receipt of all amounts credited to his Deferred Compensation Account, his Beneficiary shall be paid in a lump sum all amounts then credited to such Participant's Deferred Compensation Account, plus accrued but unpaid interest to the date of payment. If there is more than one Beneficiary then designated, such Account shall be distributed to such Beneficiaries in the proportions designated by such Participant, or in the absence of any such designation, in equal shares. Any payment made pursuant to this Section 3.05(a) shall be made in the calendar year in which the Death or Permanent Disability (as applicable) of the Participant occurs or such later date as may be permitted under Internal Revenue Code Section 409A without the Participant incurring any taxes or interest or penalties thereunder.

(b)   <u>Installment Payments</u>. Except as provided below, amounts in the Participant's Deferred Compensation Account attributable to Deferred Compensation contributions shall be paid to such Participant and to AIG annually in arrears on the Interest Payment Date for the Interest Period beginning in October of each year in equal pro rata installments ("Installment Payments") over a period of time (the "Distribution Period") corresponding to the approximate average life of AIGFP's swap transaction portfolio, as last determined by the Board before the beginning of the calendar year preceding the date of

the Deferred Compensation contribution. However, for calendar year 2009 and 2010, the period of time that shall be used is six years, and as to Deferred Compensation contributions made prior to 2009, the installment schedule established under this section as in effect prior to December 31, 2008 shall remain applicable. The Distribution Period for a Deferred Compensation contribution shall commence on the Interest Reset Date in January of the calendar year next succeeding the calendar year in respect of which the Deferred Compensation contribution was made, with the first Installment Payment therefore being distributed on the Interest Payment Date for the Interest Period beginning in October of the calendar year in which the Distribution Period commences. Installment Payments shall be paid net of any taxes required by law to be withheld by AIGFP.

(c)    <u>Early Distribution</u>. In addition to the foregoing, to the extent and in the manner permitted under Section 409A(a)(2) of the Internal Revenue Code, amounts credited to a Participant's or to AIG's Deferred Compensation Account may be distributed on such earlier date as determined by the Committee, with the approval of the Board; provided that (i) except as set forth in (ii) and (iii) below, any such early distributions shall be made from Participants' and AIG's Deferred Compensation Accounts on a pro rata basis, (ii) any such early distributions can be made from AIG's Deferred Compensation Account in an amount such that, after giving effect to such distribution, the aggregate amount credited to AIG's Deferred Compensation Account shall equal 70% of the aggregate amount credited to the sum of (a) the Deferred Compensation Accounts of AIG and all Participants taken together, plus (b) the aggregate amount notionally credited to all Japanese Plan participants and (iii) a settlement of the entire balance in a Participant's Deferred Compensation Account can be agreed to by the Committee, with the approval of the Board, in connection with the termination of a Participant's employment with the Company.

(d)    <u>Foreign Currency Alternative</u>. Participants who are employed outside the United States may elect to have the Installment Payments and the interest payments (but not the Additional Return

-12-

Payments) on their annual Deferred Compensation contribution paid in the currency in which their cash bonuses are paid in lieu of U.S. Dollars (provided such currency is one of Yen, Euro, Pounds Sterling and Hong Kong Dollars).  In the event a Participant shall make such an election, then the applicable Deferred Compensation contribution shall be converted from U.S. Dollars into the applicable foreign currency at the spot foreign exchange rate at or about 11:00 a.m. (New York time) on the date such contribution is deemed pursuant to Section 3.02 to have been credited to the Participant's account, as determined in good faith by AIGFP.  Such translated Deferred Compensation amount shall then earn interest in accordance with Section 3.03 except that the applicable interest rate shall be the equivalent three-month LIBOR rate in the alternative designated currency.  Participant elections shall be made not later than December 1 of the year in which the Deferred Compensation contribution has been made, by submitting an election form in the form of Appendix A to the Chief Financial Officer of AIGFP.

(e)      General.   All payments of interest, Installment Payments and Additional Return Payments, and any early distribution of amounts credited to a Participant's Deferred Compensation Account, shall be paid to such Participants from the company or companies from which such payment represents compensation for services provided by such Participant; provided that for Participants whose employment has been transferred from an AIGTG group company to an AIG Financial Products Corp. group company in the same country, all such payments shall be paid from the AIG Financial Products Corp. group company to which the Participant has been transferred.

-13-

# SECTION 4

## MISCELLANEOUS

4.01.    <u>AIGFP's Liability</u>.

(a)  The benefits payable hereunder shall constitute an unsecured debt of AIG Financial Products Corp. to the Participants and their Beneficiaries and to AIG and shall not have the benefit of any guarantee by AIG of payment obligations of AIG Financial Products Corp.  For the avoidance of doubt, and notwithstanding anything else contained herein to the contrary, (i) the payment of benefits payable hereunder to each of the Participants and their Beneficiaries and to AIG shall be made only from the general funds of AIG Financial Products Corp., (ii) AIG Financial Products Corp. shall not segregate or earmark any of its assets nor hold any assets in trust or in any special account for this purpose, and (iii) none of the Participants, the Participants' Beneficiaries or AIG shall have any legal or equitable interest in, lien on, or claim to, any particular asset of AIG Financial Products Corp. by virtue of this Deferred Compensation Plan.  If AIG Financial Products Corp. shall become the subject of any bankruptcy or insolvency case or proceeding, or shall make an assignment for the benefit of creditors, or shall become the subject of a  reorganization whether or not pursuant to bankruptcy laws, or if any other relief shall be granted to AIG Financial Products Corp. generally from the rights of creditors, then in any such event (a "Bankruptcy/Insolvency Event") the obligations under this Deferred Compensation Plan to Participants and their Beneficiaries and to AIG shall be subordinate and junior in right of payment and otherwise, to the prior payment in full of all of the other obligations of AIG Financial Products Corp., whether now

existing or hereafter incurred, except to the extent payment of any such obligations is expressly made subordinate to or *pari passu* with the payment obligations hereunder.   If, in connection with a Bankruptcy/Insolvency Event, the claims (collectively "Creditors' Claims") of all other present and future creditors of AIG Financial Products Corp., other than those claims that are expressly made subordinate to or *pari passu* with claims for benefits payable hereunder, can be immediately fully satisfied, or adequate provision made for them, payments will be made at the times specified in this Plan.  If, in connection with a Bankruptcy/Insolvency Event, Creditors' Claims cannot be immediately satisfied or provision made for them, then during the period prior to such condition being satisfied   ("the Delay Period"), the following special rules shall apply:  AIG Financial Products Corp. will try to satisfy or provide for Creditors' Claims as soon as reasonably practicable so as to minimize Delay Period restrictions.  During the Delay Period, no benefit payments shall be made.  For the calendar year in which the Delay Period ends, (1) any payments that first became due during that calendar year will be paid by the end of that year or, if later, within 75 days after the date they first became due, and (2) any payments that first became due in an earlier calendar year will be paid to the extent doing so would not violate Internal Revenue Code Section 409A (e.g., because paying them in any earlier year in the Delay Period would have jeopardized AIG Financial Products Corp.'s ability to continue in business as a going concern).  The right to any other payment that first became due during the Delay Period shall lapse except to the extent AIG Financial Products Corp. determines that it may amend the Plan to provide for its payment without violating Internal Revenue Code Section 409A.

(b)  The outstanding balance credited to the Deferred Compensation Accounts of each Participant and of AIG shall be subject to reduction, from time to time, to the extent of any losses incurred (i) by AIGFP (excluding AIGTG) or (ii) by AIGTG resulting from transactions entered into on or after January 1, 2003, which losses in the case of (i) and (ii) for any year in the aggregate exceed the outstanding

market and credit reserves and current year income of AIGFP (excluding outstanding market and credit reserves relating to transactions entered into by AIGTG before January 1, 2003), but before base capital of AIGFP (for the avoidance of doubt including AIGTG, and consisting of equity, retained earnings, if any, and subordinated debt).   Such reductions shall be made among the Participants (including for this purpose, participants in the Japanese Plan) and AIG on a pro rata basis.   AIG Financial Products Corp. shall be obligated subsequently to restore amounts so deducted from Participants' and AIG's account balances, plus accrued interest thereon at the interest rate determined in accordance with Section 3.03 and, in connection therewith, the Board shall adopt a plan (which shall not be subject to the approval of AIG or the Participants) setting forth a schedule under which AIG Financial Products Corp. shall restore amounts deducted from Participants' and AIG's account balances (plus accrued interest thereon).   Any such restoration plan shall provide that any restored amounts shall be paid in 2013; to the extent amounts have not been restored by December 31, 2013, all restoration rights shall permanently lapse except to the extent AIG Financial Products Corp. determines that it may amend the Plan to provide for payment of restored amounts without violating Internal Revenue Code Section 409A.Notwithstanding the terms of any such plan, in a bankruptcy or insolvency of AIG Financial Products Corp. each Participant and Participant's Beneficiary and AIG shall have an unsecured claim, subordinated and junior in payment and subject to the limitation on rights and interests to the extent provided in the immediately preceding subparagraph, against AIG Financial Products Corp. for the amount, if any, by which the balances credited to their Deferred Compensation Account were reduced and not subsequently restored (plus credit for accrued interest thereon), in addition to such claims as are described in the immediately preceding subparagraph.   For the avoidance of doubt, if AIG Financial Products Corp. consolidates or amalgamates with, or merges with or into, or transfers all or substantially all of its assets to, another entity, then the

resulting, surviving or transferee entity shall assume all of the obligations of AIG Financial Products Corp. hereunder.

4.02. <u>Nonassignability</u>. Subject to Section 3.05(c)(iii), neither AIG nor any Participant or Beneficiary shall have the power to subject any right to receive payments under this Deferred Compensation Plan to assignment, pledge, sale, attachment, garnishment or any other transfer, alienation or encumbrance, nor shall such rights be subject to AIG's, the Participant's or Beneficiary's debts or to seizure for satisfaction of judgments, alimony or separate maintenance obligations.

4.03. <u>Continuation as Employee</u>. Neither this Deferred Compensation Plan nor the payment of any benefits hereunder shall be construed as giving the Participant any right to be retained as an employee of AIGFP. Except as provided in the next sentence, Participants who cease to be employees of AIGFP shall not lose their Deferred Compensation, which shall continue to be distributed as provided in Section 3.05 and to earn interest as provided in Section 3.03 (but not Additional Return Payments pursuant to Section 3.04). Notwithstanding any provision herein to the contrary, Participants who steal or embezzle from AIG or AIGFP or engage in an act of dishonesty, disloyalty or breach of trust against AIG or AIGFP that is comparable to theft or embezzlement shall lose their right to Deferred Compensation, including all amounts then credited to their Deferred Compensation Account and any interest accrued thereon.

4.04. <u>Amendment and Termination</u>. The Committee may from time to time, with the approval of the Board, amend this Deferred Compensation Plan in whole or in part; provided, however, that any such amendment (i) shall be effective as of the next succeeding Interest Reset Date falling in January (other than an amendment to this Deferred Compensation Plan that (a) has the effect of altering or eliminating the voluntary deferral rights of Participants under Section 3.01(b) hereof or of reducing the portion of Participants' Notional Bonus Amount that is subject

-17-

to automatic deferral under Section 3.01(a) hereof, or (b) is adopted in connection with the adoption or proposed adoption of, or a change or anticipated change in, any federal, state or other law or regulation (including any tax law or regulation) applicable to the Deferred Compensation Plan; any such amendment described in such clause (a) or (b) shall be effective immediately or as otherwise specified therein) and (ii) cannot, subject to Section 4.01 hereof, reduce or delay payment of any Participant's or AIG's benefits accrued up to the date of such amendment.  The Committee shall promptly notify all Participants and AIG of any amendments to this Deferred Compensation Plan.  The Board may suspend or terminate this Deferred Compensation Plan; provided, however, that any such suspension or termination cannot, subject to Section 4.01 hereof, reduce or delay payment of any Participant's or AIG's benefits accrued up to the date of such suspension or termination.  Such amendment, suspension or termination shall not be effective until made in writing and shall be communicated in writing to all Participants and to AIG.

4.05.   <u>Governing Law</u>.  The law of the State of Connecticut shall govern the interpretation, application and operation of this Deferred Compensation Plan.

4.06.   <u>Claims Procedure</u>.  Claims for benefits under the Plan shall be filed with the Committee, on forms supplied by the Committee.  Written notice of the Committee's disposition of a claim shall be furnished to the claimant within 30 days after the application therefor is filed.  In the event the claim is denied the reasons for the denial shall be specifically set forth in writing, pertinent provisions of the Deferred Compensation Plan shall be cited, and, where appropriate, an explanation as to how the claimant can perfect the claims will be provided.  If AIG, a Participant or a Beneficiary has been denied a benefit, each shall be entitled, upon request to the Board, to appeal the denial of the claimed benefit within 90

-18-

days following the Committee's determination described in the preceding sentence.  Upon such appeal, the Board (or a special committee designated by the Board) shall, as soon as practicable, meet with and hear the position of the claimant.  Its decision following such meeting shall be made within 30 days and shall be communicated in writing to the claimant.

4.07    <u>Information</u>.  For so long as the Deferred Compensation Plan is in effect, AIGFP shall provide each Participant and AIG with quarterly Deferred Compensation account statements setting forth (i) the Participant's or AIG's (as the case may be) Deferred Compensation account balance, (ii) the amount of interest and, for account statements covering the quarterly period in which such amounts would be paid, the Additional Return Payment and Installment Payment, if any, paid on such balance during such quarterly period and (iii) the Installment Payment schedule for the Participant or AIG.  In addition, AIGFP shall provide Participants and AIG with an AIGFP annual financial summary (which shall include a statement of the average life of AIGFP's swap transaction portfolio as of the date of such financial information), and shall endeavor to keep Participants who are then employees of AIGFP apprised of material developments involving AIGFP's business or accounting procedures applicable to AIGFP insofar as they relate to the Deferred Compensation Plan.  A form of quarterly statement is attached as Appendix B hereto.

4.08    <u>Singapore Office Participants</u>.  Notwithstanding any other provision of the Plan to the contrary, Participants who are based in a Singapore office of AIGFP shall have their automatic and voluntary deferrals contributed to their Deferred Compensation Account on an after tax basis after deducting Singapore taxes payable in respect of such Participants' Notional Bonus Amount.

4.09    <u>Compliance with Internal Revenue Code Section 409A</u>.  It is intended that amounts awarded or deferred under this Plan will not be taxable under Internal Revenue Code Section 409A.  This

Plan shall be interpreted and administered, to the extent possible, in a manner that does not result in a "plan failure" (within the meaning of Internal Revenue Code Section 409A(a)(1)) of this Plan or any other plan or arrangement maintained by AIG-FP or any affiliate.

      4.10    <u>Foreign Participants not Subject to U.S. Taxation</u>.  If a Participant is not subject to U.S. income taxation on any benefits under this Plan or any other plan that would be aggregated with it for purposes of applying Internal Revenue Code Section 409A, the Participant's rights will be determined under either the Plan terms in effect immediately before the December 2008 restatement of the Plan or the terms in effect immediately after such restatement, whichever is more favorable to such Participant as determined by the Committee.  Such a Participant shall not accrue any further benefits under this Plan (or any other plan that would be aggregated with this Plan for purposes of Section 409A) to the extent such benefits would be subject to Internal Revenue Code Section 409A, and any benefits that cannot be accrued for that reason will be paid in another way, if any, that is not subject to Section 409A.

APPENDIX A

AIG FINANCIAL PRODUCTS CORP.
DEFERRED COMPENSATION PLAN
ELECTION FORM

1.  Pursuant to the provisions of Section 3 of the Deferred Compensation Plan, in addition to the automatic deferral under the Plan I hereby elect to have the amount or percentage of amounts specified below deferred in the manner provided for in the Deferred Compensation Plan (see Section 3.01(b) for restrictions applicable to members of the Paris office):

_____ USD    Amount to be deferred as a voluntary deferral in addition to the automatic deferral under the Plan (to the extent I am awarded a Notional Bonus Amount that is sufficient to cover this voluntary deferral amount).

_____ USD    Any Notional Bonus Amount awarded to me in excess of this amount (that is not subject to automatic deferral under the Plan) should be treated as a voluntary deferral.

_____ %    This percentage of the Notional Bonus Amount remaining after the automatic deferral should be treated as a voluntary deferral.

2.  In the event that I should die prior to receipt of all distributions to which I am entitled under the Deferred Compensation Plan, I hereby direct that, pursuant to Section 3.05 of the Deferred Compensation Plan, all amounts due to me as deferred compensation under Section 3 of the Deferred Compensation Plan be distributed as follows:

Proportion                     Name of Beneficiary(ies)

_____                   _____

_____                   _____

_____                   _____

3.  I hereby elect, pursuant to Section 3.05 (d) of the Deferred Compensation Plan, to have the Installment Payments and interest payments in respect of my Deferred Compensation contribution for calendar year _____ paid in _____ [specify foreign currency] in lieu of U.S. Dollars.

_____    _____    _____
Date          Signature                          Name (Please Print)

APPENDIX B

DEFERRED COMPENSATION
ACCOUNT STATEMENT
FOR QUARTERLY PERIOD ENDING _____

The Deferred Compensation balance in your account is an unsecured subordinated liability of AIG Financial Products Corp. to you and your beneficiaries.  See Section 4.01 of the AIGFP Deferred Compensation Plan for additional details.

The details of your account balance for the current year are as follows:

|  | **In USD** | **In Local Currency** (_____) |
|---|---|---|
| Deferred Compensation Balance January 1, _____ |  |  |
| Year Generated  _____ | _____ | _____ |
| Installment Payments |  |  |
| Year Generated  _____ | _____ | _____ |
| Deferred Compensation Balance December 31, _____ |  |  |
| Year Generated  _____ | _____ | _____ |

| Interest Earned: |  |  |
|---|---|---|
| First Quarter |  | _____ |
| Second Quarter |  | _____ |
| Third Quarter |  | _____ |
| Fourth Quarter |  | _____ |
| Additional Return Payments | _____ | _____ |
| Total Earnings |  | _____ |

SCHEDULE A

<u>AUTOMATIC DEFERRALS</u>

| **Position** | **Notional Bonus Amounts** |
| --- | --- |
| AIGFP Executives with Notional Bonus Amounts Exceeding $250,000 | 10% of first $500,000<br>20% of next $250,000<br>30% of next $250,000<br>40% of next $250,000<br>50% of remainder |

30% portion of annual Distributable Income that is allocable to AIGFP employees.  All Additional Return Payments shall be paid net of any taxes required by law to be withheld by AIGFP.

3.05.    <u>Payment of Benefit</u>.

(a)    <u>Distribution Events</u>.  Upon the earlier to occur of the Distribution Events set forth below, AIGFP shall direct that all amounts credited to a Participant's Deferred Compensation Account shall be paid in a lump sum to such Participant.  The Distribution Events are:

(a)    Death of the Participant; or

(b)    Permanent Disability of the Participant.

Upon the death of a Participant prior to his receipt of all amounts credited to his Deferred Compensation Account, his Beneficiary shall be paid in a lump sum all amounts then credited to such Participant's Deferred Compensation Account, plus accrued but unpaid interest to the date of payment.  If there is more than one Beneficiary then designated, such Account shall be distributed to such Beneficiaries in the proportions designated by such Participant, or in the absence of any such designation, in equal shares.  Any payment made pursuant to this Section 3.05(a) shall be made in the calendar year in which the Death or Permanent Disability (as applicable) of the Participant occurs or such later date as may be permitted under Internal Revenue Code Section 409A without the Participant incurring any taxes or interest or penalties thereunder.

(b)    <u>Installment Payments</u>.  Except as provided below, amounts in the Participant's Deferred Compensation Account attributable to Deferred Compensation contributions shall be paid to such Participant and to AIG annually in arrears on the Interest Payment Date for the Interest Period beginning in October of each year in equal pro rata installments ("Installment Payments") over a period of time (the "Distribution Period") corresponding to the approximate average life of AIGFP's swap transaction portfolio, as last determined by the Board before the beginning of the calendar year preceding the date of

-11-

the Deferred Compensation contribution.  However, for calendar year 2009 and 2010, the period of time that shall be used is six years, and as to Deferred Compensation contributions made prior to 2009, the installment schedule established under this section as in effect prior to December 31, 2008 shall remain applicable.  The Distribution Period for a Deferred Compensation contribution shall commence on the Interest Reset Date in January of the calendar year next succeeding the calendar year in respect of which the Deferred Compensation contribution was made, with the first Installment Payment therefore being distributed on the Interest Payment Date for the Interest Period beginning in October of the calendar year in which the Distribution Period commences.  Installment Payments shall be paid net of any taxes required by law to be withheld by AIGFP.

(c)    <u>Early Distribution</u>.  In addition to the foregoing, to the extent and in the manner permitted under Section 409A(a)(2) of the Internal Revenue Code, amounts credited to a Participant's or to AIG's Deferred Compensation Account may be distributed on such earlier date as determined by the Committee, with the approval of the Board; provided that (i) except as set forth in (ii) and (iii) below, any such early distributions shall be made from Participants' and AIG's Deferred Compensation Accounts on a pro rata basis, (ii) any such early distributions can be made from AIG's Deferred Compensation Account in an amount such that, after giving effect to such distribution, the aggregate amount credited to AIG's Deferred Compensation Account shall equal 70% of the aggregate amount credited to the sum of (a) the Deferred Compensation Accounts of AIG and all Participants taken together, plus (b) the aggregate amount notionally credited to all Japanese Plan participants and (iii) a settlement of the entire balance in a Participant's Deferred Compensation Account can be agreed to by the Committee, with the approval of the Board, in connection with the termination of a Participant's employment with the Company.

(d)    <u>Foreign Currency Alternative</u>.  Participants who are employed outside the United States may elect to have the Installment Payments and the interest payments (but not the Additional Return

-12-

Payments) on their annual Deferred Compensation contribution paid in the currency in which their cash bonuses are paid in lieu of U.S. Dollars (provided such currency is one of Yen, Euro, Pounds Sterling and Hong Kong Dollars).  In the event a Participant shall make such an election, then the applicable Deferred Compensation contribution shall be converted from U.S. Dollars into the applicable foreign currency at the spot foreign exchange rate at or about 11:00 a.m. (New York time) on the date such contribution is deemed pursuant to Section 3.02 to have been credited to the Participant's account, as determined in good faith by AIGFP.  Such translated Deferred Compensation amount shall then earn interest in accordance with Section 3.03 except that the applicable interest rate shall be the equivalent three-month LIBOR rate in the alternative designated currency.  Participant elections shall be made not later than December 1 of the year in which the Deferred Compensation contribution has been made, by submitting an election form in the form of Appendix A to the Chief Financial Officer of AIGFP.

(e)    General.    All payments of interest, Installment Payments and Additional Return Payments, and any early distribution of amounts credited to a Participant's Deferred Compensation Account, shall be paid to such Participants from the company or companies from which such payment represents compensation for services provided by such Participant; provided that for Participants whose employment has been transferred from an AIGTG group company to an AIG Financial Products Corp. group company in the same country, all such payments shall be paid from the AIG Financial Products Corp. group company to which the Participant has been transferred.

-13-

SECTION 4

<u>MISCELLANEOUS</u>

4.01.    <u>AIGFP's Liability</u>.

(a)  The benefits payable hereunder shall constitute an unsecured debt of AIG Financial Products Corp. to the Participants and their Beneficiaries and to AIG and shall not have the benefit of any guarantee by AIG of payment obligations of AIG Financial Products Corp.  For the avoidance of doubt, and notwithstanding anything else contained herein to the contrary, (i) the payment of benefits payable hereunder to each of the Participants and their Beneficiaries and to AIG shall be made only from the general funds of AIG Financial Products Corp., (ii) AIG Financial Products Corp. shall not segregate or earmark any of its assets nor hold any assets in trust or in any special account for this purpose, and (iii) none of the Participants, the Participants' Beneficiaries or AIG shall have any legal or equitable interest in, lien on, or claim to, any particular asset of AIG Financial Products Corp. by virtue of this Deferred Compensation Plan.  If AIG Financial Products Corp. shall become the subject of any bankruptcy or insolvency case or proceeding, or shall make an assignment for the benefit of creditors, or shall become the subject of a  reorganization whether or not pursuant to bankruptcy laws, or if any other relief shall be granted to AIG Financial Products Corp. generally from the rights of creditors, then in any such event (a "Bankruptcy/Insolvency Event") the obligations under this Deferred Compensation Plan to Participants and their Beneficiaries and to AIG shall be subordinate and junior in right of payment and otherwise, to the prior payment in full of all of the other obligations of AIG Financial Products Corp., whether now

-14-

existing or hereafter incurred, except to the extent payment of any such obligations is expressly made subordinate to or *pari passu* with the payment obligations hereunder.  If, in connection with a Bankruptcy/Insolvency Event, the claims (collectively "Creditors' Claims") of all other present and future creditors of AIG Financial Products Corp., other than those claims that are expressly made subordinate to or *pari passu* with claims for benefits payable hereunder, can be immediately fully satisfied, or adequate provision made for them, payments will be made at the times specified in this Plan.  If, in connection with a Bankruptcy/Insolvency Event, Creditors' Claims cannot be immediately satisfied or provision made for them, then during the period prior to such condition being satisfied   ("the Delay Period"), the following special rules shall apply:  AIG Financial Products Corp. will try to satisfy or provide for Creditors' Claims as soon as reasonably practicable so as to minimize Delay Period restrictions.  During the Delay Period, no benefit payments shall be made.  For the calendar year in which the Delay Period ends, (1) any payments that first became due during that calendar year will be paid by the end of that year or, if later, within 75 days after the date they first became due, and (2) any payments that first became due in an earlier calendar year will be paid to the extent doing so would not violate Internal Revenue Code Section 409A (e.g., because paying them in any earlier year in the Delay Period would have jeopardized AIG Financial Products Corp.'s ability to continue in business as a going concern).  The right to any other payment that first became due during the Delay Period shall lapse except to the extent AIG Financial Products Corp. determines that it may amend the Plan to provide for its payment without violating Internal Revenue Code Section 409A.

