IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

———————————————————x
                                          :
In re:                                    :        Chapter 11
                                          :
AIG FINANCIAL PRODUCTS CORP.,             :        Case No. 22-11309 (MFW)
                                          :
            Debtor[1].                    :
                                          :
———————————————————:
                                          :
AIG FINANCIAL PRODUCTS CORP.,             :
                                          :
            Plaintiff,                    :
                                          :
            v.                            :        Adv. Pro. No. 23-50110 (MFW)
                                          :
                                          :
                                          :        **JURY TRIAL DEMANDED**
LEE ARTHURS, DAVID ACKERT,                :
MITCHELL BELL, ERIK BENGTSON,             :
PAUL BRADSHAW, THOMAS BUTTKE,             :
JOHN CAPPETTA, DAVID CHANG,               :
ROBERT CHANG, JASON DESANTIS,             :
RICHARD FABBRO, KENNETH FARRAR,           :
JONATHAN FRAADE, CARL GIESLER             :
JR., JAMES HAAS, CHARLES HSIEH,           :
THOMAS KALB, THOMAS KUSHNER,              :
ROBERT LEARY, JONATHAN                    :
LIEBERGALL, NATHANIEL LITWAK,             :
BRENDAN LYNCH, ALFRED MEDIOLI,            :
MATTHEW MIHALY, JOANN PALAZZO,            :
EUGENE PARK, ANDREW PARTNER,              :
CARL PETERSON, STEVEN PIKE,               :
THOMAS PLAGEMANN, ROBERT                  :
POWELL, DANIEL RAAB, ANN REED,            :
PAUL SCHREINER, DMITRY                    :
SATANOVSKY, MARY HEATHER                  :
SINGER, KEITH STEIN, FRANK                :
STROHM, TIMOTHY SULLIVAN JR.,             :
CHRISTIAN TOFT, JOE TOM, RYAN             :
VETTER, STEVEN WAGAR, THOMAS              :
WARD, MARTIN WAYNE, JAMES WOLF,           :

---

[1] The Debtor in this case, along with the last four digits of the Debtor's federal tax identification number, is: AIG Financial Products Corp. (9410). The Debtor's address is 50 Danbury Road, Wilton, Connecticut 06897.

:
Defendants.:

_____x

## EMPLOYEES PLAINTIFFS' ANSWER,
## AFFIRMATIVE DEFENSES, COUNTERCLAIM, AND THIRD PARTY-CLAIMS

Defendants Lee Arthurs, David Ackert, Mitchell Bell, Erik Bengtson, Paul Bradshaw, Thomas Buttke, John Cappetta, David Chang, Robert Chang, Jason Desantis, Richard Fabbro, Kenneth Farrar, Jonathan Fraade, Carl Giesler Jr., James Haas, Charles Hsieh, Thomas Kalb, Thomas Kushner, Robert Leary, Jonathan Liebergall, Nathaniel Litwak, Brendan Lynch, Alfred Medioli, Matthew Mihaly, Joann Palazzo, Eugene Park, Andrew Partner, Carl Peterson, Steven Pike, Thomas Plagemann, Robert Powell, Daniel Raab, Ann Reed, Paul Schreiner, Dmitry Satanovsky, Mary Heather Singer, Keith Stein, Frank Strohm, Timothy Sullivan Jr., Christian Toft, Joe Tom, Ryan Vetter, Steven Wagar, Thomas Ward, Martin Wayne, and James Wolf (collectively, "Employee Plaintiffs"[2] or "Defendants" or "Counterclaim Plaintiffs" or "Third Party Claim Plaintiffs"), by and through their counsel, answer and state their affirmative defenses and counterclaims to AIG Financial Products Corp.'s ("Debtor" or "AIG FP" or "Plaintiff") Complaint for Declaratory Relief ("Complaint") and claims against third party intervenor American International Group, Inc. ("AIG Inc.") as follows:

## NATURE OF THIS ACTION

1.    Admit that this action purports to be filed pursuant to Rule 7001 of the Federal Rules of Bankruptcy, sections 105, 502, and 510 of Title 11 of the United States Code (the "Bankruptcy Code"), and the Declaratory Judgment Act (28 U.S.C. § 2201), but deny that AIG FP

---

[2] The Defendants are 46 former employees of AIG FP and are plaintiffs in the suit pending in the Connecticut Superior Court captioned *Arthurs v. AIG Financial Products Corp.*, Case No. X08-FST-CV-19-6046057-S (Conn. Super. Ct.) (the "Connecticut Litigation").

is entitled to any such relief and otherwise deny the allegations of Paragraph 1.

2.      Admit that AIG FP purports to seek declaratory relief, but deny that AIG FP is entitled to any such relief and otherwise deny the allegations of Paragraph 2.

3.      Admit that the Employee Plaintiffs are former AIG FP employees who were **_required_** to participate in certain deferred compensation plans, including the Deferred Compensation Plan, dated December 1, 1995 (as amended and modified, the "DCP") and the Special Incentive Plan, effective as of December 1, 2007 (as amended and modified, the "SIP," and together with the DCP, the "Compensation Plans").[3] Admit that pursuant to the Compensation Plans, the Employee Plaintiffs' deferred compensation was credited to Deferred Compensation Accounts ("DCAs") established by the DCP, or SIP accounts established by the SIP ("SIP Accounts,") together with the DCAs, the "Plan Accounts"). In addition to the compensation the Employee Plaintiffs were required to defer into their Plan Accounts, AIG FP repeatedly implored the Employee Plaintiffs to voluntarily defer more money into the accounts and assured them that they were making a good investment in their employer's business. Admit that, in breach of its obligations, in a letter dated July 31, 2014, AIG FP informed the Employee Plaintiffs that it would not restore or pay their DCA or SIP Account balances. Admit that thereafter, a timely lawsuit was filed in the Connecticut Superior Court in 2019 to recover the hundreds of millions of dollars in damages caused by AIG FP's breaches of contract, violation of the covenant of good faith and fair dealing, and violation of Connecticut labor law in failing to pay the Employee Plaintiffs their certain earned and vested deferred compensation. The remaining allegations of Paragraph 3 are denied.

4.      Admit that AIG FP was contractually obligated to restore the balances in the

---

[3] The DCP and SIP have been amended over time. Each of the Defendants was a participant in the DCP and a number were also participants in the SIP.

Employee Plaintiffs' Plan Accounts. Admit that, despite AIG Inc.'s repayment of its government obligations plus $20 billion in interest, AIG FP's return to profitability, its continuation as a solvent business, and its legal obligations under the Compensation Plans, AIG FP did not adopt a repayment plan to restore the deferred compensation it owed the Employee Plaintiffs. Further admit that the purported loan pursuant to the "Revolving Credit Agreement" (as defined by AIG FP) was an equity infusion. The remaining allegations of Paragraph 4 of the Complaint are denied. Paragraph 4 also states legal conclusions to which no response is required.

5.      The allegations set forth in Paragraph 5 of the Complaint state legal conclusions to which no response is required. To the extent that a response is required, the allegations of Paragraph 5 are denied.

## JURISDICTION AND VENUE

6.      Admit that, on December 14, 2022 (the "Petition Date"), AIG FP filed a purported petition for relief under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, captioned under the case name *In re AIG Financial Products Corp.* (Case No. 22-11309) (MFW) (the "Chapter 11 Case") along with a Declaration of William C. Kosturos, Chief Restructuring Officer of Debtor (the "First Day Declaration"), but deny that AIG FP is entitled to the relief sought in the Chapter 11 Case or the First Day Declaration. The remaining allegations of Paragraph 6 are denied.

7.      The allegations set forth in Paragraph 7 of the Complaint state legal conclusions to which no response is required. To the extent that a response is required, the Employee Plaintiffs deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 7 and leave AIG FP to its proof. Admit that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409, but assert that aspects of this mater, including Defendants'

counterclaims are non-core proceedings. Pursuant to Local Rule of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>") 9013-1(f), the Employee Plaintiffs do not consent to the entry of a final order or judgment by the Court in connection with this adversary proceeding (the "<u>Adversary Proceeding</u>") to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

8.      The allegations set forth in Paragraph 8 of the Complaint state legal conclusions to which no response is required. To the extent that a response is required, the Employee Plaintiffs deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 8 of the Complaint and leave AIG FP to its proof.

<u>**PARTIES**</u>

9.      Admit that AIG FP is a wholly-owned, direct subsidiary of AIG Inc. The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the truth of the remainder of the allegations of Paragraph 9 of the Complaint and leave AIG FP to its proof.

10.      The Employee Plaintiffs admit that they are former employees of AIG FP and were required to participate in certain deferred compensation plans and that AIG FP required them to defer significant portions of their compensation. The Employee Plaintiffs otherwise deny the remaining allegations of Paragraph 10 of the Complaint and leave AIG FP to its proof.

11.      Admitted.

12.      Admitted.

13.      Admitted.

14.      Admitted.

15.      Admitted.

16.     Admitted.

17.     Admitted.

18.     Admitted.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     Admitted.

27.     Admitted.

28.     Admitted.

29.     Admitted.

30.     Admitted.

31.     Admitted.

32.     Admitted.

33.     Admitted.

34.     Admitted.

35.     Admitted.

36.     Admitted.

37.     Admitted.

38.     Admitted.

39.    Admitted.

40.    Admitted.

41.    Admitted.

42.    Admitted.

43.    Admitted.

44.    Admitted.

45.    Admitted.

46.    Admitted.

47.    Admitted.

48.    Admitted.

49.    Admitted. [4]

50.    Admitted.

51.    Admitted.

52.    Admitted.

53.    Admitted.

54.    Admitted.

55.    Admitted.

56.    Admitted.

---

[4] Defendant-Employee Plaintiff Timothy Sullivan Jr. is deceased as of the time of this filing. The Employee Plaintiffs will file a notice and substitution of party pursuant to Rule 25 of the Federal Rules of Civil Procedure and Rule 7025 of the Federal Rules of Bankruptcy Procedure.

## FACTUAL BACKGROUND

### A.    AIG FP's DEFERRED COMPENSATION PLANS

#### 1.    The Deferred Compensation Plan and Relevant Provisions

57.    To the extent Paragraph 57 references the DCP and SIP such documents speak for themselves. The Employee Plaintiffs deny the remaining allegations of Paragraph 57.

58.    To the extent Paragraph 58 references the DCP, such document speaks for itself. The Employee Plaintiffs deny the remaining allegations of Paragraph 58.

59.    To the extent Paragraph 59 references the DCP, such document speaks for itself. The Employee Plaintiffs deny the remaining allegations of Paragraph 59.

60.    To the extent Paragraph 60 references the DCP, such document speaks for itself. The Employee Plaintiffs deny the remaining allegations of Paragraph 60.

61.    To the extent Paragraph 61 references the DCP, such document speaks for itself. The Employee Plaintiffs deny the remaining allegations of Paragraph 61.

62.    To the extent Paragraph 62 references the DCP, such document speaks for itself. The Employee Plaintiffs deny the remaining allegations of Paragraph 62.

63.    The Employee Plaintiffs admit that the DCP included a mechanism requiring AIG FP to restore the reduced Plan Account balances (the "Restoration Provision") and that, to the extent Paragraph 63 references the DCP, such document speaks for itself. The Employee Plaintiffs further admit that AIG FP acted in bad faith and otherwise breached its contractual obligation by failing to restore the account balances. The Employee Plaintiffs deny the remaining allegations of Paragraph 63.

64.    The Employee Plaintiffs admit that AIG Inc. guaranteed the prompt payment when due of all obligations of AIG FP pursuant to the General Guarantee Agreement (the "General Guarantee"), dated as of December 4, 1995. To the extent Paragraph 64 references the DCP, such

document speaks for itself. Paragraph 64 also states legal conclusions to which no response is needed. To the extent that a response is required, the Employee Plaintiffs deny the remaining allegations of Paragraph 64.

65.     To the extent Paragraph 65 of the Complaint references the DCP, such document speaks for itself. The Employee Plaintiffs deny the remaining allegations of Paragraph 65.

66.     Paragraph 66 of the Complaint calls for a legal conclusion to which no response is required. To the extent that a response is required, the Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the truth of the allegations of Paragraph 66 of the Complaint and leave AIG FP to its proof.

67.     The Employee Plaintiffs deny that their claims would be subordinated to all other AIG FP obligations, including equity capital contributions disguised as loans. Defendants deny the remaining allegations of Paragraph 67 of the Complaint and leave AIG FP to its proof. Paragraph 67 of the Complaint also states legal conclusions to which no response is needed.

## 2.    The Special Incentive Plan and Relevant Provisions

68.     The Employee Plaintiffs admit that they brought a prepetition lawsuit against AIG FP to recover amounts owed under the SIP. To the extent Paragraph 68 references the SIP, such document speaks for itself. The Employee Plaintiffs deny the remaining allegations of Paragraph 68.

69.     To the extent Paragraph 69 references the SIP, such document speaks for itself. The Employee Plaintiffs otherwise deny knowledge of information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 69 of the Complaint and leave AIG FP to its proof.

70.     To the extent Paragraph 70 references the SIP, such document speaks for itself. The Employee Plaintiffs otherwise deny knowledge of information sufficient to form a belief as to the

truth of the remaining allegations of Paragraph 70 of the Complaint and leave AIG FP to its proof.

71.     To the extent Paragraph 71 references the SIP, such document speaks for itself. The Employee Plaintiffs otherwise deny knowledge of information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 71 of the Complaint and leave AIG FP to its proof.

72.     Defendants deny that their claims would be subordinated to all other AIG FP obligations, including equity capital contributions disguised as loans. To the extent Paragraph 72 references the SIP, such document speaks for itself. The Employee Plaintiffs deny the remaining allegations of Paragraph 72. Paragraph 72 of the Complaint also states legal conclusions to which no response is required.

73.     Paragraph 73 of the Complaint calls for a legal conclusion to which no response is required. To the extent that a response is required, the Employee Plaintiffs deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 73 of the Complaint and leave AIG FP to its proof.

74.     Paragraph 74 of the Complaint calls for a legal conclusion to which no response is required. To the extent that a response is required, the Employee Plaintiffs deny the allegations of Paragraph 74 of the Complaint.

75.     Paragraph 75 of the Complaint calls for a legal conclusion to which no response is required. To the extent that a response is required, the Employee Plaintiffs deny the allegations of Paragraph 75 of the Complaint. The Employee Plaintiffs deny that the language in the deferred compensation plans is clear and unambiguous. In the Connecticut Litigation, the Court found that "the terms of the DCP and SIP . . . are susceptible to more than one reasonable interpretation and the contract is ambiguous."[5] To the extent Paragraph 75 references the Compensation Plans, such

---

[5] *See* Memorandum of Decision re Motion to Strike, *Arthurs v. AIG Financial Products Corp.*, Case No. X08-FST-CV-19-6046057-S (Conn. Super. Ct.)  (May 24, 2021) [D.I. 115.01]. In the Superior Court of Connecticut, a "Motion

documents speak for themselves. The Employee Plaintiffs otherwise deny the remaining allegations of Paragraph 75 of the Complaint.

### 3.   The 2008 Employee Retention Plan

76.   The Employee Plaintiffs admit that in March 2008 AIG FP introduced an Employee Retention Plan ("ERP"). To the extent Paragraph 76 references the ERP, effective from December 1, 2007, such document speaks for itself. The Employee Plaintiffs deny that AIG FP fully paid the guaranteed amounts. The Employee Plaintiffs deny the remaining allegations of Paragraph 76.

### 4.   Total Amounts Paid to the Defendants

77.   The Employee Plaintiffs admit that they were paid wages less withholding by AIG FP. The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the payments alleged in AIG FP's Exhibit D. The Employee Plaintiffs deny that David Chang, Brendan Lynch, Matthew Mihaly, Dmitry Satanovsky, Christian Toft, Joe Tom, Steven Wagar and/or Thomas Ward executed releases waiving any claims against AIG FP related to the Compensation Plans. The Employee Plaintiffs deny the remaining allegations of Paragraph 77 of the Complaint.

78.   To the extent that Paragraph 78 references a self-serving exhibit, the document speaks for itself. The Employee Plaintiffs deny the remaining allegations of Paragraph 78.

### B.   THE 2008 FINANCIAL CRISIS RESULTED IN AIG FP INCURRING DEBT UNDER THE AIG FP REVOLVING CREDIT AGREEMENT

79.   The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the allegations of Paragraph 79 of the Complaint and leave AIG FP to its proof.

80.   The Employee Plaintiffs deny knowledge of information sufficient to form a belief

---

to Strike" is analogous to a 12(b)(6) motion to dismiss in federal court parlance. *See* Conn. Practice Book. § 10–39 (grounds for motion include, among other things, contesting "the legal sufficiency of the allegations of any complaint").

as to the allegations of Paragraph 80 of the Complaint and leave AIG FP to its proof. To the extent Paragraph 80 references the Parent Guarantee (as defined by AIG FP), such document speaks for itself.

81.    The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the allegations of Paragraph 81 of the Complaint and leave AIG FP to its proof.

82.    The Employee Plaintiffs admit that AIG Inc. received funding from the Federal Reserve. To the extent Paragraph 82 references the Fed Loan (as defined by AIG FP), such document speaks for itself. Defendants deny knowledge of information sufficient to form a belief as to the remaining allegations of paragraph 82 of the Complaint and leave AIG FP to its proof.

83.    To the extent Paragraph 83 references the AIG Funding Revolving Credit Agreement, such document speaks for itself. The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the allegations of Paragraph 83 of the Complaint and leave AIG FP to its proof. The Employee Plaintiffs deny the remaining allegations of Paragraph 83.

84.    To the extent Paragraph 84 references the AIG FP Revolving Credit Agreement, such document speaks for itself. The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the remaining allegations of Paragraph 84 of the Complaint and leave AIG FP to its proof. The Employee Plaintiffs deny the remaining allegations of Paragraph 84.

85.    The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the allegations of Paragraph 85 of the Complaint and leave AIG FP to its proof.

86.    The allegations set forth in Paragraph 86 of the Complaint call for a legal conclusion to which no response is required. To the extent Paragraph 86 references the AIG FP

Revolving Credit Agreement, such document speaks for itself. To the extent that a response is required, the Employee Plaintiffs deny the remaining allegations of Paragraph 86.

### C.   AIG FP USES THE AIG FP REVOLVING TO PAY COLLATERAL CALLS AND TO START UNWINDING ITS PORTFOLIO

87.     The Employee Plaintiffs admit that a steering committee made up of executives from AIG FP and AIG Inc., and others, was established to oversee AIG FP's portfolio. The Employee Plaintiffs deny the remaining allegations of Paragraph 87.

88.     The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the allegations of Paragraph 88 of the Complaint and leave AIG FP to its proof.

89.     The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the allegations of Paragraph 89 of the Complaint and leave AIG FP to its proof.

90.     The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the allegations of Paragraph 90 of the Complaint and leave AIG FP to its proof.

91.     The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the allegations of Paragraph 91 of the Complaint and leave AIG FP to its proof.

92.     The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the allegations of Paragraph 92 of the Complaint and leave AIG FP to its proof.

93.     The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the allegations of Paragraph 93 of the Complaint and leave AIG FP to its proof.

94.     The Employee Plaintiffs deny the allegations in Paragraph 94 of the Complaint. Paragraph 94 also calls for a legal conclusion to which no response is needed.

### D.   THE FORMER EXECUTIVE PLAN PARTICIPANTS BRING SUITS AGAINST AIG FP

95.     The Employee Plaintiffs deny that their balances were wiped out. The Employee Plaintiffs further deny that their restoration rights under the Compensation Plans lapsed. To the

extent Paragraph 95 references the Compensation Plans, such documents speak for themselves. The Employee Plaintiffs otherwise deny the remaining allegations of Paragraph 95 of the Complaint. Paragraph 95 also calls for a legal conclusion to which no response is needed.

96.     The Employee Plaintiffs admit that AIG FP sent a letter to participants in the Compensation Plans ("Plan Participants") (to the extent they actually received it) purporting to claim that "no restorations have been possible given the magnitude of losses sustained by AIG FP" and that AIG FP's "restoration obligation lapsed as of December 31, 2013." Defendants deny the truth of the assertions contained in the letter. The Employee Plaintiffs further deny that AIG FP's unwinding process and the purported absence of Distribute Income prevented AIG FP from restoring Plan Account balances under the Compensation Plans. To the extent Paragraph 96 references the Compensation Plans, such documents speak for themselves. The Employee Plaintiffs deny the remaining allegations of Paragraph 96 of the Complaint.

### 1.     AIG FP prevails in Litigation in the U.K.

97.     The Employee Plaintiffs admit that a group of London-based Plan Participants sued AIG FP in an English trial court (the "UK Action") seeking payment of deferred compensation owed to them under the Compensation Plans. The Employee Plaintiffs further admit that, in the Connecticut Litigation, AIG FP entered into a stipulation admitting that it withheld documents in the UK Action. The stipulation states:

> *AIG Financial Products Corp. ("AIGFP") hereby stipulates that certain documents identified by Plaintiffs [the Employee Plaintiffs] herein were not produced in the action captioned Tobias Gruber and 22 others v. AIG Management France S.A., AIG Financial Products Corp. and American International Group, Inc., number CL-2014-000921 (the "UK Action").  A list of these documents is set forth below:*
>
> *1.    AIGFP_US00942069*
> *2.    AIGFP_US00942071*
> *3.    AIGFP_US00942065*
> *4.    AIGFP_US00942066*

5.    *AIGFP_US00942336*
6.    *AIGFP_US00942343*
7.    *AIGFP_US00942350*
8.    *AIGFP_US00942347*
9.    *AIGFP_US00939840*
10.    *AIGFP_US00942076*
11.    *AIGFP_US00942087*
12.    *AIGFP_US00942088*
13.    *AIGFP_US00942194*
14.    *AIGFP_US00243021*
15.    *AIGFP_US00067018*
16.    *AIGFP_US00497703*
17.    *AIGFP_US00504121*
18.    *AIGFP_US00504123*
19.    *AIGFP_US00504114*
20.    *AIGFP_US00649750*
21.    *AIGFP_US00649751*
22.    *AIGFP_US00649752*

*Though this list should capture all documents that Plaintiffs claim are relevant to AIGFP's Fifth Special Defense to the Fourth Count of its Amended Answer that were not produced in the UK Action, Plaintiffs reserve the right, as they continue to review the production and depending on the Court's rulings on Plaintiffs' Motion for an Order of Compliance pending before the Court as of the date of this stipulation, to identify additional documents that Plaintiffs claim are relevant to AIGFP's Special Defense that AIGFP agrees shall be added to the above list to the extent that such documents were not produced in the UK Action.*

*The parties agree that this stipulation may be admitted into evidence and may be considered by the Court. In so agreeing, AIGFP does not concede that this stipulation has any relevant information.*

The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the remaining allegations of Paragraph 97 of the Complaint and leave AIG FP to its proof.

98.    The Employee Plaintiffs admit that the English trial court found that AIG FP had an unqualified obligation to restore the account balances and breached the Compensation Plans when it failed to do so. The Employee Plaintiffs respectfully refer the Court to the UK Action for a complete and accurate description of the trial court's decision on claims against AIG Inc. The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the remaining

allegations of Paragraph 98 of the Complaint and leave AIG FP to its proof.

99.     The Employee Plaintiffs admit that the English Court of Appeal rendered a decision on January 24, 2020. The Employee Plaintiffs deny that the English Court of Appeal decision has any preclusive effect on the Employee Plaintiffs' claims and, in fact, at oral argument in the Connecticut Litigation held on March 5, 2021, AIG FP's counsel admitted that it had no preclusive effect, stating: "I'm not alleging that a -- that there is a collateral estoppel effect" with respect to the ruing of the English Court. Transcript of Motion to Strike Hearing (March 5, 2021), Tr. 137:10-11. The Employee Plaintiffs further admit that, in the Connecticut Litigation, AIG FP entered into a stipulation admitting that it withheld documents in the UK Action. Defendants deny the remaining allegations of Paragraph 99 of the Complaint.

100.    The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the allegations of Paragraph 100 of the Complaint and leave AIG FP to its proof. The Employee Plaintiffs further admit that, in the Connecticut Litigation, AIG FP entered into a stipulation admitting that it withheld documents in the UK Action.

### 2.     Stayed Litigation in Connecticut

101.    The Employee Plaintiffs admit that they filed a lawsuit in the Connecticut Superior Court and that the complaint attached as Exhibit H of AIG FP's Complaint speaks for itself. The Employee Plaintiffs deny the remaining allegations in Paragraph 101 of the Complaint.

102.    The Employee Plaintiffs admit that they timely commenced the Connecticut Litigation within the applicable statute of limitations. The Employee Plaintiffs deny that the Releasing Defendants (as defined by AIG FP) previously executed releases waiving any claims against AIG FP related to the Compensation Plans. The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the remaining allegations of Paragraph 102 of the

Complaint and leave AIG FP to its proof.

103.    The Employee Plaintiffs admit that the complaint filed in the Connecticut Litigation states legally sufficient claims arising under Connecticut law, including: breach of contract, violation of the covenant of good faith and fair dealing, and violation of Connecticut's wage and hour law. The Employee Plaintiffs further admit that the Connecticut court denied AIG FP's efforts to strike these claims for failure to state a claim upon which relief can be granted. The Employee Plaintiffs deny the remaining allegations of Paragraph 103.

104.    The Employee Plaintiffs respectfully refer the Court to the UK Action for a complete and accurate description of the arguments advanced by the London-based Plan Participants. To the extent Paragraph 104 references the Employee Plaintiffs' previous pleadings and filings under Connecticut law in the Connecticut Litigation those documents speak for themselves. The Employee Plaintiffs deny the remaining allegations of Paragraph 104.

105.    The Employee Plaintiffs admit that their accompanying counterclaims request the Court to enter a declaration that AIG Inc.'s investment in AIG FP (the "Parent Investment") was an equity infusion and not a purported "loan." The Employee Plaintiffs deny the remaining allegations of Paragraph 105.

106.    The Employee Plaintiffs admit that the Connecticut Litigation was stayed as a result of the automatic bankruptcy stay and that summary judgment motions were to be filed on or before January 6, 2023 — less than a month after the December 14, 2022 bankruptcy filing. The Employee Plaintiffs further admit that the Connecticut court had entered a firm trial date of July 24, 2023 and a trial management conference for May 1, 2023.

**E.    APPOINTMENT OF THE SPECIAL COMMITTEE**

107.    Denied.

### 1.     __Formation of Special Committee__

108.    Defendants admit that AIG FP asserts that Ms. Corrie and Mr. Dubel were appointed as independent directors in January 2022. The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the remaining allegations of Paragraph 108 of the Complaint and leave AIG FP to its proof.

109.    The Employee Plaintiffs admit that AIG FP asserts that Ms. Corrie and Mr. Dubel were appointed to the Special Committee. The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the allegations of Paragraph 109 of the Complaint and leave AIG FP to its proof.

110.    The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the allegations of Paragraph 110 of the Complaint and leave AIG FP to its proof.

### 2.     __Revolver Analysis__

111.    The Employee Plaintiffs admit that AIG Inc. is the __*sole*__ equity owner of AIG FP. Defendants deny that AIG Inc. is the largest creditor of AIG FP pursuant to the purported AIG FP Revolving Credit Agreement. The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the remaining allegations of Paragraph 111 of the Complaint and leave AIG FP to its proof.

112.    The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the allegations of Paragraph 112 of the Complaint and leave AIG FP to its proof.

113.    The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the allegations of Paragraph 113 of the Complaint and leave AIG FP to its proof.

114.    The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the allegations of Paragraph 114 of the Complaint and leave AIG FP to its proof. The

Employee Plaintiffs admit that counsel for AIG FP and AIG Inc. have asserted attorney-client and common-interest privilege over, among other things, the purported "Revolver Analysis" (as defined by AIG FP) and failed to provide documents and information related to the "Revolver Analysis," improperly using privilege as a sword and shield.

115.     To the extent that Paragraph 115 cites to case law and calls for a legal conclusion, no response is required and, to the extent a response is required, the Employee Plaintiffs deny same. To the extent the remaining allegations of Paragraph 115 refer to purported findings of the Special Committee set forth in documents, such documents (which have not been provided to the Employee Plaintiffs) speak for themselves. The Employee Plaintiffs deny knowledge of information sufficient to form a belief as to the remaining allegations of Paragraph 115 and therefore leave AIG FP to its proof. The Defendants further deny that the AIG FP Revolving Credit Agreement was a true debt and otherwise deny the remaining allegations in Paragraph 115.

## F.    AIG FP COMMENCES THE CHAPTER 11 CASE

116.     The Employee Plaintiffs admit that, on December 14, 2022, AIG FP commenced a Chapter 11 case and filed a purported *Plan of Reorganization of AIG Financial Products Corp. under Chapter 11 of the Bankruptcy Code* [D.I. 6] and a related disclosure statement [D.I. 7], but deny that AIG FP is entitled to the relief sought in the Chapter 11 Case. Paragraph 116 of the Complaint also calls for legal conclusions to which no response is required. To the extent a response is required, the Employee Plaintiffs deny the remaining allegations of Paragraph 116.

117.     The Employee Plaintiffs admit that, on January 13, 2023, the Employee Plaintiffs filed a motion to dismiss[6] the Chapter 11 Case and that, it is the position of the Employee Plaintiffs

---

[6] The Employee Plaintiffs appealed this Court's opinion denying their Motion to Dismiss, which is a final order from which the Employee Plaintiffs have an automatic right of appeal. Nothing in this Answer with Affirmative Defenses and Counterclaims or in any further proceedings in this Chapter 11 Case should be deemed a waiver of the Employee Plaintiffs' rights or positions in that appeal.

that the purported AIG FP Revolving Credit Agreement was an equity infusion and not a debt. The

Employee Plaintiffs deny the remaining allegations of Paragraph 117.

G.    **THE LOANS EXTENDED TO AIG FP UNDER THE AIG FP REVOLVING CREDIT AGREEMENT ARE DEBT**

118.    The Employee Plaintiffs admit that the Special Committee asserts that the

Revolving Credit Agreement is debt but deny that the decision of the Special Committee was

proper because AIG Inc.'s investment in AIG FP was an equity infusion, not debt. To the extent

Paragraph 118 refers to specific provisions of the purported AIG FP Revolving Credit Agreement,

the Employee Plaintiffs respectfully refer the Court to said document for a complete and accurate

description of its contents. The Employee Plaintiffs deny the remaining allegations of Paragraph

118 of the Complaint.

119.    Denied.

120.    The Employee Plaintiffs admit, with the exception of their claims for unpaid

deferred compensation, that AIG FP appears to have met its other obligations as they came due.

Defendants otherwise deny knowledge of information sufficient to form a belief as to the

remaining allegations of Paragraph 120 of the Complaint and leave AIG FP to its proof.

121.    The Employee Plaintiffs deny that AIG Inc. treated the purported loans under the

AIG FP Revolving Credit Agreement as debt within the AIG corporate family and in its dealings

with third parties, including the Federal Reserve Bank of New York ("FRBNY"). Defendants

further deny that AIG Inc. recorded the purported loans it made to AIG FP as loans on its books

and records. The Employee Plaintiffs otherwise deny knowledge of information sufficient to form

a belief as to the remaining allegations of Paragraph 121 of the Complaint and leave AIG FP to its

proof.

122.    Paragraph 122 of the Complaint calls for legal conclusions to which no response is

required. To the extent a response is required, the Employee Plaintiffs deny the allegations of Paragraph 122. To the extent Paragraph 122 refers to specific provisions of the purported AIG FP Revolving Credit Agreement, the Employee Plaintiffs respectfully refer the Court to said document for a complete and accurate description of its contents. The Employee Plaintiffs deny the remaining allegations of Paragraph 122 of the Complaint.

123.    The Employee Plaintiffs deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 123 of the Complaint and leave AIG FP to its proof. The Employee Plaintiffs deny the remaining allegations of Paragraph 123.

124.    The Employee Plaintiffs deny that the AIG FP Revolving Credit Agreement was (and is) a debt against AIG FP and otherwise deny the remaining allegations of Paragraph 124 of the Complaint.

125.    The allegations set forth in Paragraph 125 of the Complaint call for legal conclusions to which no response is required. The Employee Plaintiffs deny that the same claims asserted today by AIG Inc. under the purported AIG FP Revolving Credit Agreement would have existed for AIG Inc. under the General Guarantee Agreement in the form of subrogation claims. Defendants otherwise deny the remaining allegations of Paragraph 125.

126.    The allegations set forth in Paragraph 126 of the Complaint call for legal conclusions to which no response is required. To the extent that a response is required, Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 126 of the Complaint and leave AIG FP to its proof. The Employee Plaintiffs deny the remaining allegations of Paragraph 126.

**H.    THE COMPENSATION PLANS CREATE EQUITY INTERESTS, NOT CLAIMS OR DEBT**

127.    To the extent that Paragraph 127 of the Complaint cites to caselaw, it calls for a

legal conclusion to which no response is required and, to the extent a response is required, the Employee Plaintiffs deny same. To the extent Paragraph 127 references the Compensation Plans, the Employee Plaintiffs respectfully refer the Court to those documents for a complete and accurate description of their provisions. The remaining allegations of Paragraph 127 are denied.

128.    To the extent Paragraph 128 of the Complaint references the Employee Plaintiffs' Motion to Dismiss and *In re Telegroup Inc.*, 281 F.3d 133 (3d Cir. 2001), the Employee Plaintiffs respectfully refer the Court to those documents and decision for a complete and accurate description of their contents. To the extent that Paragraph 128 cites to caselaw, it calls for a legal conclusion to which no response is required. The Employee Plaintiffs deny the remaining allegations of Paragraph 128.

129.    To the extent Paragraph 129 of the Complaint references the Compensation Plans, the Employee Plaintiffs respectfully refer the Court to those documents for a complete and accurate description of their contents. The Employee Plaintiffs deny the remaining allegations of Paragraph 129.

130.    To the extent Paragraph 130 of the Complaint references the Compensation Plans, the Employee Plaintiffs respectfully refer the Court to those documents for a complete and accurate description of their contents. The Employee Plaintiffs otherwise deny the remaining allegations of Paragraph 130.

131.    To the extent Paragraph 131 of the Complaint references the Compensation Plans, the Employee Plaintiffs respectfully refer the Court to those documents for a complete and accurate description of their contents. To the extent Paragraph 131 states legal conclusions no response is required and, to the extent a response is required, the Employee Plaintiffs deny same. The Employee Plaintiffs otherwise deny the remaining allegations in Paragraph 131.

132.    To the extent Paragraph 132 of the Complaint references the Compensation Plans, the Employee Plaintiffs respectfully refer the Court to those documents for a complete and accurate description of their contents. The Employee Plaintiffs otherwise deny the remaining allegations in Paragraph 132.

133.    Denied.

134.    Denied.

## CLAIMS FOR RELIEF

### COUNT ONE

#### (DECLARATORY JUDGMENT – THE AIG FP REVOLVER IS DEBT)

135.    The Employee Plaintiffs incorporate their responses to the preceding paragraphs as if fully set forth herein.

136.    To the extent the allegations set forth in Paragraph 136 of the Complaint call for a legal conclusion, no response is required. To the extent that a response is required, the Employee Plaintiffs deny the allegations of Paragraph 136.

137.    Denied.

138.    Denied.

### COUNT TWO

#### (DECLARATORY JUDGMENT – THE ALLEGED UNPAID AMOUNTS ARISING UNDER THE COMPENSATION PLANS ARE SUBORDINATED)

139.    The Employee Plaintiffs incorporate their response to the preceding paragraphs as if fully set forth herein.

140.    To the extent the allegations set forth in Paragraph 140 of the Complaint call for a legal conclusion, no response is required. To the extent that a response is required, the Employee Plaintiffs deny the allegations of Paragraph 140.

141. To the extent Paragraph 141 of the Complaint refers to the content of the Compensation Plans, such documents speak for themselves, and the Employee Plaintiffs respectfully refer the Court to those documents for a complete and accurate description of their contents. The Employee Plaintiffs deny the remaining allegations of Paragraph 141.

142. To the extent Paragraph 142 of the Complaint refers to the content of the AIG FP Revolving Credit Agreement, such document speaks for itself, and the Employee Plaintiffs respectfully refer the Court to such document for a complete and accurate description of its contents. The Employee Plaintiffs deny the remaining allegations of Paragraph 142.

143. To the extent the allegations set forth in Paragraph 143 of the Complaint call for a legal conclusion, no response is required. To the extent that a response is required, the Employee Plaintiffs deny the allegations of Paragraph 143.

144. To the extent the allegations set forth in Paragraph 144 of the Complaint call for a legal conclusion, no response is required. To the extent a response is required, the Employee Plaintiffs deny the allegations of Paragraph 144.

145. To the extent the allegations set forth in Paragraph 145 of the Complaint refer to the contents of the Compensation Plans, such documents speak for themselves, and the Employee Plaintiffs respectfully refer the Court to said documents for a complete and accurate description of their contents. The Employee Plaintiffs deny the remaining allegations of Paragraph 145.

146. To the extent the allegations set forth in Paragraph 146 of the Complaint call for a legal conclusion, no response is required. To the extent a response is required, the Employee Plaintiffs deny the allegations of Paragraph 146.

147. To the extent the allegations set forth in Paragraph 147 of the Complaint call for a legal conclusion, no response is required. To the extent a response is required, the Employee

Plaintiffs deny the allegations of Paragraph 147.

## COUNT THREE

### (DECLARATORY JUDGMENT – THE COMPENSATION PLANS CREATE EQUITY INTERESTS, NOT CLAIMS OR DEBT)

148.    The Employee Plaintiffs incorporate their responses to the preceding paragraphs as if fully set forth herein.

149.    To the extent the allegations set forth in Paragraph 149 of the Complaint call for a legal conclusion, no response is required. To the extent a response is required, the Employee Plaintiffs deny the allegations of Paragraph 149.

150.    To the extent the allegations set forth in Paragraph 150 of the Complaint call for a legal conclusion, no response is required. To the extent a response is required, the Employee Plaintiffs deny the allegations of Paragraph 150.

## COUNT FOUR

### (THE DEFENDANTS' UNPAID AMOUNTS, IF ANY, ARISING UNDER THE COMPENSATION PLANS SHOULD BE DISALLOWED IN THEIR ENTIRETY UNDER SECTION 502(B)(4) OF THE BANKRUPTCY CODE)

151.    The Employee Plaintiffs incorporate their responses to the preceding paragraphs as if fully set forth herein.

152.    To the extent the allegations set forth in Paragraph 152 call for a legal conclusion, no response is required. To the extent a response is required, the Employee Plaintiffs deny the allegations of Paragraph 152. In addition, the Employee Plaintiffs submit that AIG FP's claim is premature, as the Employee Plaintiffs have not yet filed their proofs of claim pursuant to Federal Rule of Bankruptcy Procedure 3003(c)(2) as no bar date has been sought by AIG FP, nor has a bar date been ordered by the Court pursuant to Federal Rule of Bankruptcy Procedure 3003(c)(3).

153.    To the extent the allegations set forth in Paragraph 153 of the Complaint call for a

legal conclusion, no response is required. To the extent a response is required, the Employee Plaintiffs deny the allegations of Paragraph 153.

154.    To the extent the allegations set forth in Paragraph 154 of the Complaint call for a legal conclusion, no response is required. To the extent a response is required, the Employee Plaintiffs deny the allegations of Paragraph 154.

155.    To the extent the allegations set forth in Paragraph 155 of the Complaint call for a legal conclusion, no response is required. To the extent a response is required, the Employee Plaintiffs deny the allegations of Paragraph 155.

## COUNT FIVE

### (CERTAIN DEFENDANTS HAVE ALREADY RELEASED THEIR CLAIMS)

156.    The Employee Plaintiffs incorporate their responses to the proceeding paragraphs as if fully set forth herein.

157.    To the extent the allegations set forth in Paragraph 157 of the Complaint call for a legal conclusion, no response is required. To the extent that a response is required, the Employee Plaintiffs deny the allegations of Paragraph 157.

158.    The Employee Plaintiffs deny that the separation or severance agreements released the claims at issue in the Connecticut Litigation or any claims under the Compensation Plans and deny that any of their claims should be disallowed. The remaining allegations of Paragraph 158 are denied.

159.    To the extent the allegations set forth in Paragraph 159 of the Complaint call for a legal conclusion, no response is required. To the extent that a response is required, the Employee Plaintiffs deny the allegations of Paragraph 159.

## PRAYER FOR RELIEF

The Employee Plaintiffs deny that AIG FP is entitled to the declaratory and other relief sought in its prayer for relief.

## GENERAL DENIAL

The Employee Plaintiffs deny each and every allegation not specifically admitted herein.

## AFFIRMATIVE DEFENSES

In further response to the Complaint for Declaratory Relief, upon information and belief and subject to further investigation and discovery, the Employee Plaintiffs submit the following affirmative defenses without assuming any burden of proof that the Employee Plaintiffs do not otherwise bear:

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

AIG FP is estopped or otherwise barred from invoking the subordination provision of Section 4.01(b) of the DCP and Section 4.01(b) of the SIP, or any other provision of those agreements, because it previously materially breached the DCP and SIP by failing to restore the account balances and then failing to pay the amounts contractually owed to the Employee Plaintiffs. Basic principles of law, equity and fairness bar AIG FP from selectively enforcing certain provisions of the DCP and SIP now, in these bankruptcy proceedings, when it previously materially breached its contractual obligations to restore the account balances, create a plan of restoration, extend the lapse date, and pay the Employee Plaintiffs the amounts they are owed. AIG FP cannot have it both ways.

### Third Affirmative Defense

AIG FP is estopped or otherwise barred from invoking the subordination provision of Section 4.01(b) of the DCP and Section 4.01(b) of the SIP, or any other provision of those agreements, because it previously materially breached the DCP and SIP by coordinating with, and/or taking direction from, AIG Inc. on whether to restore the account balances or create a plan of restoration in contravention of express language stating that any such restoration plan "shall not be subject to the approval of AIG [Inc.]."

### Fourth Affirmative Defense

AIG FP's claims for relief are barred by the doctrine of equitable estoppel because AIG FP made numerous representations, including but not limited to (1) telling the Employee Plaintiffs that their DCA and SIP Account balances would be restored so that the Employee Plaintiffs would make additional voluntary contributions, and (2) stating to rating agencies and others that it was solvent. The Employee Plaintiffs reasonably relied upon these representations and are damaged by AIG FP's adoption of subsequently inconsistent positions (including in the Connecticut Litigation and these proceedings), which are nothing more than a pretext for ignoring AIG FP's obligation to restore the account balances and pay the Employee Plaintiffs the amounts that they are owed pursuant to the DCP and SIP.

### Fifth Affirmative Defense

AIG FP's claims for relief are barred or limited by the doctrines of laches and equitable estoppel because, even accepting the allegations as true, AIG FP knew facts giving rise to its claims as of at least 2013 or 2014. As of at least December 2013, AIG FP had not adopted or taken steps to adopt a restoration plan or extend the lapse date in order to repay the amounts owed under the deferred compensation plans as required under the provisions of the DCP and SIP and as of July

2014 AIG FP made clear that it had no intention of restoring the DCP and SIP account balances when it informed Plan Participants that there would be no restoration, in large part due to the purported "debt" owed to AIG Inc. Furthermore, in October 2014 AIG FP was sued in the U.K. by London-based Plan Participants seeking payment of amounts owed to them under the DCP and SIP. AIG FP knew as of at least this time that there could be a legal question as to the nature of the Revolving Credit Agreement in relation to its failure to repay the deferred compensation owed to Plan Participants under the DCP and SIP.

At any time in the last decade, AIG FP could have sought a declaratory judgment to resolve whether the AIG FP Revolving Credit Agreement was debt or equity. Despite multiple ongoing litigations, beginning as far back as 2014, directly related to the question of AIG FP's obligation and ability to pay the amounts owed under the DCP and SIP, AIG FP delayed asserting its claims related to whether the funds provided to it under the AIG FP Revolving Credit Agreement were debt or equity for an unreasonable period of time to the Employee Plaintiffs' detriment.

## **Sixth Affirmative Defense**

AIG FP's claims are barred by the doctrine of *in pari delicto* because AIG FP engaged in intentional and wrongful conduct, which includes but is not limited to: (1) making false assurances to the Employee Plaintiffs that it would repay the amounts owed to them under the Compensation Plans; (2) disguising AIG Inc.'s equity infusion (which curiously was sometimes booked as debt and sometimes accounted for as equity contributions) as debt; (3) concealing documents establishing its shifting and inconsistent positions on the equity infusion (*i.e.*, AIG FP has admitted that it failed to produce certain relevant and material documents to the UK claimants in the UK Action and was ordered by the Connecticut court to produce certain of these documents that were improperly withheld from the Employment Plaintiffs, but instead filed its Chapter 11 Case to avoid

compliance with the Connecticut court's order); (4) taking inconsistent positions when it suited AIG FP (*i.e.*, representing to rating agencies, other tribunals, and others that it was solvent and now taking a directly contrary position); (5) imposing a fictional profitability condition and coordinating with AIG Inc. on the restoration of the plans in contravention of express language in the DCP and SIP; and (6) coordinating with AIG Inc. to transfer more than a hundred million dollars of AIG FP's assets to AIG Inc. and other AIG entities in a thinly veiled effort to claim insolvency and assert that there are not sufficient funds to pay the Employee Plaintiffs.

<u>**Seventh Affirmative Defense**</u>

AIG FP's claims are barred by the doctrine of unclean hands because AIG FP has engaged in a pattern of wrongful conduct designed to thwart the Employee Plaintiffs from recovering the amounts owed to them pursuant to the DCP and SIP. This wrongful conduct includes but is not limited to: (1) making false assurances to the Employee Plaintiffs that it would pay the amounts owed under the Compensation Plans; (2) disguising AIG Inc.'s equity infusion (which was sometimes booked as debt and sometimes accounted for as equity contributions) as debt; (3) concealing documents establishing its shifting and inconsistent positions on the equity infusion (*i.e.*, AIG FP has admitted that it failed to produce certain relevant and material documents to the UK claimants in the UK Action and was ordered by the Connecticut court to produce certain of these documents that were improperly withheld from the Employee Plaintiffs, but instead filed its Chapter 11 Case to avoid compliance with the Connecticut court's order); (4) taking inconsistent positions when it suited AIG FP (*i.e.*, representing to rating agencies, other tribunals, and others that it was solvent and now taking a directly contrary position); (5) imposing a fictional profitability condition and coordinating with AIG Inc. on the restoration of the plans in contravention of express language in the DCP and SIP; and (6) coordinating with AIG Inc. to

transfer more than a hundred million dollars of AIG FP's assets to AIG Inc. and other AIG entities in a thinly veiled effort to claim insolvency and assert that there are not sufficient funds to pay the Employee Plaintiffs.

### Reservation of Rights

The Employee Plaintiffs reserve the right to rely on all affirmative defenses to AIG FP's claims available to them under the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the District of Delaware, 11 U.S.C. § 101 *et seq*., or which become available to them after discovery or at trial, and further hereby reserve their right to amend this Answer as of right, or with leave of the Court, for the purpose of asserting any additional defenses. The Employee Plaintiffs further reserve their right to assert all available claims and counterclaims against AIG FP pursuant to Federal Rule of Bankruptcy Procedure 7013, including, but not limited to, any and all claims that the Employee Plaintiffs may include in any proofs of claim filed in the Chapter 11 case.

## COUNTERCLAIM AGAINST AIG FP AND CLAIMS AGAINST THIRD-PARTY INTERVENOR AIG INC.

### Introduction

1.      In December 2019, the Employee Plaintiffs—46 former employees of AIG FP, a wholly-owned subsidiary of AIG Inc.—commenced an action in the Superior Court of Connecticut, to recover millions of dollars in damages caused by AIG FP's breaches of contract and violations of Connecticut labor law in failing to pay them certain earned and vested deferred compensation.

2.      After three years of hard-fought litigation in Connecticut, which included the Connecticut court's denial of a motion to strike the Employee Plaintiffs' claims, AIG FP waited until December 14, 2022, when certain sensitive, and presumably damaging, documents were due to be produced by court order, and just months before trial, to file its Chapter 11 Case. In support of its forum shopping, AIG FP claimed to be insolvent because it purportedly owed approximately $37 billion to its parent AIG Inc., despite having represented to other tribunals, rating agencies, and others that it was in fact solvent in the fifteen years leading up to the Petition Date.

3.      There is a good reason that AIG FP had so consistently claimed to be solvent –the so-called debt claimed to be owed was in fact equity, having all the indicia of an investment by the parent, AIG Inc., in its wholly owned subsidiary, AIG FP. The purported "revolving line of credit" extended by AIG Inc. is bereft, however, of the hallmarks of valid debt: it has no set interest rate, no term of payment, and was never expected to be repaid. The supposed debt serves as merely a convenient pretext to avoid paying Employee Plaintiffs the money they earned, and which AIG FP borrowed from them during the financial downturn in 2008.

4.      Indeed, email exchanges uncovered in discovery by the Employee Plaintiffs in the Connecticut Litigation identified that the purported loan was considered by AIG Inc. to be an

equity infusion in AIG FP from the very beginning. For example, in a September 2010 email, Brian Reilly (CFO of AIG Financial Services Division) and David Herzog (CFO of AIG Inc.) confirmed that the amounts extended by AIG Inc. to AIG FP was a "capital contribution":

████████████████████████████████████████████████

████████████████████████████████████████████████

(emphasis added). Herzog's subtext was clear: AIG Inc. was determined to avoid paying Employee Plaintiffs.

5.      Based on false assurances by AIG FP that it would repay the deferred compensation that had been borrowed to address the liquidity crisis, the Employee Plaintiffs continued to work for AIG FP through the financial crisis and assisted it in navigating and maximizing the wind-down of the business.

6.      By the express terms of the Compensation Plans, AIG FP was required to either restore account balances or adopt a plan of repayment by no later than December 31, 2013 or extend that date so long as the extension did not violate section 409A of the Internal Revenue Code. Given that it had the ability to pay on or before the end of 2013, it was also required to repay the deferred compensation it had borrowed from them by that date.

7.      AIG FP, however, had no intention of paying. Instead, AIG FP, in collusion with, and at the direction of, AIG Inc., invented false legal impediments and played games with its consolidated balance sheet for the purpose of avoiding its obligations to the Employee Plaintiffs.

8.      This scheme to avoid payment was controlled and orchestrated by AIG Inc., for its benefit, notwithstanding that the deferred compensation documents expressly provided that adoption of the repayment plan "**shall not be subject to the approval of AIG [Inc.].**" (emphasis

added). AIG Inc.'s disregard of the express guardrails to repayment is startling in its arrogance.

9.      Ironically, with the skilled assistance of many of the Employee Plaintiffs, AIG FP continued to generate billions of dollars of profits during the financial crisis. As far back as 2010, and in subsequent years, AIG FP had positive cashflow of billions of dollars that rendered it able to pay the Employee Plaintiffs their deferred compensation.

10.     Instead of paying its loyal employees, AIG FP, at the direction of AIG Inc., invented a fictional condition of profitability that was nowhere in the DCP and SIP, and then used that as a strawman to not only refuse to pay, but also to avoid adopting a plan to pay the Employee Plaintiffs. Even if profitability were an actual condition, AIG FP was profitable at that time and able to pay.

11.     In furtherance of this scheme, AIG FP also sent statements to the Employee Plaintiffs suggesting that they had negative balances in their DCP and SIP Accounts of hundreds of millions of dollars to make it seem as if AIG FP would have to recoup those negative amounts before restoring the plan balances and that AIG FP's ability to repay those funds was remote. The DCP and SIP do not explicitly or implicitly allow for negative account balances. This too was an invented accounting fiction, as these negative balances suggested an obligation on the part of the Employee Plaintiffs to repay AIG FP, which AIG FP agreed were not actual obligations. There was no business or accounting justification to report negative balances on the DCP and SIP account statements other than to deter action by Plan Participants to enforce their rights.

12.     In order to prevent AIG FP from being rewarded for its bad conduct, the Employee Plaintiffs seek a declaratory judgment confirming that the alleged "debt" under the so-called Revolving Credit Agreement was an equity infusion.

13.     The Employee Plaintiffs also seek relief from AIG FP's parent, AIG Inc., because

it wrongfully and tortiously controlled AIG FP's decision not to pay the Employee Plaintiffs in violation of the express terms of the Compensation Plans and orchestrated the stripping of hundreds of millions of dollars of AIG FP's cash and other assets. The Employee Plaintiffs further seek a declaratory judgment confirming AIG FP transferred substantially all of its assets to AIG Inc. (or entities it controls) and that AIG Inc. has assumed all of the obligations of AIG FP under the DCP and SIP. The Employee Plaintiffs also seek relief against AIG Inc. for breach of the DCP and SIP.

14.    Insofar as AIG FP and AIG Inc. seek the protection of a subordination provision in the deferred compensation plans that they claim is triggered by the filing of this bankruptcy, they should be precluded from availing themselves of this convenient claim by reason of their prior breach of those agreements. AIG FP, directed by AIG Inc.'s tortious interference, breached the Compensation Plans in 2013 by not adopting a plan of repayment, not paying the deferred compensation owed on or before December 31, 2013 at a time when AIG FP could pay and there was no bankruptcy, and not extending the lapse date when it was permitted to do so as long as the extension did not violate section 409A of the Internal Revenue Code. Because the breach occurred before the filing of this bankruptcy, the subordination provisions should be assessed as of the time of the breach, rendering them inoperative here. By reason of this prior breach and the depth of bad faith conduct by AIG FP and AIG Inc., the Employee Plaintiffs seek a declaration against AIG Inc. equitably subordinating AIG Inc.'s claimed debt to the Employee Plaintiffs' claims as well as affirmative relief under Connecticut law for claims of *prima facie* tort, and tortious interference with contractual relations.

## THE PARTIES

## The Defendants-Counterclaim Plaintiffs-Third-Party Claim Plaintiffs (the Employee Plaintiffs)[7]:

15.    Plaintiff Lee Arthurs is a resident of New York, New York. Mr. Arthurs was employed by AIG FP from August of 1988 to January of 2006.

16.    Plaintiff David Ackert is a resident of Nevada. Mr. Ackert was employed by AIG FP from March of 1994 to February of 2007.

17.    Plaintiff Mitchell Bell is a resident of Connecticut. Mr. Bell was employed by AIG FP from March of 1998 to August of 2011.

18.    Plaintiff Erik Bengtson is a resident of New York. Mr. Bengtson was employed by AIG FP from June of 1994 to June of 2009.

19.    Plaintiff Paul Bradshaw is a resident of Westport, Connecticut. Mr. Bradshaw was employed by AIG FP from February of 1996 to September of 2010.

20.    Plaintiff Thomas Buttke is a resident of Weston, Connecticut. Mr. Buttke was employed by AIG FP from August of 1997 to July of 2009.

21.    Plaintiff John Cappetta is a resident of La Jolla, California. Mr. Cappetta was employed by AIG FP from October of 1992 to February of 2006.

22.    Plaintiff David Chang is a resident of Connecticut. Mr. Chang was employed by AIG FP from May of 2001 to November of 2015.

23.    Plaintiff Robert Chang is a resident of Greenwich, Connecticut. Mr. Chang was employed by AIG FP from March of 1995 to December of 2015.

24.    Plaintiff Jason DeSantis is a resident of Redding, Connecticut. Mr. DeSantis was

---

[7] Each individual listed below is a Defendant-Counterclaim Plaintiff-Third-Party Claim Plaintiff in the Adversary Proceeding as well as an Employee Plaintiff in the Connecticut Litigation and as defined herein. For convenience, each individual is identified as a Plaintiff. The Defendants-Counterclaim Plaintiffs-Third-Party Claim Plaintiffs were employed by AIG FP or another AIG entity or affiliate during the time periods indicated.

employed by AIG FP from June of 1998 to May of 2009.

25.    Plaintiff Richard Fabbro is a resident of Scarsdale, New York. Mr. Fabbro was employed by AIG FP from March of 1994 to February of 2010.

26.    Plaintiff Kenneth Farrar is a resident of Norwalk, Connecticut. Mr. Farrar was employed by AIG FP from April of 2003 to October of 2008.

27.    Plaintiff Jonathan Fraade is a resident of Connecticut. Mr. Fraade was employed by AIG FP from April of 1996 to May of 2009.

28.    Plaintiff Carl Giesler Jr. is a resident of Texas. Mr. Giesler was employed by AIG FP from September of 2007 to December of 2008.

29.    Plaintiff James Haas is a resident of Florida. Mr. Haas was employed by AIG FP from March of 1996 to July of 2011.

30.    Plaintiff Charles Hsieh is a resident of Stamford, Connecticut. Mr. Hsieh was employed by AIG FP from September of 2000 to March of 2010.

31.    Plaintiff Thomas Kalb is a resident of Houston, Texas. Mr. Kalb was employed by AIG FP from July of 2003 to June of 2006.

32.    Plaintiff Thomas Kushner is a resident of Connecticut. Mr. Kushner was employed by AIG FP from July of 2004 to October of 2008.

33.    Plaintiff Robert Leary is a resident of Florida. Mr. Leary was employed by AIG FP from April of 1995 to July of 2007.

34.    Plaintiff Jonathan Liebergall is a resident of South Carolina. Mr. Liebergall was employed by AIG FP from May of 1991 to January of 2016.

35.    Plaintiff Nathaniel Litwak is a resident of Chappaqua, New York. Mr. Litwak was employed by AIG FP from May of 2002 to May of 2009.

36.    Plaintiff Brendan Lynch is a resident of Fairfield, Connecticut. Mr. Lynch was employed by AIG FP from November of 1993 to January of 2011.

37.    Plaintiff Alfred Medioli is a resident of New Jersey. Mr. Medioli was employed by AIG FP from November of 1991 to August of 2009.

38.    Plaintiff Matthew Mihaly is a resident of Trumbull, Connecticut. Mr. Mihaly was employed by AIG FP from March of 1998 to October of 2011.

39.    Plaintiff JoAnn Palazzo is a resident of Connecticut. Ms. Palazzo was employed by AIG FP from January of 1990 to December of 2006.

40.    Plaintiff Eugene Park is a resident of Weston, Connecticut. Mr. Park was employed by AIG FP from March of 2000 to January of 2007.

41.    Plaintiff Andrew Partner is a resident of Norwalk, Connecticut. Mr. Partner was employed by AIG FP from November of 1987 to June of 2016.

42.    Plaintiff Carl Peterson is a resident of Texas. Mr. Peterson was employed by AIG FP from July of 2003 to March of 2008.

43.    Plaintiff Steven Pike is a resident of Littleton, Colorado. Mr. Pike was employed by AIG FP from July of 2003 to April of 2007.

44.    Plaintiff Thomas Plagemann is a resident of New York, New York. Mr. Plagemann was employed by AIG FP from October of 2004 to September of 2009.

45.    Plaintiff Robert Powell is a resident of Connecticut. Mr. Powell was employed by AIG FP from October of 1997 to October of 2009.

46.    Plaintiff Daniel Raab is a resident of New Jersey. Mr. Raab was employed by AIG FP from July of 2003 to April of 2009.

47.    Plaintiff Ann Reed is a resident of Darien, Connecticut. Ms. Reed was employed

by AIG FP from February of 2003 to July of 2009.

48.     Plaintiff Dmitry Satanovsky is a resident of Weston, Connecticut. Mr. Satanovsky was employed by AIG FP from January of 2004 to March of 2019.

49.     Plaintiff Paul Schreiner is a resident of Connecticut. Mr. Schreiner was employed by AIG FP from April of 1998 to August of 2009.

50.     Plaintiff Mary Heather Singer is a resident of West Hartford, Connecticut. Ms. Singer was employed by AIG FP from February of 1997 to February of 2006.

51.     Plaintiff Keith Stein is a resident of Weston, Connecticut. Mr. Stein was employed by AIG FP from November of 1993 to March of 2007.

52.     Plaintiff Frank Strohm is a resident of Austin, Texas. Mr. Strohm was employed by AIG FP from January of 1994 to May of 2006.

53.     Plaintiff Timothy Sullivan Jr. was a resident of Houston, Texas.[8] Mr. Sullivan was employed by AIG FP from July of 2003 to April of 2007.

54.     Plaintiff Chris Toft is a resident of Weston, Connecticut. Mr. Toft was employed by AIG FP from April of 2003 to November of 2015.

55.     Plaintiff Joe Tom is a resident of River Vale, New Jersey. Mr. Tom was employed by AIG FP from June of 1996 to April of 2015.

56.     Plaintiff Ryan Vetter is a resident of New York. Mr. Vetter was employed by AIG FP from April of 2006 to October of 2008.

57.     Plaintiff Steven Wagar is a resident of Norwalk, Connecticut. Mr. Wagar was employed by AIG FP from February of 1996 to May of 2016.

58.     Plaintiff Thomas Ward is a resident of Connecticut. Mr. Ward was employed by

---

[8] As noted above, Mr. Sullivan is deceased as of the time of this filing. A notice and substitution of party will be filed separately.

AIG FP from February of 1987 to April of 2017.

59.     Plaintiff Martin Wayne is a resident of Bedford, New York. Mr. Wayne was employed by AIG FP from January of 1987 to late 2008.

60.     Plaintiff James Wolf is a resident of Texas. Mr. Wolf was employed by AIG FP from February of 1995 to January of 2007.

**The Debtor (AIG FP):**

61.     The Debtor, AIG Financial Products Corp., is a wholly owned subsidiary of AIG Inc. AIG FP is located at 50 Danbury Road, Wilton, Connecticut, 06897.

**The Third-Party Intervenor (AIG Inc.):**

62.     Third-Party Intervenor American International Group Inc. intervened in this Adversary Proceeding with full participation rights as a party. *See Order Approving Stipulation Permitting AIG, Inc. to Intervene in Adversary Proceeding* [D.I. 8]. In connection with its request to intervene, which was effectuated by stipulation, AIG Inc. affirmatively declared that it "has an interest in the subject matter of the Adversary Proceeding that may be affected by its disposition." *See Proposed Order and Stipulation re AIG Intervening in Adversary Proceeding* [D.I. 6-1]. AIG Inc. is located at 1271 6th Avenue, New York, NY 10020.

## JURISDICTION AND VENUE

63.     This Court has jurisdiction over the counterclaims and third-party claims in this Adversary Proceeding pursuant to 28 U.S.C. §§ 1334 and 1367, 28 U.S.C. § 157, and 28 U.S.C. §§ 2201 and 2202. Pursuant to Local Rule 9013-1(f), the Employee Plaintiffs do not consent to the entry of a final order or judgment by the Court in connection with this Adversary Proceeding to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

64.    Venue of this adversary proceeding is proper before the Court pursuant 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

### A.    AIG FP'S DEFERRED COMPENSATION OBLIGATIONS TO THE EMPLOYEE PLAINTIFFS

65.    While working for AIG FP before and during the 2008 financial crisis, the Employee Plaintiffs were required to participate in certain bonus compensation plans that required them to defer significant portions of their bonus and other compensation: the DCP, the SIP, and the ERP. Each of the Employee Plaintiffs was a participant in the DCP and a number also participated in the SIP and the ERP.

66.    None of the Employee Plaintiffs were involved in the drafting of these deferred compensation plans, or negotiated how the plans would work, nor were they involved in establishing the amount of their compensation that would be automatically deferred under the plans.

67.    Pursuant to the Compensation Plans, the Employee Plaintiffs' deferred compensation was credited to DCAs established by the DCP, or SIP Accounts established by the SIP. The DCAs and SIP Accounts were created in each of the Employee Plaintiffs' names and maintained on AIG FP's books.

68.    According to the Compensation Plans, AIG FP was to make installment payments with interest on the Employee Plaintiffs' DCA and SIP Account balances. AIG FP was also permitted to use the money in the Employee Plaintiffs' DCAs and SIP Accounts as capital to fund its business, so long as it later restored and paid the money it took from the Employee Plaintiffs' accounts.

69.    In addition to the compensation the Employee Plaintiffs were required to defer into their DCAs and SIP Accounts, AIG FP repeatedly implored the Employee Plaintiffs to voluntarily defer more money into the accounts and assured them that they were making a good investment in their employer's business.

70.    In or around 2007 through early 2009, AIG Inc. and AIG FP experienced a liquidity crisis.

71.    Around this time, AIG FP began crediting its losses against the Employee Plaintiffs' DCAs and SIP Account balances—which resulted in the fiction that the DCA and SIP Account balances were negative.

72.    Thereafter, AIG FP stopped making installment payments to the Employee Plaintiffs on the purported basis that the DCA and SIP Account balances were negative.

73.    At the same time, AIG FP repeatedly assured its employees that it would restore the DCA and SIP Account balances (as AIG FP was contractually obligated to do by the terms of the Compensation Plans) and pay the Employee Plaintiffs the money they were owed.

74.    With these assurances in place, AIG FP continued to require the Employee Plaintiffs to defer compensation into their DCAs and SIP Accounts and to encourage them to defer even more compensation into these accounts voluntarily. Thus, despite the fictional negative balances in their accounts, and in the midst of the financial crisis, the Employee Plaintiffs were required to continue to defer their compensation into their DCA and SIP Accounts with the understanding that AIG FP would eventually pay them back.

75.    After the 2008 financial crisis, AIG Inc. returned to profitability in July 2011 and repaid all debts owed to the U.S. Government by December 2012 so that the Government realized a profit of over $20 billion. Similarly, AIG FP also returned to profitability.

76.    Pursuant to the DCP and SIP, AIG FP was required to restore the Employee Plaintiffs' DCA and SIP Account balances to their full amounts. In particular, AIG FP had until the end of 2013 to restore and pay the amounts AIG FP took from the DCA and SIP Accounts, plus interest. AIG FP also had an obligation to extend the payment date unless such an extension violation section 409A of the Internal Revenue Code.

77.    However, in breach of its obligations, in a letter dated July 31, 2014, AIG FP informed the Employee Plaintiffs that it would not restore or pay their DCA or SIP Account balances.

78.    Pursuant to the General Guarantee Agreement between AIG Inc. and AIG FP, AIG Inc. is required to pay the obligations of AIG FP, which meant that AIG FP had the financial backing of its parent and therefore did not struggle to pay amounts it owed.

79.    Despite AIG Inc.'s repayment of its government obligations, AIG FP's return to profitability, its continuation as a solvent business, and its legal obligations under the Compensation Plans, AIG FP did not adopt a repayment plan to restore the deferred compensation it owed to the Employee Plaintiffs.

80.    As a result of, among other things, AIG FP's failure to (i) restore and pay the DCA and SIP Account balances by the end of 2013, or (ii) AIG FP's failure to adopt a restoration plan, or extend the lapse date, when it was able to do so to return the money it owes to the Employee Plaintiffs, the Employee Plaintiffs have been harmed. Damages include the amount of the Employee Plaintiffs' Plan Account balances borrowed by AIG FP in the approximate amount of $194 million, plus doubled damages under Connecticut's Wage and Hour law as a result of AIG FP's bad faith conduct and accrued interest to date.

1.    **The DCP Agreement**

81.    The DCP is an agreement among participating employees and AIG FP.

82.    The DCP was adopted in or around December 1995, and was amended thereafter. The relevant version of the DCP is attached as Exhibit A.

83.    The DCP is governed by Connecticut law. *See* DCP § 4.05.

84.    Each of the Employee Plaintiffs was a "Participant" in the DCP. *See* DCP § 1.13 ("'Participant' shall mean an Executive who is participating in this Deferred Compensation Plan.").

85.    The purpose of the DCP was to incentivize employees with bonuses, encourage retention, and promote AIG FP's business.

86.    Pursuant to the terms of the DCP, each Participant was assigned a deferred compensation account, or DCA, on AIG FP's books.  "Deferred Compensation Account" was defined to mean "the account established on AIG Financial Product Corp.'s books in the name of each Participant and of AIG [Inc.] in which, pursuant to Section 3 of this Deferred Compensation Plan, Deferred Compensation amounts are credited to such Participants and to AIG."  DCP § 1.07.

87.    AIG FP was required to provide Plan Participants with quarterly statements that included information about their DCA balances and AIG FP's financial performance. For example, DCP § 4.07 provided:

> For so long as the Deferred Compensation Plan is in effect, AIGFP shall provide each Participant and AIG [Inc.] with quarterly Deferred Compensation account statements setting forth (i) the Participant's or AIG [Inc.]'s (as the case may be) Deferred Compensation account balance, (ii) the amount of interest and, for account statements covering the quarterly period in which such amounts would be paid, the Additional Return Payment and Installment Payment, if any, paid on such balance during such quarterly period and (iii) the Installment Payment schedule for the Participant or AIG [Inc.]. In addition, AIGFP shall provide Participants and AIG [Inc.] with an AIGFP annual financial summary (which shall include a statement of the

> average life of AIGFP's swap transaction portfolio as of the date of such financial information), and shall endeavor to keep Participants who are then employees of AIGFP apprised of material developments involving AIGFP's business or accounting procedures applicable to AIGFP insofar as they relate to the Deferred Compensation Plan.

DCP § 4.07.

88.    AIG FP was permitted to reduce DCA balances in the event that AIG FP sustained realized losses, so long as AIG FP adopted a repayment plan with a defined payment schedule. For example, DCP § 4.01(b) provided:

> The outstanding balance credited to the Deferred Compensation Accounts of each Participant and of AIG [Inc.] shall be subject to reduction, from time to time, to the extent of any losses incurred (i) by AIGFP (excluding AIGTG) or (ii) by AIGTG resulting from transactions entered into on or after January 1, 2003, which losses in the case of (i) and (ii) for any year in the aggregate exceed the outstanding market and credit reserves and current year income of AIGFP (excluding outstanding market and credit reserves relating to transactions entered into by AIGTG before January 1, 2003), but before base capital of AIGFP (for the avoidance of doubt including AIGTG, and consisting of equity, retained earnings, if any, and subordinated debt). Such reductions shall be made among the Participants . . . and AIG [Inc.] on a pro rata basis. **AIG Financial Products Corp. shall be obligated subsequently to restore amounts so deducted from Participants' and AIG [Inc.]'s account balances, plus accrued interest thereon at the interest rate determined in accordance with Section 3.03 and, in connection therewith, the Board shall adopt a plan (which shall not be subject to the approval of AIG [Inc.] or the Participants) setting forth a schedule under which AIG Financial Products Corp. shall restore amounts deducted from Participants' and AIG [Inc.]'s account balances (plus accrued interest thereon).** Any such restoration plan shall provide that any restored amounts shall be paid in 2013; to the extent amounts have not been restored by December 31, 2013, all restoration rights shall permanently lapse except to the extent AIG Financial Products Corp. determines that it may amend the Plan to provide for payment of restored amounts without violating Internal Revenue Code Section 409A.

DCP § 4.01(b) (emphasis added).

## 2.    The SIP Agreement

89.    The SIP is an agreement among AIG FP and certain Employee Plaintiffs ("<u>Covered</u>

Executives"). The relevant version of the SIP is attached as Exhibit B.

90.     The Employee Plaintiffs who were Covered Executives under the SIP include:

Mitchell Bell, Erik Bengtson, Paul Bradshaw, Thomas Buttke, David Chang, Robert Chang, Jason

DeSantis, Richard Fabbro, Kenneth Farrar, Jonathan Fraade, James Haas, Charles Hsieh, Thomas

Kushner, Jonathan Liebergall, Nathaniel Litwak, Brendan Lynch, Alfred Medioli, Matthew

Mihaly, Andrew Partner, Thomas Plagemann, Robert Powell, Daniel Raab, Ann Reed, Paul

Schreiner, Chris Toft, Joe Tom, Steven Wagar, Thomas Ward, and Martin Wayne.

91.     The SIP was adopted in January 2008, and was amended thereafter.

92.     The SIP is governed by Connecticut law. See SIP § 4.05.

93.     As with the DCP, AIG FP was obligated under the SIP to restore any amounts

deducted from SIP Accounts and was obligated to create a restoration plan in order to do so:

> The outstanding balance credited to the SIP Accounts of each Covered Executive and of AIG [Inc.] shall be subject to reduction, from time to time, to the extent of any losses incurred (i) by AIGFP (excluding AIGTG) or (ii) by AIGTG resulting from transactions entered into on or after January 1, 2003, which losses in the case of (i) and (ii) for any year in the aggregate exceed the outstanding market and credit reserves and current year income of AIGFP (excluding outstanding market and credit reserves relating to transactions entered into by AIGTG before January 1, 2003), but before base capital of AIGFP (for the avoidance of doubt including AIGTG, and consisting of equity, retained earnings, if any, and subordinated debt). Such reductions shall be made on a pro rata basis among the SIP Accounts under the 2007 SIP, and the Deferred Compensation Accounts under the Deferred Compensation Plan, of Covered Executives and AIG [Inc.]. **AIG Financial Products Corp. shall be obligated subsequently to restore amounts so deducted from Covered Executives' and AIG [Inc.]'s account balances, plus accrued interest thereon at the interest rate determined in accordance with Section 3.03 and, in connection therewith, the Board shall adopt a plan (which shall not be subject to the approval of AIG or the Covered Executives) setting forth a schedule under which AIG Financial Products Corp. shall restore amounts deducted from Covered Executives' and AIG [Inc.]'s account balances (plus accrued interest thereon).** Any such restoration plan shall provide that any restored amounts shall be paid in 2013; to the extent amounts have not been restored by December 31, 2013, all restoration rights shall permanently lapse except

> to the extent AIG Financial Products Corp. determines that it may amend the Plan to provide for payment of restored amounts without violating Internal Revenue Code Section 409A.

SIP § 4.0l(b) (emphasis added).

## B.      AIG FP BREACHES PLANS IN BAD FAITH

### 1.      AIG FP Fails to Pay Employee Plaintiffs Under the DCP and SIP

94.     On Monday, September 15, 2008, Lehman Brothers Holdings filed for Chapter 11 protection in New York, an event which triggered a global financial crisis.

95.     Shortly after the Lehman bankruptcy, in October 2008, AIG FP and AIG Inc. reportedly were brought to the brink of collapse. Purportedly, AIG FP's 2008 losses overwhelmed not only reserves, current year income, and DCA balances, but also base capital. Deeming AIG Inc. "too big to fail," the Federal Reserve Bank of New York provided AIG Inc. with emergency funding. The funding was agreed in principle on September 16, 2008, and formalized shortly thereafter.

96.     Pursuant to its agreement with the Federal Government, AIG Inc. received a revolving credit facility of $85 billion. AIG Inc. then infused AIG FP with $65 billion, via AIG Inc.'s subsidiary (AIG Funding), utilizing what was purported to also be a revolving credit facility. Although the two credit facilities were formalized on the same day, September 22, 2008, the marked differences between the two agreements underscore that the transaction between AIG Inc. and AIG FP was never intended to be debt, as discussed *infra* in Section E.

97.     In September 2008, as part of AIG Inc.'s bailout, then-Chairman of Allstate Insurance, Edward Liddy, was appointed as AIG Inc.'s interim chairman and chief executive officer ("CEO").

98.     Executive compensation was a source of political tension over the bailout. For example, in a letter to Mr. Liddy, dated October 22, 2008, then Attorney General of New York,

Andrew Cuomo, cautioned that "until the taxpayers are repaid with interest . . . no funds should be paid out of [AIG Inc.'s deferred compensation and bonus] pools to any executives."

99.    Despite the difficult political climate, AIG Inc. publicly proclaimed that employees of the AIG group, including the Employee Plaintiffs, were entitled to and would receive the compensation they were owed in connection with work they had already performed. In an October 16, 2008 Joint Statement from the N.Y. Attorney General and AIG Inc., Attorney General Cuomo said, "[t]hese actions are not intended to jeopardize the hard-earned compensation of the vast majority of AIG's employees, including retention and severance arrangements, who are essential to rebuilding AIG [Inc.] and the economy of New York."

100.    In early October 2008, AIG FP decided that at the year end, Plan Participants' balances would be stated as negative amounts, not merely as nil balances. Doing so enabled AIG FP to reduce future Compensation Plan balances.

101.    Recognizing the importance of retaining its employees in its effort to rebuild, the head of AIG's Financial Services Division, William Dooley (AIG FP's Acting CEO), assured AIG FP's employees in an October 2008 letter that any negative balances in their DCP and SIP Accounts would be restored, as "[b]oth the SIP and the DCP provide for the adoption of a plan for restoring these reductions to AIG [Inc.] and AIG FP participants' deferred compensation accounts."

102.    At the end of 2008, AIG FP also instituted the ERP, which was another bonus plan designed to incentivize certain employees to stay with AIG FP, and to compensate those employees who did not receive their 2007 bonus compensation or equity kicker.

103.    In a letter dated March 14, 2009, Mr. Liddy confirmed that AIG Inc. was aware of its legally enforceable obligation to pay AIG FP's employees the amounts they were owed under

the deferred compensation plans. Mr. Liddy explained to Timothy Geithner (Mr. Paulson's successor as Treasury Secretary) that "[i]n the first quarter of 2008, prior management took significant retention steps at AIG Financial Products," which "guaranteed a minimum level of pay for both 2008 and 2009." Mr. Liddy advised Mr. Geithner that "quite frankly, AIG [Inc.]'s hands are tied" and that "[o]utside counsel has advised that these are legal, binding obligations of AIG [Inc.], and there are serious legal, as well as business, consequences for not paying."

104.    Other internal documents of AIG Inc. and/or AIG FP demonstrate that AIG FP was obligated to restore the Employee Plaintiffs' DCP and SIP Account balances and repay plaintiffs the amounts they were owed pursuant to the Compensation Plans.

105.    In addition, a publicly-available March 16, 2009 letter from AIG Inc.'s and AIG FP's attorneys to the Office of the General Counsel of the Federal Reserve Bank of New York further confirmed that AIG FP's Compensation Plans, including the ERP, constituted "clear contractual obligation[s] on the part of AIG FP."

**C.    AIG FP INDUCED ITS EMPLOYEES TO CONTINUE DEFERRING COMPENSATION TO BOLSTER ITS FINANCES**

106.    Throughout this time, AIG FP assured the Employee Plaintiffs by reaffirming the terms of the DCP and SIP, and incentivized the Employee Plaintiffs to continue working, performing under employment obligations, and waiting for AIG Inc. and AIG FP's financial woes to improve.

107.    For example, a January 21, 2008 e-mail from William Shirley (AIG FP's General Counsel) to all employees said, "[The SIP] now provides that any amounts by which SIP Accounts are reduced pursuant to Section 3.02(a) or (b) (for example, where an employee resigns in 2008 or 2009) will be available for distribution to AIG FP employees in 2013 (in the same manner as, in addition to, the 30% portion of annual Distributable Income that is allocable to AIG FP employees

that year)."

108.     In 2009, relying on AIG FP's assurances, many of AIG FP's employees—including many of the Employee Plaintiffs in this action—agreed to receive part of the compensation they were owed under the ERP in the form of deferred compensation credited to the SIP plan, with the remainder to be paid in cash.

109.     In 2009, AIG FP also requested that many of the AIG FP employees—including some of the Employee Plaintiffs—voluntarily pay back a portion of their cash compensation, in order to help the company address its financial woes and for the purpose of maintaining a positive public perception. When certain AIG FP employees refused to return their compensation, AIG FP began to pressure those individuals.

110.     In 2010, AIG FP again requested that employees voluntarily pay back some or all of a second cash payment made pursuant to the ERP.

111.     As a result of these requests, and in many cases substantial pressure, in 2010, some employees, including some of the Employee Plaintiffs, returned substantial portions of their hard-earned compensation, ranging up to 20% of their overall compensation for that year.

**D.     AFTER AIG INC. AND AIG FP RETURNED TO PROFITABILITY, AIG FP REFUSED TO PAY PLAINTIFFS THE AMOUNTS THEY ARE OWED, CREATE A PLAN OF RESTORATION OR EXTEND THE LAPSE DATE**

112.     AIG Inc. was able to return to profitability in 2011 and to repay any amounts owed to the Treasury and the Federal Reserve in 2012, plus a profit of over $20 billion. Upon information and belief, AIG FP also returned to profitability before December 2013.

113.     By December 31, 2013, AIG FP should have restored and paid the DCA and SIP Account balances. *See, e.g.*, DCP § 4.01(b); SIP § 4.01(b).

114.     In fact, AIG FP could have restored—as it was obligated to do under the

Compensation Plans—the DCA and SIP Account balances, and repaid the Employee Plaintiffs from general corporate funds or via the Revolving Credit Agreement that was in place between AIG Inc. and AIG FP. The Revolving Credit Agreement was available to AIG FP for it to meet all "*direct and legitimate business needs.*"

115.    However, in a letter dated July 31, 2014, AIG FP informed the Employee Plaintiffs that it would not restore their DCA or SIP Account balances, nor would it pay them the amounts it owed them under the DCP and SIP. *See* July 31, 2014 Letter from AIG FP to DCP and SIP Plan Participants, attached as Exhibit C.

116.    By this point in time, AIG Inc.'s financial health had been restored, and the company became profitable. AIG FP continued as a solvent, wholly-owned subsidiary of AIG Inc., relying on AIG Inc. to cover its financial obligations pursuant to the General Guarantee Agreement.

117.    Despite AIG Inc.'s financial health; AIG FP's continued existence as a going concern and wholly-owned subsidiary of AIG Inc.; AIG Inc.'s and AIG FP's acknowledgement of and promise to honor the financial obligations stemming from the DCP and SIP; and AIG Inc.'s obligations under the General Guarantee Agreement; AIG FP refused to restore the Employee Plaintiffs' DCA or SIP Account balances, pay the Employee Plaintiffs the amounts they are owed for their work, create a plan of restoration or extend the lapse date.

### E.    AIG FP'S SUSPECT ACCOUNTING & MISCHARACTERIZATION OF AIG INC.'S DISGUISED EQUITY INFUSION

#### 1.    Financial Crisis and FRBNY Loan

118.    On September 22, 2008, the FRBNY extended an $85 billion line of credit to AIG Inc. As a result, AIG Inc. (through its subsidiary AIG Funding) made available up to $65 billion to AIG FP. Before the disbursement of these funds from AIG Inc., AIG FP was undercapitalized.

119.    The funding from insider, AIG Inc., to AIG FP was papered as a purported "revolving credit agreement." However, the purported Revolving Credit Agreement included certain key terms which were fundamentally inconsistent with those of a debt instrument. The agreement provided no deadline for repayment of the funds and the note had no maturity or term. Put simply, the agreement merely provided that AIG FP "unconditionally promise[d] to pay to the order of AIG Funding, Inc… the aggregate unpaid principal amount of all loans made by AIG Funding to the Borrower pursuant to the Revolving Credit Agreement dated as of September 22, 2008 . . . ." Additionally, AIG FP itself has admitted that no third party was willing to loan it money under any terms even with its parent's "backing." As such, the Revolving Credit Agreement was not an arm's length bargain.

120.    The AIG FP "revolving credit agreement" did not specify a fixed interest rate or method for determining a variable rate, but rather it provided that interest would be "at a mutually agreed rate per annum which the parties may determine, from time to time . . . ."

121.    By comparison, the FRBNY line of credit to AIG Inc. had real terms. The original October 22, 2008 FRBNY $85 billion line of credit had a two-year maturity, a variable interest rate of three-month Libor plus 850 basis points, and collateral—it transferred 79.9% of AIG Inc.'s equity to the Treasury.

## 2.    AIG FP "Revolving Credit Agreement" Treated as Equity

122.    It was well understood by all parties, including the FRBNY (the ultimate source of the funds), that the substance of this revolving credit agreement was to provide AIG FP the cash required to satisfy financial obligations as they came due and successfully complete its wind-down with no realistic expectation of repayment to AIG Inc. It served the purpose of equity.

123.    The characteristics of the cash transfers from AIG Funding to AIG FP, regardless

of being papered as purported debt, should have been (and at convenient times were) accounted for as equity contributions—consistent with their underlying economic characteristics. In this instance, AIG FP had no probable future sacrifice of economic benefits, meaning the funding arrangement was not a "liability" of AIG FP. Moreover, as it was in "wind-down" mode, AIG FP never established a sinking fund nor otherwise set aside an account or fund that would help safeguard amounts that could be used to repay the purported debt. Likewise, AIG Inc. at no point in time insisted on additional protections—as an ordinary arms-length creditor would do even though AIG FP was winding down.

124.    The wind-down of AIG FP was clearly orchestrated and controlled by AIG Inc. for the benefit of AIG Inc. and AIG Inc. provided the cash to make it happen. While AIG FP and AIG Inc. went through the motions, there was no economic substance to the payment of interest. David Herzog, AIG Inc.'s CFO affirmed such lack of economic substance. In an email dated September 7, 2010, Herzog wrote to Elias Habayeb, CFO Financial Services Division, and Robert Gender, AIG Corporate Treasurer, in relation to the proposed recapitalization plan: "███████████████ ████████████████."

125.    While dressed up as a "loan," the cash payments to AIG FP by AIG Funding were, in substance, contributions to AIG FP's equity that were made to facilitate the wind-down of AIG FP. This strategy was designed to permit AIG FP to take immediate losses and transfer assets considered to have long-term upside potential to other segments or vehicles that ultimately benefited AIG Inc. and other parties (but not AIG FP).

### 3.    AIG Inc.'s and AIG FP's Representations to the Rating Agencies

126.    AIG Inc. itself did not consider this blank check to represent "real" liabilities of AIG FP or to impact the "real" solvency of AIG FP. Indeed, it is precisely because AIG FP received

the equity infusions from its parent that it could make assertions to ratings agencies that it was solvent. In materials prepared for a discussion with Fitch Ratings on May 13, 2009, AIG FP proffered the following conclusion: "Long Term AIGFP Solvency – AIG will continue its wind-down of AIGFP, where over time the fair market value of assets is expected to exceed liabilities."

127.    In the same presentation, AIG FP generated a chart showing that the ultimate asset cash inflows totaled $37.5 billion and the ultimate liability outflows totaled $34.3 billion. Clearly, the $34.3 billion in outflows did not include the purported funding from AIG Inc. which, at the time, totaled approximately $55.7 billion.

128.    Similarly, AIG Inc. gave another presentation to Standard & Poor's which included an "overview of [AIG FP's] liabilities" as of July 23, 2010. The presentation listed eight categories of liabilities with a total remaining principal of $23.4 billion—once again excluding the AIG Inc. funding, which at the time, totaled $56.0 billion.

129.    In numerous additional presentations, AIG FP continued to show rating agencies breakdowns of liabilities that did not include the AIG Funding "loan" as a liability. That concealment was for good reason:  If Standard & Poor's, Moody's Investors Service, and Fitch Ratings downgraded AIG Inc. and AIG FP's credit rating, it would have triggered requirements forcing AIG Inc. to immediately pay hundreds of millions of dollars to post collateral to AIG FP's credit default swap counterparties and return collateral received by AIG Inc.'s insurance subsidiaries in connection with securities lending programs.

### 4.    Representations Regarding AIG FP's Solvency

130.    The amounts documented and recorded as purported loans from AIG Inc. to AIG FP were in substance equity contributions provided by AIG Inc. As such, AIG FP has in fact been a solvent entity from 2008 to the present.

131.    The amounts "loaned" by AIG Inc. to AIG FP were made so that AIG FP could pay its other obligations as they came due—the definition of solvency. The purported note's payment history reveals that hundreds of millions of dollars routinely flowed back and forth between AIG Inc. and AIG FP based on the latter's cash flow needs.

132.    In the Connecticut Litigation, Mark Balfan, AIG FP's CFO, confirmed that as a result of the funding from AIG Inc., AIG FP was able to meet its obligations and ***remain solvent***:



133.    In fact, AIG FP even took the position that it was solvent in other tribunals. In the Brookfield Asset Management Litigation, AIG FP clearly represented that it "[was], and always has been, ***solvent on both a cash flow and balance sheet basis*** . . . ." (emphasis added).

134.    AIG FP's representation that it had always been balance sheet solvent could only be true if the "loans" from AIG Inc. to AIG FP were accounted for as equity contributions.

135.    In fact, Herzog (AIG Inc.'s former CFO) has even testified that ████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████

5.     **AIG FP's Attempts to Properly Recognize the Purported Debt as Equity**

136.    The conclusion that the funding by AIG Inc. constituted equity contributions is also consistent with how AIG Inc. and AIG FP viewed these purported "loans" and described them to the Federal Reserve Bank of New York.

137.    In 2010, AIG Inc. and AIG FP began planning to clean up their books and records to align with the reality of the Parent Investment by formally recognizing the purported debt as equity. However, AIG Inc. and AIG FP abruptly changed course when they were advised that these entries could trigger AIG FP's payment obligations under the DCP and SIP.

138.    The decision to not recharacterize the debt (*e.g.*, by accurately reflecting it as an equity infusion) was made solely to avoid triggering AIG FP's obligations to deferred compensation Plan Participants—not a valid basis to mischaracterize the equity as debt.

139.    As regulated financial institutions, AIG FP and AIG Inc. had legal obligations to ensure that their financial statements accurately described the substance of transactions and the impact those transactions have on financial statements, particularly the balance sheet of the publicly-traded parent, AIG Inc.

140.    In July 2010, AIG Inc. and AIG FP developed a "recapitalization plan" that would have essentially either "forgiven" the purported loan or used book entries to inject enough equity to repay the loan. In either situation, the recapitalization plan would have properly accounted for the "loan" as equity.

141.    AIG Inc.'s and AIG FP's top executives began circulating memoranda detailing this recapitalization plan. In one presentation, Ankur Bhandari (AIG's Assistant Treasurer), noted that:

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████

142.    The proposed recapitalization plan would have been executed through book entries with no actual movement of cash between the entities. According to AIG FP's internal documents,

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████

143.    In fact, the proposed recapitalization plan would have allowed AIG Inc. and AIG FP to receive a $310+ million deferred tax asset. On February 24, 2014, Mark Balfan drafted a memorandum entitled "Connecticut Deferred Tax Asset for AIG FP" (the "Balfan Memo"). ████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

Therefore, AIG Inc.'s tax department had recorded a $310 million deferred tax asset on its books. AIG FP was asked to evaluate whether there was any possibility of utilizing the deferred tax asset.

144.    Balfan explained that ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████ Since that outcome would have been too untenable for AIG Inc. and AIG FP, Balfan concluded that the ███████████████████████████████

█████████████████ As Elias Habayeb (AIG Inc.'s former CFO) testified, █████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████

145.    It should also be noted that on February 24, 2014, ████████████████ ████████████████████████████████████████████████████ Yet, today, AIG FP now contends that its liabilities to the Employee Plaintiffs were extinguished on December 31, 2013.

146.    Although AIG FP had an obligation to restore account balances, create a restoration plan or extend the lapse date, AIG FP's top executives, including William Dooley (AIG FP's CEO), Mark Balfan (AIG FP's CFO), and Gerard Pasciucco (AIG FP's COO), deliberately breached that obligation for the benefit of the parent company—AIG Inc. In fact, these top executives—all of whom were involved in the proposed recapitalization plan—testified in the Connecticut Litigation that their true loyalties lied with the parent, not AIG FP. In other words, they placed their allegiance to AIG Inc. ahead of AIG FP's contractual obligation to restore the Employee Plaintiffs' deferred compensation, which obligation **"shall not be subject to the approval of AIG . . . ."** (emphasis added).

147.    Once these top executives and AIG FP realized that the proposed recapitalization plan could obligate AIG FP to pay the Employee Plaintiffs, AIG FP and AIG Inc. quickly shifted course. In 2011, AIG Inc. required AIG FP to formulate a partial recapitalization—using entries to set off an $18.5 billion intercompany tax receivable against the purported loan. The partial recapitalization allowed the "remaining intercompany borrowings" to stay on AIG FP's balance sheet so as to not trigger obligations under the Compensation Plans.

148.    After AIG FP, at the direction of AIG Inc., decided to abandon its original recapitalization plan, its purported "liabilities" far exceeded its assets—by tens of billions of dollars. Nonetheless, AIG FP continued to operate as a going concern for the next decade while using the Parent Investment as a pretense for avoiding repaying Plan Participants for years,

including in 2014 and 2015.

### 6. The FRBNY Begins to Ask Questions

149.    Although AIG Inc. fully repaid the FRBNY in 2012, the FRBNY continued to list it as a Systemically Important Financial Institution (SIFI) through at least 2015. As a SIFI, AIG Inc. and its subsidiaries were required to submit certain financial reports to the FRBNY. Eventually, the FRBNY began to question AIG FP's suspect accounting practices.

150.    On February 11, 2015, the FRBNY sent a letter to AIG Inc. objecting to its accounting treatment of the intercompany "loan" and its purported negative equity in AIG FP. The FRBNY asked AIG Inc. to justify the $35 billion negative equity investment AIG FP was reporting on its balance sheet.

151.    Of particular import is that the $35 billion of "negative equity" perfectly coincided with the roughly $35 billion "loan" AIG FP purportedly owed under the revolving credit agreement. In fact, Balfan explained to the FRBNY, and others, that the AIG FP "deficit" and "loan" went hand in hand. As Peter Paulson (AIG Inc.'s Associate General Counsel) explained, AIG FP had a "deficit," "not just a 'loan'".

152.    An internal email thread ███████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████

153.    Christine Button (AIG Inc.'s Associate General Counsel) prepared a document for the FBRNY that explained the legal reasons why AIG Inc. chose not reclassify the intercompany

"debt" as equity. It provided in part:

> [I]f AIG were required to provide an infusion of equity into its AIGFP subsidiary by, for example, ***reconstituting the debt that AIGFP owes to AIG as equity***, [the UK claimants] and perhaps others would likely argue that they should benefit from that infusion by having the losses on deferred compensation restored. ***Similarly, if AIG were to reclassify its negative equity in AIGFP to a liability to AIGFP on its regulatory reports, the UK claimants and perhaps others might argue that the obligation that AIGFP has to its parent has been forgiven and they should benefit from that forgiveness by having the losses on deferred compensation restored***.

(emphasis added).

154.    In July 2015, AIG FP sent a reply letter to Kenneth Lamar at the FRBNY further explaining its unique accounting practice (the "Lamar Letter"). AIG FP represented that its unique accounting practices were consistent with "the unusual circumstances surrounding the losses suffered during the financial crisis" and that deviating from the accounting practice would result in "unintended and unjustified consequences." The Lamar Letter plainly reveals those "unjustified consequences"—bolstering "the claims of certain former employees against two AIG FP deferred compensation plans."

155.    As these records reveal, AIG FP and its parent disguised an equity infusion as debt for the sole purpose of avoiding contractual obligations owed to the Employee Plaintiffs. AIG FP used its parent's capital to remain balance sheet and cash flow solvent while neither AIG FP nor AIG Inc. genuinely expected AIG FP to repay the purported loan. AIG FP and its parent relied on sophisticated legal counsel to devise a scheme to keep AIG FP "hopelessly insolvent" while nonetheless operating the business as a going concern for more than a decade—until AIG FP and

its parent needed a strategy to forum shop their two-party creditor dispute with the Employee Plaintiffs.

### 7.    AIG FP's Attempt to Conceal This Scheme

156.    AIG FP and its parent have gone to great lengths to conceal their inequitable conduct. For instance, AIG FP has admitted that it failed to produce certain relevant and material documents to the UK claimants in the UK Action. On November 9, 2022, AIG FP stipulated that it had not produced the Balfan Memo, the Lamar Letter, or twenty other recapitalization plan documents in the UK Action (together the "Stipulation Documents").

157.    In the Connecticut Litigation, AIG FP originally attempted to withhold the Stipulation Documents by improperly asserting the attorney-client privilege. After Employee Plaintiffs lodged objection after objection, AIG FP reluctantly produced the Stipulated Documents with redactions.

158.    The Employee Plaintiffs subsequently moved to compel production of these entire documents and the Connecticut court ordered the production of certain portions of them, recognizing a subject matter waiver and admonishing that AIG FP could not invoke the privilege as a sword and a shield, and requiring AIG FP to produce certain sensitive documents in unredacted form (the "Connecticut Discovery Order").

159.    However, AIG FP filed this Chapter 11 bankruptcy rather than complying with the Connecticut Discovery Order. In this Chapter 11 Case, the Employee Plaintiffs again requested the production of the documents referenced in the Connecticut Discovery Order but AIG FP outright refused—brazenly contending that the judge in the Connecticut Litigation had "wrongly decided" the privilege issues.

### F.    THE AIG INC.-AIG FP SCHEME CONTINUES TO THE PRESENT

160.    AIG Inc. and AIG FP have been working together since 2008 to deprive the

Employee Plaintiffs of their hard-earned and contractually due compensation. In addition to conspiring to disguise an equity contribution as debt and conceal the true nature of that capital contribution, AIG FP and its parent have also worked together to dissipate assets and shrink the bankruptcy estate—for the benefit of the parent, AIG Inc.

## 1. **AIG Inc.'s Control of the Bankruptcy Process**

161.    AIG Inc. dominated the bankruptcy planning process from the very beginning.

162.    For example, William Kosturos, the Chief Restructuring Officer for AIG FP, testified at his March 15, 2023 deposition that ████████████████████████████

████████████████████████████████████████████████████████

████████████████

163.    Similarly, it was AIG Inc.'s counsel—Weil Gotschal & Manges LLP ("Weil")—who first approached Mr. Dubel to serve as one of the independent directors of AIG FP, after an unfavorable development in the UK Action, only to later inform Mr. Dubel that his services were no longer needed once it appeared that the tides were turning on AIG FP's litigation luck.

164.    Weil's involvement was not limited to choosing and hiring key decision-makers at AIG FP who would be tasked with shepherding AIG FP through bankruptcy. In January 2022, AIG Inc.'s counsel also delivered a presentation to Mr. Dubel and Pamela Corrie (AIG FP's second independent director), in which they asserted that the Chapter 11 strategy could help put an end to the Employee Plaintiffs' claims against AIG FP. Significantly, this presentation took place before the Special Committee itself began assessing AIG Inc.'s purported claim against AIG FP in what they claimed was an independent investigation.

165.    AIG Inc.—and not AIG FP—served as the mastermind of AIG FP's bankruptcy planning and strategy.

2.    **AIG FP's Dissipation of Assets**

166.    In May 2022, AIG FP had approximately $299 million in cash held in an AIG Inc. "pooled account." On August 5, 2022, AIG FP's Board of Directors—that is, the Special Committee, composed of Ms. Corrie and Mr. Dubel, and director Paul Stubbs—met for, among other things, a presentation by Debevoise & Plimpton, counsel for AIG FP in the Connecticut Litigation.

167.    That same day and at that same meeting, Mr. Stubbs announced that he would begin contacting swap counterparties to begin discussions concerning AIG FP's novation of its swap portfolio to AIG Matched Funding Corp. ("AIG Matched Funding") and AIG Markets, Inc. ("AIG Markets") as part of the novation process that served no business purpose for AIG FP, but saved AIG Inc. from owing hundreds of millions of dollars to swap counterparties when AIG FP declared bankruptcy.

168.    From May 2022 until the beginning of December 2022, throughout the novation process, AIG FP's cash balance went from $299 million to approximately $175 million. On November 29, 2022, the Connecticut court ordered AIG FP to produce, by December 14, 2022, fourteen (14) specific documents relating to AIG FP's obligation to pay the Employee Plaintiffs under the DCP and SIP plans.

169.    Less than one week later, on December 5, 2022, counsel for the Employee Plaintiffs sent a letter (the "Asset Dissipation Letter") to AIG FP, requesting that AIG FP: "(i) confirm that the information provided in discovery about the current level of assets is accurate as of today, (ii) provide adequate assurances that [AIG FP] will preserve sufficient assets to pay any judgment in this Action, and (iii) cease any efforts to further dissipate the assets of the company that could prejudice our clients' rights to collect what is owed to them."

170.    AIG FP did not respond to the requests in the Asset Dissipation Letter. Instead, on the morning of December 6, 2022, AIG Inc., its outside counsel Weil, and Latham & Watkins LLP ("Latham"), and the Special Committee participated in an "all-hands" meeting at Weil's offices, during which "the filing of a bankruptcy in the event that every one of the 46 plaintiffs that were suing FP *did not quickly fall in line and agree to a settlement*" was discussed (emphasis added).

171.    On the evening of December 5, 2022, ██████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████ This was the first time the Employee Plaintiffs became aware of Weil's involvement in the Connecticut Litigation. ██████████████ ██████████████████████████████████████████████

172.    Also on December 6, 2022, the Board of AIG FP sent $35 million to AIG Matched Funding, the affiliate to which AIG FP novated its swap portfolio, using funds from the "pooled" account that AIG FP held at AIG Inc. that functioned as its primary operating account.

173.    Prior to any outreach being made to the Employee Plaintiffs, the Special Committee took the position that AIG Inc. would have to approve any settlement with the Employee Plaintiffs. Indeed, Mr. Dubel explained that ███████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████

174.    Ms. Corrie likewise explained, ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████

175.    On December 12, 2022, the Standstill Agreement expired and the Employee Plaintiffs, AIG FP and AIG Inc. had not reached a settlement. No serious settlement discussions took place other than AIG Inc. and AIG FP making threats about filing for bankruptcy.

176.    The same day the Standstill Agreement expired, AIG Inc. "swept" $130 million from AIG FP's cash "pooled" account controlled by AIG Inc. As a result of that "sweep," AIG FP lost access to those funds and was left with the $10 million in cash that appeared in AIG FP's first-day bankruptcy disclosures.

177.    AIG FP, under the stewardship of the Special Committee, was aware that such a sweep would likely take place, but did nothing to stop it. Nor did AIG FP seek to negotiate the return of that cash.

178.    Instead, two days later, on December 14, 2022, AIG FP filed for bankruptcy. The Chapter 11 filing was preceded by and authorized via a board resolution, executed on December 13, 2022, in lieu of a formal board meeting. The Special Committee could not identify a specific meeting, discussion, or procedure to authorize the Chapter 11 filing because it was a foregone conclusion that if the Employee Plaintiffs did not settle, AIG FP would file for bankruptcy.

179.    On January 19, 2023, AIG FP Chief Financial Officer Timothy Allison testified at the Section 341 meeting. In response to a question from the Office of the U.S. Trustee seeking the status of AIG FP's investigation of "an aggregate amount of approximately $250 million from certain non-debtor affiliates on account of a potential historical overpayment for certain company shared services," Mr. Allison responded that the investigation is "ongoing."

180.    To date, AIG FP has not pursued repayment of the $250 million overpayment, despite believing that those amounts should be returned to AIG FP and despite AIG Inc. guaranteeing the liability. Nor has AIG FP made any efforts to recoup the approximately $130

million swept by AIG Inc.

### 3. AIG FP's Chapter 11 Plan

181. Ironically, AIG FP's proposed Chapter 11 Plan ("Chapter 11 Plan") seeks to do exactly what it and its parent thought about doing years ago—substituting the purported "debt" for equity. Only now, AIG FP is attempting to use the bankruptcy process to ensure that the recapitalization cannot "trigger" payment of the obligations under the Compensation Plans and to otherwise seek to subordinate the Employee Plaintiffs' claims.

182. Under the Chapter 11 Plan, AIG Inc. would retain its existing interests in AIG FP in exchange for cancelling its so-called loan. In the event that the Chapter 11 Plan cannot be confirmed, AIG FP intends to toggle to a Section 363 sale in which AIG Inc. will be able to credit bid its debt—virtually ensuring that no other party can place a competitive bid. In either scenario, AIG Inc. will retain its equity in AIG FP and the purported loan will be extinguished.

183. To be clear, the purported intercompany loan was in fact a disguised equity contribution subordinate to the Employee Plaintiffs claims. To the extent the Court does not recharacterize the intercompany loan as equity, the intercompany loan should be equitably subordinated to the Employee Plaintiffs' claims because the AIG Inc. and AIG FP, at the direction of AIG Inc., engaged in a decades-long scheme to deny the Employee Plaintiffs their contractually owed compensation.

## COUNTERCLAIM AGAINST AIG FP[9]

### COUNT ONE

### Declaratory Judgment – The Parent Investment Was an Equity Infusion, Not Debt (Against AIG FP and AIG Inc.)

184.     The allegations set forth above are incorporated by reference.

185.     The Employee Plaintiffs seek a declaration that the Parent Investment in AIG FP, which was papered as part of a "revolving line of credit," was always an equity investment and was not a "loan" because it had all the hallmarks of an equity infusion – no maturity date, no payment terms, no interest rate, and the so-called "loan" was not described as such in communications with rating agencies, regulators, and others.

186.     There is a real, substantial, and justiciable controversy as to whether the Parent Investment in AIG FP is equity or debt. This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. § 2201-2.

187.     The Parent Investment in AIG FP was clearly intended to be an infusion of capital because, although it was labeled as part of a revolving line of credit, there was no maturity date, no set interest rate, and no term of payment.

188.     The parties' de facto treatment of the Parent Investment as a capital contribution is reflected by the fact that documents submitted by AIG FP to the FRBNY listed a $35 billion negative equity investment that AIG FP was reporting on its balance sheet. Of particular import is that the $35 billion of "negative equity" perfectly coincided with the roughly $35 billion "loan" under the Revolving Credit Agreement.

---

[9] The Employee Plaintiffs reserve all rights to amend their counterclaims, third-party claims and allegations stated herein, as well as to include additional claims, counterclaims and third-party claims. For the avoidance of doubt, nothing herein shall be construed as a waiver of the Employee Plaintiffs' rights to file proofs of claim in this Chapter 11 Case in respect of the claims asserted in the Connecticut Litigation or pursue those claims in the event that this Chapter 11 Case is dismissed, whether voluntarily or involuntarily, or the automatic stay is lifted.

189.    An internal email thread among AIG FP and AIG Inc. executives further reveals

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████

190.    The parties' intent to treat this transaction as an equity investment, rather than debt, is also evidenced by the fact that AIG Inc. did not account for the Parent Investment as a "loan" to either its own investors or to rating agencies. For example, in materials prepared for discussion with Fitch Ratings, AIG FP declared: "Long Term AIGFP Solvency – AIG will continue its wind-down of AIGFP, where over time the fair market value of assets is expected to exceed liabilities." Additionally, a chart prepared by AIG FP for Fitch Ratings showed that the ultimate asset cash inflows totaled $37.5 billion and the ultimate liability outflows totaled $34.3 billion. Clearly, the $34.3 billion in outflows did not include the purported funding from AIG, Inc., which, at the time, totaled approximately $55.7 billion. Further, in materials prepared for Standard & Poor's, AIG FP listed "an overview of [AIG FP's] liabilities" as of July 23, 2010 but did not list the Parent Investment, which at that time totaled $56.0 billion. In numerous additional presentations, AIG FP continued to show rating agencies breakdowns of its liabilities that did not include the purported "loan" as a liability.

191.    Undoubtedly, had AIG FP reported the Parent Investment as a loan to the ratings agencies, Standard & Poor's, Moody's Investor Service, and Fitch Ratings likely would have downgraded credit ratings which would have triggered requirements forcing AIG Inc. to immediately pay hundreds of millons of dollars to post collateral to AIG FP's credit default swap

counterparties and return collateral received by AIG Inc.'s insurance subsidiaries in connection with securities lending programs.

192.    Nor did AIG Inc. call the so-called "loan" prior to the filing of this bankruptcy. Instead, AIG FP and AIG Inc. embarked upon a coordinated effort to deny the Employee Plaintiffs the amounts they were owed under the DCP and SIP and to strip hundreds of millions of dollars from AIG FP's accounts. As David Herzog, AIG Inc.'s CFO, ███████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████████

193.    AIG FP's use of creative accounting to disguise the equity infusion is further reflected by the fact that AIG FP began a process to make its books and records properly classify the Parent Investment as equity, but that process was abruptly stopped when AIG FP realized that it would create "value leakage," *i.e.*, paying its employees the amounts it owed them. As a result of this potential "value leakage," AIG FP abandoned efforts to use a $300+ million deferred tax asset.   AIG FP and AIG Inc. did, however, use entries to set off an $18.5 billion intercompany tax receivable against the purported "loan" under the Revolving Credit Agreement. This partial recapitalization allowed the "remaining intercompany borrowings" to stay on AIG FP's balance sheet so as not to trigger obligations under the DCP or SIP.

194.    AIG FP and AIG Inc. also worked together to strip hundreds of millions of dollars of AIG FP's assets (which included assets held by AIG FP as well as funds that were being held in a pooled account controlled by AIG Inc. for AIG FP's benefit) by transferring the cash to other AIG Inc. affiliates prior to the commencement of this bankruptcy. This includes but is not limited to:

> a.    Transferring $35 million from AIG FP to AIG Matched Funding on December 6,

2022 – the day after Employee Plaintiffs sent to AIG FP the Asset Dissipation Letter in connection with the Connecticut Litigation, which requested that AIG FP (i) confirm that the information provided in discovery about the current level of assets is accurate as of today, (ii) provide adequate assurances that AIG FP will preserve sufficient assets to pay any judgment.

b.    Transferring to AIG Inc. $130 million in cash that was being held in the "pooled" account controlled by AIG Inc. for AIG FP's benefit and leaving only $10 million in the pooled account for AIG FP.

c.    AIG FP failing to account for the aggregate amount of $250 million in potential overpayments to non-debtor AIG Inc. affiliates despite the U.S. Trustee's inquiry into these items at the Section 341 meeting.

d.    AIG FP and AIG Inc. did not disclose these transfers to the Employee Plaintiffs until AIG FP filed its Chapter 11 petition.

e.    Upon information and belief, discovery is likely to show additional transfers of value from AIG FP to AIG Inc. or entities it controls as not long before the bankruptcy AIG FP had well over a billion dollars in assets.

195.    The coordinated scheme of AIG FP and AIG Inc. to sweep more than a hundred million dollars of AIG FP's assets to AIG Inc. or other AIG-related entities instead of paying the Employee Plaintiffs the compensation which they had earned was further effectuated by AIG FP's selective reading of certain provisions of the DCP and SIP. For example, notwithstanding the DCP's and SIP's restoration obligation and payment provisions, AIG FP—at AIG's insistence— refused to restore the account balances, create a restoration plan, or extend the lapse date, even though it had a positive cash flow and was solvent on a balance sheet basis. Although AIG FP

ignored its restoration obligation under the DCP and SIP, it points to other language in Section 4.01(b) of the DCP (and a similar provision in the SIP) to assert that the Plan Participants allegedly have an unsecured claim against AIG FP that is subordinated and junior in payment to all other obligations of AIG FP in bankruptcy.

196.    In the fifteen years leading up to this action, AIG FP represented to other tribunals, rating agencies, and others that it was solvent because, if it did not, there would have been a credit default with AIG FP's counterparties. Now that AIG FP and AIG Inc. have completed the derivatives novations (undertaken in the months before the bankruptcy filing), they have suddenly taken the position that the Parent Investment was a "loan" that makes it insolvent instead of an equity infusion so as to avoid paying the Employee Plaintiffs their hard-earned compensation. AIG FP should not be allowed to take different positions about its ability and obligation to pay depending on whether it is beneficial to AIG entities or to the Employee Plaintiffs.

197.    In view of the above-mentioned conduct of AIG FP and AIG Inc., this Court should enter a declaratory judgment confirming that the Parent Investment in AIG FP was an equity infusion and not a loan because that was the intent of the parties at the time and how it was and has been actually treated for years.

## CLAIMS AGAINST THIRD-PARTY INTERVENOR AIG INC.

### COUNT ONE

**Equitable Subordination (Against AIG Inc.)**

198.    The allegations set forth above are incorporated by reference.

199.    AIG Inc. engaged in and benefited from inequitable and wrongful conduct, including but not limited to orchestrating a scheme to deprive the Employee Plaintiffs of the amounts contractually owed to them and diverting assets of AIG FP to AIG Inc. and other AIG

entities. This has resulted in an injury to the Employee Plaintiffs and has conferred an unfair advantage to AIG Inc. This Court should exercise its equitable powers to cure this inequity.

200.    AIG Inc. is an insider under 11 U.S.C. § 101(31)(E) because it is an affiliate of AIG FP and a person in control of AIG FP, and also because it used its close relationship to conduct a transaction that was not an arm's length transaction. For example, the purported "revolving line of credit" has no set interest rate, no term of payment, and was never expected to be repaid. In addition, AIG FP has admitted that, at the time of the Parent Investment, no third party was willing to loan it money. As an insider, AIG Inc.'s conduct must be rigorously scrutinized and AIG Inc. bears the burden to prove the fairness of its transactions with AIG FP.

201.    AIG Inc. improperly and wrongfully dominated and controlled the actions of AIG FP so that it could gain an unfair advantage by directing AIG FP to refuse to honor its contractual payment obligations to the Employee Plaintiffs. An example of this bad faith conduct is evidenced by a September 2010 email, wherein Brian Reilly (CFO of AIG Financial Services Division) and David Herzog (CFO of AIG Inc.) had the following exchange concerning the abject refusal to honor AIG FP's obligations to pay the Employee Plaintiffs their deferred compensation:



202.    The coordinated willful misconduct of AIG Inc. and AIG FP (acting at the behest of AIG Inc.) to deny the Employee Plaintiffs of the amounts that they are contractually owed is further evidenced by the fact that, in the fifteen years leading up to this action, AIG FP represented to other tribunals and rating agencies that it was solvent even though AIG Inc. and AIG FP now

claim that the Parent Investment is a "loan" instead of equity and that, as such, AIG FP is insolvent. Undoubtedly, this benefited AIG Inc. by avoiding paying hundreds of millions of dollars in connection with AIG FP's derivatives contracts.

203.    Upon information and belief, AIG Inc. coordinated with AIG FP to mislead the Employee Plaintiffs about AIG FP's true financial condition and coordinated and directed AIG FP in connection with the following wrongful actions:

a.    To disguise AIG Inc.'s equity infusion (which curiously was sometimes booked as debt and sometimes accounted for as equity contributions);

b.    To refuse to restore the account balances, create a restoration plan or extend the lapse date even though, upon information and belief, AIG FP has had a positive cashflow since 2010;

c.    To conceal documents establishing AIG FP's shifting and inconsistent positions on the equity infusion (*i.e.*, AIG FP has admitted that it failed to produce certain relevant and material documents to the UK claimants in the UK Action and was ordered by the Connecticut court to produce documents on this topic that were improperly withheld from the Employee Plaintiffs); and

d.    To take inconsistent positions when it suited AIG FP and AIG Inc. (*i.e.*, representing to rating agencies, other tribunals, and others that AIG FP was solvent and now taking a directly contrary position).

204.    AIG Inc. also orchestrated the diversion of hundreds of millions of dollars of AIG FP's assets (which included funds held by AIG FP as well as funds that were being held in a pooled account controlled by AIG Inc. for AIG FP's benefit) by transferring the cash to other AIG Inc. affiliates prior to the commencement of this bankruptcy. This includes but is not limited to:

a.    Orchestrating the transfer of $35 million from AIG FP to AIG Matched Funding on December 6, 2022 – the day after Employee Plaintiffs sent AIG FP the Asset Dissipation Letter in connection with the Connecticut Litigation, which requested that AIG FP (i) confirm that the information provided in discovery about the current level of assets is accurate as of today, (ii) provide adequate assurances that AIG FP will preserve sufficient assets to pay any judgment;

b.    Sweeping $130 million in cash that was being held in the "pooled" account controlled by AIG Inc. for AIG FP's benefit and leaving only $10 million in the pooled account;

c.    Upon information and belief, directing AIG FP not to account for the aggregate amount of $250 million in potential overpayments to non-debtor AIG Inc. affiliates despite the U.S. Trustee's inquiry into these items at the Section 341 meeting;

d.    Controlling the timing of appointment of special committee and the timing of this bankruptcy proceedings so that the Chapter 11 petition was filed after AIG FP's assets were stripped; and

e.    Upon information and belief, discovery is likely to reveal additional diversions of assets as not long before the bankruptcy AIG FP had over a billion dollars in assets on its balance sheet.

These transactions unfairly benefitted AIG Inc. and its affiliates to the detriment of the Employee Plaintiffs.

205.    The above-described inequitable conduct has resulted in harm to the Employee Plaintiffs—who are AIG FP's only non-insider creditors—and conferred an unfair advantage on AIG Inc. because AIG Inc. has created a scenario, through a complex set of transactions, where it

and its entities wind up with all of AIG FP's assets and the Employee Plaintiffs end up with next to nothing. This is exactly the type of injustice for which the doctrine of equitable subordination was designed to remedy.

206.    As a result of the foregoing, the Employee Plaintiffs have suffered an actual harm because they are likely to recover far less than the full amounts due to them as a result of AIG Inc.'s conduct.

207.    Under principles of equitable subordination, in equity and good conscience, any and all claims that have been or may be asserted by, on behalf, or for the benefit of AIG Inc. against AIG FP in any capacity should be subordinated for purposes of distribution, pursuant to Sections 510(c)(1) and 105(a) of the Bankruptcy Code, such that no claim of AIG Inc. is paid ahead of the claim of the Employee Plaintiffs.

208.    Even if, assuming *arguendo*, AIG Inc. was found to be an outside creditor (which the Employee Plaintiffs dispute), its conduct is so egregious as to warrant equitable subordination.

209.    In view of the foregoing, the claims of AIG Inc. must be equitably subordinated to the claims of the Employee Plaintiffs, pursuant to Section 510(c) of the Bankruptcy Code, in order to prevent an unfair result.

## COUNT TWO

### Prima Facie Tort (Against AIG Inc.)

210.    The allegations set forth above are incorporated by reference.

211.    AIG Inc. engaged in a pattern of intentional and wrongful conduct designed to continually and repeatedly thwart the Employee Plaintiffs from recovering the amounts owed pursuant to the DCP and the SIP, which caused injury to the Employee Plaintiffs. This continuous course of conduct includes but is not limited to:

a.   Controlling AIG FP's accounting entries concerning the Parent Investment;

b.   Disguising AIG Inc.'s equity infusion (which curiously was sometimes booked as debt and sometimes accounted for as equity contributions);

c.   Controlling AIG FP's decisions regarding the adoption of a restoration plan notwithstanding express contract language directing that any such decision was AIG FP's alone to make;

d.   Stripping hundreds of millions of dollars of AIG FP's assets (which included funds held by AIG FP as well as funds that were being held in a pooled account controlled by AIG Inc. for AIG FP's benefit) by transferring the cash to other AIG Inc. affiliates prior to the commencement of this bankruptcy;

e.   Orchestrating the transfer of $35 million from AIG FP to AIG Matched Funding on December 6, 2022 – the day after Employee Plaintiffs sent to AIG FP the Asset Dissipation Letter in connection with the Connecticut Litigation, which requested that AIG FP (i) confirm that the information provided in discovery about the current level of assets is accurate as of today, (ii) provide adequate assurances that AIG FP will preserve sufficient assets to pay any judgment;

f.   Sweeping $130 million in cash that was being held in the "pooled" account controlled by AIG Inc. for AIG FP's benefit and leaving only $10 million in the pooled account;

g.   Upon information and belief, directing AIG FP not to account for the aggregate amount of $250 million in potential overpayments to non-debtor AIG Inc. affiliates despite the U.S. Trustee's inquiry into these items at the Section 341 meeting;

h.   Controlling the timing of appointment of special committee and the timing of this

bankruptcy proceedings so that the Chapter 11 petition was filed after AIG FP's assets were stripped; and

i.      Upon information and belief, discovery is likely to reveal additional diversions of assets as not long before the bankruptcy AIG FP had over a billion dollars in assets on its balance sheet.

212.    This inequitable conduct has resulted in harm to the Employee Plaintiffs – who are the only non-insider creditors – and conferred an unfair advantage on AIG Inc. because AIG Inc. has created a scenario, through a complex set of transactions, where it and its entities wind up with all of AIG FP's assets and the Employee Plaintiffs end up with next to nothing

213.    AIG Inc. lacks any reasonable justification for its wrongful conduct.

**214.**    As a result of the AIG Inc.'s conduct, the Employee Plaintiffs have been injured.

## COUNT THREE

### Tortious Interference with Contractual Relations (Against AIG Inc.)

215.    The allegations set forth above are incorporated by reference.

216.    The Employee Plaintiffs and AIG FP had a contractual or beneficial relationship by virtue of the DCP, SIP, and ERP.

217.    AIG Inc. knew of the existence of the DCP, SIP, and ERP.

218.    AIG Inc. engaged in a continuous pattern of intentional and wrongful conduct designed to continually and repeatedly interfere with Employee Plaintiffs' contractual rights under the DCP, SIP, and ERP by, *inter alia*, preventing AIG FP from restoring plan balances, creating a restoration plan or extending the lapse date, and thereby preventing the Employee Plaintiffs from recovering the amounts owed pursuant to the deferred compensation plans, which caused injury to the Employee Plaintiffs. This continuous course of conduct includes but is not limited to:

a.    Controlling AIG FP's accounting entries concerning the Parent Investment;

b.    Disguising AIG Inc.'s equity infusion (which curiously was sometimes booked as debt and sometimes accounted for as equity contributions);

c.    Controlling AIG FP's decisions regarding the adoption of a restoration plan notwithstanding express contract language directing that any such decision was AIG FP's alone to make;

d.    Stripping hundreds of millions of dollars of AIG FP's assets (which included funds held by AIG FP as well as funds that were being held in a pooled account controlled by AIG Inc. for AIG FP's benefit) by transferring the cash to other AIG Inc. affiliates prior to the commencement of this bankruptcy;

e.    Orchestrating the transfer of $35 million from AIG FP to AIG Matched Funding on December 6, 2022 – the day after Employee Plaintiffs sent to AIG FP the Asset Dissipation Letter in connection with the Connecticut Litigation, which requested that AIG FP (i) confirm that the information provided in discovery about the current level of assets is accurate as of today, (ii) provide adequate assurances that AIG FP will preserve sufficient assets to pay any judgment;

f.    Sweeping $130 million in cash that was being held in the "pooled" account controlled by AIG Inc. for AIG FP's benefit and leaving only $10 million in the pooled account;

g.    Upon information and belief, directing AIG FP not to account for the aggregate amount of $250 million in potential overpayments to non-debtor AIG Inc. affiliates despite the U.S. Trustee's inquiry into these items at the Section 341 meeting;

h.    Controlling the timing of appointment of special committee and the timing of this

bankruptcy proceedings so that the Chapter 11 petition was filed after AIG FP's assets were stripped; and

i.    Upon information and belief, discovery is likely to reveal additional diversions of assets as not long before the bankruptcy AIG FP had over a billion dollars in assets on its balance sheet.

219.    AIG Inc.'s above-mentioned interference with the Employee Plaintiffs' contracts rights caused the Employees Plaintiffs to so suffer monetary damages because, *inter alia*, they have been deprived of their expectation damages under the DCP, SIP, and ERP.

## COUNT FOUR

**Declaratory Judgment–AIG FP Has Transferred Substantially All of Its Assets to or Otherwise Combined with AIG Inc. under Section 4.01 of the DCP and SIP and AIG Inc. Must Assume All of the Obligations of AIG FP under the DCP and SIP (Against AIG Inc)**

220.    The allegations set forth above are incorporated by reference.

221.    In addition to requiring that AIG FP restore Plan Participants' DCP and SIP account balances, create a plan of restoration and extend the lapse date, Section 4.01 of the DCP and SIP also provides, "[f]or the avoidance of doubt, if AIG Financial Products Corp. consolidates or amalgamates with, or merges with or into, **or transfers all or substantially all of its assets to, another entity,** then the resulting, surviving or transferee entity shall assume all of the obligations of AIG Financial Products Corp. hereunder" (emphasis added) (the "Transfer Provision").

222.    Upon information and belief, AIG Inc., acting directly or through its affiliates or subsidiaries, and AIG FP have engaged in a concerted effort to transfer assets away from AIG FP for the benefit of AIG Inc. for years with the culmination of those transfers happening over the course of 2022 as AIG FP was preparing for bankruptcy.

223.    Upon information and belief, in May 2022, AIG FP had approximately $300

million in cash in a "pooled" account controlled by AIG Inc. By late October 2022, AIG FP had only approximately $175 million in that account. By the time of AIG FP's December 2022 Chapter 11 filing, AIG FP had only approximately $10 million in cash remaining (all of which was earmarked for the payment of AIG FP's bankruptcy professionals).

224.    As part of AIG FP and AIG Inc.'s scheme to strip assets from AIG FP, AIG FP novated the majority of its derivatives contracts to AIG Matched Funding in the months prior to commencing the Chapter 11 in order to avoid defaults on those derivatives contracts had they been held by AIG FP at the time of its bankruptcy filing. Such defaults, in turn, would have caused AIG Inc. to incur financial obligations in the hundreds of millions of dollars to derivative counterparties, pursuant to the General Guarantee Agreement. On December 6, 2022, AIG FP transferred $35 million from its cash "pooled" account to AIG Matched Funding as part of the novation process.

225.    The timing of AIG FP's Chapter 11 filing was tied to both pressures from the Connecticut Litigation (as AIG FP faced a court order to produce sensitive documents to the Employee Plaintiffs on the day the Chapter 11 was filed) and protecting the financial interests of its parent, AIG Inc. While AIG FP claims that it was in "financial distress" such that bankruptcy was both appropriate and necessary, AIG FP delayed the commencement of its Chapter 11 filing for months in order to complete a complex novation process that ultimately benefitted *only* AIG Inc.

226.    On August 5, 2022, Paul Stubbs, the CEO and President of AIG FP and a member of its Board of Directors, announced at a Board meeting that he would begin contacting swap counterparties to discuss AIG FP's novation of its swap portfolio. AIG FP did not file for Chapter 11 until four months later in December 2022, following the substantial completion of the novation process.

227.    AIG FP has conceded that reason for the novations was not to benefit creditors or preserve AIG FP's assets, but to help avoid the termination damages that would be sought by swap counterparties upon the filing of a bankruptcy and to relieve AIG Inc. from potentially needing to pay up to $1 billion to those counterparties on account of the General Guarantee Agreement. One of AIG FP's Special Committee members, Pamela Corrie ███████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████ Additionally, Mr. Stubbs explained that ██████████
████████████████████████████████████████████████████████████
████████████████████████████████████████ Therefore, as Ms. Corrie
explained, the Special Committee ████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████

228.    Notwithstanding this substantial benefit to parent AIG Inc., AIG FP did not receive anything close to reasonably equivalent value in return. AIG Inc. was the sole beneficiary of a novation process that served no business purpose for AIG FP, but saved AIG Inc. from owing hundreds of millions of dollars to swap counterparties when AIG FP declared bankruptcy.

229.    Upon information and belief, the asset transfers (by way of novations or otherwise) and related cash transfer to AIG Matched Funding should be deemed a transfer to AIG Inc. because AIG Inc. received the benefit of these transfers and AIG Matched Funding is a wholly owned subsidiary company of AIG FP, which is itself a wholly owned subsidiary company of AIG Inc.

230.    On December 12, 2022, AIG Inc. swept approximately $130 million from AIG FP's

cash "pooled" account, leaving AIG FP with only $10 million in cash. The Special Committee tasked with overseeing AIG FP's pre-petition actions stated they were unconcerned by AIG Inc.'s cash sweep of approximately $130 million right before the petition date, did not take steps to prevent that cash sweep, and did not seek to negotiate the return of that cash.

231.    Upon information and belief, discovery is likely to reveal additional diversions of assets to AIG Inc. or entities it controls as not long before the bankruptcy AIG FP had over a billion dollars in assets on its balance sheet.

232.    By virtue of the various transfers of value from AIG FP to AIG Inc. (acting either directly or through its affiliates or subsidiaries (including AIG Matched Funding)) in preparing AIG FP for a bankruptcy filing in 2022 and the years prior, including, but not limited to, AIG Inc.'s December 2022 sweep of $130 million from AIG FP's cash "pooled" account,  AIG FP transferred substantially all of its assets to AIG Inc. triggering the Transfer Provision.

233.    As the recipient of substantially all of AIG FP's assets, as of at least December 2022, AIG Inc. is the "transferee entity," which has now assumed all of the obligations of AIG FP under the DCP and SIP.

234.    AIG Inc. is therefore liable for the breaches of AIG FP which include, among others, to the failure (i) to restore and pay the DCA and SIP Account balances by the end of 2013, or (ii) to adopt a restoration plan when it was able to do so to return the money it owes to the Employee Plaintiffs in breach of the DCP and SIP or extend the lapse date.

235.    The Employee Plaintiffs have been harmed. Damages include the amount of the Employee Plaintiffs' Plan Account balances borrowed by AIG FP in the approximate amount of $194 million, plus doubled damages under Connecticut's Wage and Hour law as a result of AIG FP's bad faith conduct and accrued interest to date.

236.    AIG Inc., having assumed the obligations of AIG FP under the DCP and SIP has assumed AIG FP's liability for breach of the DCP and SIP and responsibility for any damages thereunder.

237.    Furthermore, in the alternative, AIG FP has in substance merged or otherwise combined with AIG Inc. Rather than being a standalone entity that controls its own operations, finances, and employees, AIG FP is entirely dependent on AIG Inc. for its limited remaining business functions. It has no direct employees and does not administer its own corporate functions. It relies on AIG Inc. and other affiliates to lend it employees and for "the day-to-day management of [its] remaining business" and receives from AIG Inc. and other affiliates certain services including "cash management, derivatives transaction, legal, compliance, administrative, operations, risk management, strategic advisory, investment management, and other related services." *See* First Day Declaration at Paragraph 29. Moreover, AIG Inc. had control over the "pooled" account that held AIG FP's cash funds prior to the Bankruptcy filing and exerted complete control over those funds when it swept $130 million from AIG FP. The conduct of AIG FP and AIG Inc. evidence that AIG FP no longer operates as an independent going concern.

238.    In view of the above-mentioned conduct of AIG FP and AIG Inc., including AIG FP's transfer of substantially all of its assets to AIG Inc. and its effective merger with AIG Inc., this Court should enter a declaratory judgment confirming that AIG Inc. is the surviving transferee entity which has assumed all of the obligations of AIG FP under the DCP and SIP.

### COUNT FIVE

**Breach of Contract (Against AIG Inc.)**

239.    The allegations set forth above are incorporated by reference.

240.    AIG Inc. and AIG FP repeatedly encouraged the Employee Plaintiffs to defer

additional portions of their compensation into the DCP and SIP so as to provide additional capital to AIG FP.

241.    The Employee Plaintiffs performed under the DCP and SIP. For example, they continued their employment through the relevant payment periods and deferred their compensation as required by the DCP and SIP.

242.    Pursuant to the DCP and SIP, over the course of their employment with AIG FP, the Employee Plaintiffs deferred substantial portions of their compensation from AIG FP into their DCP and SIP Accounts.

243.    Under Section 4.01 of the DCP and SIP, AIG FP was permitted to borrow from the DCP and SIP Plan Accounts by reducing account balances to absorb losses for a given year, but was also obligated to restore (i) restore and pay the DCP and SIP Account balances by the end of 2013, or (ii) adopt a restoration plan when it was able to do so to return the money it owes to the Employee Plaintiffs.

244.    Section 4.01(b) also permitted AIG FP to extend the period to pay the restored deferred compensation beyond 2013 as long as it could do so without violating Internal Revenue Code Section 409A:

> "Any such restoration plan shall provide that any restored amounts shall be paid in 2013; to the extent amounts have not been restored by December 31, 2013, all restoration rights shall permanently lapse *except to the extent AIG Financial Products Corp. determines that it may amend the Plan to provide for payment of restored amounts without violating Internal Revenue Code Section 409A.*"

DCP Section 4.01(b) ("Lapse Provision").

245.    The Lapse Provision does not restrict the timing of such an amendment or such a payment to December 31, 2013 or to periods either before or after December 31, 2013. Instead, the Lapse Provision covers any amendment providing for the payment of restored deferred compensation, regardless of the time of the amendment, as long as the amendment and payment

would not violate section 409A. Such an amendment would not violate Section 409A and could have been adopted by AIG FP to allow for payment in conformance with Section 409A.

246.    Moreover, at the time of AIG FP's decision not to repay the DCP and SIP Account balances, AIG FP took no steps to consider or formulate a restoration plan or to investigate whether it could amend the Compensation Plans and pay the deferred compensation owed without violating Section 409A (which it could have).

247.    AIG FP failed to adopt a restoration plan required by the Restoration Provision and failed to amend the DCP and SIP to provide for payment of the deferred compensation owed to Plan Participants in conformance with Section 409A in breach of the DCP and SIP.

248.    AIG Inc., having assumed all of the obligations under the DCP and SIP, is now obligated to restore and pay the DCP and SIP account balances, which were not paid by AIG FP.

249.    AIG Inc. has failed to perform under the DCP and SIP contracts by failing to pay the Employee Plaintiffs the amounts owed to them, create a plan of restoration or extend the lapse date, as required by Section 4.01(b) of the DCP and SIP  in breach of those contracts.

250.    As a result of AIG Inc.'s breach of the DCP and SIP, the Employee Plaintiffs have been damaged in excess of $194 million.

## PRAYER FOR RELIEF

WHEREFORE, the Employee Plaintiffs respectfully request that this Court grant the following relief:

1. Enter a declaratory judgment declaring that the purported loans extended to AIG FP under the AIG FP Revolving Credit Agreement are equity;

2. Enter a declaratory judgment equitably subordinating AIG Inc.'s claimed debt to the claims of the Employee Plaintiffs;

3. Enter a declaratory judgment that AIG Inc. has assumed all of the obligations of AIG FP under the DCP and SIP;

4. Money damages against AIG Inc. pursuant to the doctrine of *prima facie* tort;

5. Money damages against AIG Inc. pursuant to tortious interference with contractual relations;

6. Money damages against AIG Inc. for breach of contract; and

7. Awarding Employee Plaintiffs such other relief as this Court deems and just and proper.

## DEMAND FOR JURY TRIAL

The Employee Plaintiffs hereby respectfully make a demand for a trial by jury.

Dated: June 7, 2023
         Wilmington, Delaware

Respectfully submitted,

_/s/ Matthew B. McGuire_

**KOBRE & KIM LLP**
Stephen J. Astringer (No. 6375)
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 518-6451
Facsimile: (302) 518-6461
Stephen.Astringer@kobrekim.com

-and-

Steven W. Perlstein (admitted _pro hac vice_)
Daniel J. Saval (admitted _pro hac vice_)
Adam M. Lavine (admitted _pro hac vice_)
George Stamatopoulos (admitted _pro hac vice_)
Martine B. Forneret (admitted _pro hac vice_)
Donna (Dong Ni) Xu (admitted _pro hac vice_)
800 Third Avenue
New York, New York 10022
Telephone: (212) 488-1200
Facsimile: (212) 488-1220
Steven.Perlstein@kobrekim.com
Daniel.Saval@kobrekim.com
Adam.Lavine@kobrekim.com
George.Stamatopoulos@kobrekim.com
Martine.Forneret@kobrekim.com
Donna.Xu@kobrekim.com

_Counsel to the Employee Plaintiffs_

**LANDIS RATH & COBB LLP**
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
landis@lrclaw.com
mcguire@lrclaw.com

-and-

**HURWITZ SAGARIN SLOSSBERG &
KNUFF LLC**

David A. Slossberg (admitted _pro hac vice_)
Kristen L. Zaehringer (admitted _pro hac vice_)
147 North Broad Street
Milford, Connecticut 06460
Telephone: (203) 877-8000
Facsimile: (203) 878-9800
DSlossberg@hssklaw.com
KZaehringer@hssklaw.com