**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Ch. 11 |
| | ) | |
| AIG Financial Products Corp., | ) | Case No. 22-11309 (MFW) |
| | ) | |
| Debtor. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |
| AIG Financial Products Corp., | ) | Adv. No. 23-50110(MFW) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| American International | ) | |
| Group, Inc., | ) | |
| Intervening Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Lee Arthurs, et al. | ) | Rel. Docs. 1, 2, 4, 8, 11, |
| | ) | 20, 24, 33, 34, 37, 38, 43, |
| Defendants, | ) | 44, 48, 49, 52 |

**Memorandum Opinion**[1]

Before the Court is the Motion for Judgment on the Pleadings and Motion to Dismiss (the "Motion") filed by American International Group, Inc. ("AIG") and joined by AIG Financial Products Corporation ("the Debtor"). The Motion is opposed by the Defendants, a group of former top executives of the Debtor (the "Former Executives"). For the reasons stated below, the Court will deny the Motion.

---

[1]   The Court is not required to state findings of fact or conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure on a Motion to Dismiss or Motion for Judgment on the Pleadings. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Noramco LLC v. Dishman USA, Inc., No. 21-1696-WCB, 2022 WL 2817876, at *2 (D. Del. July 19, 2022).

I.   FACTUAL BACKGROUND[2]

The Debtor is a wholly owned subsidiary of AIG.  The Debtor was founded in 1987 as a joint venture between AIG and a group of Drexel Lambert investment bankers to allow AIG to access the capital markets and generate returns from trading in complex financial derivatives.[3]  The Debtor wrote credit protection through credit default swaps on mortgage-backed securities (also known as collateralized debt obligations) to the tune of hundreds of billions of dollars.

While working for the Debtor, the Former Executives participated in certain deferred compensation plans: the Deferred Compensation Plan (the "DCP"), the Special Incentive Plan (the "SIP"), and the 2008 Employee Retention Plan (the "ERP") (collectively, the "Compensation Plans").  Each of the Former Executives was a participant in the DCP and a number also participated in the SIP and the ERP.[4]  Under the Compensation Plans, the Former Executives were entitled to receive a portion of the Debtor's profits in annual bonuses, but some portion of

---

[2]   The facts recited herein include the findings of fact in the Opinion issued by the Court on May 10, 2023, resolving the prior contested matter between the parties as well as additional facts averred by the Former Executives in their counterclaim and cross-claims, which must be accepted as true on a motion to dismiss and motion for judgment on the pleadings filed by a plaintiff. (D.I. 193 194: Adv. D.I. 20.)  See also infra Part IV, A.

[3]   D.I. 193 at 1-2.

[4]   Adv. D.I. 20 at ¶ 65.

that compensation was automatically deferred.[5]  The Former
Executives could also elect to increase the amounts deferred.[6]
AIG was also a participant in the Compensation Plans and agreed
to defer a portion of the Debtor's profits to which it was
entitled.[7]  The Former Executives' deferred compensation was
reflected on a ledger of their accounts but was not segregated
from the Debtor's general funds nor held in trust for them.[8]
Absent any losses in a given year, the deferred compensation was
to be paid to them over time in installments annually, starting
in October of the next calendar year after the contribution to
the plan was made.[9]  The Plan Participants' accounts were reduced
by the amount of any losses suffered by the Debtor in excess of
certain reserves, but the Debtor was required to restore those
balances (with interest) from future profits pursuant to a plan
to be proposed by its board of directors.[10]  The Debtor's
obligation to restore the Former Executive's accounts was to

---

[5]    Id., Ex. A at § 2.01(a).

[6]    Id. at § 3.01(b).

[7]    Id. at § 2.01(b).

[8]    Id. at § 4.01(a).

[9]    Adv. D.I. 20 at ¶ 68 & Ex. A at § 3.05.  Installment
payments were to be made on a pro-rata basis for a term tied to"
the approximate average life of [the Debtor's] swap transaction
portfolio," but the DCP specified that for 2009 and 2010, the
period of time would be six years.  Id.

[10]    Id., Ex. A at § 4.01(a).

expire on December 31, 2013, unless the Debtor's Board extended that deadline.[11]  In the event of an insolvency or bankruptcy proceeding of the Debtor, the Compensation Plans provided that the Plan Participants had an unsecured claim for any amounts due to them under the Plans which was subordinated to all other claims against the Debtors.[12]

As a result of the financial crisis in the United States in 2008 and 2009, the Debtor was left owing tens of billions of dollars on its complex financial obligations and suffered a severe liquidity crisis.[13]  To avoid the massive losses that would be realized if the Debtor were forced to liquidate its holdings immediately, AIG obtained loans of almost $100 billion from the Federal Reserve Bank.[14]  With those funds AIG infused the Debtor with $65 billion through a revolving credit facility extended by another AIG subsidiary, AIG Funding.[15]  The extension of this "loan" allowed the Debtor to liquidate its obligations over time.  With that financial assistance, the Debtor became cash flow positive and balance sheet solvent over time (or at

---

[11]   Id. at § 4.01(b).

[12]   Id. at § 4.01(a).

[13]   Adv. D.I. 20 at ¶¶ 94-98.

[14]   Id. at ¶¶ at 118, 121.

[15]   Id. at ¶ 96.  The revolving credit agreement was ultimately assumed by AIG, Inc., when it merged with AIG Funding in December 2015.

least represented that it was).[16]  Notwithstanding

representations that it was solvent,[17] the Debtor did not restore

the amounts of deferred compensation due the Former Executives

under the various plans nor credit any deferred compensation to

the Former Executives' accounts.  As a result, in December 2019,

the Former Executives sued the Debtor in Connecticut asserting

they were owed in excess of $194 million in deferred

compensation.[18]


II.  <u>PROCEDURAL BACKGROUND</u>

On December 14, 2022, the Debtor filed a voluntary petition

under chapter 11 of the Bankruptcy Code.[19]  On the same day, it

filed a proposed plan of reorganization and related disclosure

statement.[20]  The Plan provided for a reorganization of the

Debtor by converting the claim of its parent, AIG, to equity and

paying a pro rata distribution of $1 million to the Former

Executives if their class accepted the plan.[21]

On January 13, 2023, the Former Executives filed a motion

---

[16]    <u>See</u> <u>id.</u> at ¶ 133.

[17]    <u>Id.</u> at ¶¶ 136, 183.

[18]    <u>Id.</u> at ¶¶ 1, 250.

[19]    D.I. 1.

[20]    D.I. 6 & 7.

[21]    D.I. 7 at I.A.2.

asking the Court to dismiss the bankruptcy case, or to abstain, asserting that the case was filed in bad faith and would result in continuing loss to the estate without a reasonable likelihood of rehabilitation.[22]  After briefing and an evidentiary hearing, the Court denied the motion in an opinion and order dated May 10, 2023.[23]

In the interim, on February 17, 2023, the Debtor filed a complaint against the Former Executives (the "Complaint").[24] Count II of the Complaint requests a declaratory judgment that the Former Executives' claims under the Compensation Plans are subordinated to AIG's claim pursuant to a provision in the Compensation Plans as enforced under section 510(a) of the Bankruptcy Code.  The Court approved a stipulation allowing AIG to intervene as a plaintiff.[25]

The Former Executives filed an answer, a counterclaim, and several cross-claims against AIG seeking a determination that their claims are senior to AIG's claim.[26]  Those claims include recharacterization or equitable subordination of AIG's claim, as well as asserting breach of contract and tort claims.  The Debtor

---

[22]   D.I. 101.

[23]   D.I. 193, 194.

[24]   Adv. D.I. 1, 2.

[25]   Adv. D.I. 8.

[26]   Adv. D.I. 20.

filed an Answer to the counterclaim against it on June 7, 2023.[27]

AIG filed a Motion to Dismiss and for Judgment on the Pleadings on July 28, 2023.[28]  The Debtor filed a Joinder to AIG's Motion.[29]  The Motion seeks a judgment in favor of the Plaintiffs on Count II of the Complaint and seeks dismissal of the Former Executives' counterclaim and cross-claims.  The Motion has been fully briefed and is ripe for decision.[30]

III. <u>JURISDICTION</u>

The Former Executives assert that while the Court has jurisdiction over their counterclaim and cross-claims, those claims are non-core.[31]  The Court concludes, however, that it has subject matter jurisdiction over the complaint, counterclaim, and cross-claims because they are core claims concerning the allowance and priority of claims against the estate.[32]

The Former Executives do not consent to a final order being

---

[27]    Adv. D.I. 24.

[28]    Adv. D.I. 33, 34, 37.

[29]    Adv. D.I. 38.

[30]    Adv. D.I. 38, 43 & 52.

[31]    Adv. D.I. 20 at ¶ 7.

[32]    28 U.S.C. §§ 157(b)(2)(B) & (O), 1334(b).  <u>See also</u> <u>Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)</u>, 348 B.R. 234, 249 (Bankr. D. Del. 2005) (holding that "[e]quitable subordination is unquestionably a 'core' proceeding pursuant to section 157(b)(2).") (citations omitted).

entered.[33]  It is not necessary to decide this issue, however,

because the Court does have authority to enter orders on

preliminary matters to the extent they do not constitute a final

adjudication of a matter over which the Court does not have

constitutional authority to enter a final order.[34]


IV.  DISCUSSION

A.  Standard of Review

1.  Rule 12(b)(6)[35]

AIG bases its Motion to Dismiss on Rule 12(b)(6), which

provides for dismissal for "failure to state a claim upon which

---

[33]  D.I. 20 at ¶ 63.

[34]  See O'Toole v. McTaggart (In re Trinsum Grp., Inc.), 467
B.R. 734, 738 (Bankr. S.D.N.Y. 2012) (holding that "before and
after Stern v. Marshall, it is clear that the bankruptcy court
may handle all pretrial proceedings, including the entry of an
interlocutory order dismissing fewer than all of the claims in an
adversary complaint, as occurred in this case.") (citations
omitted). See also Am. Media Inc. v. Anderson Mgmt. Servs. (In re
Anderson News, LLC), No. AP 11-53811-CSS, 2015 WL 4966236, at *2
(D. Del. Aug. 19, 2015) (denying motion for interlocutory appeal
and holding that bankruptcy court's authority to enter final
orders on non-core claims was not implicated by order denying
summary judgment because that order was not a final order)
(citing Boyd v. King Par, LLC, No. 1:11-CV-1106, 2011 WL 5509873,
at *2 (W.D. Mich. Nov. 10, 2011) (holding that "even if there is
uncertainty regarding the bankruptcy court's ability to enter a
final judgment . . . that does not deprive the bankruptcy court
of the power to entertain all pre-trial proceedings, including
summary judgment motions.")).

[35]  Fed. R. Civ. P. 12(b)(6).  The applicable Federal Rules of
Civil Procedure are incorporated into the Federal Rules of
Bankruptcy Procedure.  See Fed. R. Bankr. P. 7012.  Therefore,
citations herein are to the Federal Rules of Civil Procedure.

relief can be granted."[36]   Under Rule 12(b)(6), the complaint

"does not need detailed factual allegations, [but] a plaintiff's

obligation to provide the 'grounds' of his 'entitle[ment] to

relief' requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will

not do."[37]

To survive a motion to dismiss, the complaint must contain

sufficient factual matter, accepted as true, "to state a claim to

relief that is plausible on its face."[38]   Two "working

principles" underlie this pleading standard:

> First, the tenet that a court must accept a complaint's
> allegations as true is inapplicable to threadbare
> recitals of a cause of action's elements, supported by
> mere conclusory statements.   Second, determining
> whether a complaint states a plausible claim is context
> specific, requiring the reviewing court to draw on its
> experience and common sense.[39]

Under this standard, a complaint must nudge claims "across the

line from conceivable to plausible."[40]   The court must draw all

reasonable inferences in favor of the plaintiff,[41] and the movant

---

[36]   Fed. R. Civ. P. 12(b)(6).

[37]   Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

[38]   Id. at 570.

[39]   Iqbal, 556 U.S. at 663-64 (citation omitted).

[40]   Twombly, 550 U.S. at 570.

[41]   See, e.g., Alpizar-Fallas v. Favero, 908 F.3d 910, 914 (3d
Cir. 2018).

"bears the burden to show that the plaintiff's claims are not plausible."[42]

In weighing a motion to dismiss, the Third Circuit instructs courts to follow a three-part analysis. "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"[43] Second, the court must separate the factual and legal elements of the claim, accepting all of the complaint's well-pled facts as true and disregarding any legal conclusions.[44] Third, the court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief.[45] After conducting this analysis, the court may conclude that a claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct.[46]

---

[42] <u>UMB Bank, N.A. v. Sun Cap. Partners V, LP (In re LSC Wind Down, LLC)</u>, 610 B.R. 779, 783 (Bankr. D. Del. 2020).

[43] <u>Santiago v. Warminster Twp.</u>, 629 F.3d 121, 130 (3d Cir. 2010) (quoting <u>Iqbal</u>, 556 U.S. at 675).

[44] <u>Santiago</u>, 629 F.3d at 130.  <u>See also</u> <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009).

[45] <u>Santiago</u>, 629 F.3d at 130.

[46] <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 556).

2.   <u>Rule 12(c)</u>[47]

Rule 12(c) governs motions for judgment on the pleadings and
applies the same standard as Rule 12(b)(6).[48]  A 12(c) motion
differs from a 12(b)(6) motion, however, in that the movant must
establish "that no material issue of fact remains to be resolved
and that [it] is entitled to judgment as a matter of law."[49]
Further, the allegations that must be accepted as true depends on
which party is the moving party.  "In the situation in which the
plaintiff moves for judgment on the pleadings, the court must
accept as true the factual allegations in the defendant's answer
and construe the factual allegations in the light most favorable
to the defendant."[50]  In this case, therefore, in considering
AIG's Motion for Judgment on the Pleadings, the Court must accept
as true the averments of the Former Executives in their
counterclaim and cross-claims.

B.   <u>Motion to Dismiss Counterclaim/Cross-claims</u>

In their counterclaim and cross-claims, the Former

---

[47]   Fed. R. Civ. P. 12(c).

[48]   <u>Noramco</u>, 2022 WL 2817876, at *2 ("The standard that applies
to a Rule 12(b)(6) motion to dismiss for failure to state a claim
also applies to motions brought under Rule 12(c)."). <u>See also</u>
<u>Stanziale v. Richards, Layton & Finger, P.A. (In re EP</u>
<u>Liquidation, LLC)</u>, 583 B.R. 304, 319 (Bankr. D. Del. 2018).

[49]   <u>Noramco</u>, 2022 WL 2817876, at *2.

[50]   <u>Id.</u> at n.3 ("When a plaintiff seeks judgment on the
pleadings, the plaintiff is obviously not entitled to have the
allegations in its complaint treated as true.").

11

Executives seek to recharacterize AIG's claim against the Debtor arising from the revolving credit facility as an equity infusion, not a loan. They also bring several additional claims against AIG only: for equitable subordination, prima facie tort, tortious interference with contractual relations, breach of contract, and seek a declaratory judgment that because the Debtor transferred substantially all of its assets to AIG or otherwise combined with AIG, AIG must assume all of the obligations of the Debtor under the Compensation Plans. AIG's Motion, in which the Debtor joins, seeks dismissal of the counterclaim and cross-claims.

### 1. Recharacterization Claim

The Former Executives' Counterclaim against the Debtor and AIG requests a declaratory judgment "that the Parent Investment in [the Debtor] was an equity infusion and not a loan because that was the intent of the parties at the time and [is] how it was and has been actually treated for years."[51]

Recharacterization is an equitable doctrine that allows a court to determine whether a purported loan is, in substance, a capital contribution of equity.[52] The eleven factors courts have considered in recharacterization cases are: "(1) the names given to the instruments, if any, evidencing the indebtedness; (2) the

---

[51]   Adv. D.I. 20 at ¶¶ 185, 197.

[52]   Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.), 432 F.3d 448, 454-55 (3d Cir. 2006).

presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments."[53]  The Third Circuit has held that recharacterization is a question of fact and involves "an overarching inquiry" into "whether the parties called an instrument one thing when in fact they intended it as something else."[54]  "That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances.  Answers lie in facts that confer context case-by-case."[55]

---

[53]  Id. at 455 n.8 (quoting Roth Steel Tube Co. v. C.I.R., 800 F.2d at 625, 630 (6th Cir. 1986)).

[54]  SubMicron, 432 F.3d at 455-56.

[55]  Id.

The Former Executives allege that AIG's "loan" to the Debtor carried all of the hallmarks of an equity infusion: including no maturity date, no payment terms, and no interest rate.[56] Further, the Former Executives allege that AIG characterized $35 billion of the funds it "lent" to the Debtor as a "negative equity investment" on its own balance sheet.[57]  Consequently, the Former Executives contend that the AIG loan must be recharacterized as equity rather than debt.  In the Motion to Dismiss, AIG and the Debtor assert that the Former Executives' recharacterization claim must be dismissed for several reasons.

a.    Recharacterization v. Section 510(a)

First, AIG argues that recharacterization is an equitable remedy that does not find any basis in the Bankruptcy Code, except perhaps in section 105(a).[58]  In contrast, it contends that section 510(a), which states that a subordination agreement is enforceable, is an "explicit mandate" of the Bankruptcy Code.[59]  AIG states that section 510(a) expressly provides that

---

[56]    Adv. D.I. 20 at ¶¶ 119-20.

[57]    Id. at ¶¶ 150-53, 188.

[58]    SubMicron, 432 F.3d at 454-55, n.6 (noting that recharacterization is an equitable power exercised through application of section 105(a)).  See 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

[59]    11 U.S.C. § 510(a) ("A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy

the only exception to its mandate is section 510(c) (which allows equitable subordination but not recharacterization).  AIG argues that, as a result of that express exception, the Court cannot accept the Former Executives' argument that the equitable doctrine of recharacterization is another exception to enforcement of a contractual subordination agreement.[60]  It asserts that the Supreme Court has held that section 105(a) "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code" with equitable doctrines such as recharacterization.[61]

AIG contends that recharacterization is particularly impermissible in this case because it would upend the bedrock rules of priority in bankruptcy.[62]  AIG asserts that this case is

---

law.").

[60]  Law v. Siegel, 571 U.S. 415, 424 (2014) ("The Code's meticulous — not to say mind-numbingly detailed — enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions."). See also TRW Inc. v. Andrews, 534 U.S. 19, 28, (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.") (quoting Andrus v. Glover Constr. Co., 446 U.S. 608, 616-617 (1980).  See generally Antonin Scalia & Bryan A. Garner, Reading Law 107 (2012) ("Negative-Implication Canon[:] The expression of one thing implies the exclusion of others (expressio unius est exclusio alterius).").

[61]  Law v. Siegel, 571 U.S. at 421 (quoting 2 Collier on Bankruptcy ¶ 105.01[2], p. 105-6 (16th ed. 2013)).

[62]  Czyzewski v. Jevic Holding Corp., 580 U.S. 451, 469-470 (2017) (holding that a debtor may not use section 105(a) to

analogous to the situation in <u>Jevic</u> where the Supreme Court held that the bankruptcy court's approval of a non-consensual structured dismissal of a bankruptcy case under section 105(a) contravened the expressly-stated priority rules of the Bankruptcy Code.  AIG argues that, similarly, the recharacterization of its claim, which is contractually superior to the Former Executives' claims, would upset the normal priority rules of the Bankruptcy Code.

In response, the Former Executives also rely on <u>Jevic</u>, for the principle that "[t]he Code places equity holders at the bottom of the priority list."[63]  They contend that, if AIG's claim is recharacterized as an equity interest, then the Former Executives' unsecured claims, whether contractually subordinated to other claims or not, would be senior to that interest.  This, they assert, is consistent with the Bankruptcy Code's priority scheme, which provides that equity interests are entitled to a distribution only after all creditors' claims, even subordinated ones, are paid.[64]

The Court agrees with the Former Executives that the express priority scheme of the Bankruptcy Code does not preclude the

---

create an "equitable" realignment of the priority scheme that the Code's provisions themselves mandate).

[63]    <u>Id.</u> at 457.

[64]    <u>See</u> 11 U.S.C. §§ 726(a), 1129(a)(7)(A)(ii) & (b)(2)(B).

recharacterization of a claim from debt to equity. Recharacterization is an equitable doctrine that "inquire[s] into the actual nature of a transaction to determine how best to characterize it."[65]  It is only once the Court has determined what an obligation is (debt or equity) that the Bankruptcy Code priority scheme is even implicated.

Nor does the Court find persuasive AIG's argument that section 510(a) precludes recharacterization of a claim.  The Third Circuit has instructed that the focus of recharacterization is "whether a debt actually exists," not the priority of the claim.  Indeed, the Third Circuit has stated that the term recharacterization is misleading.  "The debt-versus-equity inquiry is not an exercise in recharacterizing a claim, but of characterizing the advance's true character."[66]  Thus, the true character of AIG's claim must first be determined before considering what its priority is.  Whether recharacterization of AIG's claim would have the practical effect of subordinating AIG's claim to the Former Executives' claims has no bearing on the recharacterization analysis.

---

[65]  In re Cold Harbor Assoc., L.P., 204 B.R. 904, 915 (Bankr. E.D. Va. 1997).

[66]  SubMicron, 432 F.3d at 454 n.7 (quoting Citicorp Real Estate, Inc. v. PWA, Inc. (In re Georgetown Bldg. Assoc., Ltd. P'ship), 240 B.R. 124, 137 (Bankr. D.D.C. 1999)).

b.  <u>Terms of Subordination Provision</u>

AIG argues nonetheless that, even if the Former Executives could recharacterize AIG's claim as an equity infusion rather than a loan, under the express terms of the subordination provision in the Compensation Plans AIG's claim must still be paid before the claims of the Former Executives.  That provision subordinates the Former Executives' claims to "all other obligations" of the Debtor.[67]  AIG argues that its claim is an "obligation" of the Debtor, which must be paid before the Former Executives' claims, even if it is recharacterized as equity.[68]

The Former Executives contend that the subordination provision does not subordinate their claims to equity interests, it only subordinates them to other creditors' claims.  They cite language in the subordination clause which defines the claims to

---

[67]    Adv. D.I. 20, Ex. A at § 4.01(a).

[68]    <u>Redmond v. Jenkins (In re Alternate Fuels, Inc.)</u>, 789 F.3d 1139, 1148 (10th Cir. 2015) ("Unlike disallowance of a claim, recharacterization of a loan as equity does not ultimately relieve a debtor from his obligation to repay the claimant. Although the claimant may not proceed in bankruptcy — since he no longer holds an allowed "claim" — he may still hold a valid interest in equity to be paid upon satisfaction of the debtor's other outstanding obligations."); <u>Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC (In re HH Liquidation, LLC)</u>, 590 B.R. 211, 290 (Bankr. D. Del. 2018) ("If recharacterization of an investment from debt to equity is warranted, the characterization occurs 'ab initio,' from the beginning of the investment.  Accordingly, the advance does not disappear; instead it becomes equity in the borrowing parties with all the rights and privileges associated with equity.") (citations omitted).

be paid in a bankruptcy case (ahead of their claims) as "Creditors' Claims."[69]  Thus, they assert that "the other obligations" which the Debtor must pay before them can only be other debt (rather than equity) obligations.  The Former Executives argue that, to the extent there is a dispute about the intent of the subordination provision on this point, it raises factual issues which cannot be resolved at the motion to dismiss stage.[70]

---

[69]    Adv. D.I. 20, Ex. A at § 4.01(a) (emphasis added):

If [the Debtor] shall become the subject of any bankruptcy or insolvency case or proceeding, or shall make an assignment for the benefit of creditors, or shall become the subject of a reorganization whether or not pursuant to bankruptcy laws, or if any other relief shall be granted to [the Debtor] generally from the rights of creditors, then in any such event (a "Bankruptcy/Insolvency Event") **the obligations under this Deferred Compensation Plan to Participants and their Beneficiaries and to AIG shall be subordinate** and junior in right of payment and otherwise, to the prior payment in full of all of the other obligations of [the Debtor], whether now existing or hereafter incurred, except to the extent payment of any such obligations is expressly made subordinate to or pari passu with the payment obligations hereunder.  **If, in connection with a Bankruptcy/Insolvency Event, the claims (collectively "Creditors' Claims") of all other present and future creditors of [the Debtor],** other than those claims that are expressly made subordinate to or pari passu with claims for benefits payable hereunder, can be immediately fully satisfied, or adequate provision made for them, payments will be made at the times specified in this Plan.

[70]    "When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact, and the trial court's interpretation is subject to reversal on appeal only if it is clearly erroneous."  Honulik v. Town of Greenwich,

AIG responds that the provisions are unambiguous and that the term "all other obligations" was clearly intended to have the broadest possible reading, because "all means all."  AIG contends that the reference in the Compensation Plans to "Creditors' Claims" is with respect to the timing of payments and not the obligation to pay.

The Court concludes that it cannot decide at this stage AIG's argument that its claim, even if recharacterized as equity, is an "obligation" that must be paid ahead of the Former Executives' claims.  The Compensation Plans do not define "obligation."  Therefore, AIG's argument raises factual questions of the intent of the parties which are not conducive to resolution at the motion to dismiss stage.[71]  Accordingly, the Court will deny the Motion to Dismiss the Former Executives' Counterclaim which seeks to recharacterize AIG's claim as equity.

### 2.   Equitable Subordination Claim

In their first cross-claim against AIG, the Former Executives assert a claim for equitable subordination under

---

980 A.2d 880, 888 (2009) (internal quotation omitted) (quoting David M. Somers & Assoc., P.C. v. Busch, 927 A.2d 832, 838 (2007)).

[71]   See, e.g., IKB Int'l S.A. v. Wilmington Tr. Co., 774 F. App'x 719, 724 (3d Cir. 2019) (a motion to dismiss based on terms of a contract must be denied where the contract terms are ambiguous); IS BBFP LLC v. Ctr. City Healthcare, LLC (In re Ctr. City Healthcare, LLC), Nos. 19-11466 (MFW), 23-50337(MFW), 2024 WL 124245, at *3 (Bankr. D. Del. Jan. 10, 2024) (same).

section 510(c)(1).[72]  A party seeking equitable subordination
must prove the following elements: "(1) the claimant must have
engaged in some type of inequitable conduct, (2) the misconduct
must have resulted in injury to the creditors or conferred an
unfair advantage on the claimant, and (3) equitable subordination
of the claim must not be inconsistent with the provisions of the
bankruptcy code."[73]

The Former Executives allege certain conduct on the part of
AIG that they say would make it inequitable to treat AIG's claim
as debt.  First, the Former Executives allege that the cash
infusion from AIG was made by AIG with no realistic expectation
that it could be paid back.[74]  Second, the Former Executives
allege that at least a part of the "loan" was expressly treated
as equity, not debt, on AIG's books and records and in AIG's and
the Debtor's representations to other parties, such as ratings
agencies.[75]  Third, the Former Executives allege that part of the
reason, if not the sole reason, for characterizing AIG's cash

---

[72]    11 U.S.C. § 510(c) ("Notwithstanding subsections (a) and (b)
of this section, after notice and a hearing, the court may - (1)
under principles of equitable subordination, subordinate for
purposes of distribution all or part of an allowed claim to all
or part of another allowed claim or all or part of an allowed
interest to all or part of another allowed interest.").

[73]    Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding
Unsecured Claims, 160 F.3d 982, 986-87 (3rd Cir. 1998).

[74]    Adv. D.I. 20 at ¶¶ 96, 118-21, 200-09.

[75]    Id. at ¶¶ 122-25, 126-29, 136-40, 200-09.

infusion as debt was to avoid having to repay the deferred compensation owed to the Former Executives.[76]  Finally, the Former Executives allege that AIG acted inequitably by diverting funds away from the Debtor to other accounts controlled by AIG, even on the eve of bankruptcy.[77]

AIG responds that equitable subordination is "an extraordinary remedy which is applied sparingly."[78]  It argues that the Former Executives' claim fails as a matter of law, because courts "must enforce lawful subordination agreements according to their terms and prevent junior creditors from receiving funds where they have 'explicitly agreed not to accept them.'"[79]  It argues that to even state a claim for equitable subordination, the Former Executives must allege some inequitable conduct which harmed them, such as a subsequent fraudulent transfer or preference.[80]  Finally, AIG contends that the allegations of the Former Executives do not rise to the level of inequitable conduct by AIG necessary to establish equitable subordination.

---

[76]    Id. at ¶¶ 137-38.

[77]    Id. at ¶¶ 166-80.

[78]    Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas, LLC (In re Epic Capital Corp.), 307 B.R. 767, 773 (D. Del. 2004).

[79]    In re Hinderliter Indus., Inc., 228 B.R. 848, 850 (Bankr. E.D. Tex. 1999) (citation omitted).

[80]    Epic Cap., 307 B.R. at 772.

a.  <u>Insider Status</u>

Preliminarily, the parties dispute what standard the Former Executives must meet in pleading equitable subordination.  The Former Executives argue that AIG's conduct is subject to a heightened scrutiny standard because, they allege, AIG was an insider of the Debtor.[81]  This standard requires that the plaintiff allege "only 'material evidence of unfair conduct' or 'any unfair act by the creditor as long as the conduct affects the bankruptcy results of the other creditors.'"[82]

While not disputing its status as an insider, AIG argues

---

[81]  <u>Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd. (In re Autobacs Strauss, Inc.)</u>, 473 B.R. 525, 582 (Bankr. D. Del. 2012) (noting that the most important factor in determining inequitable conduct "is whether the claimant was an insider or outsider in relation to the debtor at the time of the act" because where the claimant is an insider, the insider's conduct is "rigorously scrutinized") (citations omitted).

[82]  <u>Youngman v. Yucaipa Am. All. Fund I, L.P. (In re ASHINC Corp.)</u>, 629 B.R. 154, 217 (Bankr. D. Del. 2021) (holding that "courts look to the particularized facts before them to determine whether the conduct and injury demand equitable subordination."), <u>order adopted in part, rejected in part on other grounds</u>, 2022 WL 2666888 (D. Del. July 11, 2022).  <u>See also</u> <u>Tilton v. MBIA Inc. (In re Zohar III, Corp.)</u>, 620 F. Supp. 3d 147, 152 (D. Del. 2022) ("If it is an insider, the standard for finding inequitable conduct is much lower, though there still needs to be some plausible allegation of unfair conduct.") (internal quotes omitted).  <u>Cf.</u> <u>First Nat'l Bank v. Rafoth (In re Baker & Getty Fin. Servs.)</u>, 974 F.2d 712, 718 (6th Cir. 1992) (holding that where the defendant is not an insider, the preponderance of the evidence must show that it was guilty of "gross misconduct tantamount to fraud, overreaching or spoliation. . . ." ) (citations omitted); <u>Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)</u>, Nos. 11-10776 (MFW), 13-51215 (MFW), 2014 WL 1320145, at *7 (Bankr. D. Del. Apr. 2, 2014) (holding that "if the creditor is an outsider of the debtor, more egregious conduct is required and must be plead [sic] with particularity.").

that insider status alone is insufficient to warrant equitable subordination of its claim.[83]  AIG contends that it is an insider only because it owned the Debtor's stock and that, as a shareholder, it owed no fiduciary duty to the Debtor's creditors. Therefore, AIG argues that its insider status is no basis to subordinate its claims to those of the Former Executives who contractually agreed that their claims would be subordinate to AIG's.[84]

The Court finds that, as the parent of the Debtor, AIG was an insider of the Debtor as defined in the Bankruptcy Code.[85] The heightened scrutiny standard applies to all insiders and is not dependent on the insider having specific fiduciary duties.[86]

---

[83]    HH Liquidation, 590 B.R. at 298 (holding that it is "axiomatic that '[i]nsider status alone . . . is insufficient to warrant subordination.'") (citations omitted).

[84]    See 4 Collier on Bankruptcy ¶ 510.05[3][c] (16th ed. 2023) ("if the insider claimant has no fiduciary responsibilities, its claims, while closely scrutinized, should be subject to subordination only on grounds that would apply equally to outsiders.").

[85]    11 U.S.C. § 101(31)(E) (insider includes an "affiliate" of the debtor) & 101(2)(A) (affiliate includes an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor").

[86]    "In circumstances where the plaintiff seeks to equitably subordinate the claim of a fiduciary or insider of the debtor who is also a creditor, the line between the defendant creditor and the debtor is often blurred. The insider creditor is typically in a position to exert control over the debtor.  The creditor may also share common management and/or ownership with the debtor. In its efforts to collect its debt, therefore, the creditor may

Therefore, the Court concludes that AIG's actions vis a vis the Debtor are subject to the heightened scrutiny standard.[87]

        b.   <u>Inequitable Conduct in Formation of Contract</u>

AIG asserts that the Former Executives do not allege any kind of inequitable conduct on its part relating to the formation of the Compensation Plans, in which the Former Executives expressly agreed to be subordinated. This is significant, AIG contends, because the conduct of AIG after the formation of the contracts cannot be inequitable if it did not prejudice the Former Executives any more than they already were as subordinated creditors. In this regard, AIG argues that the cases cited by the Former Executives are inapplicable because they did not involve a party that was already contractually subordinated.

The Former Executives respond that participation in the Compensation Plans was mandatory and, therefore, inherently inequitable at its inception.[88] The Former Executives also argue

---

act directly or cause the debtor to act. On the other hand, if the claimant is not an insider, then evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary." <u>Autobacs Strauss</u>, 473 B.R. at 582 (internal quotes and citation omitted) (emphasis added) (denying dismissal of equitable subordination claim, stating that fiduciary or insider status gives rise to a heightened scrutiny standard). <u>See also</u> <u>Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)</u>, 554 F.3d 382 (3d Cir. 2009) (not considering whether insider was also a fiduciary in applying heightened scrutiny standard and affirming bankruptcy court's findings of inequitable conduct).

[87]    <u>Epic Cap.</u>, 307 B.R. at 772.

[88]    Adv. D.I. 20 at ¶ 65.

that the plain language of section 510(a) specifically acknowledges equitable subordination under section 510(c) as an exception to the enforcement of contractual subordination. Therefore, they argue that section 510(a) does not preclude the Former Executives' equitable subordination claim. Instead, they contend that the only question the Court need consider is whether the Former Executives have sufficiently pled facts to sustain the equitable subordination claim.

The Court agrees with the Former Executives. The fact that the Former Executives agreed to subordination does not preclude them from seeking to equitably subordinate AIG's claim. To hold otherwise would eviscerate the provisions of section 510(c), which are an express exception to section 510(a)'s enforcement of contractual subordination rights. Further, equitable subordination is typically sought by a creditor who is already subordinate (by contract or operation of law) to the claims of the one it seeks to subordinate. AIG has cited no case that requires a finding of inequitable conduct relating to the formation of the contractual subordination agreement as a prerequisite to pleading a claim for equitable subordination.

Therefore, the Court turns to the question of whether the Former Executives have alleged sufficient facts to state a plausible claim for equitable subordination.

c.    <u>Allegations of inequitable conduct</u>

In support of their equitable subordination claim, the Former Executives allege specific conduct of AIG that they say was inequitable.  For example, they allege that AIG improperly and wrongfully directed the Debtor's officers (whom it controlled)[89] to breach the Debtor's contractual obligations to them, by refusing to (i) restore their deferred compensation account balances, (ii) create a restoration plan, or (3) extend the lapse date.[90]  They further allege that AIG and the Debtor conspired to mislead the Former Executives about the Debtor's true financial condition,[91] by fraudulently or misleadingly representing to ratings agencies that the Debtor was solvent while asserting to the Former Executives that it was insolvent to avoid restoring the Former Executives' deferred compensation accounts.[92]  The Former Executives also allege that AIG listed a portion of the "loan" as equity on its records[93] and that AIG characterized the transaction as a loan only to avoid repaying the Former Executives under the Compensation Plans.[94]  The Former

---

[89]    Adv. D.I. 20 at ¶ 146.

[90]    <u>Id.</u> at ¶¶ 201, 203.

[91]    <u>Id.</u> at ¶ 203.

[92]    <u>Id.</u> at ¶¶ 138, 202.

[93]    <u>See id.</u> at ¶¶ 134, 137.

[94]    <u>Id.</u> at ¶¶ 138, 153.

Executives also allege that AIG acted in bad faith by not pursuing a recapitalization plan which would have reflected AIG's loan as equity because AIG had no realistic expectation that it could be paid back for the alleged "loan."[95]  Finally, they allege that AIG controlled the Debtor and directed it to divert the Debtor's funds to other AIG affiliates for the benefit of AIG on the eve of the Debtor's bankruptcy.[96]

AIG argues that its conduct was not inequitable.  First, AIG contends that there was no inequity in it extending a loan to the Debtor, even though it was unlikely that it would be repaid, because the loan actually benefitted creditors who were paid billions from those funds.  AIG asserts that if it had not provided the loan, the Debtor would have collapsed during the 2008-2009 financial crisis, and the creditors, including the Former Executives, would have collected nothing.

Further, AIG asserts that the allegations about its later refusal to "recapitalize" the Debtor by forgiving its indebtedness is not sufficient to equitably subordinate its loan. AIG argues that it had no obligation to recapitalize the Debtor. Courts have made it clear that it is not inequitable for a creditor to protect its position through legitimate means, as AIG

---

[95]    Id.  at ¶¶ 144-45.

[96]    Id. at ¶ 204.

28

did.[97]   Instead, AIG contends that courts have typically only

granted equitable subordination where a creditor enforcing its

rights received avoidable preferences or fraudulent transfers.[98]

    The Former Executives respond that they are not contending

that AIG's loan itself was inequitable.  Rather, they allege that

the inequity was the use of the loan as a pretext to deny the

Former Executives the compensation due them under the

Compensation Plans.  They contend that they are not simply

---

[97]   Tilton v. MBIA Inc. (In re Zohar III, Corp.), 639 B.R. 73,
113 (Bankr. D. Del. 2022) ("But as a general matter, the pursuit
of one's legal rights, including the exercise of contractual
rights, may not be grounds for equitable subordination 'even if
the rights are exercised harshly and cause harm to other
creditors.'") (citation omitted); Walnut Creek Mining Co. v.
Cascade Inv., LLC (In re Optim Energy, LLC), 527 B.R. 169, 178
(D. Del. 2015) (holding that insider obtaining secured status for
its loan did not amount to inequitable conduct absent further
allegations that the insider used its power or position of trust
to its own advantage).  But see Citicorp Venture Capital, Ltd.v.
Comm. of Creditors Holding Unsecured Claims, 323 F.3d 228, 235
(3d Cir. 2003) ("Although the pursuit of one's legal rights may
not be grounds for equitable subordination, protracted and
unjustified litigation tactics that harm the estate by causing it
to incur fees may justify subordination.").

[98]   Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In
re Lehman Bros. Holdings Inc.), 541 B.R. 551, 583 (S.D.N.Y. 2015)
(in dismissing an equitable subordination claim against a non-
insider, court held that in the absence of a preference or
fraudulent transfer, "there is generally no objection to a
creditor's using his bargaining position, including his ability
to refuse to make further loans needed by the debtor, to improve
the status of his existing claims.") (quoting In re W.T. Grant
Co., 699 F.2d 599, 610 (2d Cir.1983)).  Cf. Walnut Creek Mining,
527 B.R. at 177 (dismissing an equitable subordination claim that
alleged secured lender acted inequitably by designing its
transaction with the debtor to prioritize its interest over the
interests of trade creditors).

alleging that AIG used hard tactics in pursuit of a contractual right.  Instead, their allegations[99] paint a picture of a decades-long improper scheme by AIG to use its power and position of trust to control the Debtor for its own advantage and to the detriment of other creditors.[100]  The Former Executives further allege that AIG's control resulted in substantial funds being diverted from the Debtor (and its other creditors) to AIG.[101]

AIG admits that the Former Executives do allege that it received improper pre-petition transfers of assets from the Debtor.  However, it contends that these allegations fail as a matter of law because they allege harm to the estate as a whole, not any particular harm to the Former Executives.[102]  AIG argues that where the estate as a whole is harmed, the Debtor (or a trustee) is the only party with standing to assert the claim.[103] AIG further asserts that there was no particularized harm to the Former Executives because AIG was entitled to be paid before the

---

[99]    See supra notes 89-96.

[100]    Walnut Creek Mining, 527 B.R. at 177.

[101]    Adv. D.I. 20 at ¶ 204.

[102]    Zohar III, 639 B.R. at 115 n.284 (dismissing equitable subordination claim, inter alia, because plaintiffs did not allege particularized harm to themselves but only alleged that actions reduced the value of the estate).

[103]    Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC), 515 B.R. 117, 159 (Bankr. S.D.N.Y. 2014) (holding that because the estate as a whole was harmed, the trustee was the only party with standing to assert the claim.).

Former Executives under the subordination provision of the Compensation Plans.[104]  Finally, AIG argues that the total amount of allegedly improper transfers totals a "mere" $290 million. AIG says that it would be the tail wagging the dog to subordinate AIG's entire claim of $37.4 billion based on alleged improper transfers of less than 1% of that amount.[105]

The Former Executives argue that an equitable subordination claim involves an inherently factual inquiry.[106]  They contend that many of the cases AIG cites are distinguishable because they were decided on summary judgment or after trial, when the court had the benefit of all the myriad facts relevant to an equitable subordination claim.[107]

The Court concludes that the Former Executives have stated a

---

[104]   Adv. D.I. 20, Ex. A at § 4.01(a).  See Zohar III, 639 B.R. at 113 (holding that pursuit of one's legal rights cannot serve as grounds for equitable subordination).

[105]   In re Aéropostale, Inc., 555 B.R. 369, 397 (Bankr. S.D.N.Y. 2016) (stating the principle that a claim should be subordinated only to the extent necessary to offset the harm the Debtor and its creditors suffered on account of the inequitable conduct).

[106]   ASHINC Corp., 629 B.R. at 217 (noting that "courts look to the particularized facts before them to determine whether the conduct and injury demand equitable subordination.") (citations omitted).

[107]   Lehman Bros., 541 B.R. at 583  (denying summary judgment on equitable subordination claim against non-insider); Aéropostale, 555 B.R. at 375-76 (denying equitable subordination of a non-insider's claim following extensive evidentiary trial).

plausible claim for equitable subordination of AIG's claim.[108]
The allegations of the Former Executives include that (i) the
Compensation Plans were inequitable because they were mandatory
and the Former Executives had no choice but to agree to their
terms;[109] (ii) AIG internally characterized at least a part of its
loan as equity while externally characterizing it as equity or a
loan, depending on the circumstances;[110] (iii) AIG was an insider
that controlled the Debtor's top executives;[111] (iv) AIG and the
Debtor misled the Former Executives about the Debtor's true
financial condition;[112] (v) AIG directed the Debtor to file
bankruptcy thereby triggering the subordination of the claims of
the Former Executives;[113] and (vi) AIG orchestrated and benefitted
from avoidable transfers made by the Debtor on the eve of
bankruptcy.[114]

---

[108]   Twombly, 550 U.S. at 570.

[109]   Adv. D.I. 20 at ¶¶ 65, 74.

[110]   Id. at ¶ 126-27, 137, 151, 202.

[111]   Id. at ¶ 146 ("In fact, these top executives – all of whom
were involved in the proposed recapitalization plan – testified
in the Connecticut Litigation that their true loyalties lied
[sic] with the parent, not AIG FP.").

[112]   Id. at ¶ 203.

[113]   Id. at ¶¶ 161-65, 203-04 (detailing counsel for AIG's
involvement in placing key decision makers with the Debtor and
developing and planning the Debtor's bankruptcy).

[114]   Id. at ¶ 204.

The Court concludes that the conduct alleged by the Former Executives, which the Court must accept as true for purposes of the Motion to Dismiss,[115] is sufficient to state a claim for equitable subordination of AIG's claim.[116]

The Court agrees with the Former Executives that many of the cases AIG relies on are of limited applicability because they did not involve conduct by insiders or were decided after trial or on summary judgment based on consideration of all the facts presented.[117]  Equitable subordination is not founded on the express terms of a statute or contract, rather it is based on equity.  As a result, the Court's inquiry in this case is fact-intensive and the merits of the claim will be evaluated on the totality of the evidence presented of the parties' conduct to

---

[115]   See Iqbal, 556 U.S. at 663-64.

[116]   See, e.g., Lucent Techs., Inc. v. Shubert (In re Winstar Communs.), Civil Action No. 06-147-JJF, 2007 U.S. Dist. LEXIS 31137, at *10 (D. Del. Apr. 26, 2007) (equitable subordination requires proof of three elements: (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct resulted in injury to other creditors and conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code); Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.), Nos. 11-10776 (MFW), 13-51215 (MFW), 2014 Bankr. LEXIS 1362, at *26 (Bankr. D. Del. Apr. 2, 2014) ("[C]ourts recognize three general categories of behavior that may constitute inequitable conduct: 1) fraud, illegality, or breach of fiduciary duties; 2) undercapitalization; and 3) claimant's use of the debtors as a mere instrumentality or alter ego.").

[117]   See supra note 107.

determine if that conduct was inequitable.[118]  Consequently, the
Court will deny the Motion to dismiss the equitable subordination
claim of the Former Executives.

### 2.    Breach of Contract Claim[119]

In Count Five of their cross-claims, the Former Executives
assert a breach of contract claim against AIG, alleging that it
breached the Compensation Plans by, inter alia, failing to
restore their account balances.  As a predicate to that claim, in
Count Four, the Former Executives seek a declaratory judgment
that the Debtor transferred substantially all of its assets to,
or otherwise combined with, AIG resulting in AIG assuming or
becoming responsible for the Debtor's obligations under the
Compensation Plans.[120]

### a.    Party to the Compensation Plans

In its Motion to Dismiss, AIG contends that an element of
the Former Executives' breach of contract claim is absent, namely
the existence of a contract between it and the Former
Executives.[121]

---

[118]    See ASHINC Corp., 629 B.R. at 217.

[119]    The Compensation Plans are governed by Connecticut law.
Adv. D.I. 20, Ex. A at § 4.05, Ex. C at § 4.05.  See also Adv.
D.I. 37 at p. 22, Adv. D.I. 44 at p. 3 (noting parties' agreement
that the Compensation Plans are governed by Connecticut law).

[120]    Adv. D.I. 20 at ¶ 237.

[121]    Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly,
P.C., 87 A.3d 534, 540 (Conn. 2014) ("The elements of a breach of

The Former Executives argue that their contract with AIG was the Compensation Plans.  Rather than being a stranger to the Compensation Plans, they note that AIG is defined by the Plans as a "plan participant" with mandatory obligations.[122]  The Plans also reference AIG numerous times.[123]  The Former Executives argue that where an entity accepts the benefits under a contract or participates in the subject matter of the contract, it may be become a party bound by it.[124]  Lastly, the Former Executives contend that if it is unclear whether AIG was a party in privity with them under the Compensation Plans, that is an issue of contract interpretation which cannot be decided on a motion to

---

contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages.") (citations omitted).

[122]   Adv. D.I. 20, Ex. A at § 2.01(b) ("Participation by AIG. AIG's participation in the Deferred Compensation Plan shall be mandatory in an amount determined in accordance with Section 3.01(a)."), § 3.01(a) (mandating deferral of a portion of profits due to AIG by the Debtor).

[123]   Id. at § 1.06, § 1.07, § 4.07.

[124]   Ullman, Perlmutter & Sklaver v. Byers, 900 A.2d 602, 606 (Conn. App. Ct. 2006) (holding that "parties may become bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated, such as by the acceptance of benefits under the contract") (quoting Schwarzschild v. Martin, 464 A.2d 774, (Conn. 1983)); Acosta v. Flight Fit N Fun (Manchester), LLC, HHDCV196119775S, 2020 WL 8265796, *1 (Conn. Super. Ct. Dec. 22, 2020) (concluding that participant became party to agreement by intentionally and voluntarily accepting the benefits of the participation agreement).

dismiss.[125]

AIG responds that simply being a plan participant does not establish privity between it and the Former Executives, i.e. that it undertook a contractual obligation to the Former Executives.[126] AIG contends that under the Compensation Plans, it was merely a participant who agreed, as the Former Executives did, to defer its entitlement to a portion of the Debtor's profits until the Debtor became solvent. AIG argues, however, that it had no direct payment (or other) obligations to the Former Executives under the Compensation Plans. Further, AIG contends that it did not agree to perform any obligation owed by the Debtor to the Former Executives under the Plans; on the contrary, the Compensation Plans expressly provided that AIG was not guaranteeing the Debtor's obligations to the Former Executives.[127]

---

[125]   _Ullman_, 900 A.2d at 606 (holding that a contract existed between the parties even though it was not signed by the defendant because defendant had paid a retainer and directed the actions of the plaintiff).

[126]   _See, e.g._, _FCM Grp., Inc. v. Miller_, 17 A.3d 40, 54 (Conn. 2011) (holding that a party that was not a signatory to, or otherwise referenced in, the contract and was not a title holder of the property at issue could not be held liable under a construction contract for work done on a property, even if she was a beneficial owner of the property and had directed the work being done); _Bruno v. Whipple_, 54 A.3d 184, 193 (Conn. App. Ct. 2012) (affirming trial court's determination on summary judgment that there was no genuine dispute of material fact that the defendant was not a party to a contract and thus could not be held liable for its breach).

[127]   Adv. D.I. 20, Ex. A at § 4.01(a).

The Court finds AIG's position somewhat contradictory. AIG seeks to enforce the subordination provisions of the Compensation Plans against the Former Executives while asserting it is not a party to that agreement. At any rate, the Court finds that it is clear from the Compensation Plans themselves that AIG was a party to those agreements. AIG is defined as a "plan participant" under the Plans and mentioned throughout.[128]

However, AIG is correct that the Compensation Plans expressly state that AIG is not guaranteeing the Debtor's obligations to the Former Executives under those Plans.[129] Further, the Former Executives do not allege that there is any specific obligation that AIG (as opposed to the Debtor) had under the Compensation Plans which AIG breached. Therefore, the Court concludes that the Former Executives have failed to state a claim that AIG, simply by being a party to the Compensation Plans agreed to perform any obligations owed to them by the Debtor under those agreements.

b.   Assumption of Debtor's Obligations

The Former Executives argue, however, that AIG is responsible for the Debtor's obligations to them under the

---

[128]   Id.

[129]   Adv. D.I. 20, Ex. A at § 4.01(a) ("The benefits payable hereunder shall constitute an unsecured debt of [the Debtor] to the Participants and their Beneficiaries and to AIG and shall not have the benefit of any guarantee by AIG of payment obligations of [the Debtor].") (emphasis added).

Compensation Plans because (i) the Debtor effectively merged into AIG, (ii) AIG can be held liable under estoppel and ratification theories, and (iii) AIG can be held liable as a successor to the Debtor under Connecticut's continuity of enterprise doctrine.  In support, they rely on section 4.01 of the Compensation Plans which provides:

> For the avoidance of doubt, if [the Debtor] consolidates or amalgamates with, or merges with or into, or **transfers all or substantially all of its assets to, another entity,** then the resulting, surviving or transferee entity shall assume all of the obligations of [the Debtor] hereunder.[130]

The Former Executives contend that because such a consolidation occurred, section 4.01's use of the word "shall" mandates that AIG assume all of the obligations of the Debtor.[131]

### i.  Transferee Liability

The Former Executives allege that such a consolidation of the Debtor into AIG occurred.[132]  Specifically, they allege that $130 million was swept from the Debtor's account to AIG's own account on the eve of bankruptcy.[133]  They also allege that AIG directed the novation of the Debtor's outstanding derivatives

---

[130]    Id. at § 4.01(b) & Ex. C at § 4.01(b).

[131]    Cf. A. Dubreuil & Sons, Inc. v. Town of Lisbon, 577 A.2d 709 (Conn. 1990) (affirming trial court's decision that substitution of word "may" for word "shall" in arbitration provision in contract meant that arbitration was not mandatory).

[132]    Adv. D.I. 20 at ¶¶ 166-76 228-33.

[133]    Id.  at ¶¶ 176-80, 230.

contracts and the transfer of $300 million in cash from the Debtor to AIG Matched Funding.[134]  The Former Executives argue that those transfers should be deemed transfers to AIG because it greatly benefitted AIG which avoided being called on its guarantee of losses (totaling one billion dollars) that would have been incurred when the Debtor entered bankruptcy.[135]

The Former Executives finally argue that the inquiry into whether a transfer of substantially all of the Debtor's assets to AIG occurred is a fact-intensive test which should be determined by a fact finder, not based on contentions in a motion to dismiss.[136]

AIG responds that section 4.01 is not applicable because it was not the transferee of substantially all of the Debtor's assets.  The novations and the vast majority of the cash transfers made by the Debtor were to AIG Matched Funding, a subsidiary of the Debtor, not to AIG.  Even if AIG indirectly benefitted from that transfer, it contends that the plans do not provide for the assumption of obligations by an entity that benefits from a transfer, only by "the resulting, surviving, or

---

[134]   Id. at ¶ 224.

[135]   Id. at ¶ 227.

[136]   See Sizer v. Goss Int'l, No. CV03082503S, 2005 Conn. Super. LEXIS 810, at *7 (Conn. Super. Ct. Mar. 31, 2005) (denying summary judgment because question of whether the transferee acquired substantially all of the transferor's assets was a substantial disputed factual issue).

transferee entity."[137]  AIG also argues that a transfer from the
Debtor to the Debtor's own subsidiary does not qualify as a
transfer under section 4.01 because the Debtor continued to exist

   and to essentially own the transferred assets via its
ownership of AIG Matched Funding.[138]

   AIG further argues that the case on which the Former
Executives rely, New England Dairies, does not support their
claim against AIG.  In that case, the court analyzed a provision
similar to section 4.01 but held that it was the transferor of
the assets, not the transferee, that was liable for its breach.[139]
The court did not find the transferee liable for the obligation,
as it had not assumed it.  Similarly, AIG contends that, even if
it were the transferee of substantially all of the Debtor's
assets, it did not agree to assume any of the Debtor's

_____

[137]    Adv. D.I. 20, Ex. A at § 4.01(b).

[138]    See Roseton OL, LLC v. Dynegy Holdings Inc., C.A. No.
6689-VCP, 2011 WL 3275965, at *13 (Del. Ch. July 29, 2011)
(applying New York law and denying preliminary injunction because
the plaintiffs were unlikely to be able to establish that the
defendant had transferred substantially all of its assets where
the transfer was from one of its subsidiaries to another).
   In addition, AIG asserts that the transfer provision is not
even enforceable against AIG Matched Funding because the latter
did not assume the Debtor's obligations under the Compensation
Plans.  See, e.g., New England Dairies, Inc. v. Dairy Mart
Convenience Stores, Inc., No. CIV.A.3:97CV894(CFD), 2002 WL
229900, at *8 (D. Conn. Feb. 4, 2002) (holding defendant liable
for breach of provision of contract requiring that the defendant
could not sell its business without requiring the assumption of
the contract by the buyer).

[139]    New England Dairies, 2002 WL 229900, at *8.

obligations under the Compensation Plans and cannot be held liable to the Former Executives under them.

### ii.  Contractual Estoppel and Ratification

The Former Executives rely on the same allegations to assert that, under contractual estoppel and ratification doctrines, AIG cannot repudiate its assumption of the Debtor's obligations under section 4.01 because AIG knowingly accepted benefits under the Plans with awareness of the terms of the Plans and that provision.[140]

AIG responds that the estoppel and ratification arguments are inapplicable because AIG had no direct obligations to the Former Executives in the first place under the Compensation Plans and did not assume any.  Therefore, AIG contends that it is not repudiating those obligations while also accepting benefits under the Compensation Plans.

### iii. Continuity of Enterprise Theory

The Former Executives further argue that AIG may be held liable as a successor entity under Connecticut law as a continuation of the Debtor, because AIG effectively runs the Debtor's remaining business.  The Former Executives allege specifically that the Debtor was dominated by AIG in several

---

[140]  See Middletown Com. Assocs. Ltd. P'ship v. City of Middletown, 680 A.2d 1350, 1355 (Conn. App. Ct. 1996) (holding that city was estopped from contesting the validity of a contract where it accepted monthly payments from the plaintiffs under that contract).

respects, including that the Debtor's senior management ultimately owed their allegiance to AIG, not the Debtor;[141] that the Debtor relied on AIG to "lend" it employees and to provide certain services including "cash management, derivatives transaction, legal, compliance, administrative, operations, risk management, strategic advisory, investment management, and other related services;"[142] that AIG directed the Debtor to file its bankruptcy case to avoid paying the Former Executives under the Compensation Plans;[143] that AIG caused the dissipation of the Debtor's assets;[144] and that AIG controlled the treatment and accounting of the Compensation Plans.[145]  In further support of this theory, the Former Executives allege that the Debtor and AIG have a shared "pooled" bank account, and shared services agreements;[146] that AIG has oversight and control of the winddown of the Debtor including planning and executing the bankruptcy process;[147] that AIG controls the Debtor's asset management and contracts (including the Debtor's cash and derivatives

---

[141]    Adv. D.I. 20 at ¶ 146.

[142]    Id. at ¶ 237.

[143]    Id.  at ¶¶ 163-65, 170-71.

[144]    Id.  at ¶¶ 163-76, ¶¶ 228-33.

[145]    Id. at ¶¶ 166-80, ¶¶ 228-33.

[146]    Id. at ¶ 237.

[147]    Id. at ¶¶ 122-25, ¶¶ 222-32.

contracts);[148] and that AIG intends to retain its equity in the
Debtor and continue to direct the Debtor's core business either
under the proposed plan of reorganization or via a section 363
sale.[149]  As a successor of the Debtor,[150] the Former Executives
contend that AIG is liable under section 4.01(b) as a "resulting,
surviving, or transferee entity."

AIG responds that it is not a successor to the Debtor,
saying that it and the Debtor remain separate legal entities,
with separate and independent directors, and that the Debtor is
winding down its operations while AIG is not.

### iv.   Conclusion

The Court concludes that the Former Executives have alleged
sufficient facts that, if proven true, would support a breach of
contract claim against AIG.  The specific allegations enumerated

---

[148]   Id. at ¶¶ 222-32.

[149]   Id. at ¶ 182.

[150]   Adv. D.I. 20, Ex. A at § 4.01(b).  See, e.g., Medina v.
Unlimited Sys., LLC, 760 F. Supp. 2d 263, 270 (D. Conn. 2010)
(factors that demonstrate continuity of enterprise include
"continuity of management, personnel, physical location and
general business operations; continuity of shareholders;
cessation of the predecessor business shortly after the successor
entity is formed; and whether the purchaser business holds itself
out as the effective continuation of the seller"); Kendall v.
Amster, 948 A.2d 1041, 1051 (Conn. App. Ct. 2008) (affirming
finding that new company was liable as a continuation of former
company because it maintained the same business, with the same
employees doing the same jobs, under the same supervisors,
working conditions, and production processes, and produced the
same products for the same customers).

by the Former Executives (of AIG's control of the Debtor and its bank accounts and contracts to the point of directing the transfer of a substantial part of the Debtor's assets to other entities allegedly controlled by AIG)[151] support their successor entity, estoppel, and continuity of enterprise claims.[152]  At this juncture, the issue of whether and to what extent the Former Executives can prove those allegations and whether the facts they can prove rise to the level of establishing that AIG is a successor to the Debtor is disputed and, thus, is not appropriate for resolution at the motion to dismiss stage.[153]

AIG's reliance on the New England Dairies[154] case to establish that, even if it were the transferee of all of the assets of the Debtor, it could not be liable under the Compensation Plans is unconvincing.  The New England Dairies Court only held that the transferor of the business was liable under its contract for its failure to assure that the buyer did

---

[151]    Adv. D.I. 20 at ¶¶ 166-80, ¶¶ 228-33.

[152]    Kendall, 948 A.2d at 1051; Medina, 760 F. Supp. 2d at 270; Nat'l Credit Union Admin. v. Wells Fargo Advisors, LLC, No. 3:10-cv-00143-WWE, 2015 WL 5796998, at *3 (D. Conn. Sept. 30, 2015) (finding continuity of enterprise where business seeks to avoid the liabilities of a unit while continuing to operate it as before).

[153]    See Sizer, 2005 Conn. Super. LEXIS 810, at *7.

[154]    2002 WL 229900, at *8.

assume that contract.[155]  The <u>New England Dairies</u> Court did not

address whether the <u>buyer</u> or <u>transferee</u> of the business could be

held liable as a successor of the seller.[156]  In contrast, in this

case, the Former Executives do assert that AIG is the successor

to the Debtor and therefore is liable under Connecticut law for

the Debtor's obligations to them.

Therefore, the Court will deny the Motion to Dismiss Counts

Four and Five.

4.  <u>Tort Claims</u>

The Former Executives bring cross-claims for Prima Facie

Tort against AIG (Count Two) and for Tortious Interference with

Contractual Relations (Count Three).[157]  AIG's Motion seeks to

dismiss these claims on several grounds.

a.  <u>Statute of Limitations</u>

AIG contends that the tort claims must be dismissed because

the three-year statute of limitations to bring them has

expired.[158]  The limitation period begins to run when the alleged

---

[155]    <u>Id.</u>

[156]    <u>Id.</u>

[157]    The parties agree that Connecticut law applies to the
pleading standard for the alleged torts.  Adv. D.I. 44 at p. 27,
n.37; Adv. D.I. 37 at pp. 27-28.

[158]    The law of the forum typically determines whether an action
is barred by the statute of limitations.  <u>Berg Chilling Sys.,</u>
<u>Inc. v. Hull Corp.</u>, 435 F.3d 455, 462 (3d Cir. 2006) (applying
rule in diversity of citizenship case).  <u>See also</u> <u>Winstar</u>
<u>Holdings, LLC v. Blackstone Grp., LP (In re Winstar Commc'ns,</u>

injury occurs.[159]  AIG argues that the claims are untimely because they stem from harms which occurred no later than 2013 when the Former Executives allege that the Debtor, at AIG's direction, failed to restore their account balances and allowed them to lapse.

The Former Executives argue that a dismissal based on a statute of limitations defense is only appropriate if the allegations of their Complaint establish that their claim is time-barred.[160]  The Former Executives contend that, on the contrary, their Complaint alleges tortious conduct which falls within the limitations period, including their allegations that

---

Inc.), 435 B.R. 33, 45 (Bankr. D. Del. 2010) (applying statute of limitations of the forum because "Delaware courts have decided that, while choice of law provisions will be given effect, those provisions will only include the statute of limitations of the chosen jurisdiction if the inclusion is specifically noted."), aff'd 2013 WL 6053838 (D. Del Nov. 15, 2013), aff'd, 591 F. App'x 58 (3d Cir. 2015).  A choice of law analysis is unnecessary in this case, however, because the statute of limitations for both Connecticut and Delaware is three years.  Conn. Gen. Stat. Ann. § 52-577; 10 Del. Code Ann. tit. 10 § 8106.  Both states have also adopted the continuing conduct tolling doctrine.  See Frederick Hsu Living Tr. v. ODN Holding Corp., C.A. No. 12108-VCL, 2017 WL 1437308, at *43 (Del. Ch. Apr. 14, 2017), as corrected (Apr. 24, 2017); Flannery v. Singer Asset Fin. Co., LLC, 94 A.3d 553, 569 (Conn. 2014).

[159]   See Lebanon Cnty. Employees' Ret. Fund v. Collis, 287 A.3d 1160, 1197 (Del Ch. 2022).

[160]   See Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014) (stating that if the statute of limitations bar is not apparent on the face of the complaint, then it may not form the basis for dismissal of the complaint under Rule 12(b)(6)) (citation omitted).

AIG recently orchestrated the dissipation of the Debtor's assets.[161]  They also allege that AIG's most recent conduct is part of a course of tortious conduct undertaken to deny the Former Executives payment due them under the Compensation Plans which began with the financial crisis in 2008 and continues today.[162]  They argue that these allegations are sufficient to toll the statute of limitations under the continuing conduct doctrine.[163]

AIG contends that the Former Executives fail to plead a "continuing wrong" necessary to toll the applicable statute of limitations.  AIG argues that this doctrine is applied narrowly and has a demanding standard.[164]  AIG also disputes the Former Executives' contention that the allegedly wrongful transfers occurring within the limitations period are "inexorably intertwined" with the other allegedly tortious conduct, which occurred more than a decade ago.[165]  AIG, therefore, argues that

---

[161]   Adv. D.I. 20 at ¶¶ 172, 176.

[162]   Id. at ¶ 218.

[163]   Schmidt, 770 F.3d at 249; ODN Holding Corp., 2017 WL 1437308, at *43; Flannery, 94 A.3d at 569.

[164]   Abbott v. Gordon, C.A. No. 04C-09-055 PLA, 2008 WL 821522, at *13 (Del. Super. Ct. Mar. 27, 2008) (stating that courts apply the continuing wrong exception narrowly and concluding that the standard had not been met under the facts of that case).

[165]   See Desimone v. Barrows, 924 A.2d 908, 925 (Del. Ch. 2007) ("The fact that other wrongs have later occurred does not afford a plaintiff standing to challenge earlier wrongs . . . even

the Former Executives have failed to establish that the statute of limitations has been tolled by the continuing wrong doctrine.

The Court finds that the Former Executives have alleged sufficient facts that, if true, would support a tolling of the statute of limitations under the continuing wrong doctrine.  The Former Executives allege a continuing course of conduct by AIG designed to deprive them of their rights under the Compensation Plans.[166]  Although AIG contends that the alleged conduct was distinct from the prior conduct, the Court concludes that this raises a factual issue which is not conducive to resolution at the motion to dismiss stage.[167]

### b.    Failure to State a Claim for Tort

AIG also argues that the tort claims otherwise fail as a matter of law.

---

though they may be similar or related.").

[166]    Adv. D.I. 20 at ¶¶ 211, 218 (alleging course of conduct which includes AIG's controlling the Debtor's accounting  of its advance of funds; AIG's own accounting of the advance as both equity and debt; AIG's control over the Debtor's decision not to adopt a restoration plan for the accounts; AIG's orchestrating the transfer of the Debtor's assets and controlling the bankruptcy process).

[167]    Compare Buchwald Cap. Advisors, LLC v. Schoen (In re OPP Liquidating Co., Inc.), Adv. Proc. No. 21-504311, 2022 WL 774063 (Bankr. D. Del. March 14, 2022) (denying motion to dismiss allegedly time-barred claims) with Buchwald Cap. Advisors, LLC v. Schoen (In re OPP Liquidating Co., Inc.), Adv. Proc. No. 21-50431, 2024 WL 1542773 (Bankr. D. Del. Apr. 9, 2024) (granting motion for summary judgment on time-barred claims).

i.   <u>Duplicative Claims</u>

First, AIG contends that the Prima Facie Tort claim is essentially duplicative of the tortious interference claim.  It asserts that the Former Executives have pled a Prima Facie Tort claim only because they are not able to establish the elements of a tortious interference with contract claim.  This, AIG argues, is improper.[168]

In response, the Former Executives argue that the claims are not duplicative.  They assert that the prima facie tort claim seeks to hold AIG liable for its intentional wrongdoing separate and apart from its tortious interference with contract.  Even if the claims were duplicative, however, the Former Executives argue that they may plead claims in the alternative under Connecticut law.[169]

---

[168]   <u>Brandt v. Walker Digital, LLC</u>, No. X08CV0194566, 2004 WL 2757440, at *7 (Conn. Super. Ct. Nov. 1, 2004) (holding that prima facie tort is reserved for cases in which "intentional, culpable and unjustified conduct causing injury does not fall into any other theory of tort liability" and emphasizing that "a court should not countenance a party's efforts to circumvent the pleading and proof requirements of recognized causes of action"). <u>See also</u> <u>Choy v. Boyne</u>, No. CV065005693, 2006 WL3692067, at *1 (Conn. Super. Ct. Nov. 30, 2006) (granting motion to strike prima facie tort claim because the complaint contained another viable tort claim).

[169]   <u>Brandt</u>, 2004 WL 2757440, at *7 (allowing prima facie tort claim to survive motion to strike even though the plaintiff had pled other tort claims).  <u>See also</u>, <u>Coppola Const. Co. v. Hoffman Enters. Ltd. P'ship</u>, 71 A.3d 480, 490 (Conn. 2013) (holding that plaintiff may "advance alternative and even inconsistent theories of liability") (quoting <u>Dreier v. Upjohn Co.</u>, 492 A.2d 164, 167 (Conn. 1985).

The Court finds it unnecessary to determine whether the two claims are duplicative, because as the Former Executives note, Connecticut law permits a party to plead in the alternative.[170]

### ii.  Tortious Interference

AIG argues that the Former Executives have failed to state a claim for tortious interference with contractual relations because a parent company generally cannot be held liable for tortiously interfering with a subsidiary's contract with a third party.[171]  The only exception, AIG asserts, is where the parent company has an "improper motive" for interfering or interferes through improper means.[172]  AIG argues that the Former Executives have not pled facts to fall within those exceptions.  It is well-settled law, AIG argues, that an intent to protect oneself is a

---

[170]   Coppola Const., 71 A.3d at 490.  Even if state law does not allow alternative pleading, this Court has recently recognized that federal procedure allows a party to do so nonetheless.  See Ctr. City Healthcare, 2024 WL 124245, at *15 ("In addition, Rule 8 specifically allows, at the pleading stage, the assertion of inconsistent claims.").

[171]   Grey Mountain Partners, LLC v. Insurity, Inc., X03HHDCV166067644S, 2017 WL 5706830, at *4-6 (Conn. Super. Ct. Oct. 18, 2017) (granting summary judgment in favor of defendant on tortious interference claim because defendant was a controlling shareholder of the party to a contract, and plaintiff did not prove any improper motive or improper means with respect to the defendant's actions).

[172]   Commc'ns Gateway Co. v. Gartner, Inc., 3:20-CV-00700 (VAB), 2021 WL 1222198, at *12 (D. Conn. Mar. 31, 2021) (granting motion to dismiss where plaintiffs had not pled any facts to show improper motives or means or that the defendant parent company had harmed its subsidiary in any way by directing it to breach its contract with the plaintiff).

50

valid, not improper, motive.[173]

The Former Executives respond that they have alleged facts sufficient to state both claims.  They contend that the improper motive and means exceptions identified by AIG are fact-dependent issues, which are not proper subjects of a motion to dismiss.[174]

The Court concludes that there is no absolute bar to bringing a claim of tortious interference with contract against the parent of a corporation, as AIG suggests.[175]  Instead, any

_____

[173]    Boulevard Assocs. v. Sovereign Hotels, Inc., 72 F.3d 1029, 1036 (2d Cir. 1995) (stating that courts have found that "a parent company does not engage in tortious conduct when it directs its wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest") (citations omitted).  See also Grey Mountain, 2017 WL 5706830, at *5 (holding that a parent company's "desire to protect the financial interests of its consolidated corporate group" was not an improper motive).

[174]    Boulevard Assocs., 72 F.3d at 1035-38 (reversing decision below based on the trial record).

[175]    Id. at 1037 ("We do not hold that a sole shareholder is privileged to employ any means, no matter how improper, to induce a breach of a contract involving its own company.  Most states affording a privilege to sole shareholders have recognized that certain behavior may be sufficiently egregious to cross the line and become tortious.  For example, one might imagine a sole shareholder who orders the president of his or her company, at gunpoint, to breach a contract with a third party.  Or one might imagine a sole shareholder who, using fraudulent misrepresentations, deceives a third party into breaching its contract with the shareholder's own company. . . .  Accordingly, only a limited and qualified privilege to sole shareholders comports with the general rule under Connecticut law that actions involving 'fraud, misrepresentation, intimidation or molestation' or 'malic[e]' may give rise to a claim of tortious interference with contract . . . and that to make out such a claim the plaintiff must prove 'some improper motive or improper means.'") (citations omitted).

51

determination that the tort claims brought by the Former
Executives is proper or barred requires a determination of AIG's
"motives" and "means" of interference.  At this stage in the
proceeding, the Court must accept as true the facts alleged by
the Former Executives.  The Court finds that the Former
Executives have alleged sufficient facts to support a claim for a
prima facie tort and a claim for tortious interference with
contract.[176]  Therefore, the Court will deny the Motion to Dismiss
the tort claims in counts 2 and 3 of the Former Executives'
cross-claims.

     C.  <u>Motion for Judgment on the Pleadings</u>

AIG argues that it is entitled to judgment on the pleadings
at this time as to Count II of the Complaint, which seeks a
declaratory judgment that the Former Executives' claims arising
under the Compensation Plans are subordinated to AIG's claims
under the Revolver pursuant to the express terms of those Plans.
It cites sections 4.01(a) and (b) of the Plans which subordinate
the Former Executives' claims to all other obligations of the
Debtor, in the event of a bankruptcy filing by the Debtor.[177]  It
contends that those subordination provisions are enforceable as a

---

[176]    Adv. D.I. 20 at ¶¶ 211, 218.

[177]    <u>Id.</u> Ex A. at §§ 4.01(a) & 4.01(b) (quoted in text at <u>supra</u>
note 130).

matter of law under section 510(a).[178]

The Former Executives respond that the subordination provisions are not enforceable because AIG and the Debtor breached the Compensation Plans.  They argue that their allegations at least raise genuine disputes of material facts, such that judgment on the pleadings is inappropriate.

In Reply, AIG asserts that the Court can still grant its Motion as a matter of law, notwithstanding any factual disputes concerning the alleged breaches of the Compensation Plans. AIG first argues that, even assuming a material breach of the Compensation Plans occurred, such breach does not rescind the contract or make it unenforceable.  AIG contends that a material breach by one party only excuses future performance by the other party but does not terminate the contract or eliminate all of the provisions of the contract delineating the parties' rights thereunder.[179]

---

[178]   11 U.S.C. § 510(a) ("A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."); Conn. Gen. Stat. Ann. § 42a-1-310, U.C.C. Cmt. 2 ("Subordination agreements are enforceable between the parties as contracts.").

[179]   Batter Bldg. Materials Co. v. Kirschner, 110 A.2d 464, 469 (Conn. 1954) (concluding that while a material breach relieves the injured party from further fulfillment of his contractual obligations, the breaching party could still avail itself of the contract's arbitration provision, because that clause "survives for the purpose of measuring the claims arising out of the breach, and . . . determining the mode of their settlement.").

The Former Executives respond, to the contrary, that under Connecticut law a party in material breach of a contract cannot enforce the contract.[180]

AIG contends that the cases relied upon by the Former Executives do not support their broad assertion that a material breach renders all provisions of a contract unenforceable. AIG instead relies on the Lehman Brothers case where, on facts virtually identical to those of this case, the courts enforced a subordination agreement notwithstanding its breach by the moving party.[181] While the Lehman Brothers case relied on New York law, AIG argues that its rationale is similar to Connecticut caselaw enforcing an arbitration clause despite a material breach by the moving party.[182] AIG argues that both an arbitration and a subordination provision do not require further "performance" of the material provisions of a contract by the non-breaching party

---

[180]   Efthimiou v. Smith, 846 A.2d 216, 218-22 (Conn. 2004) (affirming trial court's determination that neither party was entitled to relief because both had breached their settlement agreement). Cf. Van Dyck Printing Co. v. DiNicola, 648 A.2d 898, 902 (Conn. Super. Ct. 1993) (holding that because employer's breach was not material, it could sue for breach of non-compete agreement), aff'd, 648 A.2d 877 (Conn. 1994).

[181]   Giddens v. 344 Individuals (In re Lehman Bros. Inc.), 574 B.R. 52, 61-62 (Bankr. S.D.N.Y. 2017) (holding that a subordination provision is enforceable, even by the party that materially breached that contract), aff'd, 2018 WL 10454936 at *5 (S.D.N.Y. Sept. 26, 2018), aff'd sub nom. In re Lehman Bros. Holdings Inc., 792 Fed. Appx. 16 (2d Cir. 2019).

[182]   Batter Bldg., 110 A.2d at 469.

but simply impose a condition on whether and how a party can recover.  Therefore, AIG argues that both should be enforceable, even in the face of a material breach.

The facts alleged by the Former Executives, which must be taken as true, are that AIG and/or the Debtor materially breached the Compensation Plans by failing to (i) pay the Former Executives the amounts owed to them, (ii) create a plan of restoration and (iii) extend the lapse date.[183]  The Court concludes that, even accepting those allegations as true, the claims of the Former Executives are still subject to subordination by the express terms of the Compensation Plans.  By asking the Court to enforce the subordination provision, AIG is not seeking to force the Former Executives to continue to perform their future employment or other obligations under the Plans.  Rather, AIG is simply seeking to enforce a provision of the Plans to which the Former Executives have already agreed.  In this regard, the subordination provision is similar to the subordination provision in the <u>Lehman Brothers</u> case (as well as arbitration and forum selection provisions in other cases), which have been held to survive a material breach of a contract by a party.[184]

---

[183]   Adv. D.I. 20 at ¶ 249.

[184]   <u>Batter Bldg.</u>, 110 A.2d at 469 (arbitration provision).  <u>Cf.</u> <u>Hanover Ins. Co. v. Fireman's Fund Ins. Co.</u>, 586 A.2d 567, 571-72 (Conn. 1991) (enforcing one-year time limit to bring suit

The District Court in <u>Lehman Brothers</u> concluded that seeking to enforce a subordination provision was not seeking to compel future performance by the employees.[185]   The Court rejected the employees' argument that the subordination provisions were tied to the specific provisions which were breached because those provisions contained no language linking them to each other.[186] Similarly, there is no language in the Compensation Plans that links (or conditions) enforcement of the subordination provisions with performance of the other provisions of the Plans which the Former Executives allege AIG (or the Debtor) breached.

The Second Circuit affirmed the holdings of the Bankruptcy and District Courts in Lehman, concluding that

> [W]hile Plaintiffs are correct as a general matter that a material breach excuses performance by the other party to a contract, . . . the Trustee is not seeking to compel performance but rather only to correctly classify Plaintiffs' claims in the SIPA liquidation. <u>See In re Stirling Homex Corp.</u>, 579 F.2d 206, 211 (2d Cir. 1978) (noting that the "classification of claims

---

notwithstanding breach of contract by moving party).   <u>See also</u> <u>ACTEGA Kelstar, Inc. v. Musselwhite</u>, No. 09-1255 (RBK/JS),  2009 WL 1794793, at *3 (D.N.J. June 22, 2009) (forum selection clause enforceable by breaching party); <u>Soil Shield Int'l v. Lilly Indus.</u>, No. C 98-1353 SC, 1998 U.S. Dist. LEXIS 8002, at *7 (N.D. Cal. May 26, 1998) ("The forum selection clause is not a substantive promise under the contract whose performance can be excused if one party breaches.");

[185]   <u>Lehman Bros.</u>, 2018 WL 10454936, at *5 ("Appellee does not seek to compel Appellants' performance, but rather to uphold a subordination provision which contemplates a SIPA liquidation like the one at issue here.").

[186]   <u>Id.</u> at *6.

is simply a method of recognizing difference in rights of creditors which calls for difference in treatment" (internal quotation marks omitted)).  Further, even if [Lehman] did materially breach the contract, this would not transform Plaintiffs' subordinated claims into unsubordinated claims.  Accordingly, Plaintiffs' argument that LBI breached the ESEP Agreements, thereby rendering the subordination provisions unenforceable, fails.[187]

While the <u>Lehman</u> decision is not binding, the Court finds its reasoning persuasive.  The cases cited by the Former Executives are easily distinguishable and do not support their broad contention that a material breach of a contract by one party bars that party from relying on (or enforcing) any provision of that contract.  For example, in the <u>Efthimiou</u> case, the Court merely held that, because both parties had materially breached a settlement agreement, neither could demand future performance from the other.[188]  It did not hold that subordination or other provisions of a contract, which do not require future performance, are null and void.[189]  Connecticut caselaw does suggest, to the contrary, that a breach of a contract does not void the entire contract or preclude the breaching party from enforcing any provision of it.[190]

---

[187]    <u>Lehman Bros.</u>, 792 Fed. Appx. at 19.

[188]    <u>Efthimiou</u>, 846 A.2d at 220-22.

[189]    <u>Id.</u>

[190]    <u>See Van Dyck Printing</u>, 648 A.2d at 902-03 (rejecting argument that an employer's breach precluded it from enforcing a non-compete clause).

Accordingly, the Court concludes that the subordination provisions of the Compensation Plans are enforceable, even if AIG and the Debtor breached the Compensation Plans as alleged by the Former Executives.

However, simply because the subordination provisions are enforceable does not entitle AIG to the judgment that it seeks, namely, a declaratory judgment that the Former Executives' claims for "the alleged unpaid amounts (if any) arising under the Compensation Plans are subordinated and junior in right of payment to all of [the Debtor]'s obligations arising in connection with the [the Debtor] Revolving Credit Agreement."[191] This is because, as the Court has found above, the Former Executives have stated plausible claims for recharacterization and/or equitable subordination of AIG's claim.  Therefore, a final determination of whose claim is superior in payment must await a final resolution of this adversary proceeding. Accordingly, the Court will deny the Motion for Judgment on the Pleadings as to Count II.

V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court will deny the Motion to Dismiss and for Judgment on the Pleadings.

---

[191]    Adv. D.I. 2 at ¶ 147.

An appropriate order is attached.

Dated: May 9, 2024                    BY THE COURT:

                                      Mary F. Walrath
                                      United States Bankruptcy Judge