(b)  The outstanding balance credited to the Deferred Compensation Accounts of each Participant and of AIG shall be subject to reduction, from time to time, to the extent of any losses incurred (i) by AIGFP (excluding AIGTG) or (ii) by AIGTG resulting from transactions entered into on or after January 1, 2003, which losses in the case of (i) and (ii) for any year in the aggregate exceed the outstanding

market and credit reserves and current year income of AIGFP (excluding outstanding market and credit reserves relating to transactions entered into by AIGTG before January 1, 2003), but before base capital of AIGFP (for the avoidance of doubt including AIGTG, and consisting of equity, retained earnings, if any, and subordinated debt).   Such reductions shall be made among the Participants (including for this purpose, participants in the Japanese Plan) and AIG on a pro rata basis.   AIG Financial Products Corp. shall be obligated subsequently to restore amounts so deducted from Participants' and AIG's account balances, plus accrued interest thereon at the interest rate determined in accordance with Section 3.03 and, in connection therewith, the Board shall adopt a plan (which shall not be subject to the approval of AIG or the Participants) setting forth a schedule under which AIG Financial Products Corp. shall restore amounts deducted from Participants' and AIG's account balances (plus accrued interest thereon).   Any such restoration plan shall provide that any restored amounts shall be paid in 2013; to the extent amounts have not been restored by December 31, 2013, all restoration rights shall permanently lapse except to the extent AIG Financial Products Corp. determines that it may amend the Plan to provide for payment of restored amounts without violating Internal Revenue Code Section 409A.Notwithstanding the terms of any such plan, in a bankruptcy or insolvency of AIG Financial Products Corp. each Participant and Participant's Beneficiary and AIG shall have an unsecured claim, subordinated and junior in payment and subject to the limitation on rights and interests to the extent provided in the immediately preceding subparagraph, against AIG Financial Products Corp. for the amount, if any, by which the balances credited to their Deferred Compensation Account were reduced and not subsequently restored (plus credit for accrued interest thereon), in addition to such claims as are described in the immediately preceding subparagraph.   For the avoidance of doubt, if AIG Financial Products Corp. consolidates or amalgamates with, or merges with or into, or transfers all or substantially all of its assets to, another entity, then the

resulting, surviving or transferee entity shall assume all of the obligations of AIG Financial Products Corp. hereunder.

4.02.   <u>Nonassignability</u>.   Subject to Section 3.05(c)(iii), neither AIG nor any Participant or Beneficiary shall have the power to subject any right to receive payments under this Deferred Compensation Plan to assignment, pledge, sale, attachment, garnishment or any other transfer, alienation or encumbrance, nor shall such rights be subject to AIG's, the Participant's or Beneficiary's debts or to seizure for satisfaction of judgments, alimony or separate maintenance obligations.

4.03.   <u>Continuation as Employee</u>.   Neither this Deferred Compensation Plan nor the payment of any benefits hereunder shall be construed as giving the Participant any right to be retained as an employee of AIGFP.   Except as provided in the next sentence, Participants who cease to be employees of AIGFP shall not lose their Deferred Compensation, which shall continue to be distributed as provided in Section 3.05 and to earn interest as provided in Section 3.03 (but not Additional Return Payments pursuant to Section 3.04).   Notwithstanding any provision herein to the contrary, Participants who steal or embezzle from AIG or AIGFP or engage in an act of dishonesty, disloyalty or breach of trust against AIG or AIGFP that is comparable to theft or embezzlement shall lose their right to Deferred Compensation, including all amounts then credited to their Deferred Compensation Account and any interest accrued thereon.

4.04.   <u>Amendment and Termination</u>.   The Committee may from time to time, with the approval of the Board, amend this Deferred Compensation Plan in whole or in part; provided, however, that any such amendment (i) shall be effective as of the next succeeding Interest Reset Date falling in January (other than an amendment to this Deferred Compensation Plan that (a) has the effect of altering or eliminating the voluntary deferral rights of Participants under Section 3.01(b) hereof or of reducing the portion of Participants' Notional Bonus Amount that is subject

-17-

to automatic deferral under Section 3.01(a) hereof, or (b) is adopted in connection with the adoption or proposed adoption of, or a change or anticipated change in, any federal, state or other law or regulation (including any tax law or regulation) applicable to the Deferred Compensation Plan; any such amendment described in such clause (a) or (b) shall be effective immediately or as otherwise specified therein) and (ii) cannot, subject to Section 4.01 hereof, reduce or delay payment of any Participant's or AIG's benefits accrued up to the date of such amendment.  The Committee shall promptly notify all Participants and AIG of any amendments to this Deferred Compensation Plan.  The Board may suspend or terminate this Deferred Compensation Plan; provided, however, that any such suspension or termination cannot, subject to Section 4.01 hereof, reduce or delay payment of any Participant's or AIG's benefits accrued up to the date of such suspension or termination.  Such amendment, suspension or termination shall not be effective until made in writing and shall be communicated in writing to all Participants and to AIG.

4.05.    <u>Governing Law</u>.  The law of the State of Connecticut shall govern the interpretation, application and operation of this Deferred Compensation Plan.

4.06.    <u>Claims Procedure</u>.  Claims for benefits under the Plan shall be filed with the Committee, on forms supplied by the Committee.  Written notice of the Committee's disposition of a claim shall be furnished to the claimant within 30 days after the application therefor is filed.  In the event the claim is denied the reasons for the denial shall be specifically set forth in writing, pertinent provisions of the Deferred Compensation Plan shall be cited, and, where appropriate, an explanation as to how the claimant can perfect the claims will be provided.  If AIG, a Participant or a Beneficiary has been denied a benefit, each shall be entitled, upon request to the Board, to appeal the denial of the claimed benefit within 90

days following the Committee's determination described in the preceding sentence.  Upon such appeal, the Board (or a special committee designated by the Board) shall, as soon as practicable, meet with and hear the position of the claimant.  Its decision following such meeting shall be made within 30 days and shall be communicated in writing to the claimant.

4.07   <u>Information</u>.  For so long as the Deferred Compensation Plan is in effect, AIGFP shall provide each Participant and AIG with quarterly Deferred Compensation account statements setting forth (i) the Participant's or AIG's (as the case may be) Deferred Compensation account balance, (ii) the amount of interest and, for account statements covering the quarterly period in which such amounts would be paid, the Additional Return Payment and Installment Payment, if any, paid on such balance during such quarterly period and (iii) the Installment Payment schedule for the Participant or AIG.  In addition, AIGFP shall provide Participants and AIG with an AIGFP annual financial summary (which shall include a statement of the average life of AIGFP's swap transaction portfolio as of the date of such financial information), and shall endeavor to keep Participants who are then employees of AIGFP apprised of material developments involving AIGFP's business or accounting procedures applicable to AIGFP insofar as they relate to the Deferred Compensation Plan.  A form of quarterly statement is attached as Appendix B hereto.

4.08   <u>Singapore Office Participants</u>.  Notwithstanding any other provision of the Plan to the contrary, Participants who are based in a Singapore office of AIGFP shall have their automatic and voluntary deferrals contributed to their Deferred Compensation Account on an after tax basis after deducting Singapore taxes payable in respect of such Participants' Notional Bonus Amount.

4.09   <u>Compliance with Internal Revenue Code Section 409A</u>.  It is intended that amounts awarded or deferred under this Plan will not be taxable under Internal Revenue Code Section 409A.  This

Plan shall be interpreted and administered, to the extent possible, in a manner that does not result in a "plan failure" (within the meaning of Internal Revenue Code Section 409A(a)(1)) of this Plan or any other plan or arrangement maintained by AIG-FP or any affiliate.

      4.10   <u>Foreign Participants not Subject to U.S. Taxation</u>.  If a Participant is not subject to U.S. income taxation on any benefits under this Plan or any other plan that would be aggregated with it for purposes of applying Internal Revenue Code Section 409A, the Participant's rights will be determined under either the Plan terms in effect immediately before the December 2008 restatement of the Plan or the terms in effect immediately after such restatement, whichever is more favorable to such Participant as determined by the Committee.  Such a Participant shall not accrue any further benefits under this Plan (or any other plan that would be aggregated with this Plan for purposes of Section 409A) to the extent such benefits would be subject to Internal Revenue Code Section 409A, and any benefits that cannot be accrued for that reason will be paid in another way, if any, that is not subject to Section 409A.

APPENDIX A

AIG FINANCIAL PRODUCTS CORP.
DEFERRED COMPENSATION PLAN
ELECTION FORM

1.  Pursuant to the provisions of Section 3 of the Deferred Compensation Plan, in addition to the automatic deferral under the Plan I hereby elect to have the amount or percentage of amounts specified below deferred in the manner provided for in the Deferred Compensation Plan (see Section 3.01(b) for restrictions applicable to members of the Paris office):

_____ USD   Amount to be deferred as a voluntary deferral in addition to the automatic deferral under the Plan (to the extent I am awarded a Notional Bonus Amount that is sufficient to cover this voluntary deferral amount).

_____ USD   Any Notional Bonus Amount awarded to me in excess of this amount (that is not subject to automatic deferral under the Plan) should be treated as a voluntary deferral.

_____ %     This percentage of the Notional Bonus Amount remaining after the automatic deferral should be treated as a voluntary deferral.

2.  In the event that I should die prior to receipt of all distributions to which I am entitled under the Deferred Compensation Plan, I hereby direct that, pursuant to Section 3.05 of the Deferred Compensation Plan, all amounts due to me as deferred compensation under Section 3 of the Deferred Compensation Plan be distributed as follows:

Proportion                    Name of Beneficiary(ies)

_____          _____

_____          _____

_____          _____

3.  I hereby elect, pursuant to Section 3.05 (d) of the Deferred Compensation Plan, to have the Installment Payments and interest payments in respect of my Deferred Compensation contribution for calendar year _____ paid in _____ [specify foreign currency] in lieu of U.S. Dollars.

_____     _____     _____
Date           Signature                        Name (Please Print)

APPENDIX B

DEFERRED COMPENSATION
ACCOUNT STATEMENT
FOR QUARTERLY PERIOD ENDING _____

The Deferred Compensation balance in your account is an unsecured subordinated liability of AIG Financial Products Corp. to you and your beneficiaries.  See Section 4.01 of the AIGFP Deferred Compensation Plan for additional details.

The details of your account balance for the current year are as follows:

|  | **In USD** | **In Local Currency**<br>(_____) |
|---|---|---|
| Deferred Compensation Balance January 1, _____ |  |  |
| Year Generated  _____ | _____ | _____ |
| Installment Payments |  |  |
| Year Generated  _____ | _____ | _____ |
| Deferred Compensation Balance December 31, _____ |  |  |
| Year Generated  _____ | _____ | _____ |

| Interest Earned: |  |  |
|---|---|---|
| First Quarter |  | _____ |
| Second Quarter |  | _____ |
| Third Quarter |  | _____ |
| Fourth Quarter |  | _____ |
| Additional Return Payments | _____ | _____ |
| Total Earnings |  | _____ |

SCHEDULE A

<u>AUTOMATIC DEFERRALS</u>

| Position | Notional Bonus Amounts |
|---|---|
| AIGFP Executives with Notional Bonus Amounts Exceeding $250,000 | 10% of first $500,000<br>20% of next $250,000<br>30% of next $250,000<br>40% of next $250,000<br>50% of remainder |

**<u>Exhibit B</u>**

**Parent Guarantee**

## GENERAL GUARANTEE AGREEMENT

GENERAL GUARANTEE AGREEMENT, dated December 4, 1995 (the "Guarantee"), by American International Group, Inc., a Delaware corporation (the "Guarantor") in favor of each holder of a monetary obligation or liability of AIG Financial Products Corp., a Delaware corporation (the "Company"), now in existence or hereafter arising (any such obligation or liability being herein referred to as an "Obligation").

1. <u>Guarantee</u>. For value received, and to induce each such holder (each a "Guaranteed Party") to enter into transactions giving rise to Obligations, the Guarantor absolutely, unconditionally and irrevocably guarantees to each Guaranteed Party, its successors, endorsees and assigns, the prompt payment when due, subject to any applicable grace period, of all Obligations of the Company to such Guaranteed Party, whether incurred by the Company as maker, endorser, drawer, acceptor, guarantor, accommodation party or otherwise, and whether due or to become due, secured or unsecured, absolute or contingent, joint or several.

2. <u>Nature of Guarantee</u>. This Guarantee is a guaranty of payment and not of collection. The Guarantor's obligations hereunder with respect to any Obligation shall not be affected by the existence, validity, or enforceability of an Obligation or the perfection or extent of any collateral for such Obligation. The Guarantor's obligations hereunder shall not be affected by any other circumstance relating to any Obligation that might otherwise constitute a legal or equitable discharge of or defense to the Guarantor not available to the Company. No Guaranteed Party shall be obligated to file any claim relating to the Obligations owing to it in the event that the Company becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of any Guaranteed Party to so file shall not affect the Guarantor's obligations hereunder. In the event that any payment to any Party in respect of any Obligations is rescinded or must otherwise be returned for any reason whatsoever, the Guarantor shall remain liable hereunder in respect to such Obligations as if such payment had not been made. The Guarantor reserves the right to assert defenses which the Company may have to payment of any Obligation other than defenses arising from the bankruptcy or insolvency of the Company and other defenses expressly waived hereby.

3. <u>Consents, Waivers and Renewals</u>.  The Guarantor agrees that a Guaranteed Party may at any time and from time to time, either before or after the maturity thereof, without notice to or further consent of the Guarantor, extend the time of payment of, exchange or surrender any collateral for, or renew any of the Obligations owing to it, and may also make any agreement with the Company or with any other party to or person liable on any of the Obligations, or interested therein, for the extension, renewal, payment, compromise, discharge or release thereof, in whole or in part, or for any modification of the terms thereof or of any agreement between such Guaranteed Party and the Company or any of such other party or person, without in any way impairing or affecting this Guarantee.  The Guarantor agrees that a Guaranteed Party may resort to the Guarantor for payment of any of the Obligations, whether or not the Guaranteed Party shall have resorted to any collateral security, or shall have proceeded against the Company or any other obligor principally or secondarily obligated with respect to any of the Obligations. The Guarantor waives notice of the acceptance of this Guarantee and of the Obligations, presentment, demand for payment, notice of dishonor and protest.

4. <u>Expenses</u>.  The Guarantor agrees to pay on demand all fees and out-of-pocket expenses (including the reasonable fees and expenses of a Guaranteed Party's counsel) in any way relating to the enforcement or protection of the rights of a Guaranteed Party hereunder; provided, however, that the Guarantor shall not be liable for the expenses of a Guaranteed Party if no payment under this Guarantee is due.

5. <u>Subrogation</u>.  Upon payment of all the Obligations owing to any Guaranteed Party, the Guarantor shall be subrogated to the rights of such Guaranteed Party against the Company with respect to such Obligations, and such Guaranteed Party agrees to take at the Guarantor's expense such steps as the Guarantor may reasonably request to implement such subrogation.

6. <u>Third-Party Beneficiary Contract</u>.  The Guarantor hereby acknowledges that each Guaranteed Party is an intended third-party beneficiary of the Guarantee who may enforce this Guarantee directly against the Guarantor.

7. <u>Termination</u>.  This Guarantee may be terminated after 30 days notice given by the Guarantor by publication in <u>The Wall Street Journal</u>; provided, however, that in the event that a Guaranteed Party has requested, by written notice to the Secretary of the Guarantor at 70 Pine Street, New York, New York 10270, prior to the date of such publication, that such Guaranteed Party be given notice of any termination of this Guarantee (specifying the address to which such notice to

the Guaranteed Party shall be given), this Guarantee shall remain in full force and effect with respect to such Guaranteed Party until receipt by such Guaranteed Party of written notice of termination in accordance with such request. Notwithstanding the foregoing sentence, this Guarantee shall remain in full force and effect with respect to Obligations of the Company outstanding or contracted or committed for (whether or not outstanding) prior to the 30th day after publication of notice of such termination in <u>The Wall Street Journal</u>, or, in the event that a Guaranteed Party has requested notice of termination as provided above, prior to receipt by such Guaranteed Party of written notice of termination in accordance with such request, until such Obligations shall be finally and irrevocably paid in full.

        8.    <u>Governing Law</u>.  This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of laws.

AMERICAN INTERNATIONAL GROUP, INC.

By: _____
    Name:  Edward E. Matthews
    Title:  Vice Chairman

By: _____
    Name:   Kathleen E. Shannon
    Title:  Secretary

**<u>Exhibit C</u>**

**Special Incentive Plan**

December 29, 2008

# AIG FINANCIAL PRODUCTS CORP.
## 2007 SPECIAL INCENTIVE PLAN

Conformed Copy Reflecting:

### Amendment No. 1 December 29, 2008

AIG Financial Products Corp. sets out below the terms and conditions (the "2007 SIP Terms") of the AIG Financial Products Corp. 2007 Special Incentive Plan (the "2007 SIP") and the 2007 special incentive credits (the "2007 SIP Credits") to be provided hereunder to certain AIGFP executive employees and consultants (the "Covered Executives") and to American International Group, Inc. ("AIG").  The 2007 SIP Credits are independent of the Notional Bonus Amounts paid to employees of AIGFP for 2007 and the portions thereof deferred in accordance with the AIG Financial Products Corp. Deferred Compensation Plan, as amended (the "Deferred Compensation Plan").  The terms and operation of the Deferred Compensation Plan are not affected by the 2007 SIP.

As a result of the valuation adjustments associated with AIGFP's super senior credit derivative business, the Notional Bonus Amounts available in 2007 have been affected, and there will be no Additional Return Payment for 2007 under the Deferred Compensation Plan (and no analogous payment under any retirement plan in which members of AIGFP's Tokyo office participate in lieu of participating in the Deferred Compensation Plan).  The purpose of the 2007 SIP is to provide an additional compensation opportunity for Covered Executives while at the same time:

(i)        providing incentives for Covered Executives to continue developing, promoting and executing AIGFP's business,

(ii)       recognizing the serious effect that the unrecognized losses associated with the valuation adjustment have had,

(iii)      continuing to ensure that AIGFP's and its employees' interests are aligned with those of AIG and AIG's shareholders, and

(iv)      building and maintaining the formation of capital in AIGFP, including for purposes of ensuring that amounts are available to absorb losses in the event that AIGFP realizes losses on super senior credit derivatives that would have an impact on AIGFP's capital structure.

**SECTION I**
**DEFINITIONS**

For purposes of these 2007 SIP Terms, capitalized terms not otherwise defined herein shall have the meanings ascribed to them in <u>Schedule 1</u> hereto.

**SECTION II**
**PARTICIPATION**

2.01    <u>Participation</u>.

(a)    *Participation by Covered Executives*.  Covered Executives shall be those Executives of AIGFP who receive 2007 SIP Credits to their 2007 SIP Accounts pursuant to Section 3.01(a).  No Executive shall receive such a 2007 SIP Credit unless such Executive has signed an Election in the form attached as <u>Appendix A</u> hereto, and such Executive meets one or both of the following conditions:

(i)    the Executive's Notional Bonus Amount (or equivalent for consultants) for 2007 equals $1,250,000 (or, in the case of any Executive who receives guaranteed bonus compensation for 2007, such Executive's guaranteed bonus compensation for 2007, together with any discretionary incentive compensation for 2007, equals or exceeds $1,250,000); and/or

(ii)    the Executive would have received, if an Additional Return Payment had been paid under the Deferred Compensation Plan for 2007, a pro rata allocation thereof (or would have received an analogous payment under a retirement plan in which members of AIGFP's Tokyo office participate in lieu of participating in the Deferred Compensation Plan).

For the avoidance of doubt, even if an Executive qualifies under the preceding sentence, the award to such Executive of any 2007 SIP Credits shall be in AIGFP's discretion as stated in Section 3.01(a).

(b)    *Participation by AIG*.  AIG's participation shall be mandatory in an amount determined in accordance with Section 3.01(b).

**SECTION III**
**2007 SPECIAL INCENTIVE CREDITS**

3.01    <u>2007 SIP Credits</u>.

(a)    *2007 SIP Credits for Covered Executives*.   The 2007 SIP Credit for each Covered Executive shall be determined by AIGFP in its absolute discretion.  AIGFP shall, with effect from December 31, 2007, credit the 2007 SIP Account of each Covered Executive with the amount of such Covered Executive's 2007 SIP Credit.

-2-

(b)   *2007 SIP Credit for AIG*.  AIG's 2007 SIP Credit shall equal (i) the aggregate amount of the 2007 SIP Credits for all Covered Executives, <u>multiplied by</u> (ii) a fraction, the numerator of which is 7 and the denominator of which is 3.  AIGFP shall, on the date that AIG's share of AIGFP's Distributable Income in respect of 2007 (as that term is defined in the Deferred Compensation Plan) is or would have been paid to AIG by AIGFP, credit AIG's 2007 SIP Account with the amount of AIG's 2007 SIP Credit.

(c)   *Currency.*  All 2007 SIP Credits shall be recorded and maintained in US dollars.

3.02   <u>Reductions of SIP Accounts as a Result of Termination of Employment</u>.

(a)   *Termination Prior to January 1, 2009*.  If the employment (or consultancy) of a Covered Executive terminates prior to January 1, 2009 for any reason other than as a result of dismissal (or termination) without cause or death or permanent disability, the SIP Account of such Covered Executive shall be reduced to zero upon the date of such termination and such Covered Executive shall have no further right to amounts credited to such account or any other rights in respect thereof (including any accrued but unpaid interest thereon).

(b)   *Termination on or After January 1, 2009 but Prior to January 1, 2010*.  If the employment (or consultancy) of a Covered Executive terminates on or after January 1, 2009 but prior to January 1, 2010 for any reason other than as a result of dismissal (or termination) without cause or death or permanent disability, the SIP Account of such Covered Executive shall be reduced by an amount equal to two-thirds of the amount credited thereto as of the date of such termination and such Covered Executive shall have no further right to such reduction amount or any other rights in respect thereof (including any accrued but unpaid interest on such reduction amount).

(c)   *Reductions.*  Amounts by which SIP Accounts are reduced pursuant to this Section 3.02 from time to time shall not be reallocated among other SIP Accounts, but shall be released on the date payment is made to Covered Executives pursuant to Section 3.05(a) and shall be available for distribution to AIGFP employees in the year of release (in addition to, and in the same manner and subject to the same conditions as, the 30% portion of annual Distributable Income that is allocable to AIGFP employees in the year of release).

3.03   <u>Interest on 2007 SIP Credits</u>.  Amounts attributable to a Covered Executive's and to AIG's SIP Account shall earn interest, which shall be determined quarterly on the first day of each January, April, July and October in each year (each, an "<u>Interest Reset Date</u>"); provided, however, that if any Interest Reset Date would otherwise fall on a day that is not a Business Day, such Interest Reset Date will be the following day that is a Business Day.  The interest rate shall be equal to the LIBOR Rate for each Interest Reset Date.  Each such adjusted rate shall be applicable from and including the Interest Reset Date to which it relates to but not including the next succeeding Interest Reset Date or until all amounts in a Covered Executive's or AIG's SIP Account are distributed (each, an "<u>Interest Period</u>").  Interest shall be payable quarterly in arrears following the end of each Interest Period (each such date on

which interest is paid, which shall not be later than ten (10) Business Days following the end of the respective Interest Period, an "Interest Payment Date") on the balance in such SIP Account as of the Interest Reset Date on which the Interest Period commences. All amounts of interest shall be paid net of any taxes required by law to be withheld by AIGFP. For the avoidance of doubt, interest on 2007 SIP Accounts shall be an expense of AIGFP and, accordingly, shall be borne by AIG and AIGFP employees on a 70%/30% basis as a reduction in Distributable Income.

3.04    Additional Return Payment to Covered Executives.  In addition to interest payable on 2007 SIP Accounts in accordance with Section 3.03, the SIP Accounts of Covered Executives (but not AIG) may be credited as of the Interest Reset Date falling in January of each year with such additional earnings of AIGFP (the "Additional Return Payment") as the President of AIGFP, with the approval of the Board, shall determine; provided that any Additional Return Payments (i) shall be payable only to Covered Executives who are employees or consultants of AIGFP as of the date of payment therefor and (ii) shall be allocated among such eligible Covered Executives' SIP Accounts on a pro rata basis. Additional Return Payments shall be paid to eligible Covered Executives on each Interest Payment Date for the Interest Period beginning in October of each year based on the balance in such Covered Executives' SIP Accounts as of the Interest Reset Date for the Interest Period beginning in October of such year. For the avoidance of doubt, Additional Return Payments shall be paid out of the 30% portion of annual Distributable Income that is allocable to AIGFP employees. All Additional Return Payments shall be paid net of any taxes required by law to be withheld by AIGFP.

3.05.    Payment

(a)    *Payment*.  Unless payment occurs on an earlier date pursuant to Section 3.05(b) below, the outstanding balance, if any, credited to a Covered Executive's or AIG's SIP Account as of the Interest Payment Date for the Interest Period beginning in October 2012 shall be paid to such Covered Executive or to AIG, as applicable, on such date.

(b)    *Distribution Events*.  Upon the earlier to occur of the Distribution Events set forth below, AIGFP shall direct that all amounts credited to a Covered Executive's SIP Account (subject, for the avoidance of doubt, to reductions in accordance with Section 3.02), together with interest accrued thereon, shall be paid in a lump sum to such Covered Executive prior to the end of the year in which the Distribution Event occurs or, if later, by the 15th day of the third calendar month following the date of the Distribution Event. The Distribution Events are:

(1)    Death of the Covered Executive; or

(2)    Permanent Disability of the Covered Executive.

Upon the death of a Covered Executive prior to his or her receipt of all amounts credited to his SIP Account, the Covered Executive's Beneficiary shall be paid in a lump sum

all amounts then credited to such Covered Executive's SIP Account, plus accrued but unpaid interest to the date of payment.  If there is more than one Beneficiary then designated, such SIP Account shall be distributed to such Beneficiaries in the proportions designated by such Covered Executive, or in the absence of any such designation, in equal shares.  Any payment made pursuant to this Section 3.05(b) shall be made in the calendar year in which the Death or Permanent Disability (as applicable) of the Participant occurs or such later date as may be permitted under Internal Revenue Code Section 409A without the Participant incurring any taxes or interest or penalties thereunder.

(c)     *General*.  All payments hereunder (including interest and Additional Return Payments) and any early distribution of amounts credited to a Covered Executive's SIP Account, shall be paid in US dollars to such Covered Executives from the company or companies from which such payment represents compensation for services provided by such Covered Executive.

## SECTION IV
## MISCELLANEOUS

4.01   <u>AIGFP's Liability</u>.

(a)     The amounts payable hereunder shall constitute an unsecured debt of AIG Financial Products Corp. to the Covered Executives and their Beneficiaries and to AIG and shall not have the benefit of any guarantee by AIG of payment obligations of AIG Financial Products Corp.  For the avoidance of doubt, and notwithstanding anything else contained herein to the contrary, (i) the payment of benefits payable hereunder to each of the Covered Executives and their Beneficiaries and to AIG shall be made only from the general funds of AIG Financial Products Corp., (ii) AIG Financial Products Corp. shall not segregate or earmark any of its assets nor hold any assets in trust or in any special account for this purpose, and (iii) none of the Covered Executives, the Covered Executives' Beneficiaries or AIG shall have any legal or equitable interest in, lien on, or claim to, any particular asset of AIG Financial Products Corp. in respect of any 2007 SIP Account.  If AIG Financial Products Corp. shall become the subject of any bankruptcy or insolvency case or proceeding, or shall make an assignment for the benefit of creditors, or shall become the subject of a reorganization whether or not pursuant to bankruptcy laws, or if any other relief shall be granted to AIG Financial Products Corp. generally from the rights of creditors, then in any such event (a "Bankruptcy/Insolvency Event") the obligations hereunder to Covered Executives and their Beneficiaries and to AIG shall be subordinate and junior in right of payment and otherwise, to the prior payment in full of all of the other obligations of AIG Financial Products Corp., whether now existing or hereafter incurred, except to the extent payment of any such obligations is expressly made subordinate to or pari passu with the payment obligations hereunder.  If, in connection with a Bankruptcy/Insolvency Event, the claims (collectively "Creditors' Claims") of all other present and future creditors of AIG Financial Products Corp., other than those claims that are expressly made subordinate to or pari passu with claims for benefits payable hereunder, can be immediately fully satisfied, or adequate provision made for them, payments will be made at the times specified in this Plan.

-5-

If, in connection with a Bankruptcy/Insolvency Event, Creditors' Claims cannot be immediately satisfied or provision made for them, then during the period prior to such condition being satisfied ("the Delay Period"), the following special rules shall apply:  AIG Financial Products Corp. will try to satisfy or provide for Creditors' Claims as soon as reasonably practicable so as to minimize Delay Period restrictions.  During the Delay Period, no benefit payments shall be made.  For the calendar year in which the Delay Period ends, (1) any payments that first became due during that calendar year will be paid by the end of that year or, if later,  within 75 days after the date they first became due, and (2) any payments that first became due in an earlier calendar year will be paid to the extent doing so would not violate Internal Revenue Code Section 409A (e.g., because paying them in any earlier year in the Delay Period would have jeopardized AIG Financial Products Corp.'s ability to continue in business as a going concern).  The right to any other payment that first became due during the Delay Period shall lapse except to the extent AIG Financial Products Corp. determines that it may amend the Plan to provide for its payment without violating Internal Revenue Code Section 409A. Notwithstanding the foregoing, the obligations hereunder to Covered Executives, their Beneficiaries and to AIG shall be pari passu with obligations under the Deferred Compensation Plan

(b)      The outstanding balance credited to the SIP Accounts of each Covered Executive and of AIG shall be subject to reduction, from time to time, to the extent of any losses incurred (i) by AIGFP (excluding AIGTG) or (ii) by AIGTG resulting from transactions entered into on or after January 1, 2003, which losses in the case of (i) and (ii) for any year in the aggregate exceed the outstanding market and credit reserves and current year income of AIGFP (excluding outstanding market and credit reserves relating to transactions entered into by AIGTG before January 1, 2003), but before base capital of AIGFP (for the avoidance of doubt including AIGTG, and consisting of equity, retained earnings, if any, and subordinated debt).  Such reductions shall be made on a pro rata basis among the SIP Accounts under the 2007 SIP, and the Deferred Compensation Accounts under the Deferred Compensation Plan, of Covered Executives and AIG.  AIG Financial Products Corp. shall be obligated subsequently to restore amounts so deducted from Covered Executives' and AIG's account balances, plus accrued interest thereon at the interest rate determined in accordance with Section 3.03 and, in connection therewith, the Board shall adopt a plan (which shall not be subject to the approval of AIG or the Covered Executives) setting forth a schedule under which AIG Financial Products Corp. shall restore amounts deducted from Covered Executives' and AIG's account balances (plus accrued interest thereon).  Any such restoration plan shall provide that any restored amounts shall be paid in 2013; to the extent amounts have not been restored by December 31, 2013, all restoration rights shall permanently lapse except to the extent AIG Financial Products Corp. determines that it may amend the Plan to provide for payment of restored amounts without violating Internal Revenue Code Section 409A.  Notwithstanding the terms of any such plan, in a bankruptcy or insolvency of AIG Financial Products Corp. each Covered Executive and Covered Executive's Beneficiary and AIG shall have an unsecured claim, subordinated and junior in payment and subject to the limitation on rights and interests to the extent provided in the immediately preceding subparagraph, against AIG Financial Products Corp. for the

amount, if any, by which the balances credited to their SIP Account were reduced and not subsequently restored (plus credit for accrued interest thereon), in addition to such claims as are described in the immediately preceding subparagraph.  For the avoidance of doubt, if AIG Financial Products Corp. consolidates or amalgamates with, or merges with or into, or transfers all or substantially all of its assets to, another entity, then the resulting, surviving or transferee entity shall assume all of the obligations of AIG Financial Products Corp. hereunder.

4.02    Nonassignability.  Neither AIG nor any Covered Executive or Beneficiary shall have the power to subject any right to receive payments under these 2007 SIP Terms to assignment, pledge, sale, attachment, garnishment or any other transfer, alienation or encumbrance, nor shall such rights be subject to AIG's, the Covered Executive's or Beneficiary's debts or to seizure for satisfaction of judgments, alimony or separate maintenance obligations.

4.03    Continuation as Employee or Consultant.  Neither these 2007 SIP Terms nor the payment of any benefits hereunder shall be construed as giving any Covered Executive any right to be retained as an employee or consultant of AIGFP.

4.04    Amendment and Termination.  The Committee may from time to time, with the approval of the Board, amend these 2007 SIP Terms in whole or in part; provided, however, that any such amendment may not, subject to Section 4.01 hereof, reduce or delay payment of any Covered Executive's or AIG's benefits accrued up to the date of such amendment.  Any such amendment shall be effective immediately or as otherwise specified therein and shall be communicated in writing to all Covered Executives and to AIG.

4.05    Governing Law.  The law of the State of Connecticut shall govern the interpretation, application and operation of this document.

4.06    Claims Procedure.  Claims for benefits under these 2007 SIP Terms shall be filed with the Committee, on forms supplied by the Committee.  Written notice of the Committee's disposition of a claim shall be furnished to the claimant within 30 days after the application therefor is filed.  In the event the claim is denied, the reasons for the denial shall be specifically set forth in writing, pertinent provisions of these 2007 SIP Terms shall be cited, and, where appropriate, an explanation as to how the claimant can perfect the claims will be provided.  If AIG, a Covered Executive or a Beneficiary has been denied a benefit, each shall be entitled, upon request to the Board, to appeal the denial of the claimed benefit within 90 days following the Committee's determination described in the preceding sentence.  Upon such appeal, the Board (or a special committee designated by the Board) shall, as soon as practicable, meet with and hear the position of the claimant.  Its decision following such meeting shall be made within 30 days and shall be communicated in writing to the claimant.

4.07    Information.  For so long as 2007 SIP Credits remain payable hereunder, AIGFP shall provide each Covered Executive and AIG with quarterly SIP Account statements setting forth (i) the Covered Executive's or AIG's (as the case may be) SIP

-7-

Account balance, (ii) the amount of any Additional Return Payment and any interest on any Additional Return Payment that is credited to the SIP Account during such quarterly period, and (iii) the amount of interest paid on such SIP Account balance during such quarterly period.  In addition, AIGFP shall provide Covered Executives and AIG with an AIGFP annual financial summary, and shall endeavor to keep Covered Executives who are then employees of AIGFP apprised of material developments involving AIGFP's business or accounting procedures applicable to AIGFP insofar as they relate to these 2007 SIP Terms. A form of quarterly statement is attached as Appendix B hereto.

   4.08 Compliance with Internal Revenue Code Section 409A.  It is intended that amounts awarded or deferred under this Plan will not be taxable under Internal Revenue Code Section 409A.  This Plan shall be interpreted and administered, to the extent possible, in a manner that does not result in a "plan failure" (within the meaning of Internal Revenue Code Section 409A(a)(1)) of this Plan or any other plan or arrangement maintained by AIG-FP or any affiliate.

   4.09 Foreign Participants not Subject to U.S. Taxation.  If a Participant is not subject to U.S. income taxation on any benefits under this Plan or any other plan that would be aggregated with it for purposes of applying Internal Revenue Code Section 409A, the Participant's rights will be determined under either the Plan terms in effect immediately before the December 2008 restatement of the Plan or the terms in effect immediately after such restatement, whichever is more favorable to such Participant as determined by the Committee.  Such a Participant shall not accrue any further benefits under this Plan (or any other plan that would be aggregated with this Plan for purposes of Section 409A) to the extent such benefits would be subject to Internal Revenue Code Section 409A, and any benefits that cannot be accrued for that reason will be paid in another way, if any, that is not subject to Section 409A.

SCHEDULE 1

# DEFINITIONS

"AIGFP" means AIG Financial Products Corp., including, where applicable, all subsidiaries thereof, and AIG Trading Group Inc., including, where applicable, all subsidiaries thereof ("AIGTG").

"Beneficiary" shall mean such person or trustee as may be designated by a Covered Executive or otherwise determined pursuant to Section 3.01 of the Deferred Compensation Plan or, in the case of any Covered Executive who is not a participant under the Deferred Compensation Plan, as may be designated in writing by the Covered Executive.

"Board" shall mean the Board of Directors of AIG Financial Products Corp.

"Business Day" shall mean any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in New York City and London.

"Committee" shall mean a committee consisting of the chief executive officer of AIG Financial Products Corp., the chief financial officer of AIG Financial Products Corp. and the secretary of AIG Financial Products Corp.

"Covered Executive" shall mean an Executive who receives a 2007 SIP Credit to his or her 2007 SIP Account pursuant to Section 3.01(a) of these 2007 SIP Terms.

"Executive" shall mean an executive employee of AIGFP with the title of Assistant Vice President or higher or a consultant of AIGFP.

"LIBOR Rate" shall mean the rate for an Interest Reset Date, which is the rate for deposits in U.S. Dollars for a period of three (3) months, which appears on the Telerate Page 3750 as of 11:00 a.m., London time, on the day that is two London Banking Days preceding that Interest Reset Date. If such rate does not appear on the Telerate Page 3750, the rate for that Interest Reset Date shall be determined in accordance with the definition of USD-LIBOR-Reference Banks.

"London Banking Day" shall mean any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London.

"Notional Bonus Amount" shall have the meaning ascribed thereto under the Deferred Compensation Plan.

"Permanent Disability" shall mean that a Participant has been found to be disabled by the U.S. Social Security Administration.  The date of such a disability will be the date on which

that Social Security determination is rendered, not the earlier date as of which the disability commenced.  If the Participant is not covered by the U.S. Social Security system, the Participant shall be considered permanently disabled on the first anniversary of the commencement of his or her disability if the Committee determines before then that the Participant has satisfied the U.S. Social Security definition of disability and the Participant remains continuously disabled through that first anniversary. "Reference Banks" shall mean four major banks in the London interbank market.

"SIP Account" shall mean the account established on AIG Financial Product Corp.'s books in the name of each Covered Executive and of AIG in which, pursuant to Section 3 of these 2007 SIP Terms, 2007 SIP Credits for Covered Executives and AIG are recorded.

 "USD-LIBOR-Reference Banks" shall mean that the rate for an Interest Reset Date will be determined on the basis of the rates at which deposits in U.S. Dollars are offered by the Reference Banks at approximately 11:00 a.m., London time, on the date that is two London Banking Days preceding that Interest Reset Date to prime banks in the London interbank market for a period of three (3) months commencing on that Interest Reset Date.  AIGFP will request the principal London office of each of the Reference Banks to provide a quotation of its rate.  If at least two such quotations are provided, the rate for that Interest Reset Date will be the arithmetic mean of the quotations.  If fewer than two quotations are provided as requested, the rate for that Interest Reset Date will be the arithmetic mean of the rates quoted by major banks in New York City, selected by AIGFP, at approximately 11:00 a.m., New York City time, on that Interest Reset Date for loans in U.S. Dollars to leading European banks for a period of three (3) months commencing on that Interest Reset Date.

APPENDIX A

Election

I hereby elect to participate in the AIG Financial Products Corp. 2007 Special Incentive Plan (the "2007 SIP").

I acknowledge that I have received, read and understood the 2007 SIP Terms and that my participation in the 2007 SIP, including any credits or payments to me under the 2007 SIP, will be subject to the 2007 SIP Terms, which provide in part that the balance in my SIP Account (i) is subject to reduction pursuant to Section 3.02 prior to January 1, 2010, and (ii) is an unsecured subordinated liability of AIG Financial Products Corp. to me and my beneficiaries subject to Section 4.01.

I further recognize that any 2007 SIP Credits credited to my 2007 SIP Account under the 2007 SIP are separate from and independent of any Notional Bonus Amount I might receive for 2007, as that term is defined in the AIG Financial Products Corp. Deferred Compensation Plan, and I waive any claim that amounts represented by 2007 SIP Credits credited to me under the 2007 SIP would be subject to, or payable to me pursuant to, the AIG Financial Products Corp. Deferred Compensation Plan.

_____

Date:

**2007 SPECIAL INCENTIVE PLAN**
**ACCOUNT STATEMENT**
**FOR QUARTERLY PERIOD ENDING _____**

The balance in your SIP Account (i) is subject to reduction pursuant to Section 3.02 of the 2007 SIP Terms prior to January 1, 2010, and (ii) is an unsecured subordinated liability of AIG Financial Products Corp. to you and your beneficiaries subject to Section 4.01 of the 2007 SIP Terms.

The details of your account balance for the current year are as follows:

**In USD**

SIP Account Balance January 1, _____

_____

SIP Account Balance December 31, _____

_____

Additional Return Payments January [10], _____

_____

Interest Earned:
    First Quarter
    Second Quarter
    Third Quarter
    Fourth Quarter

    Total Earnings

## Exhibit D

**Total Payments Made to the Defendants**

**CONFIDENTIAL**

**Net Cash Compensation for 2002-2009**

| | Name | Title | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | IND TOTAL | CUMM TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Person 1 | Managing Director | $16,961,685 | $22,403,059 | $22,027,517 | $23,201,273 | $25,521,207 | $12,739,373 | N/A | N/A | $122,854,114 | $122,854,114 |
| 2 | Person 2 | Managing Director | $15,166,772 | $18,793,163 | $17,186,299 | $18,083,921 | $8,947,813 | $7,912,780 | N/A | N/A | $86,090,748 | $208,944,862 |
| 3 | Person 3 | Managing Director | $8,081,279 | $10,125,208 | $9,780,788 | $10,385,234 | $12,138,977 | $6,719,289 | $4,797,500 | $3,730,000 | $65,758,275 | $274,703,137 |
| 4 | Person 4 | Managing Director | $6,239,329 | $8,808,054 | $9,002,070 | $9,447,830 | $9,887,572 | $5,986,760 | N/A | N/A | $49,371,615 | $324,074,752 |
| 5 | Person 5 | Managing Director | $4,279,871 | $4,957,732 | $6,075,054 | $6,146,044 | $7,051,393 | $4,180,368 | $3,100,000 | $3,177,500 | $38,967,962 | $363,042,714 |
| 6 | Person 6 | Managing Director & Head of Tax | $3,829,326 | $4,961,772 | $4,609,543 | $4,772,096 | $5,322,360 | $3,430,648 | $2,650,000 | $2,474,423 | $32,050,168 | $395,092,882 |
| 7 | Person 7 | Managing Director | $2,298,441 | $4,020,736 | $4,246,628 | $5,349,459 | $6,590,692 | $2,679,581 | N/A | N/A | $25,185,537 | $420,278,419 |
| 8 | Person 8 | Managing Director | $3,654,082 | $3,884,915 | $3,447,664 | $4,029,403 | $4,935,359 | $2,675,208 | $2,062,500 | $100,000 | $24,789,131 | $445,067,550 |
| 9 | Person 9 | Managing Director | $2,503,163 | $4,920,666 | $4,576,861 | $4,568,264 | $4,963,580 | $2,295,249 | N/A | N/A | $23,827,783 | $468,895,333 |
| 10 | Person 10 | Managing Director | $1,571,344 | $1,997,861 | $2,141,903 | $2,687,351 | $3,827,875 | $2,436,129 | $2,937,500 | $3,008,750 | $20,608,713 | $489,504,046 |
| 11 | Person 11 | Managing Director | $2,370,309 | $2,742,970 | $2,583,681 | $2,670,693 | $2,937,426 | $2,125,574 | $2,200,000 | $2,006,667 | $19,637,320 | $509,141,366 |
| 12 | Person 12 | Vice President | $2,314,786 | $2,657,943 | $2,505,002 | $2,521,781 | $2,779,419 | $2,055,375 | $1,550,000 | $1,600,000 | $17,984,306 | $527,125,672 |
| 13 | Person 13 | Managing Director and Counsel | $1,601,216 | $2,109,558 | $2,181,460 | $2,490,534 | $2,982,249 | $2,118,501 | $2,100,000 | $1,927,500 | $17,511,018 | $544,636,690 |
| 14 | Person 14 | Managing Director | $2,151,269 | $2,528,965 | $2,288,375 | $2,293,575 | $2,198,800 | $838,696 | N/A | N/A | $12,299,680 | $556,936,370 |
| 15 | Person 15 | Managing Director | $1,849,267 | $2,072,647 | $2,377,670 | $2,402,488 | $2,244,156 | $938,502 | N/A | N/A | $11,884,730 | $568,821,100 |
| 16 | Person 16 | Vice President | N/A | $1,825,000 | $2,056,717 | $1,792,710 | $1,867,211 | $1,867,320 | $1,325,000 | $1,080,000 | $11,813,958 | $580,635,058 |
| 17 | Person 17 | Managing Director | $1,373,964 | $2,294,261 | $2,447,508 | $2,826,932 | $1,988,400 | $870,790 | N/A | N/A | $11,801,855 | $592,436,913 |
| 18 | Person 18 | Managing Director | $1,408,133 | $1,567,370 | $1,505,810 | $1,486,438 | $1,626,738 | $1,482,305 | $1,045,000 | $35,417 | $10,157,211 | $602,594,124 |
| 19 | Person 19 | Managing Director | $2,265,610 | $2,465,834 | $1,992,468 | $1,396,483 | $599,190 | $440,914 | N/A | N/A | $9,160,499 | $611,754,623 |
| 20 | Person 20 | Vice President | $1,010,174 | $1,268,292 | $1,146,975 | $1,131,489 | $1,829,249 | $864,227 | $817,500 | $690,750 | $8,758,656 | $620,513,279 |
| 21 | Person 21 | Vice President | $684,882 | $715,272 | $1,318,235 | $1,224,074 | $1,360,385 | $1,356,620 | $1,010,000 | $996,500 | $8,665,968 | $629,179,247 |
| 22 | Person 22 | Vice President | $607,192 | $835,019 | $954,133 | $1,046,379 | $1,090,882 | $1,295,084 | $1,275,000 | $1,310,000 | $8,413,689 | $637,592,936 |
| 23 | Person 23 | Vice President & Assistant Treasurer | $1,030,367 | $1,200,628 | $1,105,482 | $1,040,222 | $1,009,829 | $965,564 | $767,500 | $725,750 | $7,845,342 | $645,438,278 |
| 24 | Person 24 | Vice President and Counsel | $695,000 | $876,170 | $904,608 | $906,430 | $1,096,195 | $1,211,648 | $1,025,000 | $1,050,000 | $7,765,051 | $653,203,329 |
| 25 | Person 25 | Executive Director | $663,851 | $770,744 | $705,024 | $1,237,648 | $1,302,783 | $1,169,250 | $820,000 | $798,000 | $7,467,300 | $660,670,629 |
| 26 | Person 26 | Managing Director | N/A | $1,270,000 | $1,608,754 | $1,321,265 | $1,623,463 | $1,412,696 | $150,000 | N/A | $7,386,178 | $668,056,807 |
| 27 | Person 27 | Managing Director | N/A | $1,050,000 | $1,255,000 | $1,698,632 | $2,328,522 | $697,029 | N/A | N/A | $7,029,183 | $675,085,990 |
| 28 | Person 28 | Managing Director | N/A | $1,050,000 | $1,400,000 | $1,788,280 | $2,064,968 | $653,621 | N/A | N/A | $6,956,869 | $682,042,859 |
| 29 | Person 29 | Vice President | $412,753 | $484,004 | $797,583 | $709,772 | $873,531 | $1,700,128 | $925,000 | $892,500 | $6,795,271 | $688,838,130 |
| 30 | Person 30 | Vice President | $643,160 | $527,759 | $687,236 | $879,579 | $1,096,022 | $979,962 | $750,000 | $655,000 | $6,218,718 | $695,056,848 |
| 31 | Person 31 | Vice President | $640,054 | $743,683 | $706,047 | $778,136 | $922,781 | $801,184 | $675,000 | $700,000 | $5,966,885 | $701,023,733 |
| 32 | Person 32 | Vice President | $426,835 | $404,831 | $375,727 | $580,347 | $717,082 | $1,014,423 | $710,000 | $709,000 | $5,248,245 | $706,271,978 |
| 33 | Person 33 | Managing Director | N/A | N/A | $1,150,000 | $1,187,760 | $1,096,975 | $796,994 | $680,000 | $327,010 | $5,238,739 | $711,510,717 |
| 34 | Person 34 | Managing Director | N/A | N/A | $759,615 | $702,445 | $675,000 | $144,753 | $1,475,000 | $1,298,333 | $5,055,146 | $716,565,863 |
| 35 | Person 35 | Managing Director | N/A | N/A | N/A | N/A | N/A | $1,525,000 | $1,840,000 | $980,000 | $4,345,000 | $720,910,863 |
| 36 | Person 36 | Vice President | $883,207 | $951,070 | $994,641 | $1,069,093 | $227,176 | $214,000 | N/A | N/A | $4,339,187 | $725,250,050 |
| 37 | Person 37 | Vice President | $437,853 | $898,248 | $449,408 | $512,651 | $596,773 | $523,942 | $441,000 | $425,400 | $4,285,275 | $729,535,325 |
| 38 | Person 38 | Trading Officer | N/A | $420,000 | $578,754 | $541,810 | $609,143 | $539,025 | $640,000 | $591,000 | $3,919,732 | $733,455,057 |
| 39 | Person 39 | Managing Director | N/A | $425,000 | $325,000 | $388,750 | $601,757 | $325,367 | $827,500 | $932,250 | $3,825,624 | $737,280,681 |
| 40 | Person 40 | Trading Officer | N/A | $427,500 | $441,940 | $469,000 | $471,653 | $481,447 | $225,000 | N/A | $2,516,540 | $739,797,221 |
| 41 | Person 41 | Trading Officer | N/A | N/A | N/A | N/A | $625,000 | $600,000 | $552,500 | $384,750 | $2,162,250 | $741,959,471 |
| 42 | Person 42 | Vice President | N/A | N/A | $215,000 | $206,398 | $310,944 | $346,095 | $510,000 | $499,000 | $2,087,437 | $744,046,908 |
| 43 | Person 43 | Trading Officer | N/A | N/A | N/A | $210,518 | $492,331 | $702,600 | $616,000 | N/A | $2,021,449 | $746,068,357 |
| 44 | Person 44 | Vice President | $230,000 | $215,000 | $215,000 | $252,789 | $223,000 | $237,111 | $250,000 | $246,500 | $1,869,400 | $747,937,757 |
| 45 | Person 45 | Vice President | N/A | N/A | $265,000 | $296,786 | $216,898 | $263,655 | $517,500 | N/A | $1,559,839 | $749,497,596 |
| 46 | Person 46 | Trading Officer | N/A | $435,000 | $517,500 | $533,548 | $23,190 | $22,864 | N/A | N/A | $1,532,102 | $751,029,698 |
| | **TOTAL** | | $88,285,174 | $120,105,934 | $121,909,680 | $129,576,310 | $131,895,949 | $84,637,651 | $41,267,000 | $33,352,000 | $751,029,698 | |

**Exhibit E**

**AIG FP Revolving Credit Agreement**

## **REVOLVING CREDIT AGREEMENT**

REVOLVING CREDIT AGREEMENT ("Agreement") dated as of this 22nd day of September, 2008, by and between AIG Funding, Inc. a Delaware corporation, with its principal executive offices located at 70 Pine Street, New York, NY 10270 ("AIG Funding") and AIG Financial Products Corp. a Delaware corporation with its principal executive offices located at 50 Danbury Road, Wilton, CT 06897 ("Borrower").

WHEREAS, the Borrower has requested of AIG Funding a Sixty-Five Billion Dollars ($65,000,000,000.00) revolving loan facility, and AIG Funding is willing to grant that request, subject to the terms and conditions hereof;

NOW, THEREFORE, in consideration of the mutual promises and covenants made herein, and other good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## 1. SECTION 1. THE LOANS

### 1.1    The Borrowings

Subject to the terms and conditions of this Agreement, AIG Funding agrees, in its sole discretion, upon the receipt of an authorized written request from the Borrower, to lend Borrower from time to time from the date of this Agreement up to but not including the Termination Date (as hereinafter defined) amounts not exceeding Sixty-Five Billion Dollars ($65,000,000,000) in aggregate principal amount at any one time.

### 1.2    Interest

Interest shall be paid upon the unpaid principal amount of all loans made pursuant to this Agreement for the period from the date of the borrowing of such principal through but excluding the date upon which such principal is fully paid at a mutually agreed rate per annum which the parties may determine, from time to time (but in no event shall such rate be higher than the maximum rate permitted by law). Interest shall be calculated on the aggregate unpaid principal amount on the basis of the actual days elapsed in a year of three hundred sixty (360) days. Interest shall be payable monthly in arrears by the fifteenth (15th) day of each month (the "Interest Payment Dates") until such time as the aggregate unpaid principal amount is paid in full. Interest shall be compounded on the first day of each month. If any payment becomes due and payable on a Saturday, Sunday or a legal or bank holiday in the State of New York (any day, other than such days a "Business Day"), such payment shall be due and payable on the immediately preceding Business Day, subject to the terms of this Section 1.2.

1.3    The Note

All borrowings made by Borrower pursuant to Section 1.1 hereof shall be evidenced by the Borrower's execution and delivery of a single promissory note in the form of Exhibit A attached hereto ("Note"), dated the date of the making of the initial loan, payable to the order of AIG Funding in the aggregate principal amount of Sixty-Five Billion Dollars ($65,000,000,000) or, if less, the aggregate unpaid principal amount of all loans made by AIG Funding to the Borrower pursuant to this Agreement.  AIG Funding shall note upon a schedule attached as Schedule 1 to the Note, all borrowings made by Borrower pursuant to Section 1.1 hereof and all repayments of principal made by Borrower pursuant to Section 1.4 hereof.  Such notations shall, in the absence of manifest error, be conclusive as to the aggregate unpaid principal amount of all loans made by AIG Funding pursuant to Section 1.1 hereof, provided, however, that the failure to make such notation with respect to any loan or repayment shall not limit or otherwise affect the obligations of the Borrower under this Agreement or the Note.  Borrower may from time to time request that AIG Funding provide Borrower with a copy of the Schedule so that Borrower may confirm the aggregate unpaid principal balance referenced in the Note.

1.4    Voluntary Repayments

Borrower shall have the right to repay the principal amount of the loans made by AIG Funding hereunder, in whole at any time or in part from time to time, without premium or penalty.  If the Borrower repays in whole, then such repayment shall be accompanied by all accrued interest owed to the date of repayment.

1.5    Manner of Payment

All payments to be made by the Borrower on account of borrowings hereunder shall be made without set-off or counterclaim in lawful currency of the United States of America prior to 12:00 Noon, New York City time, on the date when due, in immediately available funds.

1.6    Termination

   a) This Agreement shall have a term of twenty-four (24) months and shall automatically renew on the anniversary hereof for a twelve (12) month term on such anniversary and any subsequent annual anniversary (each, an "Anniversary Date") unless the Agreement is terminated by a written instrument signed by each of the parties hereto.  In the event that an Anniversary Date shall fall on a day that is not a Business Day, then such Anniversary Date shall be deemed to be the immediately succeeding Business Day.

   b) Notwithstanding paragraph a) above, this Agreement (x) may be terminated at any time by the Borrower upon thirty (30) days' prior written

notice to AIG Funding, (y) may be terminated immediately by AIG Funding upon any breach by the Borrower of any material obligation set forth in this Agreement, and (z) shall automatically and without further action by the Borrower or AIG Funding terminate in the event of any insolvency or bankruptcy of the Borrower, provided in each of the foregoing cases that, upon such termination, all outstanding indebtedness under this Agreement shall automatically and without further action by AIG Funding or the Borrower become immediately due and payable, and shall be paid by the Borrower to AIG Funding.

Termination of this Agreement shall result in a termination of AIG Funding's obligation to make loans hereunder only, and shall not relieve the Borrower of any obligations hereunder.

c) The 'Termination Date' shall be the date on which this Agreement terminates, whether by a written instrument signed by the parties pursuant to Section 1.6(a) or by early termination pursuant to Section 1.6(b).

## SECTION 2.  CONDITIONS PRECEDENT TO BORROWINGS

### 2.1   Initial Borrowing

The obligation of AIG Funding to make any loan is conditional upon receipt by AIG Funding of (i) the Note in the form attached as Exhibit A hereto, duly executed by the Borrower and (ii) certified copies of Resolutions of Borrower's Board of Directors authorizing the execution and delivery by it of this Agreement and the Note and the incurrence and repayment of the obligations thereunder.

## SECTION 3.  COVENANTS

### 3.1   Right of Inspection

So long as any indebtedness under this Agreement remains unpaid, or for so long as the Borrower shall have the right to borrow hereunder, AIG Funding may inspect Borrower's properties and its books and records from time to time at any reasonable time and make copies of such books and records from time to time at any reasonable time.

### 3.2   Merger Transactions

The Borrower will not merge with or into or consolidate with any other person, sell, transfer or dispose of all or substantially all of its assets or undergo any change in the control of its voting stock, so long as any indebtedness owed under this Agreement remains unpaid, unless it receives the prior written authorization of AIG Funding.  For purposes of this agreement, person shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

### 3.3    Use of Proceeds

The Borrower shall use the proceeds of loans under this Agreement solely for the purpose of its direct and legitimate business needs.

### SECTION 4.  MISCELLANEOUS

4.1    Neither the failure nor any delay on the part of AIG Funding to exercise any right, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any further exercise of such right, power or privilege or any exercise of any other right, power or privilege.

4.2    The provisions of this Agreement shall not be modified, amended or waived save in writing, executed by all parties.  This Agreement, the obligations and rights hereunder and all supporting documents referred to herein shall be construed in accordance with the laws of the State of New York, without giving effect to any contrary result otherwise required under applicable principles of conflicts or choice of law.   In the case any one or more of the provisions contained in this agreement should be invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

4.3    Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of Borrower and AIG Funding, their successors and assigns, except that the Borrower may not assign or otherwise transfer any of its obligations, rights or interests in or to this Agreement without the prior written consent of AIG Funding and its successors or assigns.

4.4    All notices required in writing under this Agreement shall be considered as having been given by one party to the other upon the latter party's receipt of same.  All such notices shall be transmitted by registered or certified mail or by facsimile.  Such written notice shall be sent to the attention of the Chief Financial Officer and General Counsel of each of the parties hereto.

4.5    This Agreement and any termination thereof pursuant to Section 1.6(a) may be executed in any number of counterparts, each of which counterpart when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same Agreement. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto.

[THE FOLLOWING PAGE IS THE SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their proper and duly authorized officers, upon the date set out under their respective signatures below with this Agreement being effective as of the date first above written.

AIG FUNDING, INC.

By: _____

Name: Neil Friedman

Title: Vice President

Date: 10/29/2010

AIG FINANCIAL PRODUCTS CORP.

By: _____

Name:

Title:

Date:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their proper and duly authorized officers, upon the date set out under their respective signatures below with this Agreement being effective as of the date first above written.

AIG FUNDING, INC.

By: _____
Name:
Title:
Date:

AIG FINANCIAL PRODUCTS CORP.

By: _____
Name: Gerard Poscimero
Title: Ceo
Date: 10/28/10

- 5 -

## PROMISSORY NOTE

EFFECTIVE DATE:  September 22, 2008

For valuable consideration, receipt of which is hereby acknowledged, AIG Financial Products Corp., a Delaware corporation ("Borrower"), hereby unconditionally promises to pay to the order of AIG Funding, Inc., a Delaware corporation ("AIG Funding") in legal currency of the United States of America and in immediately available funds, the principal sum of Sixty-Five Billion Dollars ($65,000,000,000) or, if less, the aggregate unpaid principal amount of all loans made by AIG Funding to the Borrower pursuant to the Revolving Credit Agreement dated as of September 22, 2008, between AIG Funding and Borrower (the "Revolving Credit Agreement").  Borrower further agrees to pay interest in like manner upon the unpaid principal amount hereof until such principal balance referenced in this Note has been paid in full at a mutually agreed rate per annum which the parties may determine, from time to time (but in no event shall such rate be higher than the maximum rate permitted by law).  Interest shall be payable monthly in arrears by the fifteenth (15th) day of each month (hereinafter referred to as the "Interest Payment Dates") until such time as the aggregate unpaid principal balance referenced in this Note is paid in full.  Daily interest shall be computed based upon the actual days elapsed in a year of three hundred sixty (360) days.  Interest shall be compounded on the first day of each month.  If any payment on this Note becomes due and payable on a Saturday, Sunday or legal or bank holiday in the State of New York, such payment shall be due and payable on the immediately preceding day which is not a Saturday, Sunday or legal or bank holiday in the State of New York ("Business Day").

Borrower may repay the principal amount of the loans made by AIG Funding under this Note, in whole at any time or in part from time to time, without premium or penalty.  If the Borrower repays in whole, then such repayment shall be accompanied by all accrued interest owed to the date of repayment.

Except as may be specifically provided herein, Borrower waives presentment for payment, demand, notice of nonpayment, notice of protest and protest of this Note, and agrees to pay, as soon as incurred, all costs and expenses, including reasonable counsel fees, incidental to the collection of this Note or in any way relating to the rights of holder hereunder.  The holder hereof may release, renew or extend any of the liabilities of Borrower and may make additional advances or extensions of credit to it or grant other indulgences or extend the time for any payment of principal or interest hereunder, all from time to time, without further notice to or assent from any other party or any endorser hereof.

The Borrower hereby authorizes AIG Funding to endorse on the Schedule annexed to this Note all loans made to the Borrower and all repayments of

principal amounts in respect of such loans, which endorsements shall, in the absence of manifest error, be conclusive as to the outstanding principal amount of all loans hereunder; provided, however, that the failure to make such notation with respect to any loan or repayment shall not limit or otherwise affect the obligations of the Borrower under the Revolving Credit Agreement or this Note.

Terms used herein which are defined in the Revolving Credit Agreement shall have their defined meanings when used herein.

This Note shall be governed by the laws of the State of New York, without giving effect to any contrary result otherwise required under applicable conflict or choice of law rules.

This Note is the Note referred to in the Revolving Credit Agreement and is qualified by, and subject to, all of the terms and conditions provided therein.  In the event that any conflict, inconsistency or incongruity arises between the provisions of the Revolving Credit Agreement and the terms of this Note, the terms of the Revolving Credit Agreement shall in all respects control.

AIG FINANCIAL PRODUCTS CORP.,
as Borrower

By: _____
Name:
Title:
Date:

Schedule I

LOANS AND REPAYMENT OF PRINCIPAL UNDER
REVOLVING CREDIT AGREEMENT DATED AS OF SEPTEMBER 22, 2008
BETWEEN AIG FUNDING, INC. AND AIG FINANCIAL PRODUCTS CORP.

| DATE | AMOUNT OF LOAN | AMOUNT OF PRINCIPAL REPAID | UNPAID PRINCIPAL BALANCE | NAME OF PERSON MAKING NOTATION |
|------|----------------|----------------------------|--------------------------|--------------------------------|
|      |                |                            |                          |                                |

## Schedule I

## LOANS AND REPAYMENT OF PRINCIPAL UNDER
## REVOLVING CREDIT AGREEMENT DATED AS OF SEPTEMBER 22, 2008
## BETWEEN AIG FUNDING, INC. AND AIG FINANCIAL PRODUCTS CORP.

| DATE | AMOUNT OF LOAN | AMOUNT OF PRINCIPAL REPAID | UNPAID PRINCIPAL BALANCE | NAME OF PERSON MAKING NOTATION |
|------|------|------|------|------|
|      |      |      |      |      |

**<u>Exhibit F</u>**

**AIG FP Revolver Borrowings & Paydowns**

**LOANS AND REPAYMENT OF PRINCIPAL UNDER**
**AIG FP REVOLVER AS OF SEPTEMBER 22, 2008**

| DATE | AMOUNT OF LOAN | CAPITALIZED INTEREST | AMOUNT OF PRINCIPAL REPAID | UNPAID PRINCIPAL BALANCE |
|---|---|---|---|---|
| 09/22/08 | 26,040,369,819.93 | 0.00 | 0.00 | 26,040,369,819.93 |
| 09/23/08 | 2,800,000,000.00 | 0.00 | 0.00 | 28,840,369,819.93 |
| 09/26/08 | 500,000,000.00 | 0.00 | 0.00 | 29,340,369,819.93 |
| 09/29/08 | 5,000,000,000.00 | 0.00 | 0.00 | 34,340,369,819.93 |
| 09/30/08 | 5,024,583,478.61 | 0.00 | 0.00 | 39,364,953,298.54 |
| 10/07/08 | 500,000,000.00 | 0.00 | 0.00 | 39,864,953,298.54 |
| 10/08/08 | 1,500,000,000.00 | 0.00 | 0.00 | 41,364,953,298.54 |
| 10/09/08 | 1,500,000,000.00 | 0.00 | 0.00 | 42,864,953,298.54 |
| 10/14/08 | 4,000,000,000.00 | 0.00 | 0.00 | 46,864,953,298.54 |
| 10/21/08 | 1,000,000,000.00 | 0.00 | 0.00 | 47,864,953,298.54 |
| 10/22/08 | 1,500,000,000.00 | 0.00 | 0.00 | 49,364,953,298.54 |
| 10/24/08 | 0.00 | 0.00 | 500,000,000.00 | 48,864,953,298.54 |
| 10/29/08 | 0.00 | 0.00 | 1,518,233,156.03 | 47,346,720,142.51 |
| 11/03/08 | 500,000,000.00 | 0.00 | 0.00 | 47,846,720,142.51 |
| 11/04/08 | 0.00 | 0.00 | 750,000,000.00 | 47,096,720,142.51 |
| 11/10/08 | 500,000,000.00 | 0.00 | 0.00 | 47,596,720,142.51 |
| 11/13/08 | 500,000,000.00 | 0.00 | 0.00 | 48,096,720,142.51 |
| 11/14/08 | 600,000,000.00 | 0.00 | 0.00 | 48,696,720,142.51 |
| 11/17/08 | 300,000,000.00 | 0.00 | 0.00 | 48,996,720,142.51 |
| 11/18/08 | 1,400,000,000.00 | 0.00 | 0.00 | 50,396,720,142.51 |
| 11/19/08 | 750,000,000.00 | 0.00 | 0.00 | 51,146,720,142.51 |
| 11/21/08 | 1,000,000,000.00 | 0.00 | 0.00 | 52,146,720,142.51 |
| 11/24/08 | 800,000,000.00 | 0.00 | 0.00 | 52,946,720,142.51 |
| 12/01/08 | 300,000,000.00 | 0.00 | 0.00 | 53,246,720,142.51 |
| 12/05/08 | 300,000,000.00 | 0.00 | 0.00 | 53,546,720,142.51 |
| 12/08/08 | 300,000,000.00 | 0.00 | 0.00 | 53,846,720,142.51 |
| 12/10/08 | 200,000,000.00 | 0.00 | 0.00 | 54,046,720,142.51 |
| 12/19/08 | 0.00 | 0.00 | 1,800,000,000.00 | 52,246,720,142.51 |
| 12/22/08 | 300,000,000.00 | 0.00 | 0.00 | 52,546,720,142.51 |
| 12/23/08 | 0.00 | 0.00 | 800,000,000.00 | 51,746,720,142.51 |
| 12/26/08 | 0.00 | 0.00 | 500,000,000.00 | 51,246,720,142.51 |
| 12/31/08 | 0.00 | 0.00 | 250,000,000.00 | 50,996,720,142.51 |
| 01/02/09 | 250,000,000.00 | 0.00 | 0.00 | 51,246,720,142.51 |
| 01/08/09 | 0.00 | 0.00 | 300,000,000.00 | 50,946,720,142.51 |
| 01/11/09 | 100,000,000.00 | 0.00 | 0.00 | 51,046,720,142.51 |
| 01/12/09 | 300,000,000.00 | 0.00 | 0.00 | 51,346,720,142.51 |
| 01/15/09 | 0.00 | 0.00 | 600,000,000.00 | 50,746,720,142.51 |
| 01/20/09 | 100,000,000.00 | 0.00 | 0.00 | 50,846,720,142.51 |
| 01/23/09 | 100,000,000.00 | 0.00 | 0.00 | 50,946,720,142.51 |
| 01/27/09 | 500,000,000.00 | 0.00 | 0.00 | 51,446,720,142.51 |
| 01/29/09 | 300,000,000.00 | 0.00 | 0.00 | 51,746,720,142.51 |
| 01/30/09 | 400,000,000.00 | 0.00 | 0.00 | 52,146,720,142.51 |
| 02/02/09 | 400,000,000.00 | 0.00 | 0.00 | 52,546,720,142.51 |

| DATE | AMOUNT OF LOAN | CAPITALIZED INTEREST | AMOUNT OF PRINCIPAL REPAID | UNPAID PRINCIPAL BALANCE |
|---|---|---|---|---|
| 02/04/09 | 0.00 | 0.00 | 100,000,000.00 | 52,446,720,142.51 |
| 02/05/09 | 0.00 | 0.00 | 300,000,000.00 | 52,146,720,142.51 |
| 02/06/09 | 0.00 | 0.00 | 200,000,000.00 | 51,946,720,142.51 |
| 02/09/09 | 0.00 | 0.00 | 200,000,000.00 | 51,746,720,142.51 |
| 02/11/09 | 0.00 | 0.00 | 200,000,000.00 | 51,546,720,142.51 |
| 02/17/09 | 200,000,000.00 | 0.00 | 0.00 | 51,746,720,142.51 |
| 02/18/09 | 0.00 | 0.00 | 200,000,000.00 | 51,546,720,142.51 |
| 02/19/09 | 100,000,000.00 | 0.00 | 0.00 | 51,646,720,142.51 |
| 02/20/10 | 900,000,000.00 | 0.00 | 0.00 | 52,546,720,142.51 |
| 02/26/09 | 900,000,000.00 | 0.00 | 0.00 | 53,446,720,142.51 |
| 02/27/09 | 600,000,000.00 | 0.00 | 0.00 | 54,046,720,142.51 |
| 03/02/09 | 300,000,000.00 | 0.00 | 0.00 | 54,346,720,142.51 |
| 03/03/09 | 0.00 | 0.00 | 300,000,000.00 | 54,046,720,142.51 |
| 03/04/09 | 500,000,000.00 | 0.00 | 0.00 | 54,546,720,142.51 |
| 03/10/09 | 200,000,000.00 | 0.00 | 0.00 | 54,746,720,142.51 |
| 03/17/09 | 0.00 | 0.00 | 300,000,000.00 | 54,446,720,142.51 |
| 03/25/09 | 0.00 | 0.00 | 300,000,000.00 | 54,146,720,142.51 |
| 03/26/09 | 100,000,000.00 | 0.00 | 0.00 | 54,246,720,142.51 |
| 03/27/09 | 600,000,000.00 | 0.00 | 0.00 | 54,846,720,142.51 |
| 03/31/09 | 500,000,000.00 | 0.00 | 0.00 | 55,346,720,142.51 |
| 04/02/09 | 200,000,000.00 | 0.00 | 0.00 | 55,546,720,142.51 |
| 04/06/09 | 0.00 | 0.00 | 100,000,000.00 | 55,446,720,142.51 |
| 04/13/09 | 100,000,000.00 | 0.00 | 0.00 | 55,546,720,142.51 |
| 04/15/09 | 600,000,000.00 | 0.00 | 0.00 | 56,146,720,142.51 |
| 04/16/09 | 0.00 | 0.00 | 200,000,000.00 | 55,946,720,142.51 |
| 04/19/09 | 0.00 | 0.00 | 200,000,000.00 | 55,746,720,142.51 |
| 04/21/09 | 200,000,000.00 | 0.00 | 0.00 | 55,946,720,142.51 |
| 04/24/09 | 0.00 | 0.00 | 300,000,000.00 | 55,646,720,142.51 |
| 04/28/09 | 0.00 | 0.00 | 100,000,000.00 | 55,546,720,142.51 |
| 04/29/09 | 0.00 | 0.00 | 26,119.71 | 55,546,694,022.80 |
| 05/10/09 | 600,000,000.00 | 0.00 | 0.00 | 56,146,694,022.80 |
| 05/12/09 | 0.00 | 0.00 | 400,000,000.00 | 55,746,694,022.80 |
| 05/18/09 | 0.00 | 0.00 | 200,000,000.00 | 55,546,694,022.80 |
| 05/19/09 | 0.00 | 0.00 | 100,000,000.00 | 55,446,694,022.80 |
| 05/20/09 | 0.00 | 0.00 | 200,000,000.00 | 55,246,694,022.80 |
| 05/22/09 | 0.00 | 0.00 | 200,000,000.00 | 55,046,694,022.80 |
| 06/01/09 | 0.00 | 0.00 | 200,000,000.00 | 54,846,694,022.80 |
| 06/02/09 | 0.00 | 0.00 | 500,000,000.00 | 54,346,694,022.80 |
| 06/08/09 | 500,000,000.00 | 0.00 | 0.00 | 54,846,694,022.80 |
| 06/09/09 | 0.00 | 0.00 | 0.00 | 54,846,694,022.80 |
| 06/15/09 | 0.00 | 0.00 | 400,000,000.00 | 54,446,694,022.80 |
| 06/16/09 | 100,000,000.00 | 0.00 | 0.00 | 54,546,694,022.80 |
| 06/17/09 | 0.00 | 0.00 | 100,000,000.00 | 54,446,694,022.80 |
| 06/18/09 | 0.00 | 0.00 | 100,000,000.00 | 54,346,694,022.80 |
| 06/29/09 | 100,000,000.00 | 0.00 | 0.00 | 54,446,694,022.80 |
| 06/30/09 | 400,000,000.00 | 0.00 | 0.00 | 54,846,694,022.80 |
| 07/01/09 | 100,000,000.00 | 0.00 | 0.00 | 54,946,694,022.80 |
| 07/02/09 | 300,000,000.00 | 0.00 | 0.00 | 55,246,694,022.80 |
| 07/06/09 | 0.00 | 0.00 | 200,000,000.00 | 55,046,694,022.80 |

| DATE | AMOUNT OF LOAN | CAPITALIZED INTEREST | AMOUNT OF PRINCIPAL REPAID | UNPAID PRINCIPAL BALANCE |
|---|---|---|---|---|
| 07/08/09 | 0.00 | 0.00 | 200,000,000.00 | 54,846,694,022.80 |
| 07/09/09 | 0.00 | 0.00 | 200,000,000.00 | 54,646,694,022.80 |
| 07/13/09 | 0.00 | 0.00 | 200,000,000.00 | 54,446,694,022.80 |
| 07/14/09 | 100,000,000.00 | 0.00 | 0.00 | 54,546,694,022.80 |
| 07/16/09 | 0.00 | 0.00 | 100,000,000.00 | 54,446,694,022.80 |
| 07/17/09 | 300,000,000.00 | 0.00 | 0.00 | 54,746,694,022.80 |
| 07/23/09 | 0.00 | 0.00 | 200,000,000.00 | 54,546,694,022.80 |
| 07/24/09 | 0.00 | 0.00 | 200,000,000.00 | 54,346,694,022.80 |
| 08/03/09 | 0.00 | 0.00 | 300,000,000.00 | 54,046,694,022.80 |
| 08/04/09 | 200,000,000.00 | 0.00 | 0.00 | 54,246,694,022.80 |
| 08/05/09 | 0.00 | 0.00 | 200,000,000.00 | 54,046,694,022.80 |
| 08/06/09 | 0.00 | 0.00 | 100,000,000.00 | 53,946,694,022.80 |
| 08/07/09 | 0.00 | 0.00 | 100,000,000.00 | 53,846,694,022.80 |
| 08/11/09 | 0.00 | 0.00 | 100,000,000.00 | 53,746,694,022.80 |
| 08/13/09 | 100,000,000.00 | 0.00 | 0.00 | 53,846,694,022.80 |
| 08/14/09 | 200,000,000.00 | 0.00 | 0.00 | 54,046,694,022.80 |
| 08/18/09 | 100,000,000.00 | 0.00 | 0.00 | 54,146,694,022.80 |
| 08/19/09 | 0.00 | 0.00 | 100,000,000.00 | 54,046,694,022.80 |
| 08/20/09 | 100,000,000.00 | 0.00 | 0.00 | 54,146,694,022.80 |
| 08/26/09 | 0.00 | 0.00 | 100,000,000.00 | 54,046,694,022.80 |
| 09/08/09 | 200,000,000.00 | 0.00 | 0.00 | 54,246,694,022.80 |
| 09/09/09 | 100,000,000.00 | 0.00 | 0.00 | 54,346,694,022.80 |
| 09/17/09 | 0.00 | 0.00 | 100,000,000.00 | 54,246,694,022.80 |
| 09/21/09 | 300,000,000.00 | 0.00 | 0.00 | 54,546,694,022.80 |
| 09/22/09 | 0.00 | 0.00 | 200,000,000.00 | 54,346,694,022.80 |
| 09/23/09 | 0.00 | 0.00 | 300,000,000.00 | 54,046,694,022.80 |
| 09/24/09 | 0.00 | 0.00 | 100,000,000.00 | 53,946,694,022.80 |
| 09/25/09 | 0.00 | 0.00 | 400,000,000.00 | 53,546,694,022.80 |
| 09/28/09 | 0.00 | 0.00 | 200,000,000.00 | 53,346,694,022.80 |
| 10/05/09 | 400,000,000.00 | 0.00 | 0.00 | 53,746,694,022.80 |
| 10/06/09 | 200,000,000.00 | 0.00 | 0.00 | 53,946,694,022.80 |
| 10/14/09 | 0.00 | 0.00 | 500,000,000.00 | 53,446,694,022.80 |
| 10/16/09 | 0.00 | 0.00 | 300,000,000.00 | 53,146,694,022.80 |
| 10/19/09 | 0.00 | 0.00 | 100,000,000.00 | 53,046,694,022.80 |
| 10/20/09 | 300,000,000.00 | 0.00 | 0.00 | 53,346,694,022.80 |
| 10/26/09 | 2,700,000,000.00 | 0.00 | 0.00 | 56,046,694,022.80 |
| 10/28/09 | 0.00 | 0.00 | 100,000,000.00 | 55,946,694,022.80 |
| 11/06/09 | 0.00 | 0.00 | 100,000,000.00 | 55,846,694,022.80 |
| 11/09/09 | 0.00 | 0.00 | 100,000,000.00 | 55,746,694,022.80 |
| 11/10/09 | 0.00 | 0.00 | 400,000,000.00 | 55,346,694,022.80 |
| 11/12/09 | 0.00 | 0.00 | 400,000,000.00 | 54,946,694,022.80 |
| 11/19/09 | 0.00 | 0.00 | 100,000,000.00 | 54,846,694,022.80 |
| 11/20/09 | 0.00 | 0.00 | 200,000,000.00 | 54,646,694,022.80 |
| 11/24/09 | 0.00 | 0.00 | 100,000,000.00 | 54,546,694,022.80 |
| 11/25/09 | 100,000,000.00 | 0.00 | 0.00 | 54,646,694,022.80 |
| 12/02/09 | 69,370,378.00 | 0.00 | 0.00 | 54,716,064,400.80 |
| 12/03/09 | 69,319,889.00 | 0.00 | 0.00 | 54,785,384,289.80 |
| 12/04/09 | 69,319,889.00 | 0.00 | 0.00 | 54,854,704,178.80 |
| 12/07/09 | 400,000,000.00 | 0.00 | 0.00 | 55,254,704,178.80 |

| DATE | AMOUNT OF LOAN | CAPITALIZED INTEREST | AMOUNT OF PRINCIPAL REPAID | UNPAID PRINCIPAL BALANCE |
|---|---|---|---|---|
| 12/09/09 | 49,084,472.00 | 0.00 | 0.00 | 55,303,788,650.80 |
| 12/10/09 | 0.00 | 0.00 | 100,000,000.00 | 55,203,788,650.80 |
| 12/11/09 | 0.00 | 0.00 | 100,000,000.00 | 55,103,788,650.80 |
| 12/14/09 | 0.00 | 0.00 | 100,000,000.00 | 55,003,788,650.80 |
| 12/15/09 | 0.00 | 0.00 | 100,000,000.00 | 54,903,788,650.80 |
| 12/16/09 | 0.00 | 0.00 | 500,000,000.00 | 54,403,788,650.80 |
| 12/17/09 | 400,000,000.00 | 0.00 | 0.00 | 54,803,788,650.80 |
| 12/18/09 | 0.00 | 0.00 | 300,000,000.00 | 54,503,788,650.80 |
| 12/22/09 | 0.00 | 0.00 | 400,000,000.00 | 54,103,788,650.80 |
| 12/23/09 | 100,000,000.00 | 0.00 | 0.00 | 54,203,788,650.80 |
| 12/29/09 | 1,354,273.00 | 0.00 | 0.00 | 54,205,142,923.80 |
| 12/30/09 | 400,000,000.00 | 0.00 | 0.00 | 54,605,142,923.80 |
| 01/11/10 | 0.00 | 0.00 | 200,000,000.00 | 54,405,142,923.80 |
| 01/19/10 | 0.00 | 0.00 | 200,000,000.00 | 54,205,142,923.80 |
| 01/25/10 | 1,400,000,000.00 | 0.00 | 0.00 | 55,605,142,923.80 |
| 02/01/10 | 300,000,000.00 | 0.00 | 0.00 | 55,905,142,923.80 |
| 02/03/10 | 0.00 | 0.00 | 200,000,000.00 | 55,705,142,923.80 |
| 02/04/10 | 0.00 | 0.00 | 100,000,000.00 | 55,605,142,923.80 |
| 02/08/10 | 0.00 | 0.00 | 400,000,000.00 | 55,205,142,923.80 |
| 02/10/10 | 0.00 | 0.00 | 100,000,000.00 | 55,105,142,923.80 |
| 02/12/10 | 200,000,000.00 | 0.00 | 0.00 | 55,305,142,923.80 |
| 02/17/10 | 200,000,000.00 | 0.00 | 0.00 | 55,505,142,923.80 |
| 02/18/10 | 100,000,000.00 | 0.00 | 0.00 | 55,605,142,923.80 |
| 02/19/10 | 300,000,000.00 | 0.00 | 0.00 | 55,905,142,923.80 |
| 02/23/10 | 0.00 | 0.00 | 100,000,000.00 | 55,805,142,923.80 |
| 03/05/10 | 200,000,000.00 | 0.00 | 0.00 | 56,005,142,923.80 |
| 03/09/10 | 100,000,000.00 | 0.00 | 0.00 | 56,105,142,923.80 |
| 03/11/10 | 100,000,000.00 | 0.00 | 0.00 | 56,205,142,923.80 |
| 03/15/10 | 0.00 | 0.00 | 100,000,000.00 | 56,105,142,923.80 |
| 03/23/10 | 0.00 | 0.00 | 100,000,000.00 | 56,005,142,923.80 |
| 03/25/10 | 0.00 | 0.00 | 400,000,000.00 | 55,605,142,923.80 |
| 03/26/10 | 0.00 | 0.00 | 200,000,000.00 | 55,405,142,923.80 |
| 03/31/10 | 0.00 | 0.00 | 100,000,000.00 | 55,305,142,923.80 |
| 04/07/10 | 0.00 | 0.00 | 100,000,000.00 | 55,205,142,923.80 |
| 04/08/10 | 100,000,000.00 | 0.00 | 0.00 | 55,305,142,923.80 |
| 04/14/10 | 0.00 | 0.00 | 200,000,000.00 | 55,105,142,923.80 |
| 04/20/10 | 0.00 | 0.00 | 100,000,000.00 | 55,005,142,923.80 |
| 04/26/10 | 2,300,000,000.00 | 0.00 | 0.00 | 57,305,142,923.80 |
| 04/27/10 | 0.00 | 0.00 | 500,000,000.00 | 56,805,142,923.80 |
| 04/29/10 | 0.00 | 0.00 | 100,000,000.00 | 56,705,142,923.80 |
| 04/30/10 | 200,000,000.00 | 0.00 | 0.00 | 56,905,142,923.80 |
| 05/07/10 | 0.00 | 0.00 | 250,000,000.00 | 56,655,142,923.80 |
| 05/10/10 | 0.00 | 0.00 | 150,000,000.00 | 56,505,142,923.80 |
| 05/12/10 | 100,000,000.00 | 0.00 | 0.00 | 56,605,142,923.80 |
| 05/14/10 | 0.00 | 0.00 | 200,000,000.00 | 56,405,142,923.80 |
| 05/18/10 | 100,000,000.00 | 0.00 | 0.00 | 56,505,142,923.80 |
| 05/20/10 | 0.00 | 0.00 | 100,000,000.00 | 56,405,142,923.80 |

| DATE | AMOUNT OF LOAN | CAPITALIZED INTEREST | AMOUNT OF PRINCIPAL REPAID | UNPAID PRINCIPAL BALANCE |
|---|---|---|---|---|
| 05/21/10 | 0.00 | 0.00 | 200,000,000.00 | 56,205,142,923.80 |
| 05/28/10 | 250,000,000.00 | 0.00 | 0.00 | 56,455,142,923.80 |
| 06/02/10 | 150,000,000.00 | 0.00 | 0.00 | 56,605,142,923.80 |
| 06/04/10 | 150,000,000.00 | 0.00 | 0.00 | 56,755,142,923.80 |
| 06/07/10 | 0.00 | 0.00 | 100,000,000.00 | 56,655,142,923.80 |
| 06/09/10 | 0.00 | 0.00 | 150,000,000.00 | 56,505,142,923.80 |
| 06/10/10 | 0.00 | 0.00 | 100,000,000.00 | 56,405,142,923.80 |
| 06/13/10 | 0.00 | 0.00 | 200,000,000.00 | 56,205,142,923.80 |
| 06/14/10 | 0.00 | 0.00 | 100,000,000.00 | 56,105,142,923.80 |
| 06/15/10 | 0.00 | 0.00 | 100,000,000.00 | 56,005,142,923.80 |
| 06/17/10 | 100,000,000.00 | 0.00 | 0.00 | 56,105,142,923.80 |
| 06/25/10 | 0.00 | 0.00 | 200,000,000.00 | 55,905,142,923.80 |
| 06/28/10 | 0.00 | 0.00 | 100,000,000.00 | 55,805,142,923.80 |
| 06/30/10 | 150,000,000.00 | 0.00 | 0.00 | 55,955,142,923.80 |
| 07/01/10 | 100,000,000.00 | 0.00 | 0.00 | 56,055,142,923.80 |
| 07/06/10 | 0.00 | 0.00 | 150,000,000.00 | 55,905,142,923.80 |
| 07/07/10 | 100,000,000.00 | 0.00 | 0.00 | 56,005,142,923.80 |
| 07/09/10 | 0.00 | 0.00 | 50,000,000.00 | 55,955,142,923.80 |
| 07/14/10 | 100,000,000.00 | 0.00 | 0.00 | 56,055,142,923.80 |
| 07/21/10 | 0.00 | 0.00 | 100,000,000.00 | 55,955,142,923.80 |
| 07/26/10 | 0.00 | 0.00 | 200,000,000.00 | 55,755,142,923.80 |
| 07/30/10 | 200,000,000.00 | 0.00 | 0.00 | 55,955,142,923.80 |
| 08/03/10 | 100,000,000.00 | 0.00 | 0.00 | 56,055,142,923.80 |
| 08/09/10 | 0.00 | 0.00 | 200,000,000.00 | 55,855,142,923.80 |
| 08/10/10 | 0.00 | 0.00 | 100,000,000.00 | 55,755,142,923.80 |
| 08/11/10 | 0.00 | 0.00 | 100,000,000.00 | 55,655,142,923.80 |
| 08/17/10 | 0.00 | 0.00 | 100,000,000.00 | 55,555,142,923.80 |
| 08/24/10 | 0.00 | 0.00 | 250,000,000.00 | 55,305,142,923.80 |
| 08/25/10 | 100,000,000.00 | 0.00 | 0.00 | 55,405,142,923.80 |
| 08/27/10 | 200,000,000.00 | 0.00 | 0.00 | 55,605,142,923.80 |
| 08/31/10 | 250,000,000.00 | 0.00 | 0.00 | 55,855,142,923.80 |
| 09/07/10 | 0.00 | 0.00 | 200,000,000.00 | 55,655,142,923.80 |
| 09/10/10 | 0.00 | 0.00 | 100,000,000.00 | 55,555,142,923.80 |
| 09/13/10 | 100,000,000.00 | 0.00 | 0.00 | 55,655,142,923.80 |
| 09/20/10 | 100,000,000.00 | 0.00 | 0.00 | 55,755,142,923.80 |
| 09/21/10 | 0.00 | 0.00 | 100,000,000.00 | 55,655,142,923.80 |
| 09/22/10 | 0.00 | 0.00 | 100,000,000.00 | 55,555,142,923.80 |
| 09/23/10 | 0.00 | 0.00 | 100,000,000.00 | 55,455,142,923.80 |
| 10/12/10 | 100,000,000.00 | 0.00 | 0.00 | 55,555,142,923.80 |
| 10/13/10 | 200,000,000.00 | 0.00 | 0.00 | 55,755,142,923.80 |
| 10/15/10 | 0.00 | 0.00 | 300,000,000.00 | 55,455,142,923.80 |
| 10/18/10 | 0.00 | 0.00 | 100,000,000.00 | 55,355,142,923.80 |
| 10/20/10 | 0.00 | 0.00 | 100,000,000.00 | 55,255,142,923.80 |
| 10/21/10 | 0.00 | 0.00 | 100,000,000.00 | 55,155,142,923.80 |
| 10/27/10 | 0.00 | 0.00 | 100,000,000.00 | 55,055,142,923.80 |
| 10/29/10 | 200,000,000.00 | 0.00 | 0.00 | 55,255,142,923.80 |

| DATE | AMOUNT OF LOAN | CAPITALIZED INTEREST | AMOUNT OF PRINCIPAL REPAID | UNPAID PRINCIPAL BALANCE |
|---|---|---|---|---|
| 11/02/10 | 100,000,000.00 | 0.00 | 0.00 | 55,355,142,923.80 |
| 11/03/10 | 250,000,000.00 | 0.00 | 0.00 | 55,605,142,923.80 |
| 11/08/10 | 100,000,000.00 | 0.00 | 0.00 | 55,705,142,923.80 |
| 11/15/10 | 100,000,000.00 | 0.00 | 0.00 | 55,805,142,923.80 |
| 11/17/10 | 0.00 | 0.00 | 200,000,000.00 | 55,605,142,923.80 |
| 12/01/10 | 0.00 | 0.00 | 100,000,000.00 | 55,505,142,923.80 |
| 12/03/10 | 0.00 | 0.00 | 400,000,000.00 | 55,105,142,923.80 |
| 12/06/10 | 0.00 | 0.00 | 200,000,000.00 | 54,905,142,923.80 |
| 12/08/10 | 200,000,000.00 | 0.00 | 0.00 | 55,105,142,923.80 |
| 12/10/10 | 0.00 | 0.00 | 500,000,000.00 | 54,605,142,923.80 |
| 12/13/10 | 500,000,000.00 | 0.00 | 0.00 | 55,105,142,923.80 |
| 12/14/10 | 200,000,000.00 | 0.00 | 0.00 | 55,305,142,923.80 |
| 12/15/10 | 200,000,000.00 | 0.00 | 0.00 | 55,505,142,923.80 |
| 12/17/10 | 0.00 | 0.00 | 100,000,000.00 | 55,405,142,923.80 |
| 12/22/10 | 0.00 | 0.00 | 1,500,000,000.00 | 53,905,142,923.80 |
| 12/23/10 | 0.00 | 0.00 | 400,000,000.00 | 53,505,142,923.80 |
| 12/29/10 | 0.00 | 0.00 | 100,000,000.00 | 53,405,142,923.80 |
| 01/25/11 | 0.00 | 0.00 | 100,000,000.00 | 53,305,142,923.80 |
| 01/26/11 | 300,000,000.00 | 0.00 | 0.00 | 53,605,142,923.80 |
| 01/27/11 | 0.00 | 0.00 | 100,000,000.00 | 53,505,142,923.80 |
| 02/01/11 | 50,000,000.00 | 0.00 | 0.00 | 53,555,142,923.80 |
| 02/03/11 | 0.00 | 0.00 | 150,000,000.00 | 53,405,142,923.80 |
| 02/08/11 | 0.00 | 0.00 | 100,000,000.00 | 53,305,142,923.80 |
| 02/18/00 | 0.00 | 0.00 | 100,000,000.00 | 53,205,142,923.80 |
| 02/22/11 | 50,000,000.00 | 0.00 | 0.00 | 53,255,142,923.80 |
| 02/23/11 | 100,000,000.00 | 0.00 | 0.00 | 53,355,142,923.80 |
| 02/25/11 | 50,000,000.00 | 0.00 | 0.00 | 53,405,142,923.80 |
| 03/02/11 | 100,000,000.00 | 0.00 | 0.00 | 53,505,142,923.80 |
| 03/09/11 | 100,000,000.00 | 0.00 | 0.00 | 53,605,142,923.80 |
| 03/11/11 | 0.00 | 0.00 | 100,000,000.00 | 53,505,142,923.80 |
| 03/15/11 | 0.00 | 0.00 | 18,284,768,330.00 | 35,220,374,593.80 |
| 03/24/11 | 0.00 | 0.00 | 150,000,000.00 | 35,070,374,593.80 |
| 04/06/11 | 100,000,000.00 | 0.00 | 0.00 | 35,170,374,593.80 |
| 04/08/11 | 0.00 | 0.00 | 100,000,000.00 | 35,070,374,593.80 |
| 04/15/11 | 150,000,000.00 | 0.00 | 0.00 | 35,220,374,593.80 |
| 04/18/11 | 400,000,000.00 | 0.00 | 0.00 | 35,620,374,593.80 |
| 04/28/11 | 150,000,000.00 | 0.00 | 0.00 | 35,770,374,593.80 |
| 04/29/11 | 0.00 | 0.00 | 173,771.61 | 35,770,200,822.19 |
| 05/12/11 | 100,000,000.00 | 0.00 | 0.00 | 35,870,200,822.19 |
| 05/13/11 | 100,000,000.00 | 0.00 | 0.00 | 35,970,200,822.19 |
| 05/16/11 | 500,000,000.00 | 0.00 | 0.00 | 36,470,200,822.19 |
| 05/17/11 | 500,000,000.00 | 0.00 | 0.00 | 36,970,200,822.19 |
| 05/19/11 | 200,000,000.00 | 0.00 | 0.00 | 37,170,200,822.19 |
| 05/23/11 | 0.00 | 0.00 | 600,000,000.00 | 36,570,200,822.19 |
| 05/24/11 | 0.00 | 0.00 | 300,000,000.00 | 36,270,200,822.19 |
| 05/25/11 | 0.00 | 0.00 | 500,000,000.00 | 35,770,200,822.19 |
| 05/27/11 | 100,000,000.00 | 0.00 | 0.00 | 35,870,200,822.19 |
| 05/31/11 | 0.00 | 0.00 | 9,333.68 | 35,870,191,488.51 |
| 06/01/11 | 100,000,000.00 | 0.00 | 0.00 | 35,970,191,488.51 |

| DATE | AMOUNT OF LOAN | CAPITALIZED INTEREST | AMOUNT OF PRINCIPAL REPAID | UNPAID PRINCIPAL BALANCE |
|------|---------------|---------------------|---------------------------|--------------------------|
| 06/06/11 | 250,000,000.00 | 0.00 | 0.00 | 36,220,191,488.51 |
| 06/10/11 | 0.00 | 0.00 | 100,000,000.00 | 36,120,191,488.51 |
| 06/14/11 | 0.00 | 0.00 | 50,000,000.00 | 36,070,191,488.51 |
| 06/20/11 | 0.00 | 0.00 | 100,000,000.00 | 35,970,191,488.51 |
| 06/22/11 | 100,000,000.00 | 0.00 | 0.00 | 36,070,191,488.51 |
| 06/29/11 | 150,000,000.00 | 0.00 | 0.00 | 36,220,191,488.51 |
| 06/30/11 | 0.00 | 29,155,488.05 | 0.00 | 36,249,346,976.56 |
| 07/31/11 | 0.00 | 30,471,805.26 | 0.00 | 36,279,818,781.82 |
| 08/01/11 | 0.00 | 0.00 | 3,113,553.76 | 36,276,705,228.06 |
| 08/31/11 | 0.00 | 32,331,613.64 | 0.00 | 36,309,036,841.70 |
| 09/30/11 | 0.00 | 32,384,635.16 | 0.00 | 36,341,421,476.86 |
| 10/31/11 | 0.00 | 33,572,205.16 | 0.00 | 36,374,993,682.02 |
| 11/30/11 | 0.00 | 32,828,431.80 | 0.00 | 36,407,822,113.82 |
| 12/31/11 | 0.00 | 34,683,810.60 | 0.00 | 36,442,505,924.42 |
| 01/31/12 | 0.00 | 34,770,199.85 | 0.00 | 36,477,276,124.27 |
| 02/29/12 | 0.00 | 30,365,913.88 | 0.00 | 36,507,642,038.15 |
| 03/30/12 | 3,113,553.76 | 0.00 | 0.00 | 36,510,755,591.91 |
| 03/31/12 | 0.00 | 31,380,722.11 | 0.00 | 36,542,136,314.02 |
| 04/30/12 | 0.00 | 29,943,235.50 | 0.00 | 36,572,079,549.52 |
| 05/31/12 | 0.00 | 30,998,189.91 | 0.00 | 36,603,077,739.43 |
| 06/30/12 | 0.00 | 30,173,137.15 | 0.00 | 36,633,250,876.58 |
| 07/31/12 | 0.00 | 31,245,618.93 | 0.00 | 36,664,496,495.51 |
| 08/31/12 | 0.00 | 31,032,320.60 | 0.00 | 36,695,528,816.11 |
| 09/30/12 | 0.00 | 29,689,740.85 | 0.00 | 36,725,218,556.96 |
| 10/31/12 | 0.00 | 30,504,986.73 | 0.00 | 36,755,723,543.69 |
| 11/30/12 | 0.00 | 29,212,661.43 | 1,000,000,000.00 | 35,784,936,205.12 |
| 12/17/12 | 1,000,000,000.00 | 0.00 | 0.00 | 36,784,936,205.12 |
| 12/31/12 | 0.00 | 30,060,292.58 | 0.00 | 36,814,996,497.70 |
| 01/31/13 | 0.00 | 30,338,624.96 | 0.00 | 36,845,335,122.66 |
| 02/28/13 | 0.00 | 27,241,803.16 | 0.00 | 36,872,576,925.82 |
| 03/31/13 | 0.00 | 30,236,844.53 | 0.00 | 36,902,813,770.35 |
| 04/30/13 | 0.00 | 29,196,276.26 | 0.00 | 36,932,010,046.61 |
| 05/31/13 | 0.00 | 30,050,242.81 | 0.00 | 36,962,060,289.42 |
| 06/30/13 | 0.00 | 28,916,651.75 | 0.00 | 36,990,976,941.17 |
| 07/31/13 | 0.00 | 29,786,059.49 | 0.00 | 37,020,763,000.66 |
| 08/31/13 | 0.00 | 29,574,139.44 | 0.00 | 37,050,337,140.10 |
| 09/30/13 | 0.00 | 28,519,497.00 | 0.00 | 37,078,856,637.10 |
| 10/31/13 | 0.00 | 29,215,049.14 | 0.00 | 37,108,071,686.24 |
| 11/30/13 | 0.00 | 28,161,934.15 | 0.00 | 37,136,233,620.39 |
| 12/23/13 | 0.00 | 0.00 | 76,602,072.25 | 37,059,631,548.14 |
| 12/26/13 | 0.00 | 0.00 | 831,365.51 | 37,058,800,182.63 |
| 12/31/13 | 0.00 | 29,076,420.41 | 0.00 | 37,087,876,603.04 |
| 01/23/14 | 0.00 | 0.00 | 20,310,790.83 | 37,067,565,812.21 |
| 01/24/14 | 0.00 | 0.00 | 3,451,115.65 | 37,064,114,696.56 |
| 01/31/14 | 0.00 | 28,836,438.06 | 270,140,860.47 | 36,822,810,274.15 |
| 02/28/14 | 0.00 | 25,793,151.16 | 0.00 | 36,848,603,425.31 |
| 03/31/14 | 0.00 | 28,564,013.80 | 0.00 | 36,877,167,439.11 |
| 04/30/14 | 0.00 | 26,545,414.46 | 0.00 | 36,903,712,853.57 |
| 05/31/14 | 0.00 | 28,527,287.53 | 0.00 | 36,932,240,141.10 |

| DATE | AMOUNT OF LOAN | CAPITALIZED INTEREST | AMOUNT OF PRINCIPAL REPAID | UNPAID PRINCIPAL BALANCE |
|---|---|---|---|---|
| 06/30/14 | 0.00 | 26,726,631.04 | 0.00 | 36,958,966,772.14 |
| 07/31/14 | 0.00 | 28,636,834.08 | 0.00 | 36,987,603,606.22 |
| 08/31/14 | 0.00 | 28,792,794.47 | 0.00 | 37,016,396,400.69 |
| 09/30/14 | 0.00 | 27,801,909.10 | 1,004,332,638.27 | 36,039,865,671.52 |
| 10/27/14 | 0.00 | 0.00 | 499,226,196.26 | 35,540,639,475.26 |
| 10/31/14 | 0.00 | 27,927,326.16 | 0.00 | 35,568,566,801.42 |
| 11/30/14 | 0.00 | 26,836,483.75 | 0.00 | 35,595,403,285.17 |
| 12/24/15 | 0.00 | 0.00 | 1,000,000,000.00 | 34,595,403,285.17 |
| 12/31/14 | 0.00 | 28,024,755.41 | 0.00 | 34,623,428,040.58 |
| 01/31/15 | 0.00 | 27,377,475.24 | 0.00 | 34,650,805,515.82 |
| 02/28/15 | 0.00 | 24,756,751.20 | 0.00 | 34,675,562,267.02 |
| 03/31/15 | 0.00 | 27,535,201.66 | 0.00 | 34,703,097,468.68 |
| 04/01/15 | 0.00 | 26,689,552.99 | 0.00 | 34,729,787,021.67 |
| 05/31/15 | 0.00 | 27,630,281.00 | 0.00 | 34,757,417,302.67 |
| 06/30/15 | 0.00 | 11,519,847.54 | 0.00 | 34,768,937,150.21 |
| 07/31/15 | 0.00 | 11,998,540.93 | 0.00 | 34,780,935,691.14 |
| 08/31/15 | 0.00 | 12,232,110.43 | 0.00 | 34,793,167,801.57 |
| 09/30/15 | 0.00 | 11,740,159.04 | 0.00 | 34,804,907,960.61 |
| 10/31/15 | 0.00 | 11,972,067.18 | 0.00 | 34,816,880,027.79 |
| 11/30/15 | 0.00 | 12,879,153.11 | 0.00 | 34,829,759,180.90 |
| 12/31/15 | 0.00 | 19,110,794.15 | 0.00 | 34,848,869,975.05 |
| 01/31/16 | 0.00 | 18,791,478.71 | 0.00 | 34,867,661,453.76 |
| 02/19/16 | 0.00 | 0.00 | 850,000,000.00 | 34,017,661,453.76 |
| 02/29/16 | 0.00 | 17,768,252.18 | 0.00 | 34,035,429,705.94 |
| 03/31/16 | 0.00 | 18,549,214.65 | 0.00 | 34,053,978,920.59 |
| 04/30/16 | 0.00 | 18,128,068.11 | 0.00 | 34,072,106,988.70 |
| 05/31/16 | 0.00 | 19,266,025.57 | 0.00 | 34,091,373,014.27 |
| 06/30/16 | 0.00 | 18,758,778.01 | 0.00 | 34,110,131,792.28 |
| 07/31/16 | 0.00 | 20,381,656.50 | 0.00 | 34,130,513,448.78 |
| 08/31/16 | 0.00 | 21,289,941.16 | 0.00 | 34,151,803,389.94 |
| 09/30/16 | 0.00 | 20,615,736.12 | 0.00 | 34,172,419,126.06 |
| 10/31/16 | 0.00 | 21,608,578.02 | 0.00 | 34,194,027,704.08 |
| 11/30/16 | 0.00 | 22,955,875.55 | 0.00 | 34,216,983,579.63 |
| 12/20/16 | 0.00 | 0.00 | 500,000,000.00 | 33,716,983,579.63 |
| 12/31/16 | 0.00 | 28,467,946.93 | 0.00 | 33,745,451,526.56 |
| 01/31/17 | 0.00 | 28,428,883.76 | 0.00 | 33,773,880,410.32 |
| 02/28/17 | 0.00 | 25,757,912.58 | 0.00 | 33,799,638,322.90 |
| 03/31/17 | 0.00 | 34,408,801.69 | 0.00 | 33,834,047,124.59 |
| 04/30/17 | 0.00 | 33,693,071.93 | 0.00 | 33,867,740,196.52 |
| 05/31/17 | 0.00 | 36,299,415.72 | 0.00 | 33,904,039,612.24 |
| 06/08/17 | 0.00 | 0.00 | 350,000,000.00 | 33,554,039,612.24 |
| 06/30/17 | 0.00 | 39,973,514.23 | 0.00 | 33,594,013,126.48 |
| 07/31/17 | 311,865,994.00 | 41,492,246.82 | 0.00 | 33,947,371,367.30 |
| 08/31/17 | 0.00 | 41,916,130.17 | 0.00 | 33,989,287,497.47 |
| 09/30/17 | 0.00 | 40,645,522.97 | 0.00 | 34,029,933,020.44 |
| 10/31/17 | 0.00 | 42,265,394.23 | 0.00 | 34,072,198,414.66 |
| 11/30/17 | 0.00 | 44,003,676.38 | 0.00 | 34,116,202,091.05 |
| 12/19/17 | 0.00 | 0.00 | 98,000,000.00 | 34,018,202,091.05 |
| 12/31/17 | 0.00 | 51,870,119.17 | 0.00 | 34,070,072,210.22 |

| DATE | AMOUNT OF LOAN | CAPITALIZED INTEREST | AMOUNT OF PRINCIPAL REPAID | UNPAID PRINCIPAL BALANCE |
|---|---|---|---|---|
| 01/01/18 | 0.00 | 52,029,684.90 | 0.00 | 34,122,101,895.12 |
| 02/28/18 | 0.00 | 49,044,834.46 | 0.00 | 34,171,146,729.58 |
| 03/13/18 | 0.00 | 0.00 | 415,000,000.00 | 33,756,146,729.58 |
| 03/31/18 | 0.00 | 60,840,157.99 | 0.00 | 33,816,986,887.56 |
| 04/30/18 | 0.00 | 59,377,274.62 | 0.00 | 33,876,364,162.18 |
| 05/31/18 | 0.00 | 63,602,506.72 | 0.00 | 33,939,966,668.90 |
| 06/30/18 | 0.00 | 64,829,013.17 | 0.00 | 34,004,795,682.07 |
| 07/31/18 | 0.00 | 66,667,582.66 | 0.00 | 34,071,463,264.73 |
| 08/10/18 | 0.00 | 0.00 | 456,000,000.00 | 33,615,463,264.73 |
| 08/31/18 | 0.00 | 66,138,549.67 | 0.00 | 33,681,601,814.40 |
| 09/30/18 | 0.00 | 68,547,392.61 | 0.00 | 33,750,149,207.01 |
| 10/31/18 | 0.00 | 72,714,696.47 | 0.00 | 33,822,863,903.48 |
| 11/30/18 | 0.00 | 71,852,446.51 | 0.00 | 33,894,716,349.98 |
| 12/31/18 | 0.00 | 79,385,455.40 | 0.00 | 33,974,101,805.38 |
| 01/31/19 | 0.00 | 78,957,020.56 | 0.00 | 34,053,058,825.95 |
| 02/28/19 | 0.00 | 71,226,702.13 | 0.00 | 34,124,285,528.07 |
| 03/31/19 | 0.00 | 79,383,041.06 | 0.00 | 34,203,668,569.13 |
| 04/15/19 | 0.00 | 0.00 | 165,000,000.00 | 34,038,668,569.13 |
| 04/22/19 | 0.00 | 0.00 | 125,000,000.00 | 33,913,668,569.13 |
| 04/29/19 | 0.00 | 0.00 | 147,000,000.00 | 33,766,668,569.13 |
| 04/30/19 | 0.00 | 76,174,884.80 | 0.00 | 33,842,843,453.93 |
| 05/06/19 | 0.00 | 0.00 | 114,000,000.00 | 33,728,843,453.93 |
| 05/17/19 | 0.00 | 0.00 | 25,000,000.00 | 33,703,843,453.93 |
| 05/31/19 | 0.00 | 76,647,629.57 | 0.00 | 33,780,491,083.50 |
| 06/30/19 | 0.00 | 73,258,061.99 | 0.00 | 33,853,749,145.49 |
| 07/31/19 | 0.00 | 70,966,655.14 | 0.00 | 33,924,715,800.63 |
| 08/31/19 | 0.00 | 67,540,339.75 | 0.00 | 33,992,256,140.38 |
| 09/30/19 | 0.00 | 63,211,432.98 | 0.00 | 34,055,467,573.36 |
| 10/31/19 | 0.00 | 58,237,006.91 | 0.00 | 34,113,704,580.27 |
| 11/30/19 | 0.00 | 54,255,004.33 | 0.00 | 34,167,959,584.60 |
| 12/31/19 | 0.00 | 58,826,577.39 | 0.00 | 34,226,786,161.99 |
| 01/31/20 | 0.00 | 54,385,174.78 | 0.00 | 34,281,171,336.77 |
| 02/29/20 | 0.00 | 49,801,038.45 | 0.00 | 34,330,972,375.22 |
| 03/31/20 | 0.00 | 35,161,381.38 | 0.00 | 34,366,133,756.60 |
| 04/30/20 | 0.00 | 17,287,024.43 | 0.00 | 34,383,420,781.03 |
| 05/31/20 | 0.00 | 11,032,808.08 | 0.00 | 34,394,453,589.11 |
| 06/11/20 | 1,919,704,373.00 | 0.00 | 0.00 | 36,314,157,962.11 |
| 06/30/20 | 0.00 | 11,244,822.80 | 0.00 | 36,325,402,784.91 |
| 07/31/20 | 0.00 | 11,296,221.50 | 0.00 | 36,336,699,006.41 |
| 08/31/20 | 0.00 | 11,111,994.71 | 0.00 | 36,347,811,001.12 |
| 09/30/20 | 0.00 | 10,499,368.11 | 0.00 | 36,358,310,369.22 |
| 10/31/20 | 0.00 | 10,930,752.33 | 0.00 | 36,369,241,121.55 |
| 11/30/20 | 0.00 | 10,509,195.30 | 0.00 | 36,379,750,316.85 |
| 12/31/20 | 0.00 | 10,862,639.75 | 0.00 | 36,390,612,956.61 |
| 01/31/21 | 0.00 | 10,051,137.84 | 0.00 | 36,400,664,094.45 |
| 02/28/21 | 0.00 | 8,904,006.89 | 0.00 | 36,409,568,101.34 |
| 03/22/21 | 0.00 | 0.00 | 106,260,740.00 | 36,303,307,361.34 |
| 03/31/21 | 0.00 | 9,663,196.95 | 0.00 | 36,312,970,558.29 |
| 04/30/21 | 0.00 | 9,479,198.36 | 0.00 | 36,322,449,756.64 |

| DATE | AMOUNT OF LOAN | CAPITALIZED INTEREST | AMOUNT OF PRINCIPAL REPAID | UNPAID PRINCIPAL BALANCE |
|---|---|---|---|---|
| 05/25/21 | 600,444,846.00 | 0.00 | 0.00 | 36,922,894,602.64 |
| 05/31/21 | 0.00 | 9,171,251.40 | 0.00 | 36,932,065,854.04 |
| 06/30/21 | 0.00 | 9,363,817.53 | 0.00 | 36,941,429,671.57 |
| 07/31/21 | 0.00 | 9,288,717.26 | 0.00 | 36,950,718,388.83 |
| 08/31/21 | 0.00 | 9,100,140.81 | 0.00 | 36,959,818,529.64 |
| 09/30/21 | 0.00 | 8,751,161.03 | 0.00 | 36,968,569,690.67 |
| 10/31/21 | 0.00 | 9,116,634.13 | 0.00 | 36,977,686,324.80 |
| 11/30/21 | 0.00 | 8,947,983.79 | 0.00 | 36,986,634,308.59 |
| 12/31/21 | 0.00 | 9,690,241.34 | 0.00 | 36,996,324,549.93 |
| 01/31/22 | 0.00 | 9,716,673.57 | 0.00 | 37,006,041,223.51 |
| 02/28/22 | 0.00 | 11,759,656.43 | 0.00 | 37,017,800,879.93 |
| 03/31/22 | 0.00 | 20,956,527.72 | 0.00 | 37,038,757,407.65 |
| 04/30/22 | 0.00 | 29,745,517.42 | 0.00 | 37,068,502,925.07 |
| 05/31/22 | 0.00 | 40,273,909.05 | 0.00 | 37,108,776,834.11 |
| 06/30/22 | 0.00 | 57,708,477.34 | 0.00 | 37,166,485,311.45 |
| 07/31/22 | 0.00 | 82,324,787.04 | 0.00 | 37,248,810,098.49 |
| 08/31/22 | 0.00 | 88,656,306.79 | 0.00 | 37,337,466,405.29 |
| 09/30/22 | 0.00 | 103,153,774.17 | 0.00 | 37,440,620,179.46 |
| 10/31/22 | 0.00 | 127,474,557.94 | 0.00 | 37,568,094,737.40 |
| 11/30/22 | 0.00 | 133,724,572.42 | 0.00 | 37,701,819,309.82 |
| 12/14/22 | 0.00 | 60,860,968.22 | 126,877,725.25 | 37,635,802,552.79 |

**<u>Exhibit G</u>**

**Compensation Plan Restoration Lapse Letter**



**AIG Financial Products Corp.**
50 Danbury Road, Wilton, CT 06897-4444
(203) 222-4700  (800) 248-SWAP
Fax: (203) 222-4780  Telex: 910-2409432  AIGFPC

**CONFIDENTIAL**

To:   DCP/SIP Participant

Date:  July 31, 2014

Re:   Account Statements, 2007 Special Incentive Plan and
      Deferred Compensation Plan

Enclosed herewith is the final statement of your account balance in the 2007 Special
Incentive Plan ("SIP") and the Deferred Compensation Plan ("DCP") as of January 1,
2014.

As explained in previous correspondence, your DCP and SIP accounts carry a negative
balance based on losses sustained by AIGFP and taken into account pursuant to Section
4.01(b) of the DCP and the SIP. As noted previously, the negative balances do not create
any obligation on your part to pay any amount to AIGFP. Moreover, while Section
4.01(b) provides for the restoration of losses after providing for the satisfaction of all
other creditors, no restoration has been possible given the magnitude of losses sustained
by AIGFP. Pursuant to amended Section 4.01(b), this restoration obligation lapsed as of
December 31, 2013 for all U.S. taxpayers and there is no further liability to such
participants under the DCP and SIP Plans. Accordingly, the Company will no longer
issue DCP and SIP account statements to participants who are US taxpayers.

TO:  DCP/SIP Participants

The enclosed memo was to accompany your DCP and SIP statements that you received in July of
this year.

**<u>Exhibit H</u>**

**Complaint in Connecticut Litigation (Without Exhibits)**

RETURN DATE:      DECEMBER 31, 2019

D.N. _____

| | |
|---|---|
| LEE ARTHURS; DAVID ACKERT; MITCHELL BELL; ERIK BENGTSON; PAUL BRADSHAW; THOMAS BUTTKE; JOHN CAPPETTA; DAVID CHANG; ROBERT CHANG; JASON DESANTIS; RICHARD FABBRO; KENNETH FARRAR; JONATHAN FRAADE; CARL GIESLER JR.; JAMES HAAS; CHARLES HSIEH; THOMAS KALB; THOMAS KUSHNER; ROBERT LEARY; JONATHAN LIEBERGALL; NATHANIEL LITWAK; BRENDAN LYNCH; ALFRED MEDIOLI; MATTHEW MIHALY; JOANN PALAZZO; EUGENE PARK; ANDREW PARTNER; CARL PETERSON; STEVEN PIKE; THOMAS PLAGEMANN; ROBERT POWELL; DANIEL RAAB; ANN REED; PAUL SCHREINER; DMITRY SATANOVSKY; MARY HEATHER SINGER; KEITH STEIN; FRANK STROHM; TIMOTHY SULLIVAN JR.; CHRIS TOFT; JOE TOM; RYAN VETTER; STEVEN WAGAR; THOMAS WARD; MARTIN WAYNE; JAMES WOLF, | : SUPERIOR COURT<br><br>: J.D. OF FAIRFIELD<br><br>: AT BRIDGEPORT<br><br>:<br><br>:<br><br>:<br><br>:<br><br>: |
| v. | : |
| AIG FINANCIAL PRODUCTS CORP. | : DECEMBER 6, 2019 |

## **COMPLAINT**

## **COUNT ONE: BREACH OF THE DCP**

1.      The plaintiffs—46 former employees of AIG Financial Products Corp. ("AIG FP"), a wholly-owned subsidiary of American International Group, Inc. ("AIG")—bring this action to recover millions of dollars in damages caused by AIG FP's breaches of contract and violations of Connecticut labor law.

2.      The events that give rise to this action are described in detail below.  In short, while working for AIG FP before and during the 2008 financial crisis, the plaintiffs participated in certain bonus compensation plans with AIG FP that required them to defer significant portions of their bonus and other compensation.  Those plans were: the Deferred Compensation Plan ("DCP"), the Special Incentive Plan ("SIP"), and the Employee Retention Plan ("ERP" and collectively, the

"Plans"). Each of the plaintiffs was a Participant in the DCP, and many were also Covered Executives pursuant to the SIP.

3.      Pursuant to the Plans, the plaintiffs' deferred compensation was credited to Deferred Compensation Accounts ("DCAs") established by the DCP, or SIP accounts established by the SIP ("SIP Accounts"). The DCAs and SIP Accounts were created in each of the plaintiffs' names and maintained on AIG FP's books.

4.      The stated purposes of the Plans were (i) to incentivize performance by top employees, (ii) to provide employees with equity in AIG FP so that their interests would be aligned with those of AIG FP's shareholders, and (iii) to encourage retention.

5.      According to the Plans, AIG FP was to make installment payments with interest on the plaintiffs' DCA and SIP Account balances. AIG FP was also permitted to use the money in the plaintiffs' DCAs and SIP Accounts as capital to fund its business, so long as it later restored and paid the money it took from the plaintiffs' accounts.

6.      In addition to the compensation the plaintiffs were required to defer into their DCAs and SIP Accounts, AIG FP repeatedly implored the plaintiffs to voluntarily defer more money into the accounts, and assured them that they were making a good investment in their employer's business.

7.      In or around 2007 through early 2009, AIG and AIG FP were reportedly at the brink of insolvency and needed to increase their liquidity.

8.      Around the same time, AIG FP credited its losses against the plaintiffs' DCAs and SIP Account balances—which resulted in the fiction that the DCA and SIP Account balances were negative—so as to avoid paying the plaintiffs their deferred compensation and bonuses.

9.     Thereafter, AIG FP stopped making installment payments to the plaintiffs on the purported basis that the DCA and SIP Account balances were negative.

10.     At the same time, AIG FP assured its employees that it would restore the DCA and SIP Account balances (as AIG FP was contractually obligated to do by the Plans), and pay the plaintiffs the money they were owed.

11.     With these assurances in place, AIG FP continued to require employees to defer compensation into their DCAs and SIP Accounts and to encourage them to defer even more compensation into these accounts voluntarily.  Thus, despite the fictionally negative balances in their accounts, and in the midst of the financial crisis, the plaintiffs were required to continue to defer their compensation into their DCA and SIP Accounts with the understanding that AIG FP would eventually pay them back.

12.     Upon information and belief, after the 2008 financial crisis, AIG returned to profitability in July 2011 and repaid all debts owed to the U.S. Government by December 2012 so that the Government realized a profit of over $20 billion.

13.     Pursuant to the DCP and SIP, AIG FP was required to restore the plaintiffs' DCA and SIP Account balances to their full amounts.  In particular, AIG FP had until the end of 2013 to restore and pay the amounts AIG FP took from the DCA and SIP accounts, plus interest.

14.     However, in breach of its obligations, in a letter dated July 31, 2014, AIG FP informed the plaintiffs that it would not restore or pay their DCA or SIP Account balances.

15.     Upon information and belief, in 2019, AIG was ranked 66th in the Fortune 500 list. Today, AIG's profits are in the billions of dollars, and it continues to operate globally in the financial and insurance industries.

16.     Today, AIG FP also continues to operate as a going concern and a wholly-owned subsidiary of AIG.

17.     Pursuant to a guarantee agreement (the "General Guarantee Agreement") between AIG and AIG FP, AIG is required to pay the obligations of AIG FP, which means that AIG FP has remained solvent throughout this time.

18.     Despite its return to profitability, repayment of its government obligations, its continuation as a solvent business, and its legal obligations under the Plans, AIG FP did not adopt a repayment plan to restore the deferred compensation it owed to the plaintiffs.

19.     As a result of, among other things, AIG FP's failure to (i) restore and pay the DCA and SIP Account balances by the end of 2013, or (ii) adopt a restoration plan when it was able to do so to return the money it owes to the plaintiffs, the plaintiffs have been damaged in excess of $185 million.

## I.     THE PARTIES:

### *The Plaintiffs:*

20.     Many of the plaintiffs currently reside in Connecticut, and the subject matter of this action is the same with respect to all of the plaintiffs.

21.     Plaintiff Lee Arthurs is a resident of New York, New York. Mr. Arthurs was employed by AIG FP from August of 1988 to January of 2006.

22.     Plaintiff David Ackert is a resident of Nevada. Mr. Ackert was employed by AIG FP from March of 1994 to February of 2007.

23.     Plaintiff Mitchell Bell is a resident of Connecticut. Mr. Bell was employed by AIG FP from March of 1998 to August of 2011.

24.     Plaintiff Erik Bengtson is a resident of New York. Mr. Bengtson was employed by AIG FP from June of 1994 to June of 2009.

25.     Plaintiff Paul Bradshaw is a resident of Westport, Connecticut. Mr. Bradshaw was employed by AIG FP from February of 1996 to September of 2010.

26.     Plaintiff Thomas Buttke is a resident of Weston, Connecticut. Mr. Buttke was employed by AIG FP from August of 1997 to July of 2009.

27.     Plaintiff John Cappetta is a resident of La Jolla, California. Mr. Cappetta was employed by AIG FP from October of 1992 to February of 2006.

28.     Plaintiff David Chang is a resident of Connecticut. Mr. Chang was employed by AIG FP from May of 2001 to November of 2015.

29.     Plaintiff Robert Chang is a resident of Greenwich, Connecticut. Mr. Chang was employed by AIG FP from March of 1995 to December of 2015.

30.     Plaintiff Jason DeSantis is a resident of Redding, Connecticut. Mr. DeSantis was employed by AIG FP from June of 1998 to May of 2009.

31.     Plaintiff Richard Fabbro is a resident of Scarsdale, New York. Mr. Fabbro was employed by AIG FP from March of 1994 to February of 2010.

32.     Plaintiff Kenneth Farrar is a resident of Norwalk, Connecticut. Mr. Farrar was employed by AIG FP from April of 2003 to October of 2008.

33.     Plaintiff Jonathan Fraade is a resident of Connecticut. Mr. Fraade was employed by AIG FP from April of 1996 to May of 2009.

34.     Plaintiff Carl Giesler Jr. is a resident of Texas. Mr. Giesler was employed by AIG FP from September of 2007 to December of 2008.

35.     Plaintiff James Haas is a resident of Florida. Mr. Haas was employed by AIG FP from March of 1996 to July of 2011.

36.     Plaintiff Charles Hsieh is a resident of Stamford, Connecticut. Mr. Hsieh was employed by AIG FP from September of 2000 to March of 2010.

37.     Plaintiff Thomas Kalb is a resident of Houston, Texas. Mr. Kalb was employed by AIG FP from July of 2003 to June of 2006.

38.     Plaintiff Thomas Kushner is a resident of Connecticut. Mr. Kushner was employed by AIG FP from July of 2004 to October of 2008.

39.     Plaintiff Robert Leary is a resident of Florida. Mr. Leary was employed by AIG FP from April of 1995 to July of 2007.

40.     Plaintiff Jonathan Liebergall is a resident of South Carolina. Mr. Liebergall was employed by AIG FP from May of 1991 to January of 2016.

41.     Plaintiff Nathaniel Litwak is a resident of Chappaqua, New York. Mr. Litwak was employed by AIG FP from May of 2002 to May of 2009.

42.     Plaintiff Brendan Lynch is a resident of Fairfield, Connecticut. Mr. Lynch was employed by AIG FP from November of 1993 to January of 2011.

43.     Plaintiff Alfred Medioli is a resident of New Jersey. Mr. Medioli was employed by AIG FP from November of 1991 to August of 2009.

44.     Plaintiff Matthew Mihaly is a resident of Trumbull, Connecticut. Mr. Mihaly was employed by AIG FP from March of 1998 to October of 2011.

45.     Plaintiff JoAnn Palazzo is a resident of Connecticut. Ms. Palazzo was employed by AIG FP from January of 1990 to December of 2006.

46.     Plaintiff Eugene Park is a resident of Weston, Connecticut. Mr. Park was employed by AIG FP from March of 2000 to January of 2007.

47.     Plaintiff Andrew Partner is a resident of Norwalk, Connecticut. Mr. Partner was employed by AIG FP from November of 1987 to June of 2016.

48.     Plaintiff Carl Peterson is a resident of Texas. Mr. Peterson was employed by AIG FP from July of 2003 to March of 2008.

49.     Plaintiff Steven Pike is a resident of Littleton, Colorado. Mr. Pike was employed by AIG FP from July of 2003 to April of 2007.

50.     Plaintiff Thomas Plagemann is a resident of New York, New York. Mr. Plagemann was employed by AIG FP from October of 2004 to September of 2009.

51.     Plaintiff Robert Powell is a resident of Connecticut. Mr. Powell was employed by AIG FP from October of 1997 to October of 2009.

52.     Plaintiff Daniel Raab is a resident of New Jersey. Mr. Raab was employed by AIG FP from July of 2003 to April of 2009.

53.     Plaintiff Ann Reed is a resident of Darien, Connecticut. Ms. Reed was employed by AIG FP from February of 2003 to July of 2009.

54.     Plaintiff Dmitry Satanovsky is a resident of Weston, Connecticut. Mr. Satanovsky was employed by AIG FP from January of 2004 to March of 2019.

55.     Plaintiff Paul Schreiner is a resident of Connecticut. Mr. Schreiner was employed by AIG FP from April of 1998 to August of 2009.

56.     Plaintiff Mary Heather Singer is a resident of West Hartford, Connecticut. Ms. Singer was employed by AIG FP from February of 1997 to February of 2006.

57.   Plaintiff Keith Stein is a resident of Weston, Connecticut. Mr. Stein was employed by AIG FP from November of 1993 to March of 2007.

58.   Plaintiff Frank Strohm is a resident of Austin, Texas. Mr. Strohm was employed by AIG FP from January of 1994 to May of 2006.

59.   Plaintiff Timothy Sullivan Jr. is a resident of Houston, Texas. Mr. Sullivan was employed by AIG FP from July of 2003 to April of 2007.

60.   Plaintiff Chris Toft is a resident of Weston, Connecticut. Mr. Toft was employed by AIG FP from April of 2003 to November of 2015.

61.   Plaintiff Joe Tom is a resident of River Vale, New Jersey. Mr. Tom was employed by AIG FP from June of 1996 to April of 2015.

62.   Plaintiff Ryan Vetter is a resident of New York. Mr. Vetter was employed by AIG FP from April of 2006 to October of 2008.

63.   Plaintiff Steven Wagar is a resident of Norwalk, Connecticut. Mr. Wagar was employed by AIG FP from February of 1996 to May of 2016.

64.   Plaintiff Thomas Ward is a resident of Connecticut. Mr. Ward was employed by AIG FP from February of 1987 to April of 2017.

65.   Plaintiff Martin Wayne is a resident of Bedford, New York. Mr. Wayne was employed by AIG FP from January of 1987 to late 2008.

66.   Plaintiff James Wolf is a resident of Texas. Mr. Wolf was employed by AIG FP from February of 1995 to January of 2007.

***The Defendant:***

67.   Defendant AIG FP is a division of and wholly owned subsidiary company of AIG. AIG FP is located at 50 Danbury Road, Wilton, Connecticut, 06897.

## II.   JURISDICTION

68.   This Court may properly exercise personal jurisdiction over AIG FP under Connecticut law and the due process clause of the Fourteenth Amendment to the United States Constitution.  For example, personal jurisdiction over defendant AIG FP is proper in Connecticut under C.G.S.A § 33-929.

69.   Personal jurisdiction over defendant AIG FP is proper in Connecticut because, among other things, AIG FP currently maintains a principal place of business in Connecticut, at 50 Danbury Road, Wilton, Connecticut, 06897.

70.   According to its corporate registration with the Connecticut Secretary of State, AIG FP is a registered business entity in Connecticut and has appointed an agent for service of process in Connecticut: R & C Service Company, which has a business address at 280 Trumbull Street, Hartford, CT, 06103.

71.   According to AIG FP's current registration information in Connecticut, AIG FP's principals maintain a business address at 50 Danbury Road, Wilton, Connecticut, 06897, which is the same as AIG FP's business address in Connecticut.

72.   AIG FP's Managing Director and General Counsel, Gregory J. Ruffa, is identified as one of AIG FP's principals in its Corporate Registration and maintains a Connecticut address in Wilton, Connecticut.

73.   AIG FP's Chief Financial Officer, Timothy Allison, is identified as one of AIG FP's principals in its Corporate Registration and maintains a Connecticut address in Wilton, Connecticut.

74.   AIG FP's Executive Vice President, Timothy Prister, is identified as one of AIG FP's principals in its Corporate Registration and maintains a Connecticut address in Wilton, Connecticut.

75.     Further, AIG FP employed each of the plaintiffs during the times relevant to this action at its principal place of business in Connecticut.

76.     AIG FP and the plaintiffs were parties to the DCP and SIP, agreements which were made and intended to be performed in Connecticut. The plaintiffs were employed and performed services or other work for AIG FP under the terms of their employment in Connecticut, and performed their obligations under the terms of the DCP and the SIP in Connecticut.

77.     In 2019, AIG FP admitted in a proceeding related to this dispute (the English Judgment, discussed in detail below) that it is headquartered in Connecticut.

78.     Further, as explained in detail below in Count Four, AIG FP's refusal to pay the plaintiffs' wages violated one or more of Connecticut's wage and hour laws.

## III.     THE DCP AGREEMENT

79.     The DCP is an agreement among participating employees ("Participants") and AIG FP.

80.     The DCP was adopted in or around December 1995, and was amended thereafter. The relevant version of the DCP is attached as Exhibit A.

81.     The DCP is governed by Connecticut law. *See* DCP § 4.05.

82.     Each of the plaintiffs was a "Participant" in the DCP. *See* DCP § 1.13 ("'Participant' shall mean an Executive who is participating in this Deferred Compensation Plan.").

83.     The purpose of the DCP was to incentivize employees with bonuses, encourage retention, and promote AIG's business. For example, the preamble of the DCP stated:

> The Plan provides the Plan participants a sharing of the risks and rewards of AIGFP's business and reflects the participants' commitment to the long term integrity of AIGFP. The Plan objectives are:
>    1. To promote the formation of capital in AIGFP;

2. To ensure that the interests of AIGFP Executives and AIG are aligned to promote the long term success of AIGFP;

3. To focus AIGFP on success measured not only by revenue growth but also by return on capital, quality of earnings, and enhancement of the AIG name and reputation in financial services;

4. To serve as an investment opportunity that will attract the most talented people to AIGFP and to retain those already here; and

5. To be simple, straightforward and efficient. DCP at 2 (preamble).

84.     The DCP explained that under a pre-existing arrangement with AIG, Distributable

Income was paid 70% to AIG and 30% to AIG FP employees. *See* DCP at 2 (preamble). The

DCP formalized this practice:

> Under the existing arrangement with AIG, Distributable Income is paid each year on the basis of 70% to AIG and 30% to AIGFP employees. Under the Plan a portion of the Distributable Income, apportioned 70% from AIG and 30% from AIGFP Executives, will not be paid currently but instead will be retained by AIGFP. Such retention will form part of the capital base of AIGFP and, absent losses which exhaust current revenues and reserves, will be paid subsequently to participants according to a schedule tied to the duration of AIGFP's business. The Plan will be administered so that the amounts retained under the Plan will be apportioned between AIG and AIGFP Executives on a 70%/30% basis. DCP at 2-3 (preamble).

85.     Distributable Income was defined to mean "with respect to any financial year of

AIGFP, revenues, less expenses and credit and market reserves taken for that year, as the same

shall be determined by the Board from time to time." DCP § 1.08.

86.     Pursuant to the terms of the DCP, each Participant was assigned a DCA on AIG

FP's books. "Deferred Compensation Account" was defined to mean "the account established on

AIG Financial Product Corp.'s books in the name of each Participant and of AIG in which,

pursuant to Section 3 of this Deferred Compensation Plan, Deferred Compensation amounts are

credited to such Participants and to AIG." DCP § 1.07.

87.    Rather than receive cash bonuses, under the DCP, Participants received a Notional

Bonus Amount.  "Notional Bonus Amount" was defined to mean:

> for each Participant in respect of any calendar year, the total notional bonus amount awarded to the Participant from all AIGFP companies, consisting of a cash bonus amount that is paid currently and an amount of Deferred Compensation that is credited by AIGFP to the Participant's Deferred Compensation Account and distributed to the Participant on a deferred basis subject to and in accordance with the terms hereof. DCP § 1.12.

88.    "Deferred Compensation" was defined to mean:

> with respect to each deferral, (i) as applied to each Participant, the portion of the Participant's Notional Bonus Amount that is deferred by AIGFP pursuant to Section 3 of this Deferred Compensation Plan, including both amounts subject to automatic deferral and voluntary deferrals and (ii) as applied to AIG, the amount of annual Distributable Income of AIGFP that is otherwise payable by AIGFP to AIG that is subject to automatic deferral pursuant to Section 3 of this Deferred Compensation Plan. DCP § 1.06.

89.    AIG FP was also required to credit each Participants' DCA with their portion of the

30% of Distributable Income due to AIG FP employees, which was called an "Additional Return

Payment" (or "equity kicker").  For example, DCP § 3.04 provided:

> Additional Return Payment to AIGFP Executives. In addition to interest payable on Deferred Compensation in accordance with Section 3.03, the Deferred Compensation Accounts of Participants (but not AIG) may be credited as of the Interest Reset Date falling in January of each year . . . with such additional earnings of AIGFP (the "Additional Return Payment") as the President of AIGFP, with the approval of the Board, shall determine; provided that any Additional Return Payments (i) shall be payable only to Participants who are employees of AIGFP as of the date of payment therefor and (ii) shall be allocated among such eligible Participants' Deferred Compensation Accounts on a pro rata basis. Additional Return Payments shall be paid to eligible Participants on each Interest Payment Date for the Interest Period beginning in October of each year based on the balance in such Participants' Deferred Compensation Accounts as of the Interest Reset Date for the Interest Period beginning in October of such year. For the avoidance of doubt, Additional Return Payments shall be paid out of the 30%

portion of annual Distributable Income that is allocable to AIGFP employees. All Additional Return Payments shall be paid net of any taxes required by law to be withheld by AIGFP.

90.     The plaintiffs earned interest on their DCA balances on a quarterly basis.  DCP §

3.03.  For example, DCP § 3.05(e) provided:

> All payments of interest, Installment Payments and Additional Return Payments, and any early distribution of amounts credited to a Participant's Deferred Compensation Account, shall be paid to such Participants from the company or companies from which such payment represents compensation for services provided by such Participant; provided that for Participants whose employment has been transferred from an AIGTG group company to an AIG Financial Products Corp. group company in the same country, all such payments shall be paid from the AIG Financial Products Corp. group company to which the Participant has been transferred.

91.     Credit for Deferred Compensation was to be applied to each DCA by December 31

of that year.  *See* DCP § 3.02.  However, the credit would not be payable until the next year's

fourth quarter interest payment was due, which would be the first quarter of the following year.

*See* DCP § 3.05(b).  For example, a December 31, 2006 credit would generate a first scheduled

installment payment in January 2008, payable at the same time as Q4 2007 interest.

92.     AIG FP was required to provide Participants with quarterly statements that included

information about their DCA balances and AIG FP's financial performance.  For example, DCP

§ 4.07 provided:

> For so long as the Deferred Compensation Plan is in effect, AIGFP shall provide each Participant and AIG with quarterly Deferred Compensation account statements setting forth (i) the Participant's or AIG's (as the case may be) Deferred Compensation account balance, (ii) the amount of interest and, for account statements covering the quarterly period in which such amounts would be paid, the Additional Return Payment and Installment Payment, if any, paid on such balance during such quarterly period and (iii) the Installment Payment schedule for the Participant or AIG. In addition, AIGFP shall provide Participants and AIG with an AIGFP annual financial summary (which shall include a statement of the

average life of AIGFP's swap transaction portfolio as of the date of such financial information), and shall endeavor to keep Participants who are then employees of AIGFP apprised of material developments involving AIGFP's business or accounting procedures applicable to AIGFP insofar as they relate to the Deferred Compensation Plan.

93.     If a Participant died or was permanently disabled, a Participant's total DCA balance became payable as a lump sum. *See* DCP § 3.05(a). In addition, a Committee of AIG FP's CEO, COO, CFO, and Secretary, could direct an Early Distribution of a DCA balance, subject to approval by the Board. *See* DCP § 3.05(c).

94.     If there was no early distribution, DCA credits were payable according to an installment payment schedule provided by DCP § 3.05(b):

> Except as provided below, amounts in the Participant's Deferred Compensation Account attributable to Deferred Compensation contributions shall be paid to such Participant and to AIG annually in arrears on the Interest Payment Date for the Interest Period beginning in October of each year in equal pro rata installments ("Installment Payments") over a period of time (the "Distribution Period") corresponding to the approximate average life of AIGFP's swap transaction portfolio, as last determined by the Board before the beginning of the calendar year preceding the date of the Deferred Compensation contribution. However, for calendar year 2009 and 2010, the period of time that shall be used is six years, and as to Deferred Compensation contributions made prior to 2009, the installment schedule established under this section as in effect prior to December 31, 2008 shall remain applicable. The Distribution Period for a Deferred Compensation contribution shall commence on the Interest Reset Date in January of the calendar year next succeeding the calendar year in respect of which the Deferred Compensation contribution was made, with the first Installment Payment therefore being distributed on the Interest Payment Date for the Interest Period beginning in October of the calendar year in which the Distribution Period commences. Installment Payments shall be paid net of any taxes required by law to be withheld by AIGFP.

95.     AIG FP was permitted to reduce DCA balances in the event that AIG FP sustained realized losses, so long as AIG FP adopted a repayment plan with a defined payment schedule.

For example, DCP § 4.01(b) provided:

> The outstanding balance credited to the Deferred Compensation Accounts of each Participant and of AIG shall be subject to reduction, from time to time, to the extent of any losses incurred (i) by AIGFP (excluding AIGTG) or (ii) by AIGTG resulting from transactions entered into on or after January 1, 2003, which losses in the case of (i) and (ii) for any year in the aggregate exceed the outstanding market and credit reserves and current year income of AIGFP (excluding outstanding market and credit reserves relating to transactions entered into by AIGTG before January 1, 2003), but before base capital of AIGFP (for the avoidance of doubt including AIGTG, and consisting of equity, retained earnings, if any, and subordinated debt). Such reductions shall be made among the Participants . . . and AIG on a pro rata basis. **AIG Financial Products Corp. shall be obligated subsequently to restore amounts so deducted from Participants' and AIG's account balances, plus accrued interest thereon at the interest rate determined in accordance with Section 3.03 and, in connection therewith, the Board shall adopt a plan (which shall not be subject to the approval of AIG or the Participants) setting forth a schedule under which AIG Financial Products Corp. shall restore amounts deducted from Participants' and AIG's account balances (plus accrued interest thereon).** Any such restoration plan shall provide that any restored amounts shall be paid in 2013; to the extent amounts have not been restored by December 31, 2013, all restoration rights shall permanently lapse except to the extent AIG Financial Products Corp. determines that it may amend the Plan to provide for payment of restored amounts without violating Internal Revenue Code Section 409A. (Emphasis added).

96.    Accordingly, pursuant to DCP § 4.01(b), even assuming the 2008 amendment was valid, AIG FP was obligated to restore and pay any amounts deducted from the DCAs, plus interest, by December 31, 2013, and was obligated to adopt a restoration plan in order to do so.

97.    If a Participant stopped working at AIG FP, AIG FP was required to continue distributing their DCA balance.  For example, DCP § 4.03 provided:

> Continuation as Employee. . . . Except as provided in the next sentence, Participants who cease to be employees of AIGFP shall not lose their Deferred Compensation, which shall continue to be distributed as provided in Section 3.05 and to earn interest as provided in Section 3.03 (but not Additional Return Payments

pursuant to Section 3.04). Notwithstanding any provision herein to the contrary, Participants who steal or embezzle from AIG or AIGFP or engage in an act of dishonesty, disloyalty or breach of trust against AIG or AIGFP that is comparable to theft or embezzlement shall lose their right to Deferred Compensation, including all amounts then credited to their Deferred Compensation Account and any interest accrued thereon.

98. DCP § 4.09 stated the intention that amounts awarded or deferred pursuant to the DCP would not be taxable under Internal Revenue Code Section 409A:

It is intended that amounts awarded or deferred under this Plan will not be taxable under Internal Revenue Code Section 409A. This Plan shall be interpreted and administered, to the extent possible, in a manner that does not result in a "plan failure" (within the meaning of Internal Revenue Code Section 409A(a)(1)) of this Plan or any other plan or arrangement maintained by AIG-FP or any affiliate.

## IV.   AIG FP'S CONDUCT

### *AIG FP Fails to Pay Plaintiffs Under the DCP and SIP*

99. In 2007, because of changes in the way AIG FP booked its losses and the declining financial market at the time, there was a large, negative impact on AIG FP's 2007 Distributable Income. As a result, there was also a large, negative impact on 2007 bonuses (cash and deferred), and there were no 2007 Additional Return Payments (or "equity kickers").

100. As discussed below, the SIP was launched in December 2007 to incentivize employees to continue working for AIG FP in spite of these developments.

101. On Monday, September 15, 2008, Lehman Brothers Holdings filed for Chapter 11 protection in New York, an event which triggered a global financial crisis.

102. Shortly after the Lehman bankruptcy, in October 2008, AIG FP and AIG reportedly were brought to the brink of collapse. Purportedly, AIG FP's 2008 losses overwhelmed not only reserves, current year income, and DCA balances, but also base capital.

103.    Deeming AIG "too big to fail," the Federal Reserve Bank of New York provided AIG with emergency funding.  The funding was agreed in principle on September 16, 2008, and formalized shortly thereafter.

104.    Pursuant to its agreement with the Federal Government, AIG received a revolving credit facility of $85 billion.  In turn, AIG extended AIG FP a revolving credit facility of $65 billion.  The two credit facilities were formalized on the same day: September 22, 2008.

105.    In September 2008, as part of AIG's bailout, then-Chairman of Allstate Insurance, Edward Liddy, was appointed as AIG's interim chairman and chief executive officer ("CEO"). This was done at the request of then-Secretary of the U.S. Department of Treasury Hank Paulson. Mr. Liddy assumed his role at AIG for a nominal annual salary of $1.

106.    Executive compensation was a focal point of the bailout and a source of political tension.  For example, in a letter to Mr. Liddy, dated October 22, 2008, then Attorney General of New York Andrew Cuomo cautioned that "until the taxpayers are repaid with interest…no funds should be paid out of [AIG's deferred compensation and bonus] pools to any executives."

107.    Despite the difficult political climate, AIG's position was that its employees, including the plaintiffs, were entitled to and would receive the compensation they were owed in connection with work they had already performed.  In an October 16, 2008 Joint Statement from the N.Y. Attorney General and AIG, Inc., Attorney General Cuomo said, "[t]hese actions are not intended to jeopardize the hard-earned compensation of the vast majority of AIG's employees, including retention and severance arrangements, who are essential to rebuilding AIG and the economy of New York.'"

108.    Upon information and belief, in early October 2008, AIG FP decided that at the year end, Participants' balances would be stated as negative amounts, not merely as nil balances.

AIG FP did this to make it look like the unabsorbed balance of 2008 losses would continue on its books indefinitely, unless and until the losses were absorbed. Practically, this would allow AIG FP to reduce future Plan balances and avoid having to make payments on new credits or credits created by a restoration plan (which AIG FP failed to adopt).

109.   Upon information and belief, recognizing the importance of retaining its employees in its effort to rebuild, the head of AIG's financial services division, William Dooley, assured AIG FP's employees in an October 2008 letter that any negative balances in their DCP and SIP Accounts would be restored, as "[b]oth the SIP and the DCP provide for the adoption of a plan for restoring these reductions to AIG and AIGFP participants' deferred compensation accounts."

110.   At the end of 2008, AIG FP also instituted the ERP, which was another bonus plan designed to incentivize certain employees to stay with AIF FP, and compensate those employees who did not receive their 2007 bonus compensation or equity kicker. The ERP is explained in more detail below.

111.   In a letter dated March 14, 2009, Mr. Liddy confirmed that AIG was aware of its legally enforceable obligation to pay AIG FP's employees the amounts they were owed under the Plans. Mr. Liddy explained to Timothy Geithner (Mr. Paulson's successor as Treasury Secretary) that "[i]n the first quarter of 2008, prior management took significant retention steps at AIG Financial Products," which "guaranteed a minimum level of pay for both 2008 and 2009." Mr. Liddy advised Mr. Geithner that "quite frankly, AIG's hands are tied" and that "[o]utside counsel has advised that these are legal, binding obligations of AIG, and there are serious legal, as well as business, consequences for not paying." It bears note that Mr. Liddy did not personally "participate in any AIG bonus or retention program...and, before September, did not have any relationship with AIG."

112.     Upon information and belief, other internal documents of AIG and/or AIG FP demonstrate that AIG FP was obligated to restore the plaintiffs' DCA and SIP Account balances and repay plaintiffs the amounts they were owed pursuant to the Plans.

113.     In addition, a publicly-available March 16, 2009 letter from AIG's and AIG FP's attorneys to the Office of the General Counsel of the Federal Reserve Bank of New York further confirmed that AIG FP's compensation plans, including the ERP, constituted "clear contractual obligation[s] on the part of AIG FP – which [are] guaranteed by AIG – to pay [Guaranteed Retention Awards] to participants who have not been terminated for cause, resigned without good reason, or … been terminated for failure to meet performance standards in calendar year 2008."

***AIG FP Induced Its Employees to Continue Deferring Compensation to Bolster Its Finances***

114.     Throughout this time, AIG FP assured the plaintiffs by reaffirming the terms of the DCP and SIP, and incentivized the plaintiffs to continue working, performing under employment obligations, and waiting for AIG and AIG FP's financial woes to improve.

115.     For example, a January 21, 2008 e-mail from William Shirley to all employees said, "[The SIP] now provides that any amounts by which SIP Accounts are reduced pursuant to Section 3.02(a) or (b) (for example, where an employee resigns in 2008 or 2009) will be available for distribution to AIGFP employees in 2013 (in the same manner as, in addition to, the 30% portion of annual Distributable Income that is allocable to AIGFP employees that year)."

116.     In 2009, relying on AIG's assurances, many of AIG FP's employees—including many of the plaintiffs in this action—agreed to receive part of the compensation they were owed under the ERP in the form of deferred compensation credited to the SIP plan, with the remainder to be paid in cash.

117.     In 2009, AIG FP also requested that many of the AIG FP employees—including some of the plaintiffs—voluntarily pay back a portion of their cash compensation, in order to help

the company address its financial woes and for the purpose of maintaining a positive public perception.

118.    In 2010, AIG FP again requested that employees voluntarily pay back some or all of a second cash payment made pursuant to the ERP.

119.    In or around 2009 and 2010, AIG employees reported receiving threats by members of the general public who were angered by the amount of cash compensation previously paid to those employees.

120.    On information and belief, AIG FP pressured its employees to return some percentage of their cash compensation.  As a result, in 2010, some employees, including some of the plaintiffs, returned substantial portions of their hard-earned compensation, ranging up to 20% of their overall compensation for that year.

### After AIG Returned to Profitability, AIG FP Refused to Pay Plaintiffs the Amounts They Are Owed

121.    Upon information and belief, AIG was able to return to profitability in 2011 and to repay any amounts owed to the Treasury and the Federal Reserve in 2012 plus a profit of over $20 billion.

122.    By December 31, 2013, AIG FP should have restored and paid the DCA and SIP Account balances.  *See, e.g.*, DCP § 4.01(b); SIP § 4.01(b).

123.    In fact, AIG FP could have restored—as it was obligated to do under the Plans— the DCA and SIP Account balances, and repaid the plaintiffs from general corporate funds or by borrowing from AIG under the bailout facility that was in place between AIG and AIG FP.  The bailout facility was available to AIG FP for it to meet all *"direct and legitimate business needs."*

124.    However, in a letter dated July 31, 2014, AIG FP informed the plaintiffs that it would not restore their DCA or SIP Account balances, nor would it pay them the amounts it owed

them under the DCP and SIP. *See* July 31, 2014 Letter from AIG FP to DCP and SIP Participants (Exhibit D).

125.    Upon information and belief, today, AIG's financial health has been restored, and the company is profitable. AIG FP continues as a solvent, wholly-owned subsidiary of AIG, which may rely on AIG to cover its financial obligations pursuant to the General Guarantee Agreement.

126.    Despite AIG's financial health; AIG FP's continued existence as a going concern and wholly-owned subsidiary of AIG; AIG's and AIG FP's acknowledgement of and promise to honor the financial obligations stemming from the DCP and SIP; and AIG's obligations under the General Guarantee Agreement, AIG FP refused to restore the plaintiffs' DCA or SIP Account balances or pay the plaintiffs the amounts they are owed for their work.

127.    Upon information and belief, AIG FP's obligations to pay the plaintiffs and its breach of those obligations were confirmed by decisions in lawsuits brought in England, (the "English Judgment"), which is attached as Exhibit E, and in France. The English Judgment and the French decisions are described below.

## V.    THE ENGLISH AND FRENCH JUDGMENTS

### *The Parties in the English Proceedings*

128.    Upon information and belief, in November 2018, the High Court of Justice Queen's Bench Division, Commercial Court (the "English Court") entered the English Judgment for breach of contract under Connecticut law against AIG FP and AIG Management France, SA ("Banque AIG" and collectively, the "London Defendants")[1] in favor of a group of 23 former employees of Banque AIG (the "London Claimants").[2]

---

[1] According to publicly-available documents, Banque AIG was a subsidiary of AIG FP in London that now operates as AIG Management France S.A. ("AIG MF"). Banque AIG was a subsidiary company of AIG FP and AIG Matched Funding Corp., which is itself a wholly owned subsidiary company of AIG FP.

[2] *Tobias Gruber and 22 others v. AIG Management France S.A., AIG Financial Products Corp. and*

129.    The London Claimants worked at Banque AIG in London, either employed directly there or seconded to Banque AIG from AIG FP.

130.    The London Claimants participated in the Plans at issue here.

***The Allegations***

131.    In 2016, the London Claimants filed an Amended Particulars of Claim in the English Court.    Among other things, they alleged that they were entitled to substantial remuneration by way of deferred bonus payments pursuant to the Plans.

132.    Specifically, the London Claimants brought, among other things, claims of breach of contract against Banque AIG and AIG FP under Connecticut law, which governed each of the Plans.

133.    The London Claimants alleged that AIG FP and Banque AIG breached their contracts with the claimants when they failed to restore the amounts deducted from the claimants' DCAs, and failed to adopt a restoration plan.    The Plans, the London Claimants alleged, "imposed an unqualified obligation on [AIG FP] to put a restoration plan in place; and that Participant balances had to be restored no later than 31 December 2013."    *See* English Judgment ¶ 52.    When AIG FP failed to take both of these necessary steps—to restore the DCA and SIP Account balances and to adopt a repayment plan—it breached the terms of the Plans.

134.    The London Defendants disagreed.    They argued that their restoration obligations under the Plans were dependent on AIG FP's profitability.    Because of this dependent condition, the AIG Defendants claimed, they were not required to restore DCA balances until—and unless—AIG FP had positive distributable income. *Id.* ¶ 54. According to the London Defendants, AIG

_____    _____

*American International Group, Inc.*, number CL-2014-000921, in the Commercial Court, Queen's Bench Division, of the High Court of Justice of England and Wales. *See* English Judgment ¶ 178.

FP's purported balance sheet insolvency during the relevant period precluded the restoration of the DCAs.

***The English Decision***

135.    The English Court conducted a nine-day hearing in April and May 2018.

136.    The hearing included expert witnesses on Connecticut law.  The London Claimants called an expert witness who provided the English Court with evidence addressing the applicable principles of contractual construction under Connecticut law.  The London Defendants called their own expert to produce evidence on the same topic.

137.    The English Court found in favor of the London Claimants on the breach of contract claims.  Mr. Justice Baker, who presided over the English proceedings, pointed to AIG FP's continued support from AIG as evidence that AIG FP was financially able to restore DCA balances, and that any purported balance sheet insolvency of AIG FP did not impede its ability to honor its obligations to "restore and pay out previously reduced DCP and SIP balances." *E.g. Id.* ¶¶ 51, 55.

138.    Applying Connecticut law, Mr. Justice Baker found that AIG FP breached its obligations under the Plans when it failed to adopt a restoration plan, as required by the DCP § 4.01(b)[3]-[6].  Mr. Justice Baker held that such a restoration plan was required to provide for repayment of restored balances no later than 2013. *Id.* ¶¶ 71-121.

139.    Mr. Justice Baker also found that the Plan participants' entitlement to have the Plan balances restored and paid was unqualified. *Id.* ¶¶ 100-101.

140.    The English Court made further findings as to AIG FP's solvency and ability to make the required payments to DCP Participants.  It noted that AIG FP was a going concern and had not been placed into formal insolvency proceedings. *Id.* ¶ 75.

141.    The English Court found that, "under the bail-out facility [AIG FP] had ***materially unlimited general funds*** available to it at all times . . . because of the bail-out facility, [a] negative balance sheet did not deprive [AIG FP] of working capital and/or general funds." *Id.* ¶ 55 (emphasis added).  Despite arguments by the defendants to the contrary, AIG FP "had the bail-out facility as its primary, and for present purposes ***materially unlimited***, source of general funds." *Id.* (emphasis added).  Mr. Justice Baker called the London Defendants' argument that AIG FP's balance sheet insolvency precluded restoration "false logic" that "substantially infected their case on the construction of the restoration obligations." *Id.* ¶ 55.

142.    The London Claimants claimed that unpaid amounts credited to their DCAs totaled approximately US $108 million.  However, the English Court noted that this figure was only for the 23 London Claimants, and that there were potentially "300 eligible employees in all." *Id.* ¶ 49.  According to the English Court, the total potential claims of all eligible employees could be $800 million. *Id.* ¶ 50.

143.    The English High Court scheduled a separate assessment for damages, to be heard in January 2020.

144.    Separately, AIG FP and Banque AIG sought, and were granted, permission to appeal the English Court's decision.  Arguments in that appeal were heard on November 25-27, 2019.

***The French Decisions***

145.    Upon information and belief, former employees have also brought—and won—similar claims in France.  In two separate proceedings, two former employees of Banque AIG were awarded 8.7 million euros in damages after a French court determined that Banque AIG improperly withheld bonus payments.  The French court noted that Banque AIG had withheld these payments

as a means to force employees to bear the brunt of the bank's losses.

## VI.    AIG FP'S BREACH OF THE DCP

146.    As detailed above, AIG and AIG FP repeatedly encouraged the plaintiffs to defer additional portions of their compensation into the DCP so as to provide additional capital to AIG FP.

147.    The plaintiffs performed under the DCP.   For example, they continued their employment through the relevant payment periods and deferred their compensation as required by the DCP.

148.    Pursuant to the DCP, over the course of their employment with AIG FP, the plaintiffs deferred substantial portions of their compensation from AIG FP.

149.    In breach of its contractual obligations, AIG FP did not restore the plaintiffs' DCA balances, and did not pay the plaintiffs their earned compensation credits including interest.

150.    In breach of its contractual obligations, AIG FP did not adopt any restoration plan, as required by DCP § 4.01(b).

151.    In a letter dated July 31, 2014, AIG FP expressly stated its intention not to make any payments under the DCP, which—along with AIG FP's failure otherwise to perform under the DCP—constitutes a breach of the DCP.

152.    As a result of AIG FP's breach of the DCP, the plaintiffs have suffered monetary damages in the millions of dollars.

## COUNT TWO: BREACH OF THE SIP

1-152.    The plaintiffs reassert the allegations in paragraphs ¶¶ 1-152 of Count One as if set forth fully herein.

## I.    THE SIP AGREEMENT

153.    The SIP is an agreement among AIG FP and certain employees ("Covered Executives").

154.    The plaintiffs who are Covered Executives under the SIP include: Mitchell Bell, Erik Bengtson, Paul Bradshaw, Thomas Buttke, David Chang, Robert Chang, Jason DeSantis, Richard Fabbro, Kenneth Farrar, Jonathan Fraade, James Haas, Charles Hsieh, Thomas Kushner, Jonathan Liebergall, Nathaniel Litwak, Brendan Lynch, Alfred Medioli, Matthew Mihaly, Andrew Partner, Thomas Plagemann, Robert Powell, Daniel Raab, Ann Reed, Paul Schreiner, Chris Toft, Joe Tom, Steven Wagar, Thomas Ward, and Martin Wayne.

155.    The SIP was adopted in January 2008, and was amended thereafter. The relevant version of the SIP is attached as Exhibit B.

156.    The SIP is governed by Connecticut law. *See* SIP § 4.05.

157.    Covered Executives included only those employees who would have received a DCP Notional Bonus Amount of at least $1,250,000 and/or a DCP Additional Return Payment in 2007. *See* SIP § 2.01.

158.    AIG FP introduced the SIP to incentivize certain employees to continue working at AIG FP after AIG FP began struggling financially and certain employees did not receive Additional Return Payments under the DCP in 2007.  For example, the preamble of the SIP explained:

> As a result of the valuation adjustments associated with AIGFP's super senior credit derivative business, the Notional Bonus Amounts available in 2007 have been affected, and there will be no Additional Return Payment for 2007 under the Deferred Compensation Plan . . . . The purpose of the 2007 SIP is to provide an additional compensation opportunity for Covered Executives while at the same time: (i) providing incentives for Covered Executives to continue developing, promoting and executing AIGFP's business, (ii) recognizing the serious effect that the unrecognized losses

associated with the valuation adjustment have had, (iii) continuing to ensure that AIGFP's and its employees' interests are aligned with those of AIG and AIG's shareholders, and (iv) building and maintaining the formation of capital in AIGFP, including for purposes of ensuring that amounts are available to absorb losses in the event that AIGFP realizes losses on super senior credit derivatives that would have an impact on AIGFP's capital structure.

159.    The SIP included provisions meant to encourage employees to continue working at AIG FP for a number of years, so that they would eventually receive a bonus or equity payment. For example, the SIP provided that if any Covered Executive resigned prior to January 1, 2009, their SIP Account "shall be reduced to zero" and they "shall have no further right to amounts credited to such account." *See* SIP § 3.02(a).  If a Covered Executive resigned between January 1, 2009, and January 1, 2010, they would receive one-third of their SIP bonus. *See* SIP § 3.02(b) ("If the employment . . . of a Covered Executive terminates on or after January 1, 2009 but prior to January 1, 2010 for any reason other than as a result of dismissal (or termination) without cause or death or permanent disability, the SIP Account of such Covered Executive shall be reduced by an amount equal to two-thirds of the amount credited thereto . . . .").

160.    In other words, in order to receive a full SIP bonus, a Covered Executive would have to continue working for AIG or AIG FP until January 2, 2010.

161.    SIP Accounts, similar to DCAs, were "established on [AIG FP's] books in the name of each Covered Executive and of AIG in which . . . 2007 SIP Credits for Covered Executives and AIG are recorded." *See* SIP at 10 (definitions).

162.    Unless the participating employee died or was permanently disabled, the SIP payments were payable according to SIP § 3.05(a):

> Payment. Unless payment occurs on an earlier date pursuant to Section 3.05(b) below, the outstanding balance, if any, credited to a Covered Executive's or AIG's SIP Account as of the Interest Payment Date for the Interest Period beginning in October 2012

27

shall be paid to such Covered Executive or to AIG, as applicable, on such date.

163.   Any payments made under the SIP were independent of the Notional Bonus Amounts described in the DCP. *See* SIP at 1 (preamble).

164.   All SIP payments earned interest quarterly and were payable quarterly. *See* SIP § 3.03.

165.   Like the DCP, the SIP also provided for Additional Return Payments to Covered Executives. *See* SIP § 3.04.

166.   AIG FP was required to provide quarterly SIP Account statements that included information about SIP Account balances and AIG FP's financial performance. For example, SIP § 4.07 provided:

> For so long as 2007 SIP Credits remain payable hereunder, AIGFP shall provide each Covered Executive and AIG with quarterly SIP Account statements setting forth (i) the Covered Executive's or AIG's (as the case may be) SIP Account balance, (ii) the amount of any Additional Return Payment and any interest on any Additional Return Payment that is credited to the SIP Account during such quarterly period, and (iii) the amount of interest paid on such SIP Account balance during such quarterly period. In addition, AIGFP shall provide Covered Executives and AIG with an AIGFP annual financial summary, and shall endeavor to keep Covered Executives who are then employees of AIGFP apprised of material developments involving AIGFP's business or accounting procedures applicable to AIGFP insofar as they relate to these 2007 SIP Terms.

167.   As with the DCP, AIG FP was obligated under the SIP to restore any amounts deducted from SIP Accounts and was obligated to create a restoration plan in order to do so:

> The outstanding balance credited to the SIP Accounts of each Covered Executive and of AIG shall be subject to reduction, from time to time, to the extent of any losses incurred (i) by AIGFP (excluding AIGTG) or (ii) by AIGTG resulting from transactions entered into on or after January 1, 2003, which losses in the case of (i) and (ii) for any year in the aggregate exceed the outstanding

28

market and credit reserves and current year income of AIGFP (excluding outstanding market and credit reserves relating to transactions entered into by AIGTG before January 1, 2003), but before base capital of AIGFP (for the avoidance of doubt including AIGTG, and consisting of equity, retained earnings, if any, and subordinated debt). Such reductions shall be made on a pro rata basis among the SIP Accounts under the 2007 SIP, and the Deferred Compensation Accounts under the Deferred Compensation Plan, of Covered Executives and AIG. **AIG Financial Products Corp. shall be obligated subsequently to restore amounts so deducted from Covered Executives' and AIG's account balances, plus accrued interest thereon at the interest rate determined in accordance with Section 3.03 and, in connection therewith, the Board shall adopt a plan (which shall not be subject to the approval of AIG or the Covered Executives) setting forth a schedule under which AIG Financial Products Corp. shall restore amounts deducted from Covered Executives' and AIG's account balances (plus accrued interest thereon).** Any such restoration plan shall provide that any restored amounts shall be paid in 2013; to the extent amounts have not been restored by December 31, 2013, all restoration rights shall permanently lapse except to the extent AIG Financial Products Corp. determines that it may amend the Plan to provide for payment of restored amounts without violating Internal Revenue Code Section 409A. SIP § 4.01(b) (emphasis added).

168.    Accordingly, pursuant to SIP § 4.01(b), even assuming the 2008 amendment was valid, AIG FP was obligated to restore and pay any amounts deducted from the SIP Accounts, plus interest, by December 31, 2013, and was obligated to adopt a restoration plan in order to do so.

## II.    AIG FP'S BREACH OF THE SIP

169.    AIG FP repeatedly assured AIG FP's employees that AIG FP would continue as a going concern.

170.    The plaintiffs who were Covered Executives performed under the SIP. For example, the plaintiffs continued their employment through the relevant payment periods and complied with the required compensation deferral provisions.

171.    Pursuant to the SIP, the plaintiffs who were Covered Executives deferred substantial portions of their compensation into their SIP Accounts.

172.     In breach of its contractual obligations, AIG FP has not performed under the SIP. For example, AIG FP did not restore the SIP Account balances or pay Covered Executives the earned compensation they were owed plus interest.

173.     In breach of its contractual obligations, AIG FP did not adopt a restoration plan as required by the SIP.

174.     In a letter dated July 31, 2014, AIG FP expressly stated its intention not to make any payments under the SIP, which—along with its failure to perform under the SIP—constitutes a breach of the SIP. *See* July 31, 2014 Letter from AIG FP to DCP and SIP Participants.

175.     As a result of AIG FP's breach of the SIP, the plaintiffs have suffered monetary damages in the millions of dollars.

## COUNT THREE: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

1-175.   The plaintiffs reassert the allegations in ¶¶ 1-175 of Count Two as if set forth fully herein.

176.     Under Connecticut law, the DCP and the SIP imposed a duty on AIG FP to act in good faith and deal fairly with the plaintiffs.

177.     AIG FP breached the covenant of good faith and fair dealing implied in the DCP and the SIP by:

    a)  unreasonably failing to pay the plaintiffs their earned compensation;

    b)  acting in its own self-interest, as well as in the interest of its parent corporation, AIG, by taking money owed to the plaintiffs and using it as capital to fund AIG FP's business;

    c)  acting in bad faith by repeatedly assuring the plaintiffs that they would receive the payments they were owed pursuant to the DCP and SIP when AIG FP had no intention of paying the plaintiffs;

    d)  acting unreasonably and in bad faith by pressuring the plaintiffs to

return compensation they rightfully earned for AIG and AIG FP's benefit;

e) threatening the plaintiffs who did not volunteer to return their compensation and saying they would release their names to the public.

178.    A separate agreement which is relevant to AIG FP's breach of the implied covenant of good faith and fair dealing in the DCP and the SIP is the ERP, which is described below.

## I.    THE ERP

179.    The ERP is an agreement among AIG FP and certain AIG FP employees ("Covered Persons").

180.    The ERP was adopted in or around March 2008, was effective as of December 1, 2007, and was amended. The relevant version of the ERP is attached as Exhibit C.

181.    The ERP is governed by Connecticut law. *See* ERP § 4.04.

182.    "Covered Persons" under the ERP meant:

[A]ll employees and certain designated consultants of [AIG FP] as of March 31, 2008 (excluding any employees or consultants who have notified [AIG FP] of their intent to resign on or prior to such date) who received discretionary incentive compensation, or had a Previous Guarantee, in respect of the 2007 Compensation Year or who have a Previous Guarantee in respect of the 2008 Compensation Year. ERP § 1.14.

183.    Many of the plaintiffs were Covered Persons under the ERP.

184.    Like the SIP, the ERP was designed to incentivize employees to continue working for AIG FP for a number of years. For example, the preamble of the ERP stated:

The objectives of the Plan are:

1. To provide incentives for AIG-FP's employees and consultants to continue developing, promoting and executing AIG-FP's business;

2. To recognize the uncertainty that the unrealized market valuation losses in AIGFP's super senior credit derivative and originally-rated

AAA cash CDO portfolios have created for AIG-FP's employees and consultants;

3. To ensure that AIG-FP's and its employees' and consultants' interests continue to be aligned with those of AIG and AIG's shareholders;

4. To continue to build and maintain the formation of capital in AIG-FP; and

5. To show the support by AIG of the on-going business of AIG-FP by implementing a meaningful employee retention plan.

185.    The ERP provided Guaranteed Retention Awards to Covered Persons so long as they continued to work for AIG through the actual payment.  If an employee resigned "without good reason," was fired for cause, or was fired because they failed to "meet performance standards," they would forfeit all or some of the Guaranteed Retention Award.  *See* ERP § 3.04.

186.    A Guaranteed Retention Award would be equal to the Covered Person's 2007 Total Economic Award, which was defined to mean:

> [T]he sum of (a) and (b), where (a) is the amount of the discretionary incentive compensation or Previous Guarantee awarded to such Covered Person in respect of the 2007 Compensation Year, before taking into account any deferrals of such compensation under, or contributions of amounts to, the Deferred Compensation Plan… or payments of amounts under the Deferred Compensation Plan… in respect of previous Compensation Years, and (b) is the amount, if any, of the SIP Credit credited to such Covered Person under Section 3.01(a) of the SIP, excluding the amount of such SIP Credit, if any, received in lieu of an Additional Return Payment under the Deferred Compensation Plan… ERP § 1.29.

187.    Any payments made under the ERP were expressly subject to the DCP.  For example, ERP § 3.05(a) provided:

> The payment of 2008 and 2009 Total Awards to Covered Persons who participate in the Deferred Compensation Plan will be subject to partial mandatory deferral and subsequent payment under the Deferred Compensation Plan in accordance with its terms.

188.   Under ERP § 3.02(c), AIG was responsible for covering any shortfall in funds available to pay the Guaranteed Retention Awards:

> If the aggregate amount of the Guaranteed Retention Awards for the 2008 Compensation Year or the 2009 Compensation Year exceeds the calculated Bonus Pool for such Compensation Year, AIG will cover the shortfall so that Covered Persons are paid their full Guaranteed Retention Awards (subject, for the avoidance of doubt, to deferral pursuant to Section 3.05(a)). Any such Bonus Pool shortfall shall, for purposes of Section 3.07 related to the carry-forward of Capped Realized Losses, be deemed to give rise to a Capped Realized Loss equal to the amount of such shortfall.

189.   Payment of non-deferred portions of the Guaranteed Retention Awards was guaranteed by AIG pursuant to a General Guarantee Agreement.  ERP § 3.03 provided:

> The obligation to pay the Guaranteed Retention Awards described under Section 3.01 is guaranteed by AIG pursuant to the AIG General Guarantee Agreement; provided that amounts deferred under the Deferred Compensation Plan (including Stock-Indexed Deferrals) will not, in accordance with the terms of the Deferred Compensation Plan, benefit from the AIG General Guarantee Agreement.

## II.   AIG FP BREACHED ITS DUTY TO ACT IN GOOD FAITH AND DEAL FAIRLY WITH THE PLAINTIFFS

190.   AIG FP acted in bad faith and impeded the plaintiffs' right to receive benefits that they reasonably expected to receive under the Plans.

191.   AIG FP intended to mislead or deceive the plaintiffs.  For example, as described above, AIG FP induced the plaintiffs to defer compensation under the ERP into the SIP deferred compensation pools, but later refused to pay the plaintiffs amounts owed under the SIP.  AIG FP used this money as capital to fund AIG FP's business.

192.   AIG FP acted in its own self-interest and in the self-interest of its parent corporation, AIG, in refusing to fulfill its obligations under the DCP and SIP.

193.    As described above, AIG FP threatened the plaintiffs so as to force them to return money they rightfully earned and were owed under the ERP.

194.    AIG FP's actions and inactions were an attempt to avoid the spirit of its bargain with the plaintiffs.

195.    As a result of AIG FP's breaches of the covenant of good faith and fair dealing, the plaintiffs have suffered damages in the millions of dollars.

## COUNT FOUR: VIOLATION OF CONNECTICUT WAGE AND HOUR LAW, CONN. GEN. STAT. ANN. §§ 31-71e—31-72

1-195.  The plaintiffs reassert the allegations in ¶¶ 1-195 of Count Three as if set forth fully herein.

196.    As set forth above, AIG FP failed to pay the plaintiffs the wages they were entitled to under the DCP and the SIP in violation of General Statutes §§ 31-71e, 31-72.

197.    The payments to the plaintiffs were "wages" as defined in Connecticut General Statutes § 31-71a ("'Wages' means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation.").

198.    Because AIG FP credited its losses against the plaintiffs' DCA and SIP Accounts, payments on those accounts did not occur at regular intervals.

199.    Rather, AIG FP was obligated to restore and pay DCA and SIP Account balances by the end of 2013.

200.    In a letter dated July 31, 2014, AIG FP informed the plaintiffs that it would not restore or pay their DCA or SIP Account balances.

201.    By failing to pay wages, restore the amounts that it owed, or create or execute a restoration plan, among other things, AIG FP acted in bad faith or unreasonably, and its failings

constitute violations of C.G.S.A § 31-71e and § 31-72.

202.    By reassuring the plaintiffs that they would eventually be paid, AIG FP acted in bad faith or unreasonably.

203.    By asking the plaintiffs to return portions of the money they received as guaranteed payments under the ERP, AIG FP acted in bad faith or unreasonably.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully request judgment against AIG FP for the following relief:

1.  Money damages in excess of $185 million;

2.  Twice the full amount of damages, pursuant to C.G.S.A § 31-72;

3.  Pre- and Post-Judgment Interest;

4.  Attorney's fees and costs by statute; and

5.  Such other legal and equitable relief that this Court deems just and proper.

Respectfully submitted,

HURWITZ SAGARIN
SLOSSBERG & KNUFF, LLC

By: /s/   David C. Shufrin
David C. Shufrin, Esq.
David Slossberg, Esq.

147 North Broad Street
Milford, CT  06460
Tel: 203-877-8000
Fax: 203-878-9800
Juris No. 026616
DShufrin@hssklaw.com
DSlossberg@hssklaw.com

*Attorneys for the plaintiffs*

KOBRE & KIM LLP

By: */s/* Steven W. Perlstein_____

Steven G. Kobre
Steven W. Perlstein
Sara Gribbon
Amanda Tuminelli
George Stamatopoulos

800 Third Avenue
New York, NY 10022
Telephone: (646) 488 1200

*Attorneys for the plaintiffs (Pro Hac Vice applications to be submitted)*

RETURN DATE:    DECEMBER 31, 2019

D.N. _____

| | |
|---|---|
| LEE ARTHURS; DAVID ACKERT; MITCHELL BELL; ERIK BENGTSON; PAUL BRADSHAW; THOMAS BUTTKE; JOHN CAPPETTA; DAVID CHANG; ROBERT CHANG; JASON DESANTIS; RICHARD FABBRO; KENNETH FARRAR; JONATHAN FRAADE; CARL GIESLER JR.; JAMES HAAS; CHARLES HSIEH; THOMAS KALB; THOMAS KUSHNER; ROBERT LEARY; JONATHAN LIEBERGALL; NATHANIEL LITWAK; BRENDAN LYNCH; ALFRED MEDIOLI; MATTHEW MIHALY; JOANN PALAZZO; EUGENE PARK; ANDREW PARTNER; CARL PETERSON; STEVEN PIKE; THOMAS PLAGEMANN; ROBERT POWELL; DANIEL RAAB; ANN REED; PAUL SCHREINER; DMITRY SATANOVSKY; MARY HEATHER SINGER; KEITH STEIN; FRANK STROHM; TIMOTHY SULLIVAN JR.; CHRIS TOFT; JOE TOM; RYAN VETTER; STEVEN WAGAR; THOMAS WARD; MARTIN WAYNE; JAMES WOLF, | : SUPERIOR COURT<br><br>: J.D. OF FAIRFIELD<br><br>: AT BRIDGEPORT<br>:<br>:<br>:<br>:<br>:<br>: |
| v. | : |
| AIG FINANCIAL PRODUCTS CORP. | : DECEMBER 6, 2019 |

### STATEMENT OF AMOUNT IN DEMAND

The amount in controversy exceeds $15,000, exclusive of costs and interest.

HURWITZ SAGARIN
SLOSSBERG & KNUFF, LLC

By: /s/ David C. Shufrin
David C. Shufrin, Esq.
David Slossberg, Esq.

147 North Broad Street
Milford, CT 06460
Tel: 203-877-8000
Fax: 203-878-9800
Juris No. 026616
DShufrin@hssklaw.com
DSlossberg@hssklaw.com
*Attorneys for the plaintiffs*

37

KOBRE & KIM LLP

By: _/s/_ Steven W. Perlstein_____

Steven G. Kobre
Steven W. Perlstein
Sara Gribbon
Amanda Tuminelli
George Stamatopoulos

800 Third Avenue
New York, NY  10022
Telephone: (646) 488 1200

*Attorneys for the plaintiffs (Pro Hac Vice applications to be submitted)*

38

**<u>Exhibit I</u>**

**Oral Argument Transcript on AIG FP's Motion to Strike (Pages 94-96)**

```
NO:  FST-CV19-6046057-S         :   SUPERIOR COURT

ARTHURS, LEE Et Al              :   JUDICIAL DISTRICT
                                    OF STAMFORD/NORWALK

v.                              :   AT STAMFORD, CONNECTICUT

AIG FINANCIAL PRODUCTS CORP.    :   MARCH 5, 2021



                      *E X C E R P T*



           BEFORE THE HONORABLE SHEILA OZALIS, JUDGE



A P P E A R A N C E S :


    Representing the Plaintiff(s):

         ATTORNEY DAVID SLOSSBERG
         HURWITZ SAGARIN SLOSSBERG & KNUFF, LLC
         147 NORTH BROAD STREET
         MILFORD, Connecticut 06460

         ATTORNEY DAVID SHIFREN
         OTTERSTEDT, WALLACE & KAMMER, LLP
         30 BUXTON FARMS ROAD, SUITE 125
         STAMFORD, Connecticut 06905

         ATTORNEY STEVEN W. PERLSTEIN, PHV
         ATTORNEY GEORGE STAMATOPOULOS
         KOBRE & KIM LLP
         800 THIRD AVENUE
         NEW YORK, NY 10022

    Representing the Defendant(s):

         ATTORNEY JONATHAN FREIMAN
         WIGGIN & DANA, LLP
         PO BOX 1832
         NEW HAVEN, Connecticut 0650

         ATTORNEY JOHN S. KIERNAN, PHV
         919 THIRD AVENUE
         NEW YORK, NY 10022


                         Recorded By:
                         Linda Vanek

                         Transcribed By:
                         Catherine Plavcan
                         Court Recording Monitor
                         123 Hoyt Street
                         Stamford, Connecticut  06905
```

1    -- you asked two questions.  One is in -- is this a

2    -- dividend?  And then, second is it at a time when

3    the -- when the company lacks independent financial

4    capability to -- to make the -- the dividend?  And

5    the -- the --

6        THE COURT:  Well, but let's put aside whether

7    they have the financial capability to do it.  If

8    they're going to restore the balances in the AIG

9    funds pursuant to 4.01, subsection B, when they

10   restore balances to the AIG funds, is that considered

11   a dividend?

12       ATTY. KIERNAN:  Yes, Your Honor.  And the reason

13   it is, is that the definition of dividend includes a

14   share in the profits.  They -- what Delaware law

15   essentially says is you can only dividend out of

16   profits, out of net profits.  And so -- and -- and

17   what -- what are these balances?  These balances

18   start as being a share of net profits that was

19   allocated to AIG and to employees.  And so this is an

20   allocation of a share of the -- the profits of the

21   enterprise, that that was reduced and now you -- now

22   they're saying, now you gotta pay that share of -- of

23   profits.  And -- and so that's an illegal dividend.

24       THE COURT:  Okay.  Thank you.

25       Attorney Perlstein, you --

26       ATTY. PERLSTEIN:  Sure, I --

27       THE COURT:  -- may proceed.

1    ATTY. PERLSTEIN:  -- I'd like to respond to a

2    couple of those points.  But then I can move on to

3    the next section.  So, Mr. Kiernan started out again

4    focusing on the 70/30 ratio.  But again, I would

5    focus Your Honor's attention on the fact the 70/30

6    ratio applies to distributable income.  The notional

7    bonus, however, is not tied to distributable income.

8    They're just -- Mister -- and this is a fundamental

9    difference that we have with AIG FP.  AIG FP keeps

10   thinking about this only as a profit-sharing plan.

11   And our view is that it was called the deferred

12   compensation plan for a reason.

13        The notional bonus just isn't tied to

14   distributable income.  So this -- this notion that

15   the 70/30 ratio governs everything, including the

16   notional bonus, we think just isn't a fair inference

17   from the language of the plan.  We also --

18   Mr. Kiernan is saying, you need to interpret the

19   agreement in this way to favor AIG.  But AIG drafted

20   this plan.  To the extent there's ambiguity, it gets

21   interpreted against them.  This is a motion to

22   strike.  On a motion to strike to the extent that

23   there's an inference that's being drawn, it's

24   supposed to being drawn to sustain the complaint, not

25   rule against it.

26        And on the notion of whether this is susceptible

27   to fact discovery, I think the questions Your Honor

1    asked are exactly the right type of questions.  Is

2    this really considered a dividend?  Was AIG in a

3    position to pay?  Could it A -- could AIG have

4    borrowed -- could AIG FP borrowed [as spoken] against

5    its credit facility to facilitate the dividend?

6    Maybe that was one way they could've met their

7    obligation.  There are all sorts of acts that we

8    should be able to understand about what they did,

9    what decisions they made, why they made those

10   decisions, and how that works into -- to meeting

11   their obligation to come up with a plan.

12        And also, as Mr. Stamatopoulas will address in

13   terms of exercising any discretion they had, in good

14   faith, these are all issues that should be sorted out

15   on fact discovery, but shouldn't be concluded as a

16   matter of law on a motion to strike.  So I -- I can

17   -- unless Your Honor has questions about that, I can

18   move on to --

19        THE COURT:  All right.

20        ATTY. PERLSTEIN:  -- (indiscernible) --

21        THE COURT:  Why don't you move on.

22        ATTY. PERLSTEIN:  Sure.  So a -- another

23   (indiscernible) --

24        ATTY. KIERNAN:  Your Honor, may I -- may make

25   just one comment?

26        UNIDENTIFIABLE SPEAKER:  (Indiscernible) --

27        THE COURT:  Yes, go ahead, Attorney Kiernan.

**<u>Exhibit J</u>**

**Memorandum of Law in Opposition to AIG FP's Motion to Strike (Pages 6, 26)**

DOCKET NO: X08-FST-CV-19-6046057-S

| | |
|---|---|
| LEE ARTHURS; DAVID ACKERT; MITCHELL BELL; | : SUPERIOR COURT |
| ERIK BENGTSON; PAUL BRADSHAW; THOMAS | |
| BUTTKE; JOHN CAPPETTA; DAVID CHANG; | : COMPLEX DISPUTES COURT |
| ROBERT CHANG; JASON DESANTIS; RICHARD | |
| FABBRO; KENNETH FARRAR; JONATHAN | : J.D. OF FAIRFIELD |
| FRAADE; CARL GIESLER JR.; JAMES HAAS; | |
| CHARLES HSIEH; THOMAS KALB; THOMAS | : AT STAMFORD |
| KUSHNER; ROBERT LEARY; JONATHAN | |
| LIEBERGALL; NATHANIEL LITWAK; BRENDAN | : DECEMBER 11, 2020 |
| LYNCH; ALFRED MEDIOLI; MATTHEW MIHALY; | |
| JOANN PALAZZO; EUGENE PARK; ANDREW | : |
| PARTNER; CARL PETERSON; STEVEN PIKE; | |
| THOMAS PLAGEMANN; ROBERT POWELL; | : |
| DANIEL RAAB; ANN REED; PAUL SCHREINER; | |
| DMITRY SATANOVSKY; MARY HEATHER | : |
| SINGER; KEITH STEIN; FRANK STROHM; | |
| TIMOTHY SULLIVAN JR.; CHRIS TOFT; JOE TOM; | : |
| RYAN VETTER; STEVEN WAGAR; THOMAS | |
| WARD; MARTIN WAYNE; JAMES WOLF, | : |
| | |
| v. | : |
| | |
| AIG FINANCIAL PRODUCTS CORP. | : |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE

HURWITZ SAGARIN SLOSSBERG & KNUFF, LLC

David C. Shufrin
David Slossberg
147 North Broad Street
Milford, CT 06460
Telephone: (203) 877 8000

*Attorneys for Plaintiffs*

KOBRE & KIM LLP

Steven G. Kobre
Steven W. Perlstein
Amanda Tuminelli
George Stamatopoulos
800 Third Avenue
New York, NY 10022
Telephone: (646) 488 1200

*Attorneys for Plaintiffs* (*pro hac vice forthcoming*)

In March 2008, AIGFP adopted the Employee Retention Plan (the "ERP"), which like the SIP was adopted to ensure that Plaintiffs would remain with AIGFP through the crisis and continue to defer their compensation to provide AIGFP additional liquidity. *See id.* ¶¶ 180, 184. During the financial crisis, however, AIGFP pressured Plaintiffs to return up to 20% of their annual cash compensation. *Id.* ¶ 120. In total, AIGFP borrowed $185 million in already-earned compensation that Plaintiffs deferred into their DCP and SIP accounts. *Id.* ¶ 19.

Between 2008–2009, AIGFP repeatedly assured Plaintiffs that it would eventually repay them the amounts they were owed. *Id.* ¶¶ 109, 115, 116. Further, AIG negotiated the receipt of a $85 billion credit facility with the federal government (the "AIG Bailout"); and, in turn, issued AIGFP a revolving credit facility of $65 billion, formalized on the same day as AIG's Bailout, on September 22, 2008. *Id.* ¶ 104. The revolving credit facility was at all times available to AIGFP for it to meet all "direct and legitimate business needs." *Id.* ¶ 123.

By 2012, AIG had returned to profitability and repaid the amounts it owed to the government, plus $20 billion in interest. *Id.* ¶ 12. Nevertheless, on July 31, 2014, AIGFP informed Plaintiffs that it would not restore their DCP or SIP Account balances nor repay them the amounts it had borrowed from these accounts, in excess of $185 million. *Id.* ¶ 19. AIGFP has never declared bankruptcy and is still a going concern. *Id.* ¶ 16. S*ee id.* ¶¶ 125–126.

## I.  Overview of the DCP and the SIP.

The DCP required Plaintiffs to defer portions of their already-earned compensation, consisting of a mandatorily deferred portion of their Notional Bonus (*see infra* at 20-21); a voluntarily deferred portion of their Notional Bonus; and an additional portion of 30% of AIGFP's Distributable Income. *See* Compl. ¶¶ 87 – 89; *id.* Ex. A at Schedule A. The "Deferred Compensation amounts [were] credited to [DCP] Participants" and held in Deferred Compensation Accounts ("DCAs") "in the name of each Participant[.]" *Id.* ¶ 86.

its obligations in order to take nearly $200 million of Plaintiffs' earned compensation. This plain reading of the Reduction and Restoration Provisions is also consistent with the Bankruptcy Provision, which unambiguously confirms that, even in insolvency, AIGFP owes Plaintiffs any previously unrestored amounts. *E.g.,* Compl. Ex. A § 4.01(b). AIGFP's interpretation of the Reduction Provision thus conflicts with *two* specific provisions, the Restoration and Bankruptcy Provisions, and is incorrect as a matter of law.

Equally flawed is AIGFP's assertion that account balances can only be restored and paid out from profits (*i.e.*, "absent positive Distributable Income," MTS at 27), absent which there is no obligation to restore. Indeed, the Funds Provision in Section 4.01(a) of the Plans provides that benefit payments can be made "from the general funds of AIG Financial Products Corp." and that AIGFP "shall not segregate or earmark any of its assets nor hold any assets in trust or in any special account for this purpose[.]" *Id.* Ex. A § 4.01(a). Thus, the Funds Provision makes clear that the reduced balances can be paid from AIGFP's general funds or assets, obviating the need for AIGFP to show profits before restoring the reduced balances and repaying Plaintiffs. Here, AIGFP has access to "general funds" whether in the form of assets it could sell, the resumption of business activities, or in the form of the bail-out facility it obtained from AIG for all of its legitimate business needs (as also highlighted by the English Trial Court). *Id.* Ex. E ¶ 55. Thus, contrary to AIGFP's assertions, the Plans expressly allow repayment from general funds and do not require profits before AIGFP can make repayment.[13]

---

[13] Likewise, the preamble language that "absent losses which exhaust current year *revenues* and reserves, [retained amounts] shall be paid subsequently to participants according to a schedule tied to the duration of AIGFP's business" is not an excuse for complete debt forgiveness. *See e.g.*, Compl. Ex. A § 3.05(b). This general language, to which AIGFP refers (MTS at 28), pertains to the *schedule* according to which AIGFP is obligated to repay Plaintiffs and thus has no bearing on the meaning of the entirely separate Restoration Provision in Section 4.01(b). In