**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| AIG Financial Products Corp. | ) | Case No. 22-11309 (MFW) |
| Debtor. | ) | |
| AIG Financial Products Corp. AIG, Inc., | ) | Adv. No. 23-50110 (MFW) |
| Plaintiffs, | ) | |
| v. | ) | |
| Lee Arthurs, et al., | ) | Related Docs: 2, 8, 20, 24, 163, 165, 166, 167, 217, 218, 222 |
| Defendants. | ) | |

**OPINION**[1]

Before the Court are several issues raised in the Complaint filed by AIG Financial Products Corp. ("FP") against some of its former senior level employees (collectively "the Former Executives") and raised in the counterclaims by the Former Executives against FP and American Insurance Group ("AIG").[2] For purposes of judicial economy, the Court decided to try the claims

1 This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure. To the extent it is determined that the Court does not have authority to enter a final order on any of the claims, this Opinion shall constitute the Court's proposed findings of fact and conclusions of law. See 28 U.S.C. § 157(c).

2 Adv. D.I. 1, 8, 11. Citations to the docket in the adversary proceeding are to "Adv. D.I. #." Citations to the record in the main case are to "D.I. #." FP's exhibits are "DX-#," Joint Exhibits are "JX-#," and the Former Executives' Exhibits are "CCPX-#." All citations to transcripts are to "[date] Tr. [witness] at [page:line]."

and counterclaims in the Complaint in two phases.[3] After a nine-day evidentiary hearing and briefing on the following issues (the "Initial Issues"), the Court concludes that judgment should be entered in favor of the Former Executives, and against FP and AIG, on the recharacterization, equitable subordination, and prima facie tort claims while judgment should be entered in favor of FP and AIG, and against the Former Executives, on the successor liability and tortious interference with contract claims.

## I. JURISDICTION

The Court has subject matter jurisdiction over the claims in this adversary proceeding.[4] The Court concludes that the recharacterization and equitable subordination claims are core matters because they require the Court to determine the priority of competing claims against FP's estate.[5]

The successor liability and tort claims are non-core claims because they are based on state law and do not invoke a substantive right under the Bankruptcy Code or arise in the

---

[3] 08/28/2024 Tr. at 47:1-48:23.

[4] 28 U.S.C. §§ 1334(b) & 157(a).

[5] See United States v. State St. Bank & Tr. Co., 520 B.R. 29, 38 (Bankr. D. Del. 2014) (finding that recharacterization and equitable subordination claims were core claims).

context of the bankruptcy case.[6] The Court has related-to jurisdiction over those claims, however, because their resolution will have a substantial effect on the bankruptcy estate if AIG is required to pay the Former Executives' claims.[7]

FP and AIG have consented to entry of a final order or judgment by this Court.[8] Although the Former Executives originally did not consent,[9] they have now asked this Court to make "a final determination of whose claim [AIG's or the Former Executives'] is superior in payment."[10] Therefore, the Court

---

[6] See, e.g., Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.), 295 B.R. 211, 217 (D.N.J. 2003) (holding that alter ego and successor liability claims against a related non-debtor were non-core claims because they existed independently of any bankruptcy case and did not require analysis of bankruptcy law to resolve).

[7] Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984) (describing non-core related claims). See also ConocoPhillip Co. v. SemGroup, L.P. (In re SemCrude, L.P.), 428 B.R. 82, 99-100 (Bankr. D. Del. 2010) (holding that the Court had related-to jurisdiction over third parties' declaratory judgment actions against non-debtors because those actions would determine how much was owed by or to the debtor's estate); Kelly v. Kurtz, 219 A.3d 948, 968 (2019) (stating the rule that a plaintiff is barred from recovering twice for the same injury under two different legal theories).

[8] Adv. D.I. 2 ¶ 7; Adv. D.I. 24 ¶ 63.

[9] Adv. D.I. 11 ¶¶ 7, 63.

[10] See 08/24/2024 Tr. (Counsel for the Former Executives) at 38:16-22 ("Finally, Your Honor, as this Court observed in its decision denying AIG's motion to dismiss, a final determination of whose claim is superior in payment must await a final resolution of this adversary proceeding. The employee plaintiffs agree with this and think that our proposal is the most straightforward and efficient way to proceed to conclude the adversary proceeding."). See also Adv. D.I. 11 ¶ 86 (Answer, Counterclaim and Crossclaims of Former Executives asking Court for entry of judgment in their favor on the counterclaim and crossclaims); Adv. D.I. 216 ¶ 894 (Post-trial Brief of the Former Executives asking the bankruptcy court to grant judgment in their

concludes that it has authority to enter a final judgment in this adversary proceeding.[11]

## II. FINDINGS OF FACT[12]

### A. Relationship between AIG and FP

FP began in 1987 as a wholly owned subsidiary of AIG to conduct business in the derivative contracts market.[13] In order for FP to conduct business in that market, AIG guaranteed FP's obligations to counterparties to the derivative contracts (the "Guarantee").[14]

---

favor on the Initial Issues).

[11] Wellness Int'l Network, Ltd. V. Shariff, 575 U.S. 665, 683-84 (2015) (holding that a bankruptcy court may enter a final order with parties' implied consent). See also 28 U.S.C. § 157(c)(2). If it is determined that the Court does not have authority to enter a final order, however, this Opinion shall constitute the Court's proposed findings of fact and conclusions of law. See id. § 157(b)(2)(O) & (c)(1).

[12] This section and any factual findings recited in the Conclusion of Law section constitute the Court's findings of fact pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure or, if applicable, the Court's proposed findings of fact and conclusions of law pursuant to section 157(c) of title 28.

[13] D.I. 2 ¶ 10 (Kosturos's First Day Declaration) ("[FP] was founded on January 27, 1987 as a joint venture between [AIG] and a group of Drexel Burnham Lambert bankers, led by Howard Sosin. As envisioned by AIG Inc.'s then-CEO and Chairman, AIG FP was created to originate and sell complex derivatives, allowing AIG Inc. to access these markets in order to generate attractive returns on its capital."); 04/21/2025 Tr. (Habayeb) at 45:6-7 ("FP was just one of the businesses that AIG owned.").

[14] DX-4 (AIG Guarantee). See 02/06/2025 Friedland Dep. at 295:7-10 ("Well, without the guarantee, [FP] would not have been able to have entered all the [derivative contracts] that it entered into prior to 2008."); 04/21/2025 Tr. (Habayeb) at 51:23-25 ("AIG provided the

B. The Financial Crisis

In 2007 and 2008, volatility led to a crisis in the financial markets.[15] The financial crisis prompted FP's derivative contracts counterparties to demand billions of dollars in collateral calls, pushing FP to the brink of collapse and making it totally reliant on AIG for cash.[16] The accelerating collateral calls on FP endangered AIG itself because of its Guarantee of those obligations.[17] AIG was unable to secure

guarantee to counterparts to AIG FP that if AIG FP is unable to perform under the contracts, AIG would step in and make them whole.").

[15] 04/21/2025 Tr. (Habayeb) at 53:4-11 ("So starting around the middle of 2007, there was growing concern about the quality of residential mortgage loans underwritten. And there was a lot of uncertainty on who was sitting on that risk. And that created fear in the market, and we saw a lot of volatility that continued into 2008. And that concern and volatility led to liquidity problems and other issues that put pressure on financial institutions, and we saw a number of them fail.").

[16] Id. at 53:14-21 ("So FP was being subjected to pretty material collateral calls on their derivatives, especially on the credit default swaps on the multi-sector CDO. . . . And FP ran out of cash, and AIG had to step in and start advancing cash to meet FP's obligations.").

[17] Id. at 53:24-54:3 ("In September of 2008, AIG was downgraded as the rating agencies over the course of 2008 were getting concerned about AIG's liquidity position, given the demands on the parent liquidity from the FP program as well as the SEC lending program."), 166:6-9 ("Q. And if AIG FP didn't post collateral to its counterparties, that would put AIG at risk of cross-default because of the guarantee; correct? A. Correct. That's my understanding."). See JX-94 at 117 (AIG's 10-Q for period ending September 2008 (describing "$377 billion in net notional exposure [of AIG] on AIGFP's super senior credit default swaps").

funding from private parties to fix its liquidity issues.[18] On September 15, 2008, ratings agencies downgraded AIG's long-term debt, triggering additional collateral calls on FP's derivative contracts.[19] The counterparties' increasing demands raised the specter of FP defaulting, which would cause potentially fatal cross-defaults at AIG.[20]

On September 22, 2008, the Federal Reserve Bank of New York (the "Fed") extended a two-year, $85 billion loan to AIG (the "Fed Revolver").[21] The Fed Revolver permitted AIG to use the Fed

---

[18] 04/21/2025 Tr. (Habayeb) at 55:7-11 ("Starting in August and leading up to September, AIG started exploring third-party solutions to raise capital or liquidity. And then that culminated in being unable to get anything done on the private side and having the last resort being the New York Fed.").

[19] CCPX-1057 at 18 ¶ 27 (Plastino's Expert Report) ("On September 15, 2008, [S&P], [Moody's], and [Fitch] downgraded AIG's long-term debt rating. This triggered [FP]'s obligation to post billions of dollars in additional collateral under its [derivative] contracts. . . . At this time, [FP] estimated that it needed more than $20 billion to fund collateral calls and transaction termination payments.").

[20] CCPX-1057 ¶ 28 (Plastino Report) ("[FP] did not have the funds to independently make [the collateral calls]. Mounting collateral obligations and losses squeezed [FP]'s and AIG's resources. As of September 2008, this worsening financial condition had the potential to further trigger rating agency downgrades and, in turn, more collateral calls in an escalating cycle."); 04/21/2025 Tr. (Habayeb) at 91:22-23 ("[T]o sustain some of the positions we had in FP, we needed more cash than what we had at AIG."), 166:10-13 ("Q. If FP had not posted the collateral, that would have signified an event of default for AIG? A. AIG would have to perform under the guarantee. And if it didn't, I believe then it's an event of default."); 04/25/2025 Tr. (Liebergall) at 59:19-21 ("[The cross default] would have a devastating effect. And it would cross-default - beyond the FP world, it would impact liabilities in the FP world as well.").

[21] DX-26 §§ 1.01, 2.04(a), 2.08(a). See 04/21/2025 Tr. (Habayeb) at 57:22-58:6 ("[T]his happened right after [the Fed] let Lehman fail. And there was concern that letting AIG fail, the financial system can't handle both failing, especially so close to each other.");

Revolver to lend funds to its subsidiaries, as long as the loans were made at arm's length and were not secured.[22] However, it prohibited AIG from making equity contributions to its subsidiaries, except to the extent it had already made a commitment to do so or obtained a waiver from the Fed.[23]

Once AIG received funds from the Fed, it immediately advanced some of those funds to FP to meet counterparties' collateral calls.[24] To do so, AIG sent money to a subsidiary, AIG Funding, Inc. ("AIG Funding") which then transferred the

---

04/22/2025 Tr. (Gender) at 133:16-20 ("In general, AIG had a lot of cross-exposure with Wall Street and many of the major banks. And so the fear was that if AIG collapsed, it would have a significant impact on the overall liquidity of Wall Street in general and really worldwide.").

[22] See, e.g., DX-26 §6.01(c), § 6.02, § 6.04(c), §6.07. See also 04/22/2026 Tr. (Gender) at 201:2-5 ("Q. And that was because the loan between the Fed and AIG, Inc. prohibited those intercompany fundings to be secured, right? A. Correct."), 201:16-18 ("Q [The Fed] had a pledge of all or virtually all of AIG's assets; right? A. Correct.").

[23] DX-26 § 6.04(a). See also 04/23/2025 Tr. (Herzog) at 48:17-20 ("[AIG] couldn't do activities like [recapitalize FP] without [the Fed's] approval or knowing that they wouldn't object to it.").

[24] JX-20 (Schedule to Promissory Note indicating a $26 billion advance to FP on September 22, 2008, and additional advances totaling $13 billion between September 23 and September 30, 2008); 04/25/2025 Tr. (Liebergall) at 81:4-14 ("Q. And you would give [Robert Gender, Treasurer at AIG] information that would determine what the ultimate line was - how much cash AIG would actually lend, finance, to AIG FP; right? A. . . . . So, we would track our principal and interest; all of our obligations, whether they were derivatives or assets and liabilities to ensure that we were able to make payments on those.").

money to FP.[25] The stream of funds to FP from AIG was later documented as a loan from AIG Funding ("the FP Revolver").[26] FP stopped originating new derivative contracts[27] and used the cash from AIG to wind down its business by novating or consensually terminating the derivative contracts in its portfolio.[28]

As the financial crisis unfolded, AIG installed AIG employees as FP executives and directors. By October 2009, the CEO of FP, William Dooley, was an employee of, and paid by,

---

25 04/22/2025 Tr. (Gender) at 134:22-23 ("And then AIG then would use the proceeds [from the Fed Revolver] to send to its internal bank, essentially, which is AIG Funding.").

26 JX-1; JX-20.

27 04/22/2025 Tr. (Gender) at 26:14-18 ("Q. And other than as hedges for existing positions, after 2008, did FP ever offer new derivative instruments to the market? A. No. The only derivatives that FP traded were to hedge its existing portfolio."); 04/21/2025 Tr. (Habayeb) at 95:2-6 ("Q. Did the complex derivatives business cease operations in connection with the FP wind-down? A. So if you're referring by complex derivatives like creating structured notes for others, yes. Same thing with the creditor of the portfolio. That all stopped.").

28 04/25/2025 Tr. (Liebergall) at 61:2-11 ("Q. And did your responsibilities change when the wind-down started versus what they were before the wind-down? A. Yes. Q. How so? A. Prior to the wind-down, we were obviously all the front office folks, which I was part of, were looking to generate revenue for FP and AIG, Inc. Post-crisis, all of the attention of our - all of our duties moved to reducing risk and working with AIG to mitigate risk."), 65:16-24 ("Profitability was generally not profitability. It was how much we were going to lose. As we were winding down and counterparties were being opportunistic, we were generally having to exit trades at their side of the market, meaning they were getting favorable terms versus us. So, there was a profitability target that likely said if it involved losing a certain amount of money, we were okay to do that. If it went beyond that, there were certain levels that then would trigger a steering committee approval.").

AIG.[29] At that same time, FP's CFO reported directly to an AIG employee, Elias Habayeb.[30] In October 2008, FP's Board of Directors had only two directors: one independent director (Martin Feldstein) and one employee of AIG (Dooley).[31] By February 2010, FP's Board had only two members, and both were AIG employees (Dooley and David Herzog, the CFO of AIG).[32] Dooley and Herzog considered themselves AIG employees, not FP

---

[29] 4/21/26 Tr. 115:2-9 (Habayeb) ("Q. Just to shift to your upward reports, your bosses, as CFO of FSD you reported to AIG's CFO and CO; correct? A. AIG's CFO and FSD's CEO. Q. Right. And just to put a name to those two positions, those would be Bill Dooley and David Herzog; correct? A. Correct. Q. Both of whom were AIG employees? A. Correct."), 127:11-13 ("Q. Mr. Dooley served in a dual capacity as FP's CEO and FSD's CEO; correct? A. That's correct."); 08/10/2022 Dooley Dep. at 23:15-24:5 ("I was treasurer of AIG for a while. I was in charge of the financial services companies at AIG. . . . I was the CEO of [FP] at some point in time, and maybe that – which was probably the in the '08 time frame. I'm not sure exactly when I retired from that position, but I guess it was pretty – around the time of my - my retirement [in 2015]."), 38:25-39:4 ("I was an [AIG] employee. So I was compensated from [AIG]. Q. So you always viewed yourself as an [AIG] employee, is that correct?" A. Absolutely.").

[30] 04/21/2025 Tr. (Habayeb) 114:5-20 ("Q. And when you were FSD's CFO, FP's CFO reported to you; correct? A. On a matrix basis, yeah. Q. On a matrix basis. At one point, this person was Mr. Balfan, Mr. Mark Balfan? A. Yes. Q. And you were one of his two bosses; right? A. That's correct. Q. And you had a similar downward reporting relationship with all of FP's CFOs between 2007 and 2009. Do I have that right? A. That's true. And any of the subsidiaries in financial services. Q. Okay. And that would include FP? A. That would include FP.").

[31] CCPX-961 at 68 (FP's Report to the Secretary of State of Connecticut dated 10/31/2008).

[32] Id. at 71 (FP's Report to the Secretary of State of Connecticut dated 02/03/2010).

employees.[33]

AIG controlled every aspect of the FP wind-down.[34] AIG focused the winddown on limiting AIG's exposure on its Guarantee. At that time, AIG did not consider an FP bankruptcy filing to be viable because FP's derivative contracts would be subject to the safe harbor provisions of the Bankruptcy Code[35] and would result

---

[33] 04/23/2025 Tr. (Herzog) at 57:11-13 ("Q. Now, again, were you making this statement and this decision [about the Compensation Plans] in your capacity as CFO of AIG, Inc.? A. Yes."); 08/10/2022 Dooley Dep. at 39:2-4 ("Q. So you always viewed yourself as an [AIG] employee, is that correct?" A. Absolutely."). See also id. at 12:18-22 (Herzog forgot that he was a member of FP's board).

[34] 4/21/2025 Tr. (Habayeb) at 89:24-90:2 ("Q. And at a high level, what was the purpose and role of the steering committee? A. So the purpose and role was to provide oversight and direction over the wind-down of FP."), 150:10-17 ("Q. You said, you testified you were part of the steering committee that oversaw FP's wind-down? A. Yes. Q. Were you a voting member? A. No. Q. So there's a distinction between voting members and nonvoting members; yes? A. Correct."), 150:24-151:7 ("Q. Fair to say that voting members were AIG executives and leaders? A. Correct. Q. And AIG was the one who decided who sat on the steering committee; right? A. Well, yeah. They designed the steering committee initially to kick it off. But for the FP who participated and who ran it, it was consulted - with consultations with William Kolbert and Pierre and others at the time."); 04/25/2025 Tr. (Liebergall) at 63:11-14 ("Q. Who had voting rights? A. The people on the committee which, to the best of my knowledge, consisted, I believe, primarily or almost exclusively of [AIG] individuals."), 65:1-6 ("[W]e had performance metrics at that time that were part of the wind-down plan directed by the - implemented by the steering committee. That plan focused on derisking the AIG FP portfolio and had different types of metrics in order to confirm that that derisking was occurring."), 66:14-15 ("Q. And who approved these [performance] metrics, sir? A. The steering committee."). See also CCPX-514 at 15("Performance Metrics, Performance Assessment, and Award Determination"). But see 04/21/2025 Tr. (Habayeb) at 47:25-48:2) ("When we went into winddown, we created a steering committee to oversee the winddown but the day-to-day operations stayed with the FP management team.").

[35] 11 U.S.C. § 362(b)(7) (the automatic stay does not stay the exercise of any right of a party to a securities contract, including the right to terminate the contract and offset its claim against any

in billions of dollars of exposure to AIG as a result of its Guarantee.[36]

C. The Compensation Plans

Historically, FP compensated its senior level employees, including the Former Executives, with base salaries and large bonuses.[37] In 1995, FP created the Deferred Compensation Plan ("DCP") to, inter alia, retain capital in FP and align the incentives of FP and the Former Executives.[38] Under the DCP, the Former Executives were entitled to receive collectively deferred compensation calculated as 30% of FP's "Distributable Income."[39]

---

collateral it holds or obligations it has under the contract), § 546(e) (precluding a debtor from avoiding any "transfer made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract. . . ."), § 560 (authorizing counterparties to liquidate, terminate, or accelerate swap agreements in the event of a bankruptcy filing by the other party to the agreement).

[36] See DX-394 ¶ 21 (Imburgia Report) (as of September 30, 2008, "AIG reported that [FP]'s net notional exposure on its super senior CDS portfolio was $377 billion."). See also JX-94.

[37] 04/25/2025 Tr. (Liebergall) at 70:3-8 ("Q. And at a high level, sir, how were you compensated while you worked at FP? A. Like the less - like the rest of Wall Street, it was generally a fairly small salary and then a high amount of bonus based on your performance and the organization's performance.").

[38] JX-2. See also D.I. 2 ¶ 43 (Kosturos' First Day Declaration) ("To align incentives for long-term growth over short-term profits, a portion of these profits was not paid out immediately to AIG Inc. or the executives, but rather was deferred, to be paid in the future, subject to various adjustments and conditions. This arrangement was reflected in the AIG FP Deferred Compensation Plan, dated December 1, 1995.").

[39] JX-2 § 1.08 ("Distributable Income" shall mean, with respect to any financial year of [FP], revenues, less expenses and credit and market reserves taken for that year, as the same shall be determined

That deferred compensation was reflected as a credit to the Former Executives' accounts in the DCP and as an unsecured debt owed by FP; no funds were actually placed in the accounts, segregated, secured, placed in a trust, or earmarked for payment of the DCP obligations.[40] In the event of FP's bankruptcy or insolvency, any claim the Former Executives had under the DCP would be subordinated to the claims of all other creditors of FP.[41] FP was to pay the deferred compensation over time in installments that corresponded to the lifecycle of certain financial transactions.[42]

---

by the [Board of Directors of FP]."); 04/21/2025 Tr. (Habayeb) at 116:4-6 ("Q. And FP's distributable income was intended to be FP's annual economic P&L, is that fair? A. Correct."). See also 04/21/2025 Tr. (Habayeb) at 118:5-11 ("Q. And the distributable income, it assumed full mark to market; correct? A. Correct. Q. And mark to market, just to orient the Court, means unrealized gains and losses? Yes? A. Yes.").

[40] JX-2 § 4.01(a)(i)-(iii) ("(i) the payment of benefits payable hereunder to each of the Participants and their Beneficiaries and to AIG shall be made only from the general funds of AIG Financial Products Corp., (ii) [FP] shall not segregate or earmark any of its assets nor hold any assets in trust or in any special account for this purpose, and (iii) none of the Participants, the Participants' Beneficiaries or AIG shall have any legal or equitable interest in, lien on, or claim to, any particular asset of [FP] by virtue of this Deferred Compensation Plan.").

[41] Id. § 4.01(a) ("the obligations under this Deferred Compensation Plan to Participants and their Beneficiaries and to AIG shall be subordinate and junior in right of payment and otherwise, to the prior payment in full of all of the other obligations of [FP], whether now existing or hereafter incurred, except to the extent payment of any such obligations is expressly made subordinate to or pari passu with the payment obligations hereunder.").

[42] Id. § 3.05(b).

The participating Former Executives' account balances, however, were subject to reduction if FP sustained losses greater than its current year income and market and credit reserves.[43] If losses reduced the account balances, FP had an obligation to establish a plan to restore the participating Former Executives' account balances from future profits.[44] If FP did not restore the account balances prior to December 31, 2013, however, that obligation would lapse.[45] Unlike the obligations FP had to derivative contract counterparties, AIG did not guarantee FP's obligations under the DCP.[46]

As the financial crisis deepened, FP created the Special Incentive Plan ("SIP").[47] Similar to the DCP, the SIP's goal was to build and maintain capital at FP while aligning FP's Former Executives' incentives with the company's incentives by having

---

[43] Id. § 4.01(b).

[44] Id.

[45] Id. ("Any such restoration plan shall provide that any restored amounts shall be paid in 2013; to the extent amounts have not been restored by December 31, 2013, all restoration rights shall permanently lapse except to the extent [FP] determines that it may amend the Plan to provide for payment of restored amounts without violating Internal Revenue Code Section 409A.").

[46] Id. § 4.01(a) ("The benefits payable hereunder shall constitute an unsecured debt of [FP] to the Participants and their Beneficiaries and to AIG and shall not have the benefit of any guarantee by AIG of payment obligations of [FP].").

[47] CCPX-2 (SIP); CCPX-671 ¶ 30 (11/06/2017 "First Witness Statement of William Dooley" in the UK Litigation) (describing the creation of the SIP in January 2008).

them share in FP's losses, as well as its profits.[48] At FP's sole discretion, employees who earned certain bonuses would be eligible to receive a SIP Credit.[49] Similar to the DCP, the SIP was to be paid from FP's general funds, was subordinated to all creditors in the event of a bankruptcy, was not guaranteed by AIG, and had the same restoration and sunset provisions.[50] (The DCP and the SIP are collectively referred to herein as the "Compensation Plans.")

At the time of the financial crisis, FP also created an Employee Retention Plan (the "ERP") which was meant to retain key employees responsible for FP's winddown.[51] Under the ERP,

---

[48] CCPX-2 at 1 (iii), (iv) ("The purpose of the 2007 SIP is to provide an additional compensation opportunity for Covered Executives while at the same time: . . . (iii) continuing to ensure that [FP]'s and its employees' interests are aligned with those of AIG and AIG's shareholders, and (iv) building and maintaining the formation of capital in [FP], including for purposes of ensuring that amounts are available to absorb losses in the event that [FP] realizes losses on super senior credit derivatives that would have an impact on [FP]'s capital structure."). <u>See also</u> 04/25/2025 Tr. (Powell) at 16:21-17:2 ("Q. And based on your knowledge, what was the purpose of the SIP? A. There had been unrealized losses in the super-senior CDO book - however people want to refer to it - basically, the credit book in London. And AIG wanted to acutely expose employees to the risk of loss around those losses, and so this plan was put in place to do that.").

[49] CCPX-2 § 3.01(a)(i) ("The 2007 SIP Credit for each Covered Executive shall be determined by [FP] in its absolute discretion.").

[50] <u>Id.</u> § 4.01(a).

[51] CCPX-3. <u>See also</u> DX-59 at 159 (PwC's Report on the Results of Examination for the Year Ended December 31, 2008) ("Certain key management personnel within the organization have deep institutional knowledge of AIGFP's businesses, operations and related risk exposures, which is crucial for the effective execution of the wind down plan and managing the risks associated with the process."); JX-94

executives who participated in the DCP[52] were entitled to receive the same compensation in 2008 and 2009 that they had earned in 2007.[53] Unlike the DCP and SIP, AIG guaranteed the ERP payments.[54]

FP had no profits after 2008. AIG determined by late 2008 that FP's future earnings would be unlikely to generate sufficient proceeds to restore the Compensation Plans' account balances and had written off those obligations entirely.[55] Nonetheless, FP's officers — AIG employees — told the Former Executives that FP would be able to determine whether it had sufficient assets to restore the account balances by the December 31, 2013, deadline to approve a restoration plan.[56]

---

at 60 (Am. Ins. Group., Quarterly Report (Form 10-Q) (September 30, 2008)) ("A loss of key personnel could reduce the value of AIG's businesses and impair its ability to effect a successful asset disposition plan.").

[52] CCPX-3 at 2 §§ 1.14 ("Covered Persons"), 3.05(a).

[53] Id. § 3.01 (a)-(b). See also 04/25/2025 Tr. (Powell) at 18:10-14 ("So they took whatever your prior year's compensation was and the ERP guaranteed that you would get at least that much pay for the two following years.").

[54] CCPX-3 § 3.03.

[55] CCPX-105 at 1 (10/09/2008 email from Habayeb to Cenci stating "SIP and Deferreds get written off. Retention amounts are not written off at this time."); CCPX-153 at 3-4 (11/07/2008 FP Deferred Compensation Plans Memo) ("As a result of the overall situation and assessment of [FP]'s capacity in generating future earnings, management concluded that it is unlikely that [FP] would generate enough earnings to pay current deferrals.").

[56] CCPX-104 at 4 (10/09/2008 Letter from William Dooley to FP Employees); CCPX-191 at 2 (Memorandum from William Dooley to all participants in the Compensation Plans).

D. Recapitalization Plan

In 2010, shortly before it repaid the Fed loan, AIG considered recapitalizing FP by forgiving $35 billion of the FP Revolver, applying an $18 billion tax payable it owed to FP, and leaving the balance of the FP Revolver at $2 billion.[57] Doing so would have eliminated FP's negative equity.[58] AIG rejected the recapitalization plan when it discovered that eliminating FP's negative equity would obligate FP to restore the Former Executives' accounts in the Compensation Plans.[59] It was shortly

---

[57] JX-11 at 5 ("[AIG] will make a deemed payment of $53.7 B to [FP]. The deemed payment will consist of: $18.5 B to satisfy the potential liability of [AIG] to [FP] under the tax sharing agreement; & $35.3 B capital contribution to eliminate the negative equity in AIGFP").

[58] JX-13 at 3 (07/26/2010 Fed Funding Request: Business case and supporting computations") ("In order to further facilitate the unwind process and correctly reflect the amount collectable from [FP], it is proposed to eliminate the negative equity in [FP].").

[59] JX-14 at 2 (09/01/2010 email from Shea to Leahy and others) ("If the proposed recapitalization substitutes equity for debt, thereby creating a solvent FP with assets that could fund a restoration plan, there is a significant risk that at some point prior to the expiration of the limitations period, FP will face breach of contract litigation demanding compliance with the restoration plan obligation. . . . this would represent a potential $600 million liability of the worst sort[.]"); id. at 1 (09/01/2010 email from Herzog to Rielly and Gender) ("I don't care how it's driven, we're not paying the deferred comp."); CCPX-451 at 2 (09/02/2010 email from Herzog to Leahy) ("Under no circumstances should we restore benefits under any [deferred compensation] plan."); 04/21/2025 Tr. (Habayeb) at 124:17-19 ("I can tell you the motivation behind not forgiving any portion of the loan was that you would put the AIG shareholder at the disadvantage, and they would get less of a recovery . . . ."); JX-15 at 2 (09/07/2010, memo from Reilly to Herzog summarizing decisions made on September 3 conference call, including to reduce the "current recapitalization proposal by an amount large enough so that <u>indebtedness to more senior creditors</u> (DCP/SIP plans are secondary to all other creditors) is greater than any [FP] 'end of business' cash flow projection.") (emphasis in original).

thereafter that the advances made by AIG to FP were documented as a loan and signed.[60] AIG dictated the terms of the loan.[61]

Due to FP's financial condition from 2008 to 2013, FP never made any payments to the Former Executives under the Compensation

[60] JX-1; JX-20.

[61] 04/22/2025 Tr. (Gender) at 140:12-17 ("Q. And to your understanding, did your team at treasury create [the FP Revolver] as well? A. Yes, I believe so. Q. And were there any negotiations with FP over the creation of this document? A. No. This is their standard intercompany agreement."), 206:6–8 ("Q. There's no negotiation with FP over the interest rate ascribed to [the FP Revolver]; correct? A. No."); 04/25/2025 Tr. (Liebergall) at 98:22-99:12 ("Q. You characterized the funding as a loan even though you knew by this time that there was not executed formal documentation for the loan; right? A. Again, I didn't - I didn't know there was not formal executed documentation. I had never seen it. And at that point in time, to remind you, we were in the middle of a wind-down, and we were - and particularly, my role in the - in the front office was to derisk the company. And part of derisking the company was ensuring that we can make our payments on our assets, our liability and our derivatives. AIG was telling us here's what - here's what you're going to call it; here's how it is. And we did that. That wasn't a - you know, our - our goal was not to do anything to ultimately jeopardize the wind-down that would ultimately adversely impact FP and [AIG]."), 114:24–115:7 (" Q. Sir, did you ever negotiate any terms for the funding arrangement between AIG and FP? A. No. Q. Did you ever understand that those terms were up for negotiation? A. No. Q. Did anyone ever suggest to you that you could negotiate those terms? A. No."). See also 04/23/2025 Tr. (Herzog) at 79:12–16 ("Q. You don't recall any negotiations about the interest rate of the arrangement taking place, correct? A. Negotiations between who? Q. Between FP and AIG. A. I don't recall negotiations."); 04/22/2025 Tr. (Allison) at 56:1-12 ("Q. And the whole time you've been the CFO of FP, you're not aware of any negotiations between [AIG] and FP to determine an interest rate? A. That's correct. Since I've been the CFO of FP or the chief accounting officer of FP, generally the rate has been a standard rate plus a number of basis points. Q. But you don't know who agreed on the current rate, do you, sir? A. That's right. Q. And you're not aware of any negotiations over that rate the entire time you've been the CFO? A. There haven't been any, to my knowledge.").

Plans.[62] On July 31, 2014, participants in the Compensation Plans received a letter stating that the losses FP had sustained since 2008 had wiped out the balances in their accounts and prevented FP from restoring those account balances.[63]

UK-based Former Executives sued FP and AIG in 2014 for restoration of their accounts in the Compensation Plans. After those Former Executives won at the trial level, that decision was reversed on appeal in 2020.[64] US-based Former Executives brought similar litigation against FP in 2019 in Connecticut.[65]

E. Pre-Bankruptcy Transfers

In early 2022, FP was facing mounting pressure from the Former Executives' litigation.[66] On January 21, 2022, FP

---

[62] 04/25/2025 Tr. (Powell) at 43:16-18 ("Q. And to date, how much of your outstanding [DCP] balance has been paid to you? A. Zero."), 44:8-10 ("Q. Okay. And how much of [the SIP] has [FP] paid to you to date? A. None.").

[63] CCPX-948 at 1 (07/31/2014 Letter to DCP/SIP Participants) ("Moreover, while Section 4.01(b) provides for the restoration of losses after providing for the satisfaction of all other creditors, no restoration has been possible given the magnitude of losses sustained by [FP]. Pursuant to amended Section 4.01(b), this restoration obligation lapsed as of December 31, 2013 for U.S. Taxpayers and there is no further liability to such participants under the DCP and SIP Plans.").

[64] DX-201 (Approved Judgment in UK appeal dated January 24, 2020).

[65] Arthurs et al. v. AIG Fin. Prods. Corp., No. X08-FST-CV-19-6046057-S (Conn. Super. Ct.).

[66] CCPX-709 at 3 (01/22/2022 email attaching a PowerPoint presentation from AIG's counsel to the Special Committee) ("This presentation provides background relating to a potential chapter 11 bankruptcy filing by AIG Financial Products Corp. ("FP") as a means to advance its winddown most efficiently given its current balance sheet . . . and ongoing litigation relating to its historical executive

appointed John Dubel and Pamela Corrie, who have extensive experience in the restructuring industry, as independent directors to serve on a Special Committee to consider FP's strategic alternatives.[67] Although hired by FP, the independent directors had ties to counsel for AIG, who advised them of the opportunity.[68] AIG's counsel provided the Special Committee with

deferred compensation plan (the "DCP"). . . . While FP believes the DCP claims are without merit, litigation is ongoing and is expected to be costly and protracted. At present, a chapter 11 bankruptcy filing by FP is a viable strategy for resolving this situation.").

[67] JX-39 (Unanimous Written Consent of the Board of Directors of [FP] appointing Dubel and Corrie to the Special Committee); JX-40 (Unanimous Written Consent of the Board of Directors of [FP] empowering Dubel and Corrie to consider restructuring alternatives); DX-357 (Corrie's Select Directorship/Restructuring Experience); DX-358 (Dubel's Select Directorship/Restructuring Experience); 04/24/2025 Tr. (Dubel) at 92:9-12 ("Q. Which entity engaged you and Ms. Corrie? A. FP. Q. And which entity pays for your services? A. FP.), 94:20-95:12) ("Q. [C]ould you briefly summarize for the Court what authority was delegated to the Special Committee by the Board? A. Sure. I mean, basically, anything having to do with looking at alternatives and potential strategic transactions. Anything having to do with any interplay of contracts or anything else between FP and any of the other affiliated entities that were not necessarily directly under our umbrella. Also, looking at anything as it had to do with our subsidiaries and how they might have interplay with AIG or any of its affiliates. We had the ability to, you know, we were responsible for overseeing any of that information. We had responsibility for negotiating with all of the various stakeholders in the company. We had the ability to hire advisors and hire a chief restructuring officer, which we did. And then basically whatever we came up with, we would sit down, you know, and implement it.").

[68] 03/15/2023 Pamela Corrie Dep. at 17:18-22 ("Well, [counsel for AIG] asked me to [serve as] an independent director for the purpose of determining what type of strategic transaction would best accomplish the objective of winding down [FP]."); 04/24/2025 Tr. (Dubel) at 125:21-25 ("Q. And then [counsel for AIG] came back to you in late 2021, fair, to potentially undertake a similar engagement? A. Yes. I can't remember exactly when it was probably November, December, time frame.").

presentations explaining AIG's view of FP's situation.[69]

The Special Committee ultimately agreed with AIG's position that FP should file a bankruptcy petition. In preparation for that filing, the Committee directed that FP engage in a series of transactions.[70] First, it authorized FP to set off $33.9 billion[71] in accounts payable it owed to its subsidiaries against FP's equity in those subsidiaries.[72] Second, it approved the

---

[69] CCPX-709 at 3("At present, a chapter 11 bankruptcy filing by FP is a viable strategy for resolving [the Compensation Plan litigation]. In an FP bankruptcy, any DCP claims would be expressly non-guaranteed, unsecured, and subordinated."); JX-51 at 13 (04/13/2022 A&M Update to the Special Committee of the Board presentation) (showing potential losses of $163 to $510 million if FP retained the derivatives and filed for bankruptcy versus losses of only $6 million if FP novated the derivative contracts).

[70] 04/24/2025 Tr. (Kosturos) at 19:20-20:1-3 (testifying that the Special Committee, not AIG made the decision to effectuate the offsets); 04/22/2025 Tr. (Allison) at 43:5-8, 44:17-20 (confirming that the Special Committee directed the offsets and novations, not AIG); 04/24/2025 Tr. (Dubel) at 106:9-13, 115:15-17, 118:19-22 (the Special Committee approved the offsets, the novations of derivatives, and the transfer of the bonds and cash); 04/23/2025 Tr. (Stubbs) at 117:2-4 ("Q. And who made the final decision to go forward with the novations? A. The special committee."); JX-78 at 1 (Dec. 6, 2022 Unanimous Written Consent in Lieu of Meeting of Directors of AIG Financial Products Corp.) (AIGFP "intends to, effective as of December 6, 2022, make a payment by way of transfer of a portion of the Cash Pool Receivable in the amount of US$35,000,000 to [Matched Funding].").

[71] The experts disagreed on the value of the offsetting transactions. See DX-395 at 36 (identifying $34.159 billion in offsets); DX-522 at 50 (identifying $33.670 billion in offsets). It is not necessary for the Court to determine the exact value of those offsets for purposes of the Initial Issues. For its analysis, the Court assumes that the value was $33.9 billion (approximately the midpoint between the experts' figures).

[72] JX-66 at 1 (9/27/2022 memo from Allison to Special Committee) ("This memo documents the purpose and reasoning behind a series of intercompany offsetting journal entries between [FP] and certain of its subsidiaries. These intercompany journal entries are being

transfer (by novation) of 94 of FP's 97 remaining derivative contracts to an FP subsidiary, Matched Funding, and the termination of the other three contracts by agreement with the counterparties.[73] Third, the Special Committee allowed FP to transfer cash and bonds to Matched Funding, to secure Matched Funding's obligations under the novated contracts[74] and to offset

---

completed to net down intercompany balances between FP and its wholly owned subsidiaries against the 'investment in subsidiaries' on FP's books. These balances primarily relate to historical intercompany transfers between FP and its subsidiaries in the ordinary course of business."); JX-69 (9/29/2022 memo from Allison to Special Committee explaining three additional offsetting transactions); 04/24/2025 Tr. (Allison) at 37:24-38:7 ("Q. Can you describe to the Court what these journal entries are that are reflected in the transaction? A. Sure. The subsidiary, Pinestead Holdings, would record a dividend, which would reduce its equity and pay or transfer its intercompany receivable from FP to its parent. Its parent, [FP], would reduce its investment in subsidiary by the amount of the dividend and would receive the intercompany payable from itself, which it would offset against the intercompany payable to Pinestead."). See JX-50 at 2-3 (Allison's memo describing the Pinestead offset in detail).

[73] 04/23/2025 Tr. (Stubbs) at 118:17-19 ("Q. You mentioned the 94 contracts that were novated. How many contracts did FP terminate instead of novating? A. Three."), 117:24-118:1 (So as part of the reach-out to the counterparties, the first discussion was around: Would you be interested in terminating the transactions and on what terms?"), 123:11-14 ("[Matched Funding] was a logical place to put the remaining FP derivatives. Matched Funding had liabilities that go out to 2040-plus as a portfolio that's a, you know, established portfolio in the company."), 123:17-124:23 (some contracts were novated to AIG Markets, a sister company of FP, because the counterparties were regulated banks and Markets already traded in that market, but Matched [Funding] received the economic value of those transfers through pass-through transactions).

[74] 04/26/2025 Tr. at 70:6-24 (Avery) ("Q. And now what is your understanding why FP held bonds? A. The bond portfolio was used by FP to post collateral against derivatives. Q. And based on your review of the record, what percentage of the bonds were transferred out of FP? A. A hundred percent. Q. And where did the bonds get transferred to? A. To Matched Funding. Q. And based on your review of the record, what is Matched Funding doing with those bonds now? A. Continuing to hold those and manage day-to-day. As collateral needs

the value of those transfers against a payable it owed to Matched Funding.[75] The value of the derivative contracts and related cash and bonds transferred to Matched Funding was approximately $1.1 billion.[76]

---

ebb and flow, there is a change in the balances overall. But fundamentally, Matched [Funding] is managing that bond portfolio relative to the risk and the derivatives that exist at Matched Funding. Q. And is that the same or different than what FP was doing with them? A. The same.”); 04/24/2025 Tr. (Dubel) at 118:23-119:5 (“Q. Why did the Special Committee approve those transfers? A. Those bonds, cash collateral effectively [were] cash collateral for the contracts that we novated. And so we moved them over to Matched [Funding] where the contracts had been novated to. . . . Have Matched Funding have them so that they sat side by side with the contracts, which is where they were previously when they were at FP, so it made sense to move it with the contracts.”); JX-53 at 5 (06/15/2022 discussion with A&M and the Special Committee) (“All cash and bond collateral will also move along with the novated positions.”). See also 04/24/2025 Tr. (Kosturos) at 18:18-20 (the $35 million in cash came from FP’s funds in the shared cash pool), 28:22-24 (FP’s bond portfolio was transferred to Matched Funding), 29:3-30:1 (testifying that most of the bonds had already been pledged by FP as collateral for the derivative contracts and that the cash and remaining bonds were transferred to meet future collateral needs of those contracts), 31:4-32:12 (FP transferred $35 million of its cash pool funds to Matched Funding to give it additional liquidity and received fair value for that transfer).

[75] 04/22/2025 Tr. (Allison) at 43:25-44:13 (FP received fair value for the transfer of cash and bonds by offsetting the cash against a liability FP owed to Matched Funding); 04/24/2025 Tr. (Kosturos) at 31:4-30:2-32:12 (FP transferred $35 million of its cash pool funds to Matched Funding to give it additional liquidity and received fair value for that transfer).

[76] FP’s expert calculated that the value of the derivatives, cash and bonds was $870 million, but he did not include the related transfers to Markets, even though Matched Funding got their economic value. DX-395 at 36. The Former Executives’ expert calculated the value of the transfers to Matched Funding at $1.408 billion. DX-522 at 47. However, FP’s expert notes that the Former Executives’ expert took the value of the derivatives on December 31, 2021, while they decreased in value in 2022 by $162 million prior to the transfer. DX-395 ¶ 64. Again, for its analysis, the Court assumes the value of the transfers to Matched Funding, including the economic value it received from the transfers to Market, was the approximate midpoint of $1.1

In preparation for the bankruptcy filing, FP requested its own funds from the shared cash pool held at AIG.[77] Contrary to the cash pool agreement,[78] AIG refused to release the funds.[79] Instead, shortly before the bankruptcy filing, AIG unilaterally set off $127 million of FP's funds in the shared cash pool

---

billion.

77 04/24/2025 Tr. (Kosturos) at 32:19-34:16 (explaining how the Special Committee requested its cash from the AIG cash pool but was disappointed not to receive it), 64:13-17 (the Special Committee tried negotiating with AIG to get its cash back), 66:24-67:8 (the Special Committee was trying to bring back as much cash as it could into FP. See also JX-61 at 1 (08/31/2022 Minutes of Special Committee).

78 JX-52 at 3–4 (2011 Cash Pool Agreement) ("The Participants shall jointly own, in proportion to their individual contributions, such assets as are acquired by the CP Pool, the investment income derived therefrom and such reinvestments as are made in the CP Pool, and shall jointly share in the profits or losses incurred on assets invested and reinvested in the CP Pool. . . . Any Participant may cancel its participation or liquidate or withdraw all or part of its share of the CP Pool at any time by giving notice of its intention in writing or by telex to the MG Treasury Department."). There was some evidence that the 2011 cash pool agreement is no longer effective. See CCPX-862 (email from FP's counsel noting that the 2011 agreement "is no longer in effect, and the current cash pooling arrangement between [AIG] and FP is not documented in any writing"). However, the Court discounts that evidence in light of the fact that the Matched Funding cash pool agreement has virtually the same terms as the 2011 agreement and was intended to be the same as FP's agreement. Compare JX-75 at 2–4 with JX-52 2–4. See also JX-75 at 1 (10/19/2022 email from Stubbs to Cosgrove confirming that the terms of the 2022 Matched Funding cash pool agreement were "equivalent" to what was in place for FP); 04/24/2026 Tr. (Kosturos) at 80:25–81:8 (testifying that there was an oral agreement in place between FP and AIG that mirrored the terms of the prior agreement); 04/22/2026 Tr. (Allison) at 118:1–123:24 (testifying that the cash pool agreement between Matched Funding and AIG was substantively the same as the cash pool agreement that had existed between FP and AIG); 04/23/2026 Tr. (Stubbs) at 186:21–187:11 (testifying that he wanted Matched Funding to have the same cash pool agreement as FP to ensure Matched Funding's operational liquidity).

79 04/24/2025 Tr. (Kosturos) at 32:13-33:5 (testifying that FP requested cash in advance of bankruptcy from the cash pool in 2022 but was denied).

against the FP Revolver.[80] The Special Committee did not approve that transaction,[81] which left FP with only $10 million in cash.[82]

F. Filing of Bankruptcy Petition and Adversary Complaint

FP filed its bankruptcy petition on December 14, 2022.[83] At that time, FP listed assets of $152 million and liabilities of $37.9 billion.[84] On that same date, FP filed a proposed plan of reorganization (the "Bankruptcy Plan") and a disclosure statement.[85] The Bankruptcy Plan proposed converting the $37.6 billion claim of AIG under the FP Revolver to equity and paying a

---

[80] Id. at 34:17-20 ("Eventually, on the eve of filing for Chapter 11, [AIG] notified FP that they were going to offset that [$127 million] against the [FP Revolver]."), 35:3-4 ("Q. Did FP agree to AIG's offset of 127 million? A. No.), 71:14-17 ("Q. Okay, so you would agree with me that on December 12th, you weren't involved in any discussions around the offset, correct? A. No. [AIG] unilaterally did it. They didn't ask."); JX-84 (12/14/2022 email from Allison to Filanowski regarding "AIG FP Cash Pool Balances") ("This email will confirm that AIG Inc. has offset the full amount of the intercompany cash pool receivable owed by AIG Inc. to FP against the amount of the intercompany payable owed by FP to AIG Inc. The balance in this account as of Dec. 13, 2022 as $126,877,725.25"); JX-86 (showing a credit on the FP Revolver of $126.8 million on 12/14/2022); 04/28/2025 Tr. (Avery) at 72:14–73:5 (testifying how JX-84 and JX-86 show the transfer of cash from AIG to FP).

[81] 04/24/2025 Tr. (Kosturos) at 35:3-4 (testifying that FP did not approve the offset); 04/28/2025 Tr. (Avery) at 164:12-21 (testifying that AIG caused the $127 million transfer).

[82] CCPX-819 at 4 (bankruptcy planning presentation stating "10M for FP related expenses while in bankruptcy"); 04/24/2025 Tr. (Kosturos) at 34:21–35:2 (testifying that AIG left $10 million in FP to fund the bankruptcy).

[83] D.I. 1.

[84] D.I. 82 at 12 (FP's Bankruptcy Schedules' Summary of Assets).

[85] D.I. 6 & 7.

pro rata distribution of $1 million to the Former Executives for any claims they had, if their class accepted the Bankruptcy Plan.[86]

On January 13, 2023, the Former Executives filed a motion asking the Court to dismiss the bankruptcy case or to abstain.[87] On May 10, 2023, the Court issued an opinion and order denying the motion.[88]

On February 17, 2023, FP filed a complaint against the Former Executives (the "Complaint").[89] AIG and the Former Executives stipulated to AIG intervening as a plaintiff in the adversary proceeding.[90] As relevant to the Initial Issues, Count One of FP's Complaint requests a declaratory judgment that FP's obligation to AIG under the FP Revolver is debt.[91] Count Two of FP's Complaint requests a declaratory judgment that the Former Executives' claims under various compensation plans are subordinated to AIG's claim arising from the FP Revolver.[92]

---

[86] D.I. 7 at 10-11.

[87] D.I. 101.

[88] D.I. 193 (Opinion); D.I. 194 (Order). The Former Executives appealed the order denying the motion to dismiss or abstain, and the District Court affirmed the Bankruptcy Court's decision. D.I. 474.

[89] Adv. D.I. 2.

[90] Adv. D.I. 8.

[91] Adv. D.I. 2 ¶¶ 135-38.

[92] Id. ¶¶ 139-147.

The Former Executives filed an answer, a counterclaim against FP and AIG, and several crossclaims against AIG.[93] The counterclaim against FP and AIG requests a declaratory judgment that the FP Revolver was an equity investment and not a loan.[94] Count One of the crossclaims alleges that AIG's debt should be equitably subordinated to the Former Executives' claims.[95] Count Two of the crossclaims alleges a prima facie tort against AIG.[96] Count Three of the crossclaims alleges AIG tortiously interfered with the Former Executives' rights under the Compensation Plans.[97] Count Four of the crossclaims alleges that AIG is liable as a successor of FP for its obligations under the Compensation Plans because FP transferred all of its assets to AIG.[98]

AIG filed a motion for judgment on the pleadings and a motion to dismiss the Former Executives' crossclaims and counterclaim.[99] On May 9, 2024, the Court issued an opinion and

---

[93] Adv. D.I. 11.

[94] Id. ¶¶ 184-97.

[95] Id. ¶¶ 198-209.

[96] Id. ¶¶ 210-14.

[97] Id. ¶¶ 215-19.

[98] Id. ¶¶ 220-38.

[99] Adv. D.I. 33.

order denying AIG's motions.[100]

On August 28, 2024, after hearing argument, the Court ordered that the issues raised in the Complaint, counterclaim, and crossclaims be tried in two phases, with the Initial Issues (recharacterization, equitable subordination, successor liability, and tort claims) to be tried first.[101] On April 16, 2025, the parties submitted a joint pretrial order.[102] A trial on the Initial Issues was held from April 21st to April 29th, and on May 7th and 8th, 2025.[103] The parties submitted their Proposed Findings of Fact and Conclusions of Law on June 25, 2025.[104] The matter is ripe for decision.

## III. CONCLUSIONS OF LAW

### A. Recharacterization

The recharacterization doctrine is founded on the bankruptcy courts' equitable authority to ensure "that substance will not give way to form, that technical considerations will not prevent substantial justice from being done."[105]

---

100 Adv. D.I. 81 (Opinion); Adv. D.I. 82 (Order).

101 08/28/2024 Tr. at 47:1-48:23.

102 Adv. D.I. 169.

103 Adv. D.I. 173-74, 176-77, 179, 183-84, 186, 188, 192, 208, 212.

104 Adv. D.I. 216-17.

105 Cohen v. KB Mezzanine Fund II (In re SubMicron), 432 F.3d 448, 454 (3d Cir. 2006) (quoting Pepper v. Litton, 308 U.S. 295, 305

1. The Submicron Test

In determining whether a debt should be recharacterized as equity, the Third Circuit has stated that the overarching inquiry is "whether the parties called an instrument one thing when in fact they intended it as something else."[106] Whether the parties intended an advance of funds to be debt or equity is a fact-intensive inquiry which "may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances."[107]

As a preliminary matter, it is important to note that AIG totally controlled FP.[108] "Where, as here, the transactions occur

(1939)). See also Hartford Holdings v. Mladen (In re Eternal Enter., Inc.), 557 B.R. 277, 287 (Bankr. D. Conn. 2016) ("If bankruptcy courts were bound by a party's own characterization of its rights against a debtor, 'controlling equity owners of a troubled corporation could jump the line of the bankruptcy process and thwart the company's outside creditors' and investors' priority rights.'") (quoting Sender v. Bronze Grp, Ltd (In re Hedged-Investments Assocs., Inc.), 380 F.3d 1292, 1298 (10th Cir. 2004)).

106 SubMicron, 432 F.3d at 456. See also Radnor Holdings Corp. v. Tennenbaum Cap. Partners (In re Radnor Holdings Corp.), 353 B.R. 820, 838 (Bankr. D. Del. 2006) ("the overarching inquiry in a recharacterization case is the intent of the parties at the time of the transaction, determined not by applying any specific factor, but through a common sense evaluation of the facts and circumstances surrounding a transaction[.]") (emphasis in original).

107 SubMicron, 432 F.3d at 456.

108 See supra notes 29-36 and accompanying text. AIG's control of FP was particularly evident in the prosecution of this adversary proceeding. Although the Former Executives filed cross claims against AIG, AIG did not file pre-trial or post-trial briefs on the Initial Issues and participated in the trial only to a limited extent. Instead, AIG relied on FP's counsel to conduct the trial and joined in

between related entities rather than at arms' length, they are 'subject to particular scrutiny because the control element suggests the opportunity to contrive a fictional debt.'"[109] Thus, the Court must analyze the transaction's objective attributes to determine its true economic nature.[110]

a. What the Parties Said

The documents and relevant correspondence called the advances loans. The FP Revolver bears the name "Revolving Credit Agreement" and its language includes the typical nomenclature of loans.[111] The Promissory Note contains an unconditional promise to repay the advances.[112] As is characteristic of debt, the FP

---

the briefs filed by FP in opposition to the relief requested by the Former Executives. See, e.g., D.I. 218, D.I. 214, D.I. 213, D.I. 202, D.I. 201, D.I. 200, D.I. 199, D.I. 198, D.I. 163. Further, FP opposed the relief sought by the Former Executives, even when granting it might be in the best interest of FP. For example, FP opposed the recharacterization of the FP Revolver as equity even though it would significantly reduce the amount of claims against the estate.

[109] Geftman v. Comm'r, 154 F.3d 61, 68 (3d Cir. 1998) (emphasis added) (quoting In re Uneco, Inc., 532 F.2d 1204, 1207 (8th Cir. 1976).

[110] Cohen v. KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.) 291 B.R. 314, 323 (quoting Geftman, 154 F.3d at 68) ("[T]he transaction must be scrutinized according to 'an objective test of economic reality' to determine its true economic nature."), aff'd, 432 F.3d 448 (3d Cir. 2006).

[111] JX-1 at 1 (Revolving Credit Agreement) (referring to the "revolving loan facility," "borrowings," and "proceeds of the loan."); JX-20 at 2 (Promissory Note) (identifies AIG Funding as the "lender" and FP as the "borrower").

[112] JX-20 ("[FP] . . . unconditionally promises to pay to the order of AIG Funding . . . in legal currency of the United States of America and in immediately available funds, the principal sum of Sixty-Five Billion Dollars ($65,000,000,000) or if less, the aggregate unpaid

Revolver and Promissory Note limited AIG's upside to repayment of principal and interest rather than providing an unlimited right to share in FP's profits.[113] Contemporaneous emails and other documents also refer to the advances as loans.[114] The witnesses

principal amount of all loans made by [AIG Funding] to [FP] pursuant to the [FP Revolver] dated as of September 22, 2008, between [AIG Funding] and [FP].").

113 JX-1 at 1; JX-20 at 1. See also 05/08/2025 Tr. (Plastino) at 102:10-12 ("Q. If you look at that document, AIG's recovery was capped to unpaid principal and accrued interest; correct? A. I believe so, yes.").

114 See, e.g., DX-529 at 2-3 (09/25/2008 email from Friedman to Gender) (advising that a lawyer was drawing up the paperwork for, inter alia, the FP loan and asked what interest rate should be used for that loan); DX-32 (09/29/2008 email from Friedman) (describing all the relevant terms of the loan from AIG to AIG Funding to FP); DX-86 at 16 (12/24/2008 email from Micottis stating "There seems to be a great deal of confusion about how we should represent and account for our large loan . . . . from [AIG Funding]."); DX-55 (10/03/2008 email from Prister, at FP, to Gender, AIG's treasurer, (requesting a "borrow" of $1 billion); DX-87 at 2 (05/01/2009 email from Chorengal of AIG to the Fed) (describing the intercompany advances to FP as a loan and requesting a waiver to allow a reduction in the interest rate that FP had to pay to AIG Funding); DX-48 at 28-31 (11/18/2008 letter to Senator Charles E. Grassley) (attaching a chart showing "Use of Funds Under Federal Reserve Facilities" and listing "Loans to AIGFP for collateral postings, general investment agreements and other maturities" totaling $43 billion"). See also JX-94 at 45 (Excerpt from AIG's September 30, 2008 10-Q reflecting loans to FP); JX-95 at 45 (Excerpt from AIG's 2008 10-K reflecting loans from AIG to FP were $46 billion at the end of 2008); DX-62 at 2 (FP's 2008 Balance Sheet showing $66.2 billion in intercompany loans); DX-60 at 7 (Audit Planning Memo) (noting FP's receipt of "significant intercompany loans financed by [the Fed]"); DX-59 at 157 (PwC Audit Report) (defining advances from AIG to FP as "borrowing"); DX-62 at 2 (AIG's Financial Products balance sheet reflecting the FP revolver in the liabilities line as "Loans, notes, mortgages payable intercompany."); DX-38 at 3 (Minutes from the October 15, 2008, AIG board meeting) ("[B]orrowings from the [Fed Revolver] were or will be used for a capital contribution of approximately $1.5 billion to Nan Shan, intercompany loans to AI Credit Corp. and [FP] to meet ordinary obligations, maturing transactions and maturing debt, GIC terminations and collateral calls.") (emphasis added).

presented at trial consistently testified that the FP Revolver was a loan.[115]

Therefore, the Court finds that the parties "said" that the FP Revolver was a loan, not an equity infusion. This factor is not dispositive nor particularly helpful, however, because the Court is charged with determining the substance rather than the form of the parties' transaction.[116]

b. What the Parties Did

i. Use of AIG Funding to Lend

Although the loan was made to FP by AIG Funding,[117] another

---

[115] See, e.g., 04/20/2025 Tr. (Allison) at 27:6-29:25 (testifying that the FP Revolver is reflected as debt on FP's financial statements); 04/22/2025 Tr. (Gender) at 146:13-25 ("Q. Does the fact that the signature dates on the FP revolving credit agreement and the promissory note, does the fact that they're in 2010, the date, change when you believe the funding to FP actually started? A. No. I believe it started with the effective date. Q. In September of 2008? A. Exactly. Q. And let me just ask you: Why do you have that understanding? . . . . A. Because I was there when we made the first loan to FP, so I was in the room when the loan was made."), 192:21-24 ("Prior to September 2008, funding by [AIG], to subsidiaries was unusual for the parent company; correct? A. Not - not unusual. There was a whole program from [AIG] Funding that loaned money to subsidiaries."); 04/21/2025 Tr. (Habayeb) at 70:22-71:6 ("AIG's practice, when it lent money to its subsidiaries, it was – [with the] exception of the insurance companies was generally in the form of a - this intercompany facility. That was the typical practice. And generally, the terms that were extended would be based on what [AIG Funding] is able to get. . . . That was the general practice before 2008. And sitting here today, I continue to believe this facility was consistent with that general practice.").

[116] SubMicron, 432 F.3d at 456 ("Form is no doubt a factor, but in the end it is no more than an indicator of what the parties actually intended and acted on.").

[117] 04/22/2025 Tr. (Gender) at 136:12-16 ("Q. Did AIG Funding ever make capital contributions or equity investments in any entities within the AIG corporate entity? A. No. It was totally outside of

subsidiary of AIG, the Court rejects the argument that this precludes a finding of an equity contribution. The origin of the funding was AIG, FP's sole shareholder, and AIG ultimately received the repayments from FP.[118] The Court concludes that funneling that money through another AIG subsidiary does not change the economic reality that the funds came from AIG.

ii. Delayed Execution of Loan Documents

AIG advanced billions of dollars to FP over a two-year period before any loan documents were signed.[119] Although the

---

the game plan for AIG Funding."); 04/21/2025 Tr. (Habayeb) at 62:8-23 ("Q. You testified earlier that AIG used AIG Funding for borrowing and as a vehicle for lending to other AIG subsidiaries. Just to be clear, was AIG Funding used only for lending? A. It was. Q. During your time at AIG, was [AIG Funding] ever used to make equity investments in or contribute capital to other subsidiaries? A. I'm not aware of any situations. The other thing, AIG Funding had no subsidiaries. Q. And what's the relevance of that to my questioning? A. Because, typically, if you're going to make a capital contribution, it's the parent making a capital contribution to the subsidiary. So, AIG Funding had no subsidiaries as far as I knew. And so it would have been [AIG] that would have made any capital contributions.").

[118] See supra notes 24-26 and accompanying text. See also 04/21/25 Tr. (Habayeb) at 74:11-16 ("So FP needed cash to cover collateral calls, debt maturities and transactions that are being put to them. And they - AIG start - was advancing, had previously advanced money, but now under the revolver was advancing more money to FP. But every time there was excess cash in FP, it was used to repay whatever balance was outstanding on the loan."); DX-32 ("AIG Funding will pay interest on its loans from [AIG] cost + 18bps (which rate shall reset monthly on the first day of each month). AIG Funding will charge [FP] at the same interest rate as above. When [FP] repays on its intercompany loan (including monthly interest), the repayment will go to [AIG Funding] and in turn the latter will repay [AIG].").

[119] JX-86 (schedule of borrowings and payments under the FP Revolver maintained by AIG's Treasury Department); JX-1 (FP Revolver) (dated as of September 22, 2008, but signed on October 28, 2010); JX-20 (Promissory Note) (same).

evidence shows that the parties started drafting loan documents in 2008, the FP Revolver and Promissory Notes were not executed until two years later, in October 2010.[120] Furthermore, there is no evidence that FP's Board of Directors ever approved the loan, even though the FP Revolver required that it do so.[121]

iii. Due Diligence and Negotiations

In addition, AIG did not act as a creditor normally would. It did no due diligence or credit analysis of FP before advancing any funds or executing the loan documents.[122] Because AIG

---

[120] See, e.g., DX-529 at 2-3 (09/25/2008 email from Friedman to Gender) ("Aaron is drawing up the loan agreements, starting with ILFC."); 04/22/2025 Tr. (Gender) at 149:5-8 ("Q. Okay. And do you see where Mr. Friedman notes that "Aaron is drawing up the loan agreements"? First of all, do you know who Aaron is? A. I'm assuming he's a lawyer in the group."), 149:25-150:4 ("These are the intercompany loan agreements that were kind of established [the week of September 22, 2008]. Q. Okay. And which intercompany loan agreements? A. They were to several. One was ILFC. One was FP. And one was - it was another entity, AGFC, I think. Q. Okay. And when you refer to "FP," you're talking about the FP revolver? A. Correct."); JX-1 at 5-6 (signed October 28 and 29, 2010); JX-20 at 2 (signed October 28, 2010).

[121] 05/07/2025 Tr. (Plastino) at 29:20-22 ("Q. Did you see in your review of material any board resolution of AIG FP authorizing [the FP Revolver]? A. I did not."); JX-1 § 2.1 ("The obligation of AIG Funding to make any loan is conditional upon receipt by AIG Funding of . . . (ii) certified copies of Resolutions of Borrower's Board of Directors authorizing the execution and delivery by it of this Agreement and the Note and the incurrence and repayment of the obligations thereunder.").

[122] 04/22/2025 Tr. (Gender) at 189:21–192:15 ("Q. [T]reasury entered into transactions with subsidiaries on a non-arm's length basis. Is that what I'm hearing? A. Exactly. I mean - exactly, because they were subsidiaries. They were hundred percent owned subsidiary. . . . We did not do - when we provided intercompany loans, treasury did not do any credit analysis of our subsidiaries. . . . Q. Treasury did not take into consideration the health of the balance sheet of the sub when deciding, from the treasury perspective, whether to write an intercompany loan. Fair? A. Again, we did not do a formal credit

controlled FP, FP had no ability to negotiate the terms of the FP Revolver.[123] Instead, the terms were dictated by AIG.[124]

Although AIG unilaterally drafted the loan documents, it failed to include normal credit terms, such as a payment schedule or a fixed end date.[125] AIG did not insist on any security for its advances[126] and had no expectation that it would be repaid by FP for the funds it advanced.[127]

---

analysis of our subsidiaries before we provided intercompany loan. It was more of a business discussion between the management of the subsidiary and the holding company.).

[123] See supra note 61 and accompanying text.

[124] Id.

[125] See infra notes 158-61 and accompanying text. See also JX-1; JX-86.

[126] See infra notes 197-98 and accompanying text.

[127] 4/21/25 Tr. (Habayeb) at 189:10-19 ("A. So we expected some recovery. I don't know if it's - you don't know if it's going to be 100 percent. It became clear over time it's going not going to be 100 percent, but you still expect to get some recovery. . . . . Q. In 2010 there was a very low probability that AIG could recover the entire principal of this so-called loan; correct? A. Correct. The question is how much could AIG get."); 08/19/2022 Balfan Dep. at 289:11-17 ("Q. Well, was there any reasonable expectation that FP would ever pay off that $35 billion? A. Probably not. I can't put myself in the minds of other people. But in my opinion, almost impossible to pay off that debt."); 04/22/2025 Tr. (Allison) at 61:6–9 ("Q. And you're not aware of [AIG] ever putting pressure on FP to repay the [FP Revolver]? A. I have not felt pressured by [AIG] to repay the [FP Revolver]."); 04/25/2025 Tr. (Liebergall) at 115:8–10 (Q. Did you ever feel any pressure from the parent to pay interest? A. No."); 07/07/2022 Herzog Dep. at 207:7-15 ("Q. At that point in time, did you give any consideration to whether FP would be able to pay off its debt to AIG? A. I did not. Q. Did you care one way or the other? A. I don't recall caring or not caring. I just don't recall giving much thought to it."); 01/23/2024 Gender Dep. at 185:16-186:8 ("Q. I want to know whether or not AIG FP could ever repay these amounts. That was something that you as treasurer - that was fully within purview. A. I guess it would be if that was meaningful

iv. Recapitalization Plans

The Court finds that AIG divulged its true intent in funding FP when it sought to convert the vast majority of the outstanding balance of the FP Revolver into equity. In 2010, before any loan documents were even executed[128] and shortly before AIG repaid the Fed loan,[129] AIG proposed converting $35 billion of the loan to equity, offsetting $18.5 billion against a tax receivable AIG owed to FP, and leaving only a balance of $2 billion as a loan.[130] AIG stated that the purpose of the recapitalization plan was to help AIG repay its Fed loan and to improve FP's earnings by reducing substantially its borrowing and interest expense.[131] AIG

information. Q. Well, when you say 'meaningful,' what could be more meaningful? A. Well, [FP], was a 100-percent-owned subsidiary of AIG. Q. Okay. So what's significant about that? A. Essentially it's –it's intercompany transactions so it's eliminated in the consolidation process.").

128 See, e.g., JX-1 at 5-6 (signed October 28 and 29, 2010; JX-20 at 2 (signed October 28, 2010).

129 DX-26 at 17 ("Maturity Date" shall mean September 22, 2010); CCPX-669 at 11 (summary from the Congressional Research Service stating that AIG repaid the Fed Revolver in January 2011).

130 JX-13 at 3; JX-15 at 3.

131 Id. (08/30/2010 email from Chorengel of AIG to the Fed) (requesting authority to recapitalize FP's outstanding loan balance "to correctly reflect the amount collectible from [FP]" by "eliminat[ing] the negative equity in [FP]."); CCPX-428 at 1 (07/22/2010 email from Reilly to Blake) ("By the end of the third quarter [AIG] will be re-capitalizing [FP]. By doing this we will be substantially lowering the Fed loan outstanding and thus the associated interest expense. This would improve quarterly earnings at [FP] by $400-500M a quarter. Want to make see [sic] if we need to be concerned with regard to the deferred comp calculation."). See generally JX-86 (reflecting median interest per quarter of $501 million on the FP Revolver).

abandoned the recapitalization plan only after its outside counsel advised that restoring FP to financial health might obligate FP to restore the Former Executives' account balances under the Compensation Plans.[132]

Ultimately, AIG paid off the Fed Revolver in January 2011[133] and set off the FP tax receivable against the FP Revolver in March 2011.[134] In June 2011, FP stopped making cash payments of interest on the FP Revolver and began paying the interest in kind (by adding it to the principal balance of the loan).[135]

---

[132] JX-14 at 2 ("If the proposed recapitalization substitutes equity for debt, thereby creating a solvent FP with assets that could fund a restoration plan, there is a significant risk that at some point prior to the expiration of the limitations period, FP will face breach of contract litigation demanding compliance with the restoration plan obligation. As this would represent a potential $600 million liability of the worst sort (since the Company has assured multiple constituencies that these bonus obligations have been completely extinguished), it seems worthwhile to ask if financial statement simplification is worth this risk."); id. at 1 (09/02/2010 email from Herzog to Reilly and Gender) ("I don't care how its driven, we're not paying the deferred comp. We'll reverse / rescind the capital contribution before we pay deferred comp. Nothing should be done until this is resolved. NO entries."); CCPX-451 at 2 ("Clearly, there should be no effect on the comp plans, one way or another. Under no circumstances should we restore benefits under any plan. After the recap there will still be several billion dollars of intercompany debt at FP"); 04/23/2025 Tr. (Herzog) at 52:12-15 ("Q. Did AIG ultimately go forward with the full proposed recapitalization that was described in the waiver request we just looked at? A. We did not.").

[133] See CCPX-669 at 11.

[134] See JX-86 at 5 (showing $18 billion credit applied to the FP Revolver on 03/15/2011).

[135] 04/22/2025 Tr. (Allison) at 19:11-13 ("Q. How often would you say FP made repayments? A. Pardon me, FP made repayments frequently, up until the end of 2011, and then there were more intermittent."); JX-86 (showing cash interest payments through May 2011 totaling $6.1 billion and paid in kind interest accruing from June 2011 until FP filed for bankruptcy in December 2022 totaling $5 billion).

After abandoning the recapitalization plan, AIG finally papered the FP Revolver as a debt.[136] Interestingly, AIG was entertaining the recapitalization plan at the same time that it was considering an intercompany loan policy that would have mandated treating the FP Revolver as equity instead of debt.[137]

AIG's view of the transaction as equity rather than debt is also evidenced by the Bankruptcy Plan that FP filed on December 14, 2022.[138] That Plan, filed with AIG's support,[139] proposes allowing AIG to retain its equity in FP in satisfaction of the amounts due under the FP Revolver.[140]

---

136 Compare JX-14 with JX-1 (FP Revolver signed 10/29/2010) and JX-20 (Promissory Note signed 10/29/2010).

137 JX-16 at 4 (09/07/2010 email from Bhandari to Reilly and Hallman with a presentation on "Project LAIR") ("Transactions between affiliated entities should be entered into as if between unrelated parties (i.e. on an 'arm's length' basis). Therefore exposure to credit risk, covenants, pricing and modifications must be assessed based on the debtor's financial position, taking into consideration the health of its balance sheet, income statement, cash flows, business plan, budgets, forecasts and conditions in the market at the time of the loan," and "Equity injections may be made if market conditions/leverage of the subsidiary does not justify debt.").

138 D.I. 6.

139 See, e.g., D.I. 2 at ¶ 65 (Kosturos's First Day Declaration); D.I. 6 at 20, 37, 51 ("This Plan is the product of extensive discussions and negotiations between and among, inter alia, the Debtor, the Parent, and their respective professionals.").

140 D.I. 7 at 28 (FP's Disclosure Statement) ("[AIG] as the sole Holder of the Allowed Class 4 Prepetition Revolving Loan Claim, will retain the Existing [FP] Interests in exchange for, and in full satisfaction, settlement, discharge and release of, such Allowed Class 4 Claim.").

c. Economic Reality

As noted above, the parties in their contracts and other documents have called the FP Revolver a loan.[141] The Court concludes, however, that this nomenclature does not reflect the reality of the transaction. In 2008, the terms of the loan AIG obtained from the Fed prohibited equity contributions from AIG to its subsidiaries, without the Fed's consent.[142] Given the political climate at the time of the 2008 financial crisis,[143] and

---

141 See supra notes 111-15 and accompanying text.

142 DX-26 § 6.04(a) ("[U]nless the [Fed] shall otherwise consent in writing, [AIG] will not, nor will it cause or permit any [non-insurance subsidiary with more than $50 million in assets] to . . . . Purchase, hold or acquire any Equity Interests, evidences of indebtedness or other securities of, make or permit to exist any loans or advances to, or make or permit to exist any investment or any other interest in, any other Person, except: (i) investments by [AIG] and the Subsidiaries existing on the date hereof in the Equity Interests of the Subsidiaries, and (ii) additional investments by [AIG] and the Subsidiaries in the Equity Interests of the Subsidiaries . . . provided that . . . (B) investments made after the Closing Date by [AIG] . . . shall only be permitted (x) pursuant to funding commitments in effect on, and disclosed to the [Fed] on or prior to, the Closing Date or (y) with the prior written consent of the [Fed]."). See also 04/23/2025 Tr. (Herzog) at 48:17-20 ("[AIG] couldn't do activities like [recapitalize FP] without [the Fed's] approval or knowing that they wouldn't object to it.").

143 See, e.g., DX-48 at 15 (10/10/2008 press release quoting Sen. Grassley) ("Sen. Chuck Grassley, ranking member of the Committee on Finance, is urging the government to rein in the executive compensation, travel, and other expenses of the companies and banks that are getting financial aid, stating that 'Treasury. . . will have to verify for us that tax dollars intended to help stabilize the economy aren't wasted on expensive corporate retreats and big executive paydays, adding insult to injury. Treasury indicated in its announcement today that it will apply stricter limits on compensation in individual bank rescues. While this provides some comfort, it doesn't address the other ways taxpayers can get ripped off. Corporate executives can be endlessly creative about feathering their own nests. Treasury has to be many steps ahead.'").

AIG's need for approval of a loan for itself from the Fed, the Court concludes that AIG had to call its advances to FP a loan even though it considered them an equity infusion.

The economics of the transaction also provide evidence that the advances were not loans. AIG did no due diligence and knew that FP was not in a position to repay the loan,[144] because it faced enormous losses on its derivative contracts.[145] AIG took no security and had no assured source of repayment of the advances.[146] While FP did make some payments of interest and sporadic payments of principal, it was often from cash realized by exiting its derivative contracts or from borrowings under the FP Revolver.[147] The parties only papered the transaction as a

---

[144] See supra note 122 and accompanying text.

[145] See supra notes 16-20 and accompanying text.

[146] See infra notes 197-198 and accompanying text.

[147] See, e.g., 04/21/2025 Tr. (Allison) at 24:20-25:9 ("Q. So where did FP obtain the funds it used to make principal and interest payments on the revolver? A. From unwinding its positions. Q. And how did unwinding positions generate cash to make payments? A. Well, if you - when you unwound a position, if it had been a position that you had to post collateral on, you would receive back the collateral and then you could sell that and use those funds to pay down the loan or if you had a spread that you'd earned unwinding the liability, unwinding whatever asset was associated with it, you may have made money on that too. And you may have - when you generated the cash from that transaction, that excess cash would be used to pay down the line."); 04/25/2025 Tr. (Liebergall) at 84:17-25 ("Q. Okay. Now, once this borrowing started in September of 2008 from AIG to FP, FP actually made numerous interest payments in connection with the borrowing; correct? A. Again, they were interest payments made, funded by themselves. So, as I mentioned to you earlier, when we'd have a cash need, in that circumstance, AIG, we would effectively ask them for money to give them money. So, the net impact - but that is what they called it at that time, yes.").

loan two years later[148] after AIG realized that its plan to treat the advances as equity would require FP to honor its obligations to the Former Executives under the Compensation Plan.[149] Although AIG's witnesses testified at trial that the advances were loans, AIG's CFO Herzog previously admitted that the labels did not really matter.[150] Viewing the parties' actions and the objective

---

148 JX-1 at 5 (executed on October 28 and 29, 2010); JX-20 (executed on October 28, 2010). See also 04/22/2025 Tr. (Gender) at 145:21-23 ("Q. Do you have any idea why the FP revolving credit agreement and promissory note are dated effective as of September 2008 but not signed until 2010?), 146:6 ("A. No, I don't know."); 04/21/2025 Tr. (Habayeb) at 71:8-10 ("Q. Are you aware that the FP revolver was not signed until 2010? A. I was not. But, you know, it's an intercompany loan."). See, e.g., Roth Steel Tube Co. v. Comm'r, 800 F.2d 625, 631 (6th Cir. 1986) (noting that certain advances which were not evidenced by notes or other instruments of indebtedness or recorded as loans on accounting records provided "little if any support of a finding of bona fide debt.").

149 See supra notes 59-60, 132 and accompanying text.

150 06/11/2012 Herzog Dep. at 429:4-430:10 ("Q. In that case, Mr. Herzog, tell me what the factors were that – as far as you understand, led the company to decide to extend the funding to FP in the third quarter in the form of a loan, as distinguished from, in whole or in part, as capital? A. My recollection for the rationale for a loan versus capital, which we could have just as easily made some of all of it equity, so, it – again, there's no — there's - there's nothing complicated about was it loaned [sic] – you know, cash goes in, and as either you account for it as an equity contribution [sic], which you could just as easily put it in as a loan and made a – and we've done this from time to time – made non-cash equity contributions in the way of loan forgiveness. And we've done that from time to time throughout the company. And so, I think the - if I recall specifically, we were – we were focused on should there be cash generated inside [FP]. The easiest way to get that cash out of [FP] to the parent was in the form of – of "normal course" interest payments. So, you put an interest charge on the loan, and to the extent there's cash inside [FP], they pay the intercompany interest, and it just makes it mechanically and ministerially easier."). See also 05/07/2025 Tr. (Plastino) at 42:6-43:5 ("And so I looked to the testimony of Mr. Herzog, for example. And he said, 'I don't recall, sitting here today, or even have a vague recollection of giving much consideration to whether it was going to get paid back or not.' So that answers the question as to ability to

economic reality of the transaction between AIG and FP in 2008 under the Third Circuit's SubMicron test, the Court concludes that the FP Revolver was an equity infusion.[151]

2. The Autostyle Test

Although the Third Circuit has eschewed a "mechanistic scorecard,"[152] many courts use multi-factor tests to evaluate the true nature of a transaction. If the Court were to apply the multi-factor test developed by the Sixth Circuit in the Autostyle case,[153] it would confirm the Court's conclusion that the advances

---

pay. There wasn't - or at least he did not give consideration to that point. And he reaffirmed that in the - in his testimony. You can see that in the second red box where he was asked whether he gave any consideration to whether FP would be able to pay off its debt to AIG. And he said, 'I did not.' He's actually being read his testimony. And then in terms of how the transaction was structured, one of his answers says, 'I don't recall the specifics, other than ministerially being easier to get cash out of FP to the holding company by way of normal intercompany interest payments and/or debt payments.' And he goes on to say that it really didn't because it all comes out in consolidation anyway, presumably the consolidation of the financial statements. So this is something that he certainly did not focus on. And to the extent he focused on it, he was looking at what he terms 'ministerial ease' rather than the fundamental economic substance of the advances.").

151 SubMicron, 432 F.3d at 456 ("the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances.").

152 Id.

153 Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.), 269 F.3d 726, 749–50 (6th Cir. 2001) (creating an eleven factor test: "(1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest

made by AIG to FP were equity and not debt.

The Court's analysis of these factors and the evidence on which it is based is detailed below,[154] but the Court summarizes its conclusions here.

Most of the factors imply that the advances were equity contributions: (i) there was no source from which FP could repay the loan and, in fact, AIG had no expectation it would be repaid; (ii) FP was not adequately capitalized at the time of the advances; (iii) there was a complete overlap of identity of interest between the creditor and stockholder because AIG was FP's sole shareholder and only lender; (iv) there was no security for the advances; (v) the advances were effectively subordinated to claims of other creditors (except the Former Executives) because AIG had guaranteed third party claims; and (vi) there was no sinking fund to repay the advances. Other factors were neutral under the circumstances of this case: (i) there was no fixed maturity date or schedule of repayment of the principal, though that is not unusual with revolving credit; (ii) interest was required to be paid but was paid from borrowings or was paid

---

between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.").

[154] See infra notes 155-254 and accompanying text.

in kind; (iii) FP had no ability to obtain a loan from a third party, but no one else could either at the time because of the financial crisis; and (iv) the advances were not used for capital assets or for business operations. Only one of the factors unqualifiedly suggests that the advances were a loan: the name given to the advances was consistent with a loan not equity.

a. Names Given to the Instruments

As the Court discussed above, the FP Revolver bears the name "Revolving Credit Agreement" and its language is typical of loan documentation.[155] The Promissory Note and other contemporaneous documents and communications also consistently refer to the advances as loans.[156]

Therefore, the Court must conclude that the first factor, the names used in the documents, suggests that the FP Revolver was a loan rather than an equity contribution.

b. Fixed Maturity Date and Schedule of Payments

"The absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans."[157]

---

[155] JX-1.

[156] See supra notes 111-15 and accompanying text.

[157] Autostyle, 269 F.3d at 750. See also Friedman's Liquidating Trust v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.), 452 B.R. 512, 520 (Bankr. D. Del. 2011).

In this case, the FP Revolver had a two-year term that renewed automatically unless AIG Funding and FP agreed in writing to terminate the FP Revolver.[158] FP had the ability to terminate the FP Revolver at any time on 30 days' notice, but AIG Funding could not terminate the FP Revolver unless FP defaulted, became insolvent, or filed for bankruptcy.[159] Because FP had the ability to extend the maturity of the FP Revolver indefinitely, the Court finds that the FP Revolver had no fixed maturity date.

The FP Revolver also had no fixed schedule for repayment of principal, instead it provided that "[FP] shall have the right to repay the principal amount of the loans made by AIG Funding hereunder, in whole at any time or in part from time to time, without premium or penalty."[160] While the Promissory Note did contain an unconditional promise to pay the principal, it also had no required payment date(s) and contained the same proviso that FP could repay the principal whenever it wanted.[161]

FP asserted that the Promissory Note had a schedule for repayment of the loan, but that schedule was prepared in 2010 and simply includes the actual payments of principal made by FP between September 2008 and October 29, 2010, when the Note was

---

[158] JX-1 § 1.6(a). This is in contrast to the Fed Revolver which had a fixed maturity date of September 22, 2010. DX-26 at 17.

[159] Id. § 1.6(b).

[160] Id. § 1.4.

[161] JX-20 at 1.

executed.[162] It did not have a schedule for required future payments of principal. Further, the parties' records show that FP was not adhering to any identifiable schedule for repaying principal.[163] Instead, whenever FP had excess cash, FP sent the cash back to AIG.[164] Therefore, the Court concludes that FP had no obligation to comply with a schedule of repayments under the FP Revolver or the Promissory Note.[165]

The Former Executives' expert witness opined that the FP Revolver's lack of a maturity date and schedule for repayment of the principal were hallmarks of equity infusions where "the company gets to determine when and if to pay dividends and return capital to its shareholders."[166]

---

162 Id. Schedule 1. Cf. JX-86 (schedule of payments from 2008 through 2024 maintained by AIG's Treasury Department).

163 See JX-20 & JX-86.

164 04/22/2025 Tr. (Allison) at 19:17-19 ("Q. What generally would trigger FP to make a repayment? A. When FP had excess cash, right, it would repay the line."); 4/21/25 Tr. (Habayeb) 74:11-16 at (testifying that "FP needed cash to cover collateral calls, debt maturities and transactions that are being put to them. And . . . AIG . . . was advancing, had previously advanced money, but now under the revolver was advancing more money to FP. But every time there was excess cash in FP, it was used to repay whatever balance was outstanding on the loan.").

165 See 4/22/25 Tr. (Gender) at 142:22-43:1 ("Q. And is there a fixed maturity date specified in here? A. No. Again, these were ongoing revolvers. They were supposed to be short-term loans originally. Q. Is there a fixed repayment schedule anywhere in here? A. No.").

166 05/07/2025 Tr. (Plastino) at 28:12-16 ("As I said, this is more consistent with how you would think about equity funding than with debt because in the case of equity funding, the company gets to determine when and if to pay dividends and return capital to its

FP's expert admitted that the FP Revolver lacked a fixed maturity date and repayment schedule,[167] but testified that revolving credit agreements typically do not have those terms

shareholders."), 32:1–33:1 ("Q. Did you also hear, in words or substance, the term 'capitalization' or a switch to 'capitalizing interest' in the context of your review of this matter? A. Yes. Q. And can you explain to the Court your analysis of that. A. Right. So it's my understanding that, at a certain point, AIG began capitalizing interest on the advances. So in other words, instead of paying it in cash or drawing down cash and using that to pay, they added the – the interest due to the outstanding balance of the advances, and this continued for a number of years. Q. Did your assessment of whether there was a maturity date impact your analysis of interest, either the capitalized or noncapitalized assertions of interest payments? A. Yes. So the ability and the practice of capitalizing interest when you have an instrument that effectively, as we discussed before, has no maturity date means that this arrangement can continue for an extended period of time with – with – with no trigger in order to cause AIG FP to return capital to [AIG] Funding and, thereby, to AIG. Q. And how, from an economic standpoint, did that factor into your analysis? A. This is a provision, again, where, effectively, the borrower gets to decide when to return capital to the provider of capital is more consistent with - it is consistent with equity rather than debt."). See also 04/21/25 Tr. (Habayeb) at 62:24–63:11 ("Q. . . . [I]n your view, how is a loan different from a capital contribution? A. So with a loan, you know, there's an expectation you get repaid and you charge interest for it. And you're higher up in the capital structure on the borrower end. In a capital contribution, you make an equity infusion. There's no interest being collected. There's no maturity date on when you expect to get it back. And you're lower in the capital structure, so you're in a loss-absorbing mode, while with the loan, you should be - have less exposure to losses than equity. And it depends, then, on the performance of the subsidiary whether you get dividends or not.") (emphasis added); 05/07/2025 Tr. (Plastino) at 28:1-10 ("So taken together with the previous clause that we looked at which talks about automatic renewal, this really puts the power in the hands of the borrower, the recipient of capital, to determine when to return that capital to the lender. I have on occasion seen loans that flip this on its head, so-called demand notes, where the provider of capital can demand that back upon written notice when they chose. I've not seen anything termed or considered to be debt where the return of capital is at the discretion of the borrower.").

[167] 01/23/2025 Imburgia Dep. at 198:17-21 ("It has a term. It doesn't have a fixed, ultimate payment date because it's a revolver. And this is a revolver issued by a parent company that owns a 100 percent of the equity.").

because borrowers draw on and repay a revolving credit line as needed, not on specified dates.[168] He opined that this is particularly true for intercompany revolvers because the parent can make the subsidiary repay the loan at any time.[169]

Notwithstanding the lack of a maturity date and payment schedule, FP notes that it made 170 separate repayments under the FP Revolver between 2008 and 2022 in the aggregate amount of $65.5 billion, of which $59.4 billion was applied as principal

[168] 05/08/2025 Tr. at 40:23-41:9 (Imburgia) ("Q. How about revolving lines of credit, in particular? Are fixed repayment schedules characteristic of revolving lines of credit, even outside of the intercompany context? A. No. Typically, the revolvers are basically providing an entity with cash flow based on - on the needs. It usually has a total amount in it that the revolver can go up to, but it - it basically is a revolver, so it's money going in and money coming out. So that money coming in and money coming out is based on needs; it's not based on a schedule. Q. So were you surprised that there was no fixed repayment schedule specified in the revolving credit agreement? A. No."). See also 4/24/25 Tr. (Kosturos) at 14:6-14 ("Number two, the term was for an initial two years and then after that it effectively evergreened. So every year, it rolled over as long as both parties agreed to, so that term was extended. And lastly, as it relates to pay downs on the debt, a revolver doesn't have pay downs. It is literally a facility that has borrowings and repayments on a basis as needed or as possible when they can make those payments. There's no fixed payment schedule. That would be a definition of a term debt."); 04/21/2025 Tr. (Habayeb) at 64:24-65:2 ("A revolving credit agreement is where a lender agrees to lend you money up to a certain amount, but it's not drawn necessarily on day one. You're able to draw on it over time as needed."). See JX-1 § 1.1 (allowing borrowings up to $65 billion).

[169] 05/08/2025 Tr. (Imburgia) at 40:13-19 ("Q. And more generally in your experience, is it actually typical that intercompany revolvers lack a fixed maturity date? A. Yes. And it's principally because, if the parent company is the hundred percent owner of the subsidiary, they could direct the subsidiary to pay down the loan at any point.").

repayments even though FP never became profitable again.[170] FP argues that "[c]ourts do not require perfect documentation to evidence an intent to create a debt."[171]

The Court agrees that perfect documentation is not required and that the lack of a maturity date and schedule of payments is just one factor to consider in determining whether the parties intended a debt or equity investment.[172]

The Court also agrees that revolving credit agreements often "roll-over" (i.e., extend the maturity date) as long as the borrower is not in default. However, it is usually the lender, not the borrower who determines if the loan maturity should be

[170] See JX-86; 04/22/2025 Tr. (Allison) at 20:10-14 ("Q. And has FP ever recouped all the losses it suffered in the 2008 financial crisis? A. No. Q. Has FP repaid portions of the revolver despite that? A. Yes.").

[171] See Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings (In re HH Liquidation), 590 B.R. 211, 292 (Bankr. D. Del. 2018). See also Joseph v. Feit (In re Liberty Brands, LLC), No. 07-10645 (MFW), 2014 WL 4792053, at *5 (Bankr. D. Del. Sept. 25, 2014) (holding that the transaction at issue was a loan even though the loan was undocumented at the time it was made because the loan was documented a short time after and included a definite maturity date and specific interest rate); Lamonica v. Tilton (In re Transcare Corp.), No. 16-10407 (SMB), 2020 WL 8021060, at *37 (Bankr. S.D.N.Y. July 6, 2020) (declining to recharacterize an insider's debt even though no loan agreement existed at all and stating that "[t]here was no time to draft a loan agreement even if anyone had thought about it").

[172] See, e.g., State St. Bank, 520 B.R. at 76 (finding that the creditor's decision not to collect the loan at maturity was not evidence of an equity contribution because the creditor did not want to force a value-destructive liquidation); Liberty Brands, 2014 WL 4792053, at *3-4 (finding that the borrower made regular payments even though there was no fixed schedule of payments and ultimately repaid the loan in full).

extended.[173] Further, while revolvers do not typically include a schedule of repayments (because they are based on a company's cash needs and ability to repay), revolving loans at least require repayment of the full principal on the maturity date.[174] There is no such requirement in the FP Revolver.[175]

FP asserted that there was no fixed maturity date because the parties did not know how long the financial crisis or the winddown of FP would last but knew it would take years.[176] The

---

[173] See State St. Bank, 520 B.R. at 76. See also 05/07/2025 Tr. (Plastino) at 27:15-18 ("This type of arrangement where a party - where the recipient of capital gets to effectively choose when to return that capital to the provider is more consistent with an equity investment than with a debt investment.").

[174] 05/08/2025 Tr. (Imburgia) at 41:1-6 ("Typically, the revolvers are basically providing an entity with cash flow based on - on the needs. It usually has a total amount in it that the revolver can go up to, but it - it basically is a revolver, so it's money going in and money coming out. So that money coming in and money coming out is based on needs; it's not based on a schedule."). But see 05/07/2025 Tr. (Plastino) at 27:12-14 ("If you're modeling this as debt, you need to be able to model the payoff date. And this makes it impossible for you to do that."), 28:1-5 ("Right. So taken together with the previous clause that we looked at which talks about automatic renewal, this really puts the power in the hands of the borrower, the recipient of capital, to determine when to return that capital to the lender."), 104:20-25 ("In - you would run into issues if you kept extending a maturity date ad infinitum, because then the real question is whether there's actually a defined obligation to pay. There are companies that I've worked with that have run into issues with the IRS, with their auditors, because they did exactly that."), 32:23-33:1 ("This is a provision, again, where, effectively, the borrower gets to decide when to return capital to the provider of capital is more consistent with - it is consistent with equity rather than debt.").

[175] JX-1.

[176] See 04/21/2025 Tr. (Habayeb) at 94:10-22 ("Q. Based on your role at AIG and involvement in the wind-down, how long was the wind-down expected to take? A. It was expected to take a number of years to get there. We knew there would be some things that we would be able to do quickly. There would be things we'll take some time to unwind.

Court rejects this argument for several reasons. First, the crisis may have excused the execution of formal documentation in 2008 but by 2010 the financial crisis had abated enough that the parties were able to execute appropriate documents. Nonetheless, AIG failed to include a maturity date or fixed schedule for repayment of the FP Revolver in those documents.

Further, while FP asserts that the loan documents were boilerplate and used historically,[177] there is conflicting

---

And some things you will just keep on the books and let them run their natural course. Q. And why for those things was it better to keep them on the books and let them run their natural course? A. There was a trade-off on how do you maximize value while managing the risk profile. So if you want to try to get something up quickly, you'll be leaving - you get less value in exchange for it."); 05/08/2025 Tr. (Imburgia) at 40:4-12 ("I believe that it would probably be illogical to have a fixed maturity date because some - some of these derivative transactions go out 10 and 20 years. So, if it did have a maturity date, it would then have to be redone and - and issued a new document. So it makes sense, because of the long period, to have it be a revolver that gave the parties the ability to fund the - the needs of the entity and gave the underlying entity the flexibility to funnel up money when it had excess cash.").

[177] 4/21/2025 Tr. (Habayeb) at 184:18-22 ("Q. And unlike third-party debt, the funding arrangement between FP and AIG had no maturity date, correct? A. I don't think it did, but I'm not 100 percent certain. The intercompany facilities we have, I don't think had maturity dates."), 186:2-3 ("Based on this, it didn't have a maturity date, which doesn't surprise me because this is all intercompany debt."); 04/22/2025 Tr. (Gender) at 143:10-20 ("Q. And it states that: 'The revolver will terminate in the event of any insolvency or bankruptcy of the borrower at which point all outstanding indebtedness under the revolver would be immediately due and payable.' Do you see that? A. Yes. Q. And was that also a standard provision? A. It was essentially just a boilerplate. Q. In all of the intercompany loan agreements at AIG? A. Yes.), 143:2-5 ("Q. And I take it from your answer it was standard for there not to be a fixed maturity date or a fixed payment schedule in the intercompany loan agreements at AIG? A. Exactly."). See also 04/21/2025 Tr. (Habayeb) at 70:16-71:6 ("Q. Was the FP revolver consistent or inconsistent with AIG's practice of lending money to the noninsurance intercompany subsidiaries? A. So FP's practice - sorry. AIG's practice, when it lent money to its

testimony on this point.[178] The Court finds it unnecessary to resolve that conflict, however, because it finds that even if the loan documents were boilerplate, it does not justify the absence of customary loan terms in the FP Revolver. Coincidentally, at the time the FP Revolver was executed, AIG was examining its historical practice of making loans to its subsidiaries and drafting a policy of best practices, suggesting that it believed the historical practice needed to be improved.[179]

While some courts have held that the lack of a fixed maturity date and repayment schedule indicates equity rather than

---

subsidiaries, it was - exception of the insurance companies was generally in the form of a - this intercompany facility. That was the typical practice. And generally, the terms that were extended would be based on what AIG Funding is able to get. And that got passed through to the insurance companies. That was the general practice before 2008. And sitting here today, I continue to believe this facility was consistent with that general practice.").

[178] 04/22/2025 Tr. (Gender) at 138:21-139:3 ("Q. And was this revolving credit agreement for the [AIG] Funding revolver drafted from scratch? A. No. We use a boilerplate. Essentially, we had - we had a form we'd been using for years and years. Predated me. Q. A form that was used for - A. All intercompany notes. Q. All intercompany notes? A. Yes."). But see id. at 198:3-7 ("Q. And I want to just go back: Before September 2008 at all, prior to that era when the crisis was afoot, there was no written credit agreement between FP and any of its affiliates that you're aware of; correct? A. Yeah, correct.").

[179] JX-16 at 4 ("Transactions between affiliated entities should be entered into as if between unrelated parties (i.e. on an 'arm's length' basis). Therefore exposure to credit risk, covenants, pricing and modifications must be assessed based on the debtor's financial position, taking into consideration the health of its balance sheet, income statement, cash flows, business plan, budgets, forecasts and conditions in the market at the time of the loan."). See also 01/23/2024 Gender Dep. at 216:8-11 ("This presentation again from my perspective is coming up with best practices. So this is a project to work on.").

debt,[180] the Court concludes that the absence of those terms in this case is not dispositive because the lack of those terms may be consistent with revolving debt.[181] Furthermore, while missing documentation usually weighs in favor of recharacterizing advances as equity contributions,[182] that alone does not demand recharacterization.[183] Similar to missing documents, missing "terms" that are typical of debt instruments also do not demand recharacterization. Therefore, the Court concludes that this factor is neutral in this case.

---

180 See, e.g., Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.), 473 B.R. 525, 574 (Bankr. D. Del. 2012) (concluding that "although there are numerous fixed repayment dates stated in the loan agreements, ABST was not regularly required to make principal payments as they came due. Therefore, this factor weighs in favor of recharacterizing the Contested Obligations as equity.").

181 Autostyle, 269 F.3d at 750 (finding that a demand note with no maturity date or schedule of payments did not compel the court to conclude the advances were equity contributions because there was a fixed rate of interest and interest payments were made); Friedman's, 452 B.R. at 520 (finding this factor to be neutral because there was a maturity date but there were no principal payments required prior to the maturity date).

182 AutoStyle, 269 F.3d at 750 (stating that an absence of instruments of indebtedness is evidence that the advances were capital contributions but affirming the bankruptcy court's finding that the instruments in that case were evidence of indebtedness). But see Roth Steel, 800 F.2d at 631 (holding that the advances were capital contributions in part because the lack of written instruments "provid[ed] little if any support for a finding of bona fide debt").

183 Liberty Brands, 2014 WL 4792053, at *4 (finding that recharacterization was not appropriate because a witness of the party seeking recharacterization testified that the advances were a loan, even though there was no written instrument, the debtor made regular payments, and the debtor ultimately repaid the loan in full).

c. Fixed Rate of Interest and Interest Payments

The absence of a fixed rate of interest and interest payments "is a strong indication that the investment was a capital contribution, rather than a loan."[184] The FP Revolver stated that interest would be paid monthly in arrears at a rate to be mutually agreed upon by the parties.[185] The parties subsequently agreed to the applicable interest rate to be paid.[186] The interest rate was an adjustable rate based on market rates.[187]

---

[184] Autobacs, 473 B.R. at 574.

[185] JX-1 § 1.6(b).

[186] DX-32 ("AIG Funding will pay interest on its loans from [AIG] cost + 18bps (which rate shall reset monthly on the first day of each month). AIG Funding will charge [FP] at the same interest rate as above."); DX-529 at 2-3 (emails setting interest rate); 04/22/2025 Tr. (Gender) at 142:4-6 (testifying that there was an agreed upon interest rate), 150:23-151:12 (testifying about interest rate discussions), 155:23-156:5 (testifying that FP's interest rate was based on AIG's borrowing costs), 202:16-203:3 (testifying that there was no interest rate in the intercompany documents because the interest rate would fluctuate every day).

[187] 4/22/25 Tr. at 141:1-17 (Gender) ("Q. And does the interest provision in the FP revolver include a fixed numerical interest rate? A. No. This is a revolver, so it didn't have a fixed rate. Q. Do you know why it didn't? A. Again, it's a revolver so it's being borrowed each day. The background of all of these notes were it used to be backed by AIG's commercial paper program, and so our interest rate would change on a daily basis. So there was no way to estimate what that interest rate was going to be, and so . . . . therefore, it was left blank, and then it would be - as we developed the data, we would charge them what the parent's interests costs would be. Q. So was it standard to have the interest rate not specified in these intercompany loan agreements? A. Absolutely.").

Pursuant to that agreement, FP did make monthly interest payments on the FP Revolver for a time.[188] The Former Executives argue, however, that the interest rate and payments were illusory because they were paid from AIG's own funds that FP drew under the FP Revolver.[189] The Former Executives further note that after 2011, FP ceased making cash interest payments and the interest payments were instead added to the FP Revolver's outstanding balance (i.e., paid in kind).[190] Their expert testified that a

---

[188] JX-86 (showing that between September 2008 and June 2011, FP made 33 interest payments in cash totaling approximately $6.1 billion and between June 2011 and December 2022, FP paid interest in kind by adding it to the principal amount of the loan, in an amount of approximately $4.9 billion).

[189] 04/25/2025 Tr. (Liebergall) at 84:17-23 ("Q. Okay. Now, once this borrowing started in September of 2008 from AIG to FP, FP actually made numerous interest payments in connection with the borrowing; correct? A. Again, they were interest payments made, funded by themselves. So, as I mentioned to you earlier, when we'd have a cash need, . . . we would effectively ask them for money to give them money."); 04/22/2025 Tr. (Gender) at 210:10–14 ("Q. And so you would fund them for the interest payments; right? A. Again, it depends on which day it was. If they had excess cash, they wouldn't need funding. If they didn't have any cash, then they would probably need to borrow from us."), 211:17-23 ("Early on, in the first year or so of the credit facility, there was a lot of cash flows going on at FP. So, on that day, every day they had to net the position. By the time we got into the second or third year, there weren't many cash flows going through FP. So at that point, they would have to borrow because there was no really other cash flows going through the system.").

[190] JX-86; JX-46 at 16 (Alvarez & Marsal presentation stating that last cash interest payment was in May 2011 and all other interest payments since were capitalized); 04/21/2025 Tr. (Habayeb) at 183:8-10("Well, if there's interest that's past due, it just gets capitalized and rolled in. I think that's pretty standard practice."); 04/22/2025 Tr. (Gender) at 212:21-23 ("Again, at some point when there was very little cash flows going through FP, then the interest payment would only be funded by new debt."); 04/22/2025 Tr. (Allison) at 58:18-21 ("Q. And from the period June 2011 to the bankruptcy, interest was capitalized? A. That's correct.");

typical lender would only allow a borrower to pay interest in kind for a short time, usually at a higher rate of interest, and that allowing FP to do so from 2011 to 2022 was not consistent with typical debt transactions.[191]

FP's expert admitted that he had never seen a parent allow capitalized interest for more than a decade, but he opined that lenders routinely allow a borrower to pay interest in kind to conserve its cash flow.[192] He also noted that the parties'

---

04/24/2025 Tr. (Kosturos) at 58:20-23 ("Q. Okay, so based on your study of [FP's] books and records for over ten years before you became CRO, the interest on the loan had been capitalized, correct? A. That's true.").

[191] 05/07/2025 Tr. (Plastino) at 33:4-34:8 ("Q. And did you consider, you know, that term when you were analyzing the assertion of payment of interest in the context of this matter? A. Sure. So pay in kind is exactly what it says. It refers to the process of, instead of paying interest in cash, you add it to the outstanding balance and carry it forward. But when you look at the market, pay-in-kind arrangements, or PIK toggles, where a borrower gets to choose whether or not to pay interest in cash or to capitalize it, they look very different than what was - what actually occurred here. A PIK toggle is typically short term. It's for one or two years. And that's because a lender doesn't want to give a borrower the opportunity to continue to effectively run their business down without crossing some tripwire that would require them to preserve the lender's capital that they advanced to them. The other difference is that, typically when you have a pay-in-kind arrangement, there's - if you capitalize the interest, it comes at a higher rate. There's an additional cost to it. And that makes sense because the act of capitalizing the interest leads to more risk. Even for a short period of time, it leads to more risk for the lender. Q. In your review of the assertions of interest being paid here, were they consistent with PIK interest, in your experience? A. No. There was no premium for capitalizing the interest; and the capitalization went on for years as opposed to for a relatively short period of time.").

[192] 05/08/2025 Tr. (Imburgia) at 82:8-12 ("Q. And you can't recall, one way or another, whether you have ever seen a parent extending to a subsidiary a loan and allowing that subsidiary to capitalize interest for more than a decade before this case, correct? A. That's correct."), 42:16-23 ("Q. And in your experience, is it typical for a

financial statements reflected the interest paid in kind as interest income and expense.[193]

The Court concludes that the parties did agree to an interest rate and FP did pay interest on the advances (originally from excess cash or additional borrowings and later by adding the interest charge to the principal balance of the loan). Capitalizing interest alone does not support a finding that the FP Revolver was an equity contribution.[194] However, the Court concludes that the interest feature of the FP Revolver was not typical of a loan transaction because the interest was paid from additional advances under the FP Revolver or paid in kind for more than a decade. The result was that FP was not paying

---

lender to permit a de-stressed borrower to capitalize interest payments even when the loan document requires cash interest? A. That's common. The reason it's common is the lender wants to make sure, in protecting their interest, that the entity, if it doesn't have cash because it needs cash for business operations or other situations, they will let them capitalize the interest.").

[193] Id. at 42:24-43:2 ("But capitalization of interest still means that you're reporting interest income, you're reporting interest expense, you're recording the amount due. You're just building it into the principal."). But see 04/23/2025 Tr. (Herzog) at 75:9-14 ("Q. So the board of AIG agreed that simplification of segment reporting warranted elimination of, what you call, the intercompany loan with FP, correct? A. No, I didn't say that. I said the objective [of the recapitalization] was the interest expense, to get rid of the interest expense in the segment reporting."). Compare JX-95 at 228 (2008 AIG 10-K reporting intercompany interest expense) and JX-99 at 238 (2009 AIG 10-K reporting interest expense for 2008 and 2009) with JX-100 at 240 (2010 AIG 10-K not reporting interest expense for 2008, 2009, and 2010).

[194] Off. Comm. Of Unsecured Creditors of Broadstripe, LLC v. Highland Cap. Mgmt. (In re Broadstripe, LLC), 444 B.R. 51, 95-96 (Bankr. D. Del. 2010) (finding that paid in kind interest was not determinative of an equity contribution).

interest, AIG was essentially paying itself interest on the FP Revolver. Because the FP Revolver had no fixed date by which the principal of the loan (and the paid in kind interest) would ever be repaid, the Court concludes that this suggests that the transaction was equity.

d. Source of Repayments

Where "the party infusing funds . . . expects to be repaid with interest no matter the borrower's fortunes . . . the funds are debt," but where "the funds infused are repaid based on the borrower's fortunes . . . they are equity."[195] "If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution."[196]

In this case, the Fed Revolver prohibited AIG from securing any of its intercompany loans.[197] Therefore, the only source of repayment that AIG Funding (and therefore, AIG) could look to was cash FP could generate from unwinding its derivative positions.[198]

---

195 SubMicron, 432 F.3d at 456.

196 See, e.g., AutoStyle, 269 F.3d at 751; Autobacs, 473 B.R. at 574–75; Friedman's, 452 B.R. at 521.

197 DX-26 § 6.02.

198 04/21/2025 Tr. (Allison) at 25:1-9 ("[W]hen you unwound a position, if it had been a position that you had to post collateral on, you would receive back the collateral and then you could sell that and use those funds to pay down the loan or if you had a spread that you'd earned unwinding the liability, unwinding whatever asset was associated with it, you may have made money on that too. And you may have - when you generated the cash from that transaction, that excess

Thus, repayment of the Revolver depended entirely on FP's success at favorably unwinding its derivative contracts.

FP argues that a borrower's ability to repay a debt will always turn to some extent on its success.[199] It contends that AIG always expected to be repaid at least a part of its advances.[200] FP asserts that it did routinely make repayments on the FP Revolver even when it was not profitable.[201] Therefore, it

cash would be used to pay down the line."); 04/21/2025 Tr. (Habayeb) at 74:15-16 ("But every time there was excess cash in FP, it was used to repay whatever balance was outstanding on the loan."); 04/25/2025 Tr. (Liebergall) at 81:14-15 ("[I]f we had excess money, we would return it back to the parent.").

[199] Liberty Brands, 2014 WL 4792053, at *4 (noting that courts recognize that "all extensions of credit depend on the debtor's success; it does not make them capital contributions."); State St. Bank, 520 B.R. at 75-76 (holding that a contingency feature which provided extra payment on maturity based on the company's fortunes did not require recharacterization where the principal amount of the loan and its fixed interest were fixed and payable regardless of the company's success).

[200] 04/22/2025 Tr. (Gender) at 147:2-5, 16 ("Q. In September of 2008, as treasurer and as the one involved in the formation of the FP loan. . . . Did you expect to get paid? A. Yes, yes.); 04/21/2025 Tr. (Habayeb) at 189:8-19 ("Q. AIG did not expect to get paid back the entire amount it made available to FP in 2008, correct? A. So we expected some recovery. I don't know if it's - you don't know if it's going to be 100 percent. It became clear over time it's going not going to be 100 percent, but you still expect to get some recovery. Q. In 2010 things were a little better than 2008. You'll agree with me on that; right, sir? A. Yes. Q. In 2010 there was a very low probability that AIG could recover the entire principal of this so-called loan; correct? A. Correct. The question is how much could AIG get.").

[201] 04/22/2025 Tr. (Allison) at 19:24-20:1 ("Q. And do you know if FP still made repayments during some of those years? A. Yes."), 20:10-17 ("Q. And has FP ever recouped all the losses it suffered in the 2008 financial crisis? A. No. Q. Has FP repaid portions of the revolver despite that? A. Yes. Q. And to your knowledge, has [AIG] ever forgiven balances owed under the revolver? A. No, not to my knowledge."). See also JX-20 (Promissory Note with Schedule of

argues that repayment was not dependent on success of FP's business.

The Court rejects FP's argument. Beginning in 2008, FP ceased originating new derivative contracts and began winding down its business.[202] Therefore, there were no profitable business operations from which AIG could expect to be paid. Although AIG received some payments from the winddown of FP's derivative contracts, the Court finds that the winddown was intended merely to minimize AIG's losses and was never expected to result in repayment of AIG in full.[203] Further, many of the repayments FP made to AIG were from new borrowings from AIG.[204]

---

Payments); 04/22/2025 Tr. (Gender) at 163:10-25 ("Q. But just looking at [JX-20], did FP continue to take draws through the end of October 2010 at the point that this promissory note was signed? A. Yes. Q. And did FP continue to make principal payments through October 2010 as well? A. Yes. Q. Based on this schedule, how frequently would you say FP took draws and made repayments of principal from September of 2008 through October of 2010? A. On a fairly frequent basis, both repayments and new borrowings.").

[202] See supra note 27 and accompanying text.

[203] 04/25/2025 Tr. (Liebergall) at 65:16-20 ("Profitability was generally not profitability. It was how much we were going to lose. As we were winding down and counterparties were being opportunistic, we were generally having to exit trades at their side of the market, meaning they were getting favorable terms versus us."). See also supra note 27 and accompanying text.

[204] 04/25/2025 Tr. (Liebergall) at 85:2-8 ("Q. FP was actually charged interest and actually made interest payments in connection with the borrowing from AIG to FP; correct? A. As I mentioned to you, yes. Funding from AIG, effectively, what I'd call a round-trip, is what they did. So, the money that we, quote, paid to them was required to be funded by them."); 04/22/2025 Tr. (Gender) at 212:18-23 ("Q. So prior to June 2011, what you just described, that funds were borrowed and then repaid the next day, was the way that FP paid interest? A. Again, at some point when there was very little cash

Therefore, the Court concludes that, unlike the cases cited by FP,[205] AIG had no real expectation that it would be repaid in full.[206] Consequently, the Court concludes that this factor

flows going through FP, then the interest payment would only be funded by new debt.”).

205 State St. Bank, 520 B.R. at 75–76 (finding that notes were risky and depended on the business’s success to return an additional amount but that finding alone was insufficient to recharacterize the debt because the lenders still expected something to be repaid); Liberty Brands, 2014 WL 4792053, at *4 (finding that borrower made payments in multiple years before ultimately paying off the loan).

206 04/23/2025 Tr. (Herzog) at 76:3–78:1 (Impeaching with 07/07/2022 Herzog Dep. at 206:12–207:15) (“Q. Did AIG, at any point in the time frame that you served as AIG’s CFO, expect that the principal balance of that loan would be repaid by FP? . . . A. Well, I won’t comment on AIG. I don’t recall, sitting here today, or even having a vague recollection of giving much consideration to whether it was going to get paid back or not. The objective of the loan was to provide funding to meet collateral calls that were stemming from contracts that had been put on the books. I just don’t recall spending a lot of time thinking about repayment. It was about meeting those needs, keeping the company out of default and getting on with paying back the US government. Q. You were AIG’s CFO after it had paid off the US government, correct? A. Correct. Q. At that point in time, did you give any consideration to whether FP would be able to pay off its debt to AIG? A. I did not.”); 04/22/2025 Tr. (Gender) at 206:12–208:13 (Impeaching Gender with 01/23/2024 Gender Dep. at 185:16–186:8) (“Q. I want to know whether or not AIG FP could ever repay these amounts. That was something that you as treasurer - that was fully within purview? A. I guess it would be if that was meaningful information. Q. Well, when you say ‘meaningful,’ what could be more meaningful? A. [FP] was 100[%] owned subsidiary of AIG. A. Okay. What is significant about that? A. Essentially it’s – it’s intercompany transactions so it’s eliminated in the consolidation process.”). See also JX-13 at 3 (2010 email from Chorengel to Dahlgren, attaching funding request) (“In order to further facilitate the unwind process and correctly reflect the amount collectable from [FP], it is proposed to eliminate the negative equity in [FP].”); JX-12 at 2 (2010 email from Bhandari to Habayeb) (“It is not expected that FP will be in a position to meet its obligations under the loan.”).

weighs in favor of recharacterizing the FP Revolver as equity.[207]

e. Adequacy of Capitalization

"Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans."[208]

At the time the funds were advanced, FP was out of cash, facing billions in losses on its derivative contracts, and entirely dependent on AIG.[209] The FP Revolver made FP's financial condition worse, not better, by adding liabilities rather than capital. Therefore, the Court finds that FP was undercapitalized from 2008 until FP filed for bankruptcy in 2022.[210]

---

[207] See Fid. Bond and Mortg. Co. v. Brand (In re Fid. Bond and Mortg. Co.), 340 B.R. 266, 303 (Bankr. E.D. Pa. 2006), aff'd sub nom. Fid. Bond & Mortg. Co. v. Brand, 371 B.R. 708 (E.D. Pa. 2007) (recharacterizing advances as equity based on expert testimony that the promissory notes were never intended to be repaid).

[208] AutoStyle, 269 F.3d at 751.

[209] 04/21/2025 Tr. (Habayeb) at 53:12-21 ("Q. And can you describe the financial state of FP during 2007 and the summer of 2008. A. So FP was being subjected to pretty material collateral calls on their derivatives, especially on the credit default swaps on the multi-sector CDO. And part of the issue there is in the CSAs, instead of referencing the market value of the derivative, it referenced the value of the bond that was being ensured. And so that drove big valuations. And FP ran out of cash, and AIG had to step in and start advancing cash to meet FP's obligations."), 55:2-3 ("By the summer of 2008, FP was out of cash. It was dependent on support from AIG.").

[210] 05/07/2025 Tr. (Plastino) at 37:11-16 ("So, in other words, if those advances are treated as debt, the liabilities that FP had exceeded its assets by $23 billion dollars, indicating not just that it was undercapitalized or thinly capitalized, but there actually was no capital at all in order to support their repayment of the advances."); 05/08/2025 Tr. (Imburgia) at 18:16-18 ("Q. Do you and Mr. Plastino further agree that FP was undercapitalized in September 2008? A. Yes."); 04/22/2025 Tr. (Allison) at 62:18-20 ("Q. And in your view, sir, [FP] has been insolvent since 2008? A. [FP] has been balance sheet insolvent since 2008."), 64:22-25 ("Again, I don't think

Undercapitalization at the time the advances were made weighs in favor of recharacterizing the advances as loans.[211]

FP argues that this factor has limited weight in the Third Circuit because courts do not want to discourage preexisting lenders from protecting their existing investment by extending additional loans.[212] FP asserts that this case is similar because AIG was making defensive advances to ensure derivative counterparties could not declare a default and call on the Guarantee, which would cause AIG itself to collapse.[213]

---

it's the revolver that makes FP insolvent. It was the losses that FP suffered in the financial crisis that made it insolvent. . . ."); 04/21/2025 Tr. (Habayeb) at 100:17-21 ("Q. So FP didn't have sufficient cash, and the belief was that AIG itself didn't have sufficient cash? A. Yeah. FP had no cash. AIG had cash and some access on the Fed facility, but we were concerned that was not enough to cover the downside risk of what may transpire.").

[211] See, e.g., AutoStyle, 269 F.3d at 751 ("holding that the adequacy of capitalization is assessed not just at the creation of the debtor but at the time of the challenged transactions as well ); Friedman's, 452 B.R. at 522 (finding that undercapitalization before and after the challenged transaction weighed in favor of recharacterization).

[212] SubMicron 432 F.3d at 457 (stating that capitalization concerns are less important when a lender is making a loan to a distressed company to protect existing loans). See also Fairchild Dornier GMBH v. Off. Comm. Of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.), 453 F.3d 225, 234 (4th Cir. 2006) (stating that the lender's insider status and undercapitalization alone were insufficient to recharacterize a loan because the insider might be the only party willing to help a struggling business and the Court did not want to discourage good faith loans); HH Liquidation, 590 B.R. at 293-94 (finding that the undercapitalization factor carried little weight where lenders were making defensive advances to maintain long-term leases).

[213] See supra notes 17-20 and accompanying text. See also 04/25/2025 Tr. (Liebergall) at 59:13-16 ("FP had to make payments. If FP failed to make payments, then an event of default and . . . cross-defaults were what we were looking to avoid."); 04/21/2025 Tr. (Habayeb) at 100:11-16 ("Q. And where FP could not fund collateral calls on

The Former Executives argue that the Guarantee, which was only a potential liability for AIG, differs from a secured loan where the lender has already put cash into the company and is seeking to protect its position. They assert that the Guarantee was, in contrast, a means by which AIG avoided adequately capitalizing FP with cash at the time of the financial crisis.

The Court agrees with the Former Executives that a Guarantee is distinguishable from a cash infusion in the form of a loan.[214]

---

derivatives, who would have to step in to pay for those? A. So AIG would have to step in. And based at the time when we looked at it, based on the cash AIG had and what's available on the 85 billion [Fed] facility, we didn't believe we had sufficient [funds] to be able to maintain these positions."), 158:13-18 ("Q. And this caused a liquidity bleed that made AIG go to the Fed? A. Yeah, . . . it was putting AIG on the verge of bankruptcy."); 04/23/2025 Tr. (Herzog) at 36:2-7 ("Q. FP used loans from AIG and funded by the Fed to satisfy cash collateral postings. Is that consistent with your recollection of how FP was actually paying these collateral calls? A. That was certainly a part of it, yes, was getting the money from the parent company."); 04/23/2025 Tr. (Stubbs) at 192:11-20 ("Q. Right. Because ultimately, you're at [AIG]'s mercy on whether they will fund you; right, sir? A. So, yeah, obviously, if we have a cash shortfall and we need to borrow money, we would try and borrow under the line. But obviously, AIG has the option not to lend us the money; right. But as we've explained, they have a vested interest or, you know, they're aligned with us because if they don't pay us the money, we default on the payment and they end up with potentially a significant loss."); 05/08/2025 Tr. (Imburgia) 26:7-14 (" [FP], had they defaulted, the guarantees would have been called and created much more exposure [for AIG on the Guarantee]."), 99:22-100:3 ("Q. For example, AIG could not go out, in your view, and pay FP's counterparties directly because that would mean that FP would have had an event of default, right? A. Yes. They would be cross-defaults. And then – then you're off to the races with potentially a lot more exposure because of having to liquidate, kind of a fire-sale situation.").

[214] 05/07/25 Tr. (Plastino) 62:6–11 ("[T]here was always a chance that AIG FP would find itself in a distressed situation, because its own capital would have been insufficient, and that AIG would actually need to put real equity capital into the business to support that trading book and to prevent AIG FP from defaulting on its obligations.").

Therefore, the cases FP cites are inapposite because AIG was not a lender trying to protect its position as a lender. Even if AIG was defending a pre-existing loan, that loan would not negate FP's undercapitalization at the time of the advances as a relevant factor in the recharacterization analysis.[215] Therefore, the Court concludes that FP's undercapitalization suggests that the advances were equity contributions.

f. Identity of Interests

"If stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated."[216] This factor is most relevant when there are multiple stockholders who make advances to a debtor.[217]

---

215 See, e.g., Dornier, 453 F.3d at 234 (rejecting argument that insider's agreement to continue to supply debtor with inventory was a debt because the debtor had a long history of unprofitability, was insolvent, and repayment was dependent on achieving profitability); Autobacs, 473 B.R. at 577 (while acknowledging that insiders often are the only ones willing to lend when a debtor is insolvent, nonetheless holding that insider status and insolvency are factors to be considered in recharacterization claims).

216 AutoStyle, 269 F.3d at 751 ("Where there is an exact correlation between the ownership interests of the equity holders and their proportionate share of the alleged loan . . . this evidence standing alone is almost overwhelming.") (quoting In re Cold Harbor Assocs., L.P., 204 B.R. 904, 919 (Bankr. E.D. Va. 1997.

217 Friedman's, 452 B.R. at 522 (finding that this factor weighed in favor of recharacterization because the complaint alleged that there was an "exact correlation" between the shareholders and their share of the advances made to the borrower).

FP argues that because AIG owned 100% of FP, this factor is not relevant.[218] The Former Executives argue that courts have rejected FP's argument.[219]

The Court agrees with the Autobacs Court's analysis and finds that this factor favors recharacterizing the FP Revolver as an equity investment in this case.[220]

g. Security for the Advances

FP did not pledge any collateral to AIG for the advances it made.[221] This may suggest that the FP Revolver was equity rather than debt.[222]

---

218 See, e.g., Redmond v. Jenkins (In re Alternate Fuels, Inc.), 789 F.3d 1139, 1151 (10th Cir. 2016) (discounting this factor in the case of a sole shareholder because "[w]e see no reason to assume that all funds transferred to a business owned by a single stockholder must be in the nature of equity."); Daewoo Motor Am. Inc. v. Daewoo Motor Co., Ltd. (In re Daewoo Motor Am.) 471 B.R. 721, 742 (C.D. Cal. 2012) (holding that where there is a single shareholder, "this factor is largely irrelevant."), aff'd, 554 F. App'x 638 (9th Cir. 2014).

219 See, e.g., Autobacs, 473 B.R. at 578 (rejecting argument that this factor is inapplicable where the parent of a wholly owned subsidiary is the sole lender because the parent could have obtained outside investors or lenders but chose "to retain control (or whatever other benefits they see in sole equity ownership and sole lender status) [and thereby] risk[ed] this factor weighing against them in a recharacterization claim.").

220 Id.

221 04/22/2025 Tr. (Gender) at 199:17-20 ("Q. [T]he revolver, as per this case, between Funding - AIG Funding and FP was uncollateralized, right? A. Correct.").

222 AutoStyle, 269 F.3d at 752 (stating that no security was indicative of an equity contribution but finding that the lending facility was properly secured, suggesting that the advances were debt).

FP argues that lack of security for the loan is not given much weight in this Circuit.[223] The Court finds the authority cited by FP to be distinguishable, because it involved additional advances by a creditor which already had security for its loan.[224] In this case, AIG was not a secured lender of FP seeking to preserve that status by lending additional sums that would also be secured.[225]

FP also asserts that the unsecured loan to FP was consistent with the historical practice of intercompany lending done by AIG through AIG Funding.[226] However, the testimony on that point was conflicting.[227]

---

223 See, e.g., Off. Comm. of Unsecured Creditors of Moll Indus. Inc. v. Highland Capital Management L.P. (In re Moll Indus.), 454 B.R. 574, 584 (Bankr. D. Del. 2011) (Bankr. D. Del. 2010) ("[D]ebt should not be recharacterized simply because the preexisting lenders extend additional loans to distressed borrowers, even where there is no additional collateral to support the new loans.").

224 Id.

225 See supra note 221 and accompanying text; D.I. 82 at 29 (FP's Bankruptcy Schedules listing AIG as an unsecured creditor and the FP Revolver as unsecured debt).

226 04/22/2025 Tr. (Gender) at 135:6-7 ("It was already our corporate practice that when we did intercompany loans, we did not require collateral.").

227 04/25/2025 Tr. (Liebergall) at 118:15-18 ("Q. Were there other intercompany liabilities during the time frame that you worked at FP that were intercompany and collateralized? A. Yes.").

FP contends further that the Fed Revolver precluded AIG from making a secured intercompany loan.[228] While there may have been reasons why AIG could not obtain security for its loan, the Court finds that they do not diminish the fact that the advances under the FP Revolver were not secured.[229]

Therefore, the Court concludes that this factor suggests that the FP Revolver was an equity investment, not a debt.[230]

h. Ability to Obtain Outside Financing

FP could not obtain outside financing,[231] suggesting that the

[228] See DX-26 §§ 6.01(c) ("Borrower will not, nor will it cause or permit any Restricted Subsidiary to[] Incur, create, assume or permit to exist any Indebtedness, except[] intercompany Indebtedness of the Borrower and the Subsidiaries to the extent permitted by Section 6.04(c)[.]"), 6.04(c) ("any such loans and advances made to a Loan Party shall be unsecured"); 04/22/2025 Tr. (Gender) at 135:7-11 ("But with the Fed facility, the Fed facility specifically restricted our ability to use - have any collateral for any of our intercompany loans. It was essentially forbidden under the credit facility."). See supra note 22 and accompanying text.

[229] 05/07/2025 Tr. (Plastino) at 46:18-21 ("The AIG FP advances were unsecured. And regardless of the reason for that, any - all things being equal, a loan that is unsecured will generally be harder to obtain and more expensive than one that is.").

[230] See, e.g., Autobacs, 473 B.R. at 578-79 (concluding that this factor weighed in favor of recharacterizing the advances as an equity contribution where the advance was not secured and finding that a public statement that the debtor would not incur additional secured debt did not change the analysis) (emphasis added).

[231] 04/21/2025 Tr. (Habayeb) at 55:7-11 ("Starting in August and leading up to September, AIG started exploring third-party solutions to raise capital or liquidity. And then that culminated in being unable to get anything done on the private side and having the last resort being the [Fed]."), 184:15–17 ("Q. You'll agree with me that a third party never would have extended FP a loan on any terms in 2008, right? A. Correct."); 04/22/2025 Tr. (Gender) at 133:21–25 ("Q. At that time in September of 2008, did AIG have other options for Funding? For example, from banks, private equity or any other third-party lenders? A. By the time we reached the Fed, we had exhausted

FP Revolver was equity.[232] However, the Court finds that even a healthy company would have struggled to get third-party financing during the financial crisis in 2008.[233] Therefore, this factor does not help the Court determine whether the FP Revolver was a loan or equity infusion.[234] Rather, the Court concludes that this factor is neutral because of the extraordinary circumstances existing at the time.

i. Extent Advances Were Subordinated

Subordinating a claim to all other creditors' debts can be a sign that the advance is a capital contribution, not debt.[235] When the advances are paid on par with outside creditors,

---

all other kind of third-party funding mechanisms."); 05/08/2025 Tr. (Imburgia) at 82:2-7 ("Q. Now, in your opinion, no third party would lend to [FP], no matter what the interest rate, correct? A. Yes. I think, in my deposition, you asked me about the market rate for interest, and I said that hypothetical probably doesn't make sense if lenders would be worried about being able to get their principal back.").

[232] See, e.g., AutoStyle, 269 F.3d at 752 ("When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans.") (emphasis added).

[233] 05/07/2025 Tr. (Plastino) at 39:8-11 ("[I]t would have been challenging for even potentially a healthy borrower to raise money in the market at that time because companies were hoarding cash.").

[234] See, e.g., Moll Indus., 454 B.R. at 584 (giving little weight to this factor because "[e]xisting lenders are often the only source of funding when a debtor faces distress. Therefore, inability to obtain alternative financing is insufficient to support recharacterization.").

[235] AutoStyle, 269 F.3d at 752 ("Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans.").

however, the advances resemble debt.[236]

FP argues that it made payments of principal and interest on the FP Revolver over the course of the loan,[237] at the same time it owed other creditors, proving that the FP Revolver was not subordinated to those creditors. However, the Former Executives argue that this is negated by the fact that most of the payments made by FP on the FP Revolver were funded by new advances from AIG itself.[238]

The Court finds that the FP Revolver was not contractually subordinated to other creditors' claims.[239] However, because AIG had guaranteed all of FP's obligations to third parties,[240] the

---

[236] Friedman's, 452 B.R. at 523 (holding that this factor weighed in favor of characterizing the note as debt because the advances would be repaid with general unsecured debt and ahead of subordinated debt and equity).

[237] DX-86; 04/25/2025 Tr. (Liebergall) at 81:14-17 ("[W]hen we had the money - if we had excess money, we would return it back to the parent. And when we needed money to satisfy those obligations, we would ask the parent for th[e] funds."); 04/21/2025 Tr. (Habayeb) at 188:13-18 ("[W]henever there's excess cash, that got repaid back to the parent to repay a portion of the Fed loan. And if you look at that from 2008 'til the future, there was always periods where cash builds up in FP and that goes back towards to a partial repayment on the loan to AIG.").

[238] See supra note 204 and accompanying text.

[239] See generally JX-1 (No explicit subordination clause in the FP Revolver).

[240] See CCPX-4 (AIGFP General Guarantee Agreement, Dec. 4, 1995); 05/07/2025 Tr. (Plastino) at 47:1-10 ("So it was my understanding, based on my discussions with counsel, that, effectively, through the guarantee, that the [FP] advances were subordinated to all the claims of third-party creditors. And so it's sort of – regardless of what you call the advances, it's sitting in a first-loss position. And it's going to be the returns - both the return of capital and return

Court concludes that any claim of AIG was functionally subordinate to claims of those creditors. In addition, the fact that FP was only making payments on the FP Revolver when it had available cash[241] and AIG was not putting any pressure on FP to repay the loan[242] suggests that AIG's claim was subordinated.[243] Therefore, the Court finds that this factor weighs in favor of recharacterizing the advances as equity contributions.[244]

j. Extent Advances Were Used to Acquire Capital Assets

FP did not use the advances to acquire any capital assets, instead it used the advances to meet collateral calls and operating expenses while it wound down the derivative contracts

on capital is going to be highly correlated with the performance of the [FP's] business, which is a feature that's consistent with an equity investment rather than debt.").

[241] See supra notes 147, 164, 198 and accompanying text.

[242] See supra note 127 and accompanying text.

[243] See, e.g., Autobacs, 473 B.R. at 580 (holding that this factor suggested that the advances were equity because the creditor had not insisted on payment when payment was due) (citations omitted).

[244] See, e.g., AutoStyle, 269 F.3d at 752 (stating that "[s]ubordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans" but finding this factor was only a slight indication the advances were equity because only some of the creditors had agreed to subordinate their claims to other creditors); Autobacs, 473 B.R. at 580 (holding that this factor suggested that the advances were equity because the creditor had not insisted on payment when payment was due) (citations omitted).

business.[245] This would suggest that the advances were debt rather than equity.[246]

The Former Executives argue, however, that the advances were not used for ongoing business operations of FP, instead they were used to wind down its business solely at the direction of, and for the benefit of, AIG.[247]

The Court agrees with the Former Executives that this factor does not readily suggest that the FP Revolver was debt instead of equity. Although FP did not use the funds to acquire capital assets, FP was not using the funds for new business operations from which it could generate profits to repay the FP Revolver.[248] Instead, the funds were used at the direction of AIG to unwind FP's derivative contracts in a manner that would reduce AIG's

---

[245] 04/22/2025 Tr. (Allison) at 26:11-13 ("Q. And to your knowledge, did FP ever use funds drawn from the revolver to purchase capital assets? A. Not to my knowledge."); 04/21/2025 Tr. (Habayeb) at 96:4-7 ("Q. How about for capital improvements? A. No. The only time FP used funds to buy assets is to buy issued treasuries or agency securities that would be posted as collateral.").

[246] AutoStyle, 269 F.3d at 752-53 (finding that using advances for working capital, not capital assets, weighed in favor of characterizing the advances as debt).

[247] See 04/22/2025 Tr. (Allison) at 65:22–66:4 ("Q. And the entire time the revolver has been outstanding, FP has been in wind-down mode, right, sir? A. That's correct. Q. It's your view, sir, that since September of 2008, FP has been in winddown mode? A. That's correct."); 04/21/2025 Tr. (Habayeb) at 157:1-3 ("Q. And the wind-down also meant that FP could not pursue or would not pursue new business opportunities; right, sir? A. That's correct.").

[248] 05/07/2025 Tr. (Plastino) at 47:15–18 ("So the funds were used, as I understand it, to fund collateral calls and AIG FP's obligations to its counterparties. So it wasn't used for ordinary operations; it wasn't used for capital investments.").

risk on its Guarantee of those contracts.[249]

Thus, the Court concludes that this factor is neutral.

k. Presence of Sinking Fund to Repay Advances

The FP Revolver did not establish a fund to repay the advances it received from AIG through AIG Funding.[250] That is an indication that the advances were an equity contribution rather than a debt.[251]

FP argues that because the facility was a revolver, any sinking fund payments could simply be reborrowed, making a

---

[249] 04/25/2025 Tr. (Liebergall) at 61:2–11 ("Q. And did your responsibilities change when the wind-down started versus what they were before the wind-down? A. Yes. Q. How so? A. Prior to the wind-down, we were obviously all the front office folks, which I was part of, were looking to generate revenue for FP and [AIG]. Post-crisis, all of the attention of our - all of our duties moved to reducing risk and working with AIG to mitigate risk."), 64:19–67:8 (testifying how the winddown focused on "derisking" the [FP] portfolio and used different performance metrics, for example "[p]rofitability was generally not profitability. It was how much we were going to lose."), 84:8-16 ("Q. But it's true, sir, isn't it, that even after that point, it was FP that was actually executing the day-to-day work of the company, FP, during the wind-down? A. Yes. We were given guidelines from the steering committee to operate under, and we executed them within those - within that - within that framework at their direction. And then obviously, to the extent that there was something that didn't fit into the guidelines, they would have to approve."); 04/21/2025 Tr. (Habayeb) at 150:24-151:1 ("Q. Fair to say that voting members [of the steering committee] were AIG executives and leaders? A. Correct.").

[250] 05/07/2025 Tr. (Plastino) at 47:19-24 ("Q. Presence of a sinking fund, Factor 11 is that one you considered? A. Yes. I observed that there was no sinking fund associated with the [AIG] advances. Again, all other things being equal, a sinking fund generally provides some additional assurance to a lender that they will be repaid.").

[251] AutoStyle, 269 F.3d at 753 ("The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans."); Autobacs, 473 B.R. at 581 (finding that the lack of sinking fund weighed in favor of recharacterization).

sinking fund of little use. It also contends that many debt facilities do not have sinking funds. However, the cases cited by FP for this proposition involved loans secured by collateral, making a sinking fund unnecessary.[252] As noted above, the FP Revolver was not secured by any collateral.[253]

The Court concludes that because there was no sinking fund, this factor supports a finding that the FP Revolver was equity rather than debt.[254]

3. Conclusion

After considering all of the facts of this case, the Court concludes that, under both the multi-factor test of the Sixth Circuit's Autostyle decision and the economic reality test of the Third Circuit's SubMicron decision, the FP Revolver was an equity contribution, not a loan. Therefore, the Court will enter judgment in favor of the Former Executives on their counterclaim against FP and AIG, and against FP on Count One of its Complaint, declaring that the advances made by AIG under the FP Revolver are equity not debt.

---

[252] See, e.g., Autostyle, 269 F.3d at 753 (finding that liens obviated the need for a sinking fund); HH Liquidation, 590 B.R. at 296 (same); Moll Indus., 454 B.R. at 585 (same).

[253] See supra at notes 197-98 and accompanying text.

[254] See AutoStyle, 269 F.3d at 753 (lack of a sinking fund is an indication the advance was equity).

B. Equitable Subordination

The Former Executives argue that, even if the FP Revolver is not recharacterized, AIG's unsecured claim for the advances made to FP must be equitably subordinated to the claims of the Former Executives. Although the relief sought under the equitable subordination claim is similar to the relief sought and granted for the recharacterization claim, the Court addresses the equitable subordination claim in the event its ruling on the recharacterization claim is appealed and not affirmed.

"Recharacterization and equitable subordination address distinct concerns. Equitable subordination is apt when equity demands that the payment priority of claims of an otherwise legitimate creditor be changed to fall behind those of other claimants."[255] The Court may exercise its equitable power to subordinate a claim where (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim is not inconsistent with the Bankruptcy Code.[256] "The essential purpose of equitable subordination is to undo any inequality in the claim position of

---

[255] SubMicron, 432 F.3d at 454 (citing Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims, 160 F.3d 982, 986-87 (3d Cir. 1998); AutoStyle, 269 F.3d at 749).

[256] Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.), 554 F.3d 382, 411 (3d Cir. 2009) (citing Benjamin v. Diamond (In re Mobile Steel Co.), 563 F.2d 692, 699-700 (5th Cir. 1977)).

a creditor that will produce injustice or unfairness to other creditors in terms of distribution of the estate."[257]

1. Inequitable Conduct

The party seeking to equitably subordinate another's claim bears the initial burden of presenting material evidence of inequitable or unfair conduct that injured creditors or conferred an unfair advantage.[258] Once that party provides sufficient evidence, the claimant opposing subordination bears the burden of proving the fairness of the challenged transaction.[259]

AIG, as the parent of FP, was an insider.[260] As a result, the transactions between AIG and FP are subject to rigorous scrutiny.[261] "For non-insiders, inequitable conduct must be

---

257 In re Mid-Am. Waste Sys., Inc., 284 B.R. 53, 68 (Bankr. D. Del. 2002).

258 See, e.g., Mobile Steel, 563 F.2d at 701 (requiring the party objecting to the insider's claim to put forth evidence of the claimed inequitable conduct). See also U.S. v. Noland, 517 U.S. 535, 538-39, 43 (1996) (holding that Bankruptcy Code incorporated prior caselaw on equitable subordination, including Mobile Steel but concluding that bankruptcy court cannot equitably subordinate an entire category of claims such as post-petition tax penalties and leaving open the question whether misconduct is required to subordinate a specific claim).

259 Mid-Am. Waste, 284 B.R. at 69.

260 11 U.S.C. § 101(2) & (31)(E).

261 Winstar, 554 F.3d at 412 (concluding that creditor was an insider and its dealings with the debtor were to be "rigorously scrutinized" by the court) (citations omitted); Mid-Am. Waste, 284 B.R. at 70 (stating that standard of proof for insider and fiduciary claimants is material evidence of unfair conduct rather than egregious conduct or gross misconduct). See also Adv. D.I. 81 at 24-25 ("The Court finds that, as the parent of the Debtor, AIG was an insider of the Debtor as defined in the Bankruptcy Code. . . . Therefore, the Court concludes

'egregious conduct' such as 'fraud, overreaching, or spoliation.' Conversely, for insiders, inequitable conduct requires only 'material evidence of unfair conduct' or, 'any unfair act by the creditor as long as the conduct affects the bankruptcy results of the other creditors.'"[262] This is because an "insider creditor is typically in a position to exert control over the debtor. The creditor may also share common management and/or ownership with the debtor. In its efforts to collect its debt, therefore, the [insider] creditor may act directly or cause the debtor to act."[263]

Courts have found inequitable conduct where the insider or fiduciary:

(i) dominated and exploited the debtor;
(ii) violated the "rules of fair play and good conscience;"
(iii) engaged in illegal or fraudulent conduct;
(iv) breached fiduciary duties owed to the debtor, stockholders, or creditors;
(v) used "the debtor as a mere instrumentality or alter ego;"
(vi) breached a contract; or

---

that AIG's actions vis a vis the Debtor are subject to the heightened scrutiny standard.").

[262] Youngman v. Yucaipa Am. All. Fund I, L.P. (In re Ashinc Corp.), 629 B.R. 154, 217 (Bankr. D. Del. 2021) (collecting cases, citations omitted) (quoting Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims, 323 F.3d 228, 234 (3d Cir. 2003), proposed findings of fact and conclusions of law on non-core claims adopted in part and rejected in part on other grounds, 2022 WL 2666888 (D. Del. July 11, 2022).

[263] Broadstripe, 444 B.R. at 79 (quoting Official Comm. of Unsecured Creditors of Toy King Distrib. v. Liberty Sav. Bank, FSB (In re Toy King Distrib., Inc.), 256 B.R. 1, 198 (Bankr. M.D. Fla. 2000)).

(vii) if a controlling stockholder, undercapitalized the debtor or capitalized the debtor with debt.[264]

The Former Executives contend that they have established that AIG acted inequitably and harmed them by (a) dominating and controlling FP, (b) causing FP to breach the Compensation Plans by not restoring the Former Executives' balances, while misleading the Former Executives into believing they would be restored, (c) lending funds rather than properly capitalizing FP and aborting its decision to recapitalize that loan in 2010 when it learned that doing so might restore the Former Executives' claims under the Compensation Plans, (d) delaying FP's bankruptcy filing until AIG's exposure on its Guarantee of FP's third parties' claims was significantly reduced, and (e) causing FP to transfer most of its assets and business shortly before the bankruptcy filing in 2022 solely to benefit itself.

a. AIG's Control of FP

FP contends that it maintained corporate separateness from AIG and followed proper corporate formalities from its inception through the Petition Date, including through maintaining its own (i) board of directors, (ii) officers, (iii) internal financial statements, (iv) books and records, (v) legal department, and (vi) contracts.[265]

---

264 Ashinc Corp., 629 B.R. at 217-18 (citations omitted).

265 04/22/2025 Tr. (Allison) at 11:21-12:14 ("Q. From 2008 to the present, has FP had its own officers? A. Yes. Q. Same time period, has FP maintained its own corporate records? A. Yes. Q. Same time

Despite the separate corporate forms, the Court finds that AIG did control FP from 2008 to the present.[266] The evidence shows that AIG obtained dominance and control of FP in 2008, inter alia, by removing all independent directors from FP's board and installing AIG executives such as Herzog and Dooley, who consistently acted in AIG's interest.[267] Further, FP's officers were either AIG employees or reported directly to AIG officers.[268]

FP argues that the Former Executives' control argument is insufficient to prove inequitable conduct and is a disguised veil-piercing argument that the Former Executives do not have standing to bring.[269] They contend that courts have held that

---

period, has FP had contracts in its own name? A. Yes. Q. Same time period, has it had its own legal department? A. Yes. Q. Same time period, has it tracked its intercompany payables and receivables? A. Yes. Q. Same time period, has it - does it have its own books and records? A. Yes. Q. Likewise same time period, has it prepared its own internal financial statements? A. Yes.").

266 See supra notes 29-36 and accompanying text. See also CCPX-71 at 1 (06/29/2008 email from Habayeb to Herzog) ("[FP] needs to be integrated into AIG and cannot operate autonomously as it did in the past.").

267 See supra notes 31-32 and accompanying text. See also 08/10/2022 Dooley Dep. at 39:2-4 ("Q. So you always viewed yourself as an [AIG] employee, is that correct?" A. Absolutely."); JX-14 (email dated 09/02/2010 from David Herzog stating "I don't care how it's driven, we're not paying the deferred comp. We'll reverse/rescind the capital contribution before we pay deferred comp."); 04/23/2025 Tr. (Herzog) at 57:11-13 ("Q. Now, again, were you making this statement and this decision [about the Compensation Plans] in your capacity as CFO of AIG, Inc.? A. Yes.").

268 See supra notes 29-30 and accompanying text.

269 See Harrison v. Soroof Int'l, Inc., 320 F. Supp. 3d 602, 614-27 (D. Del. 2018) (concluding that alter ego claim was a general claim which only the bankruptcy trustee had standing to

equitable subordination based on excessive control is proper only in the extreme cases of "claimant's use of the debtor as a mere instrumentality or alter ego."[270]

The Court agrees that a parent's control of a debtor (through overlapping officers and directors) is insufficient alone to support an equitable subordination claim. However, the Court concludes that the manner in which AIG used its control of FP, as detailed below, to benefit itself and to harm FP and its creditors supports the conclusion that its claim should be equitably subordinated.

b. Breach of Compensation Plans

For purposes of deciding the Initial Issues only, FP stated that the Court can assume that it breached the Compensation Plans, but that any actual breach or determination of the amount of damages caused will be decided in the second phase of the

bring); NJ Dep't of Env't Prot. v. Occidental Chem. Corp. (In re Maxus Energy Corp.), 571 B.R. 650, 660 (Bankr. D. Del. 2017) (holding that trustee has standing to bring alter ego claim on behalf of all creditors); Rosener v. Majestic Mgmt., Inc. (In re OODC LLC), 321 B.R. 128, 136 (Bankr. D. Del. 2005) (same).

[270] HH Liquidation, 590 B.R. at 298 (stating that a claimant's use of the debtors as a mere instrumentality or alter ego is inequitable conduct); Mid-Am. Waste, 284 B.R. at 70 (noting that "use of the debtor as a mere instrumentality or alter ego" in one of several bases to equitably subordinate an insider's claim). Cf. Wenske v. Blue Bell Creameries, Inc., C.A. No. 2017-0699-JRS, 2018 WL 5994971, at *5 (Del. Ch. Nov. 13, 2018) (holding that plaintiffs did not state a claim for veil-piercing with allegations of dominion and control).

trial.[271] Further, it disputes the contention that AIG caused FP to breach those contracts.

FP argues, however, that even if AIG did cause it to breach the Compensation Plans, doing so is insufficient. FP asserts that inequitable conduct must be more than simply exercising bargained for contractual rights to the detriment of another or a simple breach of a contract.[272] In fact, FP argues that "a parent company does not engage in tortious conduct when it directs its wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest to perform."[273] The Former Executives respond that causing a subsidiary to breach contracts with outside creditors so that a controlling insider can obtain an advantage over those creditors is inequitable conduct.[274]

---

271 03/13/2025 Tr. at 17:3-4 (Counsel for FP) ("In the phase one trial, the former executives can assume breach.").

272 See, e.g., Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1357 (7th Cir. 1990) (stating that "[f]irms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith'" and concluding that lender's decision not to advance entire loan amount was not inequitable); Daewoo Motor, 471 B.R. at 748 (stating that a simple breach of contract, without any evidence of advantage-taking, is insufficient to justify equitable subordination).

273 Boulevard Assocs. v. Sovereign Hotels, Inc., 72 F.3d 1029, 1036 (2d Cir. 1995).

274 See, e.g., Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.), 622 F.2d 709, 715-22 (5th Cir. 1980) (finding, among other inequitable deeds, insiders inequitably caused a failing business to take on more debt to pay themselves); Ashinc, 629 B.R. at 219-21 (finding that there was no dispute of material fact that the insider took advantage of the debtor by, inter alia, wrongfully causing the debtor to take on debt and pay its professionals' fees to the injury

The Court concludes that the Former Executives have the better argument. The cases cited by FP are distinguishable because, inter alia, they involved a non-insider creditor, a trivial breach or no breach of contract at all, or a tortious interference with contract claim, not an equitable subordination claim.[275] The cases cited by the Former Executives, in contrast, do hold that causing the debtor to breach a contract may be the basis for equitably subordinating an insider's claim.[276] Therefore, the Court rejects FP's argument that any actions taken by AIG to cause FP to breach the Compensation Plans cannot support equitable subordination of AIG's claims.

The Former Executives contend that in this case AIG caused FP to breach the Compensation Plans, specifically by preventing it from formulating a plan to restore their negative balances by

of other creditors).

[275] Boulevard Assocs., 72 F.3d at 1035-36 (case involving a tortious interference claim, not an equitable subordination claim); Kham and Nate's Shoes, 908 F.2d at 1359 (concluding that non-insider creditor's provision of only written notice, where the contract required telephonic notice, was a trivial breach that did not justify equitably subordinating the creditor's claim); Daewoo Motor, 471 B.R. at 748-49 (holding that parent had not breached contract with its subsidiary and that the subsidiary was collaterally estopped from relitigating other facts that were the basis of its equitable subordination claim).

[276] See, e.g., Multiponics, 622 F.2d at 715-16 (holding insider director engaged in inequitable conduct where, inter alia, insider authorized and participated in repeated violations of a debenture agreement between debtor and another creditor by causing debtor to repurchase his stock and an entity in which he had an interest); Ashinc, 629 B.R. at 219–21 (holding that insider engaged in inequitable conduct by causing the debtor to breach a credit agreement, giving the insider additional rights vis a vis other creditors, but reserving for trial the amount of damages caused).

December 31, 2013.[277] This inequitable conduct was compounded, they argue, by AIG inducing the Former Executives to stay at FP and work on the winddown with the promise that FP would restore their deferred compensation accounts by the deadline. The Court finds ample evidence of both contentions.

There is no dispute that FP failed to even attempt to restore the Former Executives' account balances by December 31, 2013, as required by the Compensation Plans.[278] The Court concludes that AIG, through Herzog and the other AIG employees serving at FP,[279] precluded FP from taking any steps to restore

---

277 JX-2 § 4.01(b); CCPX-2 § 4.01(b).

278 JX-2 § 4.01(b); CCPX-2 § 4.01(b); 04/22/2025 Tr. (Allison) at 66:16–67:3 ("Q. And you never took any steps to formulate a restoration plan, correct? A. I did not. . . . Q. So as an employee of AIGFP, you never took any step to formulate a restoration, not when you were the CFO or not when you were the chief accounting officer [of FP]? A. I did not.); 04/23/2025 Tr. (Herzog) at 102:16–19 ("Q. You do not recall any effort to come up with a restoration plan in connection with the FP deferred compensation plans; correct? A. Not that I'm aware of."); 04/24/2025 Tr. (Dubel) at 144:24–145:3 ("Q. At any point when you were a board member of FP, did the board undertake to restore - and I don't want to know why. I just want to know yes or no. Did the board undertake to restore balances of the DCP? A. No, sir.").

279 Stewart v. Wilmington Tr. SP Servs., Inc., 112 A.3d 271, 302–03 (Del. Ch. 2015), aff'd, 126 A.3d 1115 (Del. 2015) ("A basic tenet of corporate law, derived from principles of agency law, is that the knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself."). See also Hudson United Bank v. Cinnamon Ridge Corp., 845 A.2d 417, 430–31 (Conn. App. Ct. 2004) (holding, inter alia, that the jury could reasonably find that the bank was bound by the terms of a handwritten agreement that its vice president executed on its behalf).

the Compensation Plan accounts.[280]

The Court further concludes that AIG acted inequitably by misleading the Former Executives about FP's intent to honor the restoration obligation. Although AIG reflected the reductions to the Former Executives' accounts in AIG's public filings and communicated those reductions to the Former Executives,[281] the Court finds a pattern of deception by AIG about FP's intent to prepare a restoration plan.

On October 9, 2008, William Dooley, an AIG employee serving as FP's CEO,[282] told the Former Executives that "[b]oth the DCP and the SIP provide for the adoption of a plan for restoring

---

[280] JX-14 at 1 ("I don't care how it's driven, we're not paying the deferred comp."); CCPX-451 at 2 ("Under no circumstances should we restore benefits under any [deferred compensation] plan."). See also CCPX-233 at 17 (YE 2008 PWC rep letter for FP financials) ("[A]s of December 31, 2008, [FP], in conjunction with management of AIG, has reviewed the terms in the DCP and SIP and concluded that [FP] has the contractual right to reduce its obligations under the plans as of December 31, 2008. Management concluded that it is appropriate to write off the deferred balances in Q3 2008 because of the significant losses incurred by the relevant businesses and that there is no impact on prior period financial statements.") (emphasis added). See supra notes 55-59, 128-32 and accompanying text.

[281] JX-94 at 101 ("Due to the significant losses recognized by [FP] during 2008, the entire amount of $563 million accrued under [FP]'s various deferred compensation plans and special incentive plan was reversed in the third quarter of 2008."). See also CCPX-104 at 2 (10/9/2008 letter from Dooley to FP employees) ("The DCP and SIP provide for the deferred compensation accounts in the plans to be reduced by losses sustained by AIGFP. The losses will have a significant impact on the deferred compensation accounts of AIG and AIGFP's participants under the DCP and SIP plans. Accordingly, I expect that the accounts of AIG and AIGFP participants in the plans to have substantial negative balances at the end of the current compensation year.").

[282] See supra note 29 and accompanying text.

these reductions to . . . participants' deferred compensation amounts. . . . The formulation of a restoration plan [for the DCP and SIP] will ultimately depend on decisions made as we wind down [FP]."[283] On December 29, 2008, Dooley advised Compensation Plan participants that, as a result of recent tax code changes and to avoid immediate tax liability for the participants, FP had amended the Plans to provide for a definitive date of payment of any deferred compensation (namely December 31, 2013) and that the obligation to make any payment would lapse if not made by that date.[284] However, Dooley made no mention of the fact that FP had already written off the deferred compensation.[285] There is evidence that the Former Executives relied on Dooley's statements and remained with FP in the hope of receiving their deferred

---

[283] CCPX-104 at 2.

[284] CCPX-191 at 2 (Memorandum from William Dooley to all participants in the Compensation Plans) ("We selected December 31, 2013 as the payment date, with the expectation that by that point in time, the wind-down of AIGFP will be substantially complete, and it will be possible to determine what assets, if any, will remain available, after satisfying the claims of creditors, to restore loss-based reductions to accounts. As a result of the amendments, the Plans now require payment under any restoration plan to be made on this date if it can be made without endangering payments to senior creditors; if payment cannot be made, the right to payment lapses.").

[285] See CCPX-153 at 3 (11/07/2008 [FP] Deferred Compensation Plans Memo) ("Under the terms of the plans, the deferred compensation accounts are to be reduced by losses incurred by [FP]. As discussed in the introduction, losses at [FP] until the third quarter of 2008 have been so extensive that AIGFP's present obligations have been extinguished. [FP] is not expected to generate sufficient net earnings to reverse these losses. . . . Therefore, [FP] reversed the compensation amounts on its books as of Q3 2008 ($563 million) that were representative of the accrued liabilities on the DCP and SIP.").

compensation.[286]

In addition, several of the Former Executives testified about AIG's efforts to claw back their retention payments that FP was obligated to pay to the Former Executives under the ERP and that AIG guaranteed.[287] For example, Robert Powell, a transactional attorney at FP, testified that when FP paid him the ERP payment for 2008, FP immediately demanded that Powell return it, falsely telling him that he was the only one refusing to do so and that he would face public censure if he did not repay it.[288] When Powell refused to return any of his ERP retention

---

[286] See CCPX-107 at 1 (10/10/2008 email from Kolbert to Dooley) ("Also your statement that AIG intends to follow the respective plans was I believe both appropriate and important. . . . Given the current state of employee morale, I expect that we will see many resignations come January."); CCPX-120 at 1 (10/12/2008 email from Ong to Furlong) ("At the time of opting to volunteer 50% of my 2007 bonus, we did not know the extent of the firm's losses and we were told at each global call that we are doing ok. Had I know [sic] that we are in a bad shape then I would not have volunteered my bonus to DCP 2007 as they are my hard earned money."); CCPX-957 (11/5/2008 email from Wayne to Zampella) ("Both [DCP and SIP] include the concept of a restoration obligation and interest – which Bill [Shirley] acknowledged in an earlier note."); CCPX-138 at 2 (11/4/2008 letter to Mauro regarding deferred compensation, sender redacted) ("Many of us decided to stay with Banque AIG and allow deferrals of our remuneration on the basis of representations made to us regarding the future of [FP]. . . . We have an express entitlement to such payments and expect Banque AIG to abide by its obligations.").

[287] CCPX-3. See supra notes 51-54 and accompanying text.

[288] 04/25/2025 Tr. (Powell) at 25:25-26:8 (Q. Now, did you, in fact, in March of 2009 receive your full 2008 ERP payment? A. I did. Q. Okay. But at some point, do you recall being asked by [FP] to return all or part of that payment? A. Yes. Q. Okay. When did [FP] make that request? A. Right after they paid us."), 26:20-27:3 ("So Bill called me up and said that everybody above a certain compensation level was being required to agree to give back some or all of their pay; and that I was the last holdout, that I was going to be the only

payment, he was fired without cause later that year.[289] In March 2010, when Powell's 2009 retention payment came due, FP requested that he accept a 20% reduction.[290] When he refused, FP required that he file paperwork and appear unrepresented at a hearing with AIG and FP representatives who refused to pay him.[291] Powell ultimately received only half of the funds FP withheld.[292]

---

holdout, and that if I didn't give the money back, or at least pledge to do it, that I was going to - my name was going to be – I was going to be the only holdout and that would become public. And Andrew Cuomo was going to bring me in and put me under the bright lights."), 28:21-23 ("Q. Did there come a time when you learned what Mr. Shirley told you about being the only holdout was untrue? A. Yes.").

[289] Id. at 29:14-16 ("Q. What did you ultimately decide regarding returning all or a portion of your ERP compensation? A. I didn't give back any of it."), 31:18-21 ("Q. When did your employment with AIGFP end? A. So I was terminated in October of 2009. Q. Were you terminated for cause or without cause? A. I was terminated without cause.").

[290] Id. at 32:10-21 ("What happened in 2010 when your 2009 ERP payment was due? A. So there was a program – another, you know, give-back like program where everybody was asked to - instead of getting paid their full ERP payment to take some discount to it. I think it was 20 percent. . . . Q. Now, did you contest the 20 percent discount? A. I did.").

[291] Id. at 33:10-24, ("So, I gave them my tax returns, and then they, you know, they did nothing for a long time; and then finally they said you can come in for a hearing, but you have to come in alone, you can't bring a lawyer. You can't bring anybody with you; just you and AIG. And Gerry [Pasciucco, who was running FP at the time] told me, we're never going to pay you, so you can - you can do this as long as you want, but we're never going to pay you. You should just move on with your life.").

[292] Id. at 35:16-22 ("Q. Thank you. At some point did you hire counsel to assist you in resolving your dispute regarding the 2009 ERP payment? A. Yes, Well I had hired counsel before going into the, you know, to the meeting. I had hired counsel - it was the same counsel that I used when they - the first time they asked me to give money back. Q. Did you ultimately resolve your dispute over the 2009 ERP payment with [FP]? A. I did. Q. And what resolution did you reach? A. They ended up paying - my recollection is they ended up paying me

Paul Schreiner's testimony was similar. Although FP threatened him with public harassment too, he also refused to return any of his 2008 retention payment and was terminated without cause later in 2009.[293] When he later agreed to return 10% of his 2009 retention payment, he did so only after being assured that it would not prejudice his right to get his deferred compensation under the Compensation Plans.[294]

---

half of it, and they agreed to cover the legal bills for getting that half.").

[293] 04/25/2025 Tr. (Schreiner) at 127:20-128:23 ("Q. Okay. At some point, did [FP] ask you to return all or part of your 2008 ERP payment? A. They did. Q. Okay. And when did they do that? A. It was shortly before the payment was to be made. Q. Okay. And why did [FP] tell you that they wanted you to give back or not give you some of your ERP payment? A. So I think this is all public information. But Gerry [Pasciucco] and [Andrew] Cuomo were running around threatening people, and there was a whole thing about lists and names and threats and 'if you don't, you'll be named." And there were both direct threats by Gerry and indirect threats. And then Cuomo, of course, was threatening. . . . Q. Okay. Did you ultimately return a portion of your 2008 ERP compensation? A. I did not. . . . Q. Do you recall when you left [FP]? A. Fall of 2009. Q. And why did you leave [FP] in 2009? A. I was terminated. Q. Now, and were you terminated with or without cause? A. Without cause. . . .").

[294] Id. at 129:11-130:12 ("[When the 2009 retention payments came due in 2010] Gerry [Pasciucco] came with [Andrew] Cuomo the first time to beat us up. He came with Ken Feinberg the second time. And Ken Feinberg was threatening clawbacks and whatnot. Even though - it was a bit odd because Ken Feinberg would start with, your contracts are absolutely legal and binding but we want to take your money back anyway. It was all fairly odd. . . . So I came back and I sat down with Bill Shirley and someone else, I don't recall who, and I said, I'll give back 10 percent. . . . He wanted me to sign it, and I had worked with Bill for years. He was the general counsel, I think, at the time. And I said, Bill, basically, I'm giving back the 10 percent here, but your obligation to restore all the rights under the contract, nothing changes here. He said, Yes, yes, yes. I signed it, and we gave him the 10 percent. That's my recollection.").

Despite these assurances to the Former Executives, Herzog, acting for AIG, issued specific internal instructions in 2010 that the deferred compensation balances were not to be paid or restored under any circumstances.[295] FP did not create a restoration plan for the deferred compensation accounts nor pay them by the December 31, 2013, deadline.[296]

The Court concludes that AIG's executives were not honest with the Former Executives about their intent not to pay the deferred compensation because they feared that the Former Executives would quit if they knew their deferred compensation would never be restored.[297] AIG knew that the Former Executives

---

[295] See supra notes 59 and 132 accompanying text. JX-14; CCPX-451; JX-15 (summary of call between AIG executives and outside counsel abandoning the recapitalization plan, warning about successor liability, and discussing the need to determine the statute of limitations on and claims arising under the Compensation Plans); 04/23/2025 Tr. (Herzog) at 57:11-13 ("Now, again, were you making this statement [in JX-14, CCPX-451] and this decision in your capacity as CFO of [AIG]? A. Yes.").

[296] See supra notes 62-63 and accompanying text.

[297] 04/21/2025 Tr. (Habayeb) at 112:18-22 ("Q. There was a concern about people quitting in that time frame; correct? A. That's correct. And to be fair there was also at the AIG end at the time people quitting."); DX-59 at 159 (PwC Report on the Results of Examination for the Year Ended December 31, 2008) ("Although a retention plan is in place, risk of losing [key management personal] remains probable."); CCPX-107 (10/10/2008 email from Kolbert to Dooley) ("Given the current state of employee morale, I expect that we will see many resignations come January [2009]. Hopefully the employee retention program will keep people in their seats through the rest of the year."); CCPX-110 (10/13/2008 email from Kolbert to Micottis) ("Should the deferrals, SIP, or deferral portion of the ERP be lost come the end of the year, people are going to litigate[.] It will be a distraction to [FP] if current [FP] employees choose to participate in litigation. In fact, it may cause folks to resign."); 04/25/2025 Tr. (Powell) at 14:9-15 ("Q. Based on your understanding,

were critical to the successful winddown of the derivative contracts and the concomitant reduction in AIG's exposure to the contract counterparties under its Guarantee.[298] The Court finds these misrepresentations by AIG and its representatives constitute inequitable conduct.[299]

---

what was the purpose, from your perspective as an employee, of the deferred compensation plan? A. Well, it was intended to incent [sic] employees to stay at the business and work. . . .").

[298] DX-59 at 159 ("Certain key management personnel within the organization have deep institutional knowledge of [FP]'s businesses, operations and related risk exposures, which is crucial for the effective execution of the wind down plan and managing the risks associated with the process. Although a retention plan is in place, risk of losing these individuals remains probable."); CCPX-255 at 7-8 (03/14/2009 letter from Chair and CEO of AIG, Liddy, to Secretary of the Treasury, Geithner, enclosing memo regarding FP's retention plan) ("[FP]'s books also contain a significant number of complex - so-called bespoke - transactions that are difficult to understand and manage. This is one reason replacing key traders and risk managers would not be practical on a large scale. Personal knowledge of the trades and the unique systems at [FP] will be critical to an effective unwind of [FP]'s businesses and portfolios."); CCPX-558 at 1-2 (07/15/2011 letter from Pasciucco to Benmosche) ("I could not have [successfully wound-down FP] without the global group of hard working and diligent employees who worked in good faith to wind-down FP in a manner consistent with the objectives of reducing the risks to the overall AIG Group and paying back the taxpayer. As they have done so, they have put themselves out of work."); 04/23/2025 Tr. (Herzog) at 14:3-8 ("In [sic] it was the employees of [FP] who, in my view, best suited to organize and initiate unwinding the trades, because they were the ones who were most familiar with them, as they put the trades on or at least were familiar with the origins of the various trades and were the people in the market, so to speak, facing off with the various counterparties."), 63:12-18 ("Q. And I think you testified on direct that folks like Jon Liebergall were important, if not vital, to the derisking efforts of the winddown, fair? A. That is correct. Q. Fair to say that in 2010 FP was still managing positions that required skilled traders like Mr. Liebergall? A. I believe that to be true."); 04/21/2025 Tr. (Habayeb) at 151:25-152:3 ("Q. AIG itself lacked the institutional knowledge to wind down a book of trades as complex as FP's; right? A. Yeah.").

[299] Ashinc, 629 B.R. at 217-18 (listing domination and exploitation of the debtor as an example of inequitable conduct by an insider).

c. Lending Funds instead of Recapitalizing FP

i. Advances during the Financial Crisis

The Former Executives also assert that the actions of AIG in advancing funds to FP during and after the financial crisis in the form of loans instead of equity contributions allowed AIG to advance its interests to the detriment of the Former Executives.[300] The funds advanced by AIG were used by FP primarily to avoid a default on FP's derivative contracts, which would have resulted in hundreds of billions of dollars in liability for AIG.[301] The Former Executives argue that an equity contribution would have provided the same benefit, without elevating AIG to the status of a creditor superior to the Former

---

[300] See, e.g., Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods, Inc.), 2 F.3d 128, 132 (5th Cir. 1993) ("For example, if an insider makes a loan to an undercapitalized corporation, the combination of undercapitalization and the insider loan may allow the bankruptcy court to recharacterize the loan as a capital contribution, or to equitably subordinate the loan to the claims of other creditors."); Café Crème, Ltd. v. LeRoux (In re Le Cafe Creme, Ltd.), 244 B.R. 221, 236 (Bankr. S.D.N.Y. 2000) (subordinating shareholders' secured claims because the shareholders converted their equity interests into secured debt when the debtor was insolvent).

[301] 04/25/2025 Tr. (Liebergall) at 59:7-16 ("Q. Did you have an understanding as to whether the parent could avoid a cross-default by just posting collateral on AIG FP's behalf? A. I have an understanding. Q. What is your understanding? A. That that would not be a solution. As I mentioned to you before, the contracts were with FP. FP had to make payments. If FP failed to make payments, then an event of default and potential - and cross-defaults were what we were looking to avoid."). See also DX-4 (AIG Guarantee covering FP obligations to third parties); DX-394 ¶ 21 (Imburgia Report) (as of September 30, 2008, "AIG reported that AIGFP's net notional exposure on its super senior CDS portfolio was $377 billion.").

Executives' claims in the event of a bankruptcy filing.[302] They contend that this conduct was inequitable.

While failing to adequately capitalize a subsidiary (or loading it with debt) can be inequitable conduct,[303] the Court concludes that AIG's actions in 2008 do not constitute inequitable conduct. AIG and FP's sole source of liquidity during the financial crisis, the Fed Revolver, precluded AIG (in the absence of a waiver) from making an equity contribution to FP.[304] Given the climate in 2008 and 2009, asking for a waiver to

---

302 See 06/11/2012 Herzog Dep. at 429:4-22 ("Q. In that case, Mr. Herzog, tell me what the factors were that – as far as you understand, led the company to decide to extend the funding to FP in the third quarter in the form of a loan, as distinguished from, in whole or in part, as capital? A. My recollection for the rationale for a loan versus capital, which we could have just as easily made some of all of it equity, so, it – again, there's no — there's - there's nothing complicated about was it loaned [sic] – you know, cash goes in, and as either you account for it as an equity contribution [sic], which you could just as easily put it in as a loan and made a – and we've done this from time to time – made non-cash equity contributions in the way of loan forgiveness."). See also JX-2 § 4.01(a); CCPX-2 § 4.01(a).

303 See, e.g., Winstar, 554 F.3d at 412-13 (subordinating insider claim where insider had legal right to issue refinancing notice at its sole discretion but deliberately delayed doing so to conceal debtor's poor financial condition and to induce other creditors to provide funds to the debtor). See also Herby's Foods, 2 F.3d at 132–33 (opining that an insider loan to an undercapitalized corporation may be grounds to equitably subordinate the loan to the claims of other creditors); Lordstown Motors Corp. v. Hon Hai Precision Industry Co., Ltd. (In re Nu Ride Inc.), No. 23-10831 (MFW), 2024 WL 4376130, at *22 (Bankr. D. Del. Oct. 1, 2024) ("unfair conduct. . . includes where the insider or fiduciary[,] . . . if a controlling stockholder, undercapitalized the debtor or capitalized the debtor with debt.") (citation omitted).

304 DX-26 § 6.04(a). See also 04/23/2025 Tr. (Herzog) at 48:17-20 ("And I don't know if we had to get approval or their non-disapproval but it was - we couldn't do - we, the parent company, couldn't do activities like [recapitalization] without [the Fed's] approval or knowing that they wouldn't object to it.").

provide FP with equity could have drawn severe criticism and been denied.[305] Therefore, the Court concludes that AIG's decision to use the form of a loan to advance funds to FP in 2008 was not inequitable conduct done with any malice towards the Former Executives.[306]

ii. 2010 Recapitalization Plan

The Former Executives assert nonetheless that AIG planned to recapitalize that loan in 2010[307] but rejected that plan only because it could have obligated FP to restore the Former Executives' rights under the Compensation Plans.[308] FP responds that AIG had no obligation to recapitalize the FP Revolver and its decision to abandon the recapitalization plan was grounded in rational financial reasoning.

The Court concludes that AIG's decision not to recapitalize was inequitable.[309] The Court concluded above that AIG's 2010

---

305 See supra note 143 and accompanying text. See also 04/25/2025 Tr. (Powell) at 26:20-27:3 (describing public sentiment and threats against the Former Executives by AIG executives, Andrew Cuomo, and Ken Feinberg); 04/25/2025 Tr. (Schreiner) at 129:11-130:12 (same).

306 The Court concludes only that it was not inequitable for AIG to use the form of a loan to comply with the terms of the Fed Revolver. As the Court held above, the true intent of AIG in 2008 was to make a capital contribution to FP rather than a loan. See supra Part A.

307 See supra notes 57-58 and accompanying text.

308 See supra notes 59, 132 and accompanying text.

309 See, e.g., Winstar, 554 F.3d at 412 (subordinating insider claim where insider had legal right to issue refinancing notice "at its sole discretion" but deliberately delayed issuing notice to conceal debtor's poor financial condition to detriment of other creditors); Herby's Foods, 2 F.3d at 132–33 ("if an insider makes a loan to an

plan to recapitalize the FP Revolver reflected AIG's view that the FP Revolver was, in substance, an equity contribution.[310]

While Herzog testified that the recapitalization plan was only an effort to simplify financial reporting and that he had no intent to affect the Compensation Plans one way or the other,[311] the Court found that testimony unconvincing. The contemporaneous emails show an original intent to restore FP to financial health, including a request that the Fed authorize the recapitalization plan.[312] The evidence is also clear that AIG only aborted the

---

undercapitalized corporation, the combination of undercapitalization and the insider loan may allow the bankruptcy court . . . to equitably subordinate the loan to the claims of other creditors.") (further citation omitted); Multiponics, 622 F.2d at 715–22 (finding that controlling insider acted inequitably by causing debtor to breach its debenture agreement with non-insider creditors); Nu Ride, 2024 WL 4376130, at *22 ("unfair conduct . . . includes where the insider or fiduciary[,] . . . if a controlling stockholder, undercapitalized the debtor or capitalized the debtor with debt.") (emphasis and internal quotations omitted).

310 See supra notes 128-51 and accompanying text.

311 04/23/25 Tr. 57:14-22 (Herzog) ("Q. And by saying you wanted 'no effect on the comp plans one way or another,' what were you saying? A. I think it's self-evident what I was saying, 'no effect on comp plans one way or another,' up, down, good, bad. This is an undertaking to simplify segment reporting that shouldn't have either a windfall or a penalty associated with it. So, one way or another, I was not in favor and said "no" to anything that affected the comp plans based upon a segment reporting simplification undertaking.").

312 JX-7 (06/03/2010 email from Gender to Herzog) (stating that "We need to get the following done soonest. 1) Recapitalize FP to eliminate the inter-company debt."); JX-12 (07/21/2010 email chain explaining the recapitalization, via book entries, to eliminate FP's negative equity because "[i]t is not expected that FP will be in a position to meet its obligations under the [FP Revolver]."); JX-13 at 3 (07/26/2010 Fed Funding Request: Business case and supporting computations) ("In order to further facilitate the unwind process and correctly reflect the amount collectable from [FP], it is proposed to eliminate the negative equity in [FP]."); JX-11 at 4-5 (07/27/2010

plans to recapitalize FP when AIG learned that FP might become solvent and have to restore the Former Executives' Compensation Plan accounts.[313] Although Herzog was a Director of FP at that time, he made the decision not to recapitalize FP in order to advance the interests of AIG and its shareholders alone.[314]

---

email attaching draft slide deck of the plan to recapitalize FP, explaining that the plan intends to "facilitate the unwind process" at FP which is expected to "transfer management of its assets to AIG Inc by early 2011" and to "correctly reflect the amount collectable from AIGFP").

[313] JX-14 at 2 ("If the proposed recapitalization substitutes equity for debt, thereby creating a solvent FP with assets that could fund a restoration plan, there is a significant risk that at some point prior to the expiration of the limitations period, FP will face breach of contract litigation demanding compliance with the restoration plan obligation. . . . This would represent a potential $600 million liability of the worst sort[.]"); id. at 1 (09/01/2010 response from Herzog to Rielly and Gender) ("I don't care how it's driven, we're not paying the deferred comp."); CCPX-451 at 2 (09/02/2010 email from Herzog to Leahy) ("Under no circumstances should we restore benefits under any [deferred compensation] plan."); JX-15 at 2 (September 7, 2020, memo from Reilly to Herzog summarizing decisions made on September 3 conference call, including to reduce the "current recapitalization proposal by an amount large enough so that indebtedness to more senior creditors (DCP/SIP plans are secondary to all other creditors) is greater than any AIGFP 'end of business' cash flow projection.") (emphasis in original); id. at 3 ("There is also a clause in the plan agreement that if at some point AIG were to 'transfer all or substantially all assets' to another entity then the contract would be legally binding for the new entity and could potentially re-establish the liability. It is important to make sure participants in the [FP] 'transition' are aware of this fact and that no actions trigger the re-establishment of the DCP/SIP plan liability.) (emphasis added); JX-18 at 3 (09/16/2010 email from Reilly to FP Executives) ("1) We will move forward with the re-capitalization related to the tax balance in the amount of $18,455,480,000. . . . The remaining intercompany borrowings will stay on the balance sheet.") (emphasis in original).

[314] 04/23/2025 Tr. (Herzog) at 55:16-17 ("I would have made [the recapitalization] decision as AIG's chief financial officer."), 56:20-23 ("If there was a commercial reason, i.e., it was good for AIG shareholders, then you'd have to consider [recapitalizing FP] but I couldn't think of any then and haven't been able to think of any

FP argues that AIG's decision not to recapitalize FP was a rational financial decision that avoided incurring a potential obligation of $600 million to the Former Executives. The Court rejects that argument. The potential $600 million obligation is de minimis in comparison to the interest expense FP continued to incur because AIG did not recapitalize the FP Revolver. At that time, FP was paying $400-500 million per quarter in interest obligations to AIG.[315] FP ultimately incurred more than $6 billion in interest expense after the recapitalization plan was aborted in September 2010.[316] While some of that interest was paid in kind,[317] it nonetheless increased the amount of debt FP owed to AIG, to the detriment of FP and its other creditors.

Therefore, the Court finds that AIG's decision not to recapitalize the FP Revolver was contrary to AIG's original intent in making the advances, was done with an intent to benefit itself and to harm FP and the Former Executives, and had no financial benefit for FP. Therefore, the Court concludes that this conduct was inequitable and supports the equitable

---

since."); 04/21/2025 Tr. (Habayeb) at 124:17-20 ("I can tell you the motivation behind not forgiving any portion of the loan was that you would put the AIG shareholder at the disadvantage, and they would get less of a recovery than not forgiving the loan.").

315 JX-86.

316 Id.

317 Id. (listing almost $5 billion of the $11 billion in interest as capitalized – i.e., paid in kind).

subordination of AIG's claim.[318]

d. Timing of Bankruptcy Filing

The Former Executives also contend that FP timed its bankruptcy filing in 2022 to injure them.[319] The Former Executives assert that the bankruptcy filing in 2022 was AIG's last step in its efforts to deprive the Former Executives of their rights under the Compensation Plans. Because AIG had lent funds, rather than capitalize FP appropriately, the bankruptcy filing subordinated their deferred compensation claims to the $37 billion due under the FP Revolver on the Petition Date. Because the winddown had successfully extricated FP (and AIG) from most of FP's derivative contracts (and their related obligations), the Former Executives argue that there was no purpose for the filing other than to eliminate the claims of the Former Executives. They assert that the filing was not intended to repay AIG's $37 billion claim. In fact, the proposed Bankruptcy Plan provides that AIG will receive 100% of the equity of FP in exchange for

---

[318] See, e.g., Winstar, 554 F.3d at 397, 412-13 (finding an insider's conduct inequitable where it forced the debtor to purchase unneeded equipment from the insider, creating unnecessary debt).

[319] See, e.g., Off. Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.), 299 B.R. 732, 746 (Bankr. D. Del. 2003) (denying motion to dismiss equitable subordination claim where complaint alleged insider, inter alia, "delay[ed] the filing of the [debtors'] bankruptcy petitions (and [chose] which debtors would file) in order to protect its liens and collateral from avoidance attack").

that entire claim.[320] The outcome of the Bankruptcy Plan is what AIG would have received had it completed the recapitalization plan in 2010. However, the proposed Plan provides that the Former Executives will receive only a pro-rata share of $1 million if their class accepts the Plan.[321]

The Court disagrees with the argument of the Former Executives. Waiting to file until the derivative contracts had been wound down or novated to Matched Funding not only benefited AIG, but benefited all creditors, including the Former Executives, by allowing FP to avoid defaulting on its derivative contracts and incurring potentially hundreds of billions in liabilities.[322] The Court has already concluded that the 2022 bankruptcy filing was not a bad faith filing when it denied the Former Executives' motion to dismiss the case.[323] Therefore, the Court concludes that the filing of the bankruptcy case in 2022 was not inequitable.

---

[320] D.I. 6 at 16, 21.

[321] Id. at 17.

[322] Compare JX-53 at 3 (06/15/2022 Draft A&M presentation to the Special Committee) (showing potential losses of $510 million if FP retained the derivatives and filed for bankruptcy versus a cost of only $5 million if FP novated the derivatives) with DX-394 ¶ 21 (Imburgia Report) (as of September 30, 2008, "AIG reported that AIGFP's net notional exposure on its super senior CDS portfolio was $377 billion.").

[323] In re AIG Financial Products Corp., 651 B.R. 463, 469-74 (Bankr. D. Del. 2023).

e. Transferring FP's Assets

The Former Executives also assert that AIG acted inequitably by causing FP to transfer numerous assets for the benefit of AIG shortly before FP filed bankruptcy in 2022, including (i) eliminating $33.6 billion of investments in FP's subsidiaries,[324] (ii) novating 94 derivative contracts, and transferring $648 million in bonds and $35 million in cash related to those contracts, to Matched Funding,[325] (iii) paying unnecessary interest on the FP Revolver caused by AIG's delay in offsetting a tax receivable it owed to FP against the FP Revolver,[326] and (iv) AIG's retention of $127 million of FP's funds held in the intercompany cash pool.[327]

i. Offsets between FP and its Affiliates

The Former Executives complain that FP dissipated $33.6 billion of investments in its subsidiaries when FP offset its equity in those subsidiaries against the amounts it owed to those subsidiaries.[328] They argue that those transactions benfited AIG

[324] See supra notes 71-72 and accompanying text.

[325] See supra notes 73-75 and accompanying text.

[326] See infra note 348 and accompanying text.

[327] See supra notes 77-81 and accompanying text.

[328] See supra notes 71-72 and accompanying text.

by saving it from honoring its Guarantee. For example,[329] they argue that Pinestead (an FP subsidiary) could have called on the AIG Guarantee to pay the account payable that FP owed to it resulting in an additional $30.7 billion in assets at Pinestead, which it could have upstreamed to its parent, FP.[330] However, the Former Executives' expert acknowledged that FP could have used the funds it got from Pinestead to repay AIG which would have had the same effect as the offsetting transactions FP made.[331]

The Court concludes that the offsetting transactions were not inequitable conduct of AIG. First, AIG did not direct FP to do those transactions; the Special Committee did.[332] Second, the

---

[329] All of the offset transactions were similar to the Pinestead transaction. 04/24/2025 Tr. (Kosturos) at 19:7-13; 04/22/2025 Tr. (Allison) at 42:4-6; 04/28/2025 Tr. (Avery) at 62:15-22.

[330] See JX-50 at 2-3 (Allison's memo describing the Pinestead offset in detail); 04/22/2025 Tr. (Allison) at 74:21–75:4 ("Q. Right. Now, that liability that FP owed to Pinestead was subject to the general guarantee provided by [AIG], right? A. The - Pinestead had a – would have had the ability to draw - to call on the guarantee of [AIG], for the amounts owed to it by FP. Q. Which at the time of this memo was approximately $30.7 billion? A. Approximately.").

[331] 04/28/2025 Tr. (Avery) at 60:9-21 ("Q. Okay. And from FP's perspective, in your view, is there any difference between doing the journal entries they actually did versus the ones we just walked through, based on Mr. Allison's testimony? A. No. These are the same journal entries that Mr. Allison entered into when reducing the asset by $30 billion and removing $30 billion from AIGFP. The difference is, by calling on the guarantee, AIGFP would have been left with $30 billion in cash, either for the bankruptcy proceedings, or it would have resulted in a transfer to AIG, Inc. of $30 billion, both of which reflect this decrease in $30 billion of assets from the investment subsidiary that was executed by the elimination entries.").

[332] See supra notes 70-72 and accompanying text.

transactions did not transfer any asset away from FP.[333] FP simply offset an amount it owed to its subsidiaries against amounts they owed to it or against its equity in them.[334] FP's balance sheet was simplified but FP's net equity remained the same.[335] The fact that the offsets may have provided an indirect

---

[333] 04/22/2025 Tr. (Allison) at 38:8-10 ("Q. So did FP transfer any assets away from FP in this transaction? A. No."), 42:7-16 ("Q. Did any of [the offset transactions] involve a transfer of assets from FP? A. No. Q. So, for instance, one of them was a $2 billion transaction involving Matched [Funding]. Do you recall that, sir? A. Yes. Q. Did that Matched [Funding] offset transaction involve a transfer of assets from FP? A. No. Q. Did it involve a transfer of assets from Matched [Funding]? A. Yes."); 04/24/2025 Tr. (Kosturos) at 20:4-6 ("Q. Did FP transfer away any assets or value in any intercompany offset transaction? A. No, they didn't."); 04/24/2025 Tr. (Dubel) at 112:1-8 ("Q. In any of the intercompany offset transactions, did FP transfer away any assets? A. No, we had – w [sic] took a receivable in and offset that against the equity. But it wasn't an asset because it was a payable on our balance sheet. And by getting that sent to us, it offset the equity. So it stayed all within the liability and equity side of the balance sheet, not on the asset side."), 112:19-22 ("Q. And based on your years of restructuring experience, is this kind of intercompany offset transactions [sic] rare or uncommon in a company that's restructuring? A. No, it's not uncommon at all.").

[334] See also JX-66 at 1 (09/27/2022 memo entitled "DRAFT – Intercompany Offset Journal Entries") ("From FP's perspective the settlement of the intercompany balances primarily nets payables to subsidiaries on the books of FP against the investments of FP in the same subsidiaries.").

[335] 04/24/2025 Tr. (Kosturos) at 20:7-15 ("Q. Did any of the transactions change the net equity of FP on either a standalone or consolidated basis? A. No. Q. Was there a benefit to FP from doing these intercompany offset transactions? A. Yes. Q. And what was it? A. First of all, to clean up its balance sheet and to make a more fair representation of its balance sheet."); 04/24/2025 Tr. (Dubel) at 112:9-11 ("Q. Did any of the intercompany offset transactions change the net equity of FP? A. No."); 04/22/2025 Tr. (Allison) at 39:10-13 ("Q. The second purpose listed is 'no loss value to FP.' What does this mean? A. That means there's going to be no change in FP's equity."). See also JX-66 at 1 ("There is no change in the equity of FP from these settlements on either a standalone or consolidated basis and these transactions do not impact

benefit to AIG is immaterial.[336] Therefore, the Court concludes that the offsetting transactions done by FP in 2022 did not constitute inequitable conduct by AIG.

ii. Novations to Matched Funding

In early 2022, FP had only 97 derivative contracts left in its portfolio. FP terminated three of the contracts[337] and

---

to [sic] the value of FP. There is no gain or loss to FP or its subsidiaries from these intercompany settlements.").

[336] JX-66 at 1 ("Due to the current size of these intercompany balances (in excess of $750 million), any potential default on these intercompany payables between FP and its subsidiaries could have the potential effect of triggering a default under the terms of [AIG]'s credit agreement dated November 21, 2021. These offsetting journal entries will assist in bringing the intercompany balances below the $750 million threshold and eliminate the potential for any default. FP believes that completing the proposed transactions, and thereby reducing the risk of potential cross-default under the [AIG] loan agreement, is prudent given that (1) [AIG] is both the sole equity owner of FP and its largest creditor pursuant to the [FP] Revolving Credit Agreement and (2) [AIG] is likely the only funding source for FP since FP's cash is within the control of [AIG]. FP further understands that [AIG] supports the proposed transactions, and FP believes it is prudent and appropriate to take into account the viewpoints of [AIG] as its largest creditor and sole stockholder."). See also 04/22/2025 Tr. (Allison) at 39:17–21 ("We're discussing [in JX-66] that the intercompany balance amounts, if FP were to file for bankruptcy and there were large intercompany balances in excess of a certain amount, that could lead to [AIG] being in default of its obligations under certain loan agreements."); 04/24/2025 Tr. (Dubel) at 109:12-110:2 (testifying that the offsetting transactions allowed AIG to avoid cross default and keep FP's options open).

[337] 04/23/2025 Tr. (Stubbs) at 118:17-19 ("Q. You mentioned the 94 contracts that were novated. How many contracts did FP terminate instead of novating? A. Three."); 04/24/2025 Tr. (Dubel) at 114:21-115:6 ("We should look at those contracts that it made sense to enter into termination negotiations and discussions with. These contracts had a lot of volatility. And so, you know, even to this day, these types of contracts, as the market swings, as interest rates move, as a variety, you know, as currencies move, it can have a lot of volatility. So if we could eliminate some of that volatility and bring back collateral that we have that was good for us, yes, we might have to pay a little bit to get that done. But we looked at it from

novated the remaining 94 contracts to one of its subsidiaries, Matched Funding, which already had a similar asset portfolio.[338] As part of that transaction, FP also transferred associated bonds and cash collateral to Matched Funding.[339] The bonds and cash provided liquidity that Matched Funding would need to service the derivative contracts.[340] In exchange, FP received an offset of an

---

that cost benefit analysis.”).

[338] See supra note 73 and accompanying text. 04/23/2025 Tr. (Stubbs) at 117:24-118:1 (“Q. And so how many derivative contracts did FP end up novating? A. In the end, we novated 94 of the 97.”), 123:9-124:20 (“Q. And why were most of the derivatives novated to Matched [Funding]? A. That was a logical place to put the remaining FP derivatives. Matched Funding had liabilities that go out to 2040-plus as a portfolio that’s a, you know, established portfolio in the company. Q. And to be clear, was Matched [Funding] an FP subsidiary? A. Yes. Q. And then I see if you were novated to Markets, was Markets an FP subsidiary? A. No. Q. So why did FP novate, you know, this handful of derivatives to Markets instead of Matched [Funding]? A. So for those derivatives, the counterparties were banks. Banks have, you know, a lot of regulatory requirements placed on them. . . . . So we leveraged the fact that we had ISDAs and CSAs in place with [M]arkets . . . so that’s why we . . . asked them to face AIG Markets. Q. So for the ones that were novated to Markets, did Markets keep the economic value of the derivative contracts? A. No. Q. So what happened to the economic value? A. So we - we novated the derivative where FP was facing Markets to AIG Matched Funding facing Markets so Markets was a pass-through. . . . Q. So what entity ended up with all the economic value from the derivative contracts? A. AIG Matched Funding.”).

[339] See supra notes 74-75 and accompanying text.

[340] Id. See also 04/24/2025 Tr. (Kosturos) at 31:8-23 (“Q. Why did FP transfer that [$35 million] to Matched [Funding]? A. We wanted to put additional liquidity at Matched Funding so that they, again, could have adequate liquidity based on some of the ranges that we thought might happen over the next 12 to 18 months. Q. Was it in FP’s best interest to transfer that receivable to Matched [Funding]? A. Yes. Q. And again, why? A. Because if Matched [Funding] doesn’t have enough liquidity, they could have a potential default. And we have seen that the range of potential defaults already in the previous analysis. So that was not an outcome we could accept. So we wanted to make sure that there was adequate funding that they could

intercompany liability it owed to Matched Funding.[341]

The Former Executives contend that those transfers benefited AIG by allowing it to put FP into bankruptcy without causing an event of default of those derivative contracts thereby avoiding collateral calls in the hundreds of millions of dollars which AIG would have had to honor.[342]

---

effectively live on their own liquidity for as long as they needed to."); 04/28/2025 Tr. (Avery) at 70:7-11 ("Q. And now what is your understanding why FP held bonds? A. The bond portfolio was used by FP to post collateral against derivatives.").

[341] See supra note 75 and accompanying text. See also JX-78 (10/31/2022 Unanimous Written Consent in Lieu of Meeting of Directors of AIG Financial Products Corp.) (approving transfer of $35 million in cash to Matched Funding in partial satisfaction of payable owed by FP to Matched Funding); 04/22/2025 Tr. (Allison) at 44:5-10 ("Q. And why did FP transfer bonds to Matched [Funding]? A. To settle a portion of its intercompany liability to Matched Funding. Q. So did FP lose any value as a result of these bond transfers? A. No."); 04/24/2025 Tr. (Kosturos) at 30:2-6 ("Q. Did FP receive fair value for the bond transfers to Matched [Funding]? A. Yes, it did. Q. Did the bond transfers negatively impact FP's value? A. No."), 32:10-12 ("Q. Did FP receive fair value for the transfer of that [$35 million] receivable to Matched [Funding]? A. Yes, it did.").

[342] See, e.g., JX-53 at 4 (6/15/2022 draft presentation to the Special Committee) ("These novations are being conducted to prevent a potentially large value loss (previous estimates show potential losses of up to $510 million) resulting from counterparty terminations upon an event-of-default (bankruptcy)"). See also 04/23/2025 Tr. (Stubbs) at 169:2–21 ("Q. And your understanding was the counterparties' right to terminate would be unilateral if those derivative contracts were still at FP and they filed for bankruptcy; right? A. Yes. Q. AIGFP would be the defaulting party on those contracts; right, sir? A. Correct. Q. And you said AIG would have no rights in that circumstance; right? A. AIGFP would have no rights in those circumstances, yeah. Q. Right. And you estimated that those losses on those terminations could have been anywhere between $100 million dollars and a billion dollars, right, sir? A. Yeah. So the ranges - yeah. I didn't know what a max range was. So it could be 500. It could be a billion. It could be 2 billion, to be honest. So, yeah, it - it's something we couldn't estimate, which was part of the challenge; right? So there's unlimited potential loss. Yeah. So various ranges I used over time."); 04/24/2025 Tr. (Kosturos) at

The Court concludes, however, that those transfers did not harm FP or its creditors. Matched Funding was a subsidiary of FP.[343] Therefore, the Court finds that the transfer of the derivatives and other assets from FP to Matched Funding did not diminish FP's net value.[344] It is true that AIG benefited

---

20:24-21:3 ("[I]f FP did file Chapter 11, that under the safe harbor rules, the counterparties would be able to declare an event of default and then exercise their termination rights, which would result in a sizable loss to FP."); 04/24/2025 Tr. (Dubel) at 113:25-114:6 ("I knew from my experience that if you didn't deal with [the derivative contracts] in the appropriate manner, that it could cause harm to the company, to the estate. Number one, if we were to propose a plan that included a Chapter 11, then these contracts would fall under the safe harbor provisions of the Bankruptcy Code. If you ask me what code section, I don't know. I just know that the concept there."). See 11 U.S.C. § 362(b)(7) (the automatic stay does not stay the exercise of any right of a party to a securities contract, including the right to terminate the contract and offset its claim against any collateral it holds or obligations it has under the contract), § 546(e) (precluding a debtor from avoiding any "transfer made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract. . . ."), § 560 (authorizing counterparties to liquidate, terminate, or accelerate swap agreements in the event of a bankruptcy filing).

[343] 04/23/2025 Tr. (Stubbs) at 123:15-16 ("Q. And to be clear, was Matched [Funding] an FP subsidiary? A. Yes."); 04/28/2025 Tr. (Avery) at 153:23-154:1 ("Q. You'd agree that Matched [Funding] is a wholly owned subsidiary of FP. So, any derivatives at Matched [Funding] remained within the FP corporate family, right? A. They went to a subsidiary of [FP], yes.").

[344] 04/24/2025 Tr. (Kosturos) at 27:15-20 ("Q. How was FP's balance sheet affected by these derivative novations? A. The net equity position was not affected as the balance sheet derivatives were transferred through the intercompany account with Matched Funding, who is a 100 percent wholly owned subsidiary."), 30:5-6 ("Q. Did the bond transfers negatively impact FP's value? A. No."), 32:10-12 ("Q. Did FP receive fair value for the transfer of that receivable to Matched [Funding]? A. Yes, it did."), 37:8-25 ("Q. Did each transaction benefit FP first and foremost? A. Yes. Q. And based on your 30 years of restructuring experience, did FP make the right decision in undertaking each intercompany offset transaction, each novation and termination of a derivative contract, and each related bond and cash transfer to Matched [Funding]? . . . A. Yes. Q. Why? A. Because

indirectly from the transfers, by not being required to cover the obligations arising from defaults on the derivative contracts if they were still held when FP filed bankruptcy.[345] However, FP benfited in the first instance because it avoided those losses itself.[346] In addition, AIG did not cause FP to transfer the assets in question to Matched Funding, the Special Committee

all of the - all of the transactions that you have asked about all benefited FP to either maintain or increase the value of the entity, thereby benefiting creditors in whatever waterfall that those creditors are due to be paid on."); 04/24/2025 Tr. (Dubel) at 116:21-117:2 ("Q. Did any of these novations or terminations have an impact on the value of FP? A. No, they did not. Because all we did is we took the value of those contracts, and we moved them to one of our subsidiaries, a wholly owned subsidiary. So all we did was transfer that value into a subsidiary, which ends up in our pocket at the end of the day."), 119:9-10 ("Q. And did those transfers negatively impact FP's value? A. No, they did not."); 04/23/2025 Tr. (Stubbs) at 125:7-9 ("Q. And what net impact did the pre-petition novations have on FP's value balance sheet? A. No impact.").

[345] 11 U.S.C. §§ 362(b)(7), 546(e) & 560. See also 04/23/2025 Tr. (Stubbs) at 126:1-2 ("Q. So was any derivative contract novated to [AIG]? A. No."); DX-4 (AIG Guarantee).

[346] 04/24/2025 Tr. (Dubel) at 117:3-14 ("Q. Who primarily benefited from the novations and terminations? A. We did at FP. Q. Why? A. Because as I said, we wanted to be able to have all alternatives available to us when we ultimately came down to what the restructuring decision was. And by eliminating the risk of loss of asset value and the avoidance of any potential liabilities being created, that was a huge benefit to FP and ultimately to its creditors, whomever, wherever the waterfall fell with our creditors, it was a huge benefit to those - to those creditors."); 04/24/2025 Tr. (Kosturos) at 27:21-25 ("Q. Who primarily benefited from the derivative novations? A. Primarily FP. Q. How so? A. It avoided the potential loss of holding those positions. So the $160 million to $510 million loss ranges."); JX-53 at 3 (6/15/2022 A&M presentation to the Special Committee showing losses to FP up to $510 million if the derivatives were allowed to default).

did.[347] Therefore, the Court concludes that there was no inequitable conduct by AIG in the actions of the Special Committee in causing FP to novate the derivative contracts and related cash and bonds to Matched Funding.

iii. $18.5 Billion Tax Receivable Offset

The Former Executives also argue that AIG acted inequitably by delaying the payment or offset of a tax receivable AIG owed to FP thereby causing FP to pay additional interest on the FP Revolver.[348]

The Court agrees with the Former Executives. In September 2010, during the recapitalization discussions, AIG acknowledged that it owed FP approximately $18.5 billion under the parties' tax sharing agreement for losses suffered by FP in 2008.[349] It

---

[347] See supra notes 73-75 and accompanying text. See also 04/24/2025 Tr. (Dubel) at 119:6-8 ("Q. Did AIG direct FP to transfer the bonds or cash receivable to Matched [Funding]? A. They did not.").

[348] CCPX-677 (Mark Balfan 2018 UK Trial Day 3 Tr. 17:7–17 ("AIG owed [FP] $18.5 billion because AIG received the tax benefit of our loss. So AIG files a consolidated tax return. When [FP] suffered the massive losses in 2008, naturally [AIG] received a tax credit for 35 per cent of that loss. That tax credit was owed to [FP]. So what was described to me is rather than having an $18.5 billion payable to FP and a $55 billion payable from FP to AIG, we should simply net the two down so that all we had was a smaller payable from FP to the parent."); JX-15 at 2 (acknowledging that AIG has a tax liability of approximately $18.5 billion owed to FP); 04/22/2025 Tr. (Allison) at 25:23-26:4 ("Q. And to be clear, was there a tax-sharing agreement between AIG, Inc. and FP? A. There was. Q. What did it provide about whether AIG, Inc. had to pay for using FP's tax assets? A. It generally provided that AIG, Inc., would pay for using the tax attributes of its subsidiaries.").

[349] JX-15 at 2; JX-18 (09/16/2010 email from Reilly to Shirley and others) ("We will move forward with the [offset of] the tax balance in the amount of $18,455,480,000.").

also acknowledged that if AIG allowed FP to set off that receivable against the FP Revolver, it would reduce FP's interest expense.[350] Nonetheless, AIG did not allow FP to offset that tax obligation against the FP Revolver until March 2011.[351]

The Court agrees with the Former Executives that the delay by AIG in effectuating the tax receivable offset was inequitable and caused harm to the estate and creditors by the excess interest paid by FP as a result of that delay.[352]

iv. $127 Million Transfer to AIG

Immediately before the bankruptcy filing, AIG unilaterally took $127 million of FP's cash from the intercompany cash pool — which AIG controlled — and applied it as a partial payment of the FP Revolver.[353] AIG took that action without FP's consent and

---

[350] JX-15 at 2 (advising that offsetting AIG's tax liability of $18.5 billion against the FP Revolver would reduce FP's interest expense).

[351] JX-86 (showing an $18.5 billion payment on the FP Revolver on March 15, 2011). See also 04/23/2025 Tr. (Herzog) at 91:19–92:1 ("Q. You have no idea why FP did not move more expediently to offset that amount that FP was owed from what you allege is a loan in this case, correct? A. I'm not alleging it was a loan. It was a loan. And I don't know why they move more quickly or more slowly. Q. You have no understanding as to why this didn't happen faster or slower, correct? A. Not that I recall.").

[352] Cf. Ashinc, 629 B.R. at 220 (finding that lenders were injured by payments debtor spent on transaction and professional fees for the defendant which would otherwise have been paid to the lenders).

[353] See JX-84 at 1 (12/14/2022 email from Carbone to Allison) ("This email will confirm that [AIG] has offset the full amount of the intercompany cash pool receivable owed by [AIG] to FP against the amount of the intercompany payable owed by FP to [AIG]."); 04/24/2025 Tr. (Kosturos) at 71:14-17 ("Q. Okay, so you would agree with me that on December 12th, you weren't involved in any discussions around the offset, correct? A. No. They unilaterally did it. They didn't

despite FP's repeated requests for those funds.[354]

FP asserts that the Former Executives cannot use this as a basis for an equitable subordination claim because AIG and FP have agreed to a tolling of the statute of limitations on that claim and any other claim that FP may have against AIG.[355]

Notwithstanding the tolling agreement, the Court concludes that AIG's pre-bankruptcy action in refusing to turn over funds belonging to FP at its request constitutes inequitable conduct. That refusal violated the terms of the parties' cash pool agreement and caused harm to FP and its creditors.[356] The fact that AIG has agreed since then to toll the statute of limitations with respect to that claim[357] does not cleanse its inequitable conduct in 2022.

---

ask.").

354 See supra notes 77-81 and accompanying text.

355 DX-384 (tolling agreement between FP and AIG and its subsidiaries); 04/24/2025 Tr. (Kosturos) at 35:19-20 ("Q. By signing this [tolling agreement], what claims did you intend to toll? A. We intended to toll all claims FP has against [AIG]."). See also DX-383 (tolling agreement between FP and its non-debtor subsidiaries).

356 See JX-52 at 4 (2011 Cash Pool Agreement) ("Any Participant may cancel its participation or liquidate or withdraw all or part of its share of the CP Pool at any time by giving notice of its intention in writing or by telex to the MG Treasury Department."). See supra note 78 and accompanying text.

357 See supra note 355 and accompanying text.

v. $253 Million Overpayment to Markets

The Former Executives also contend that AIG acted inequitably by refusing to compensate FP for its prior payment of costs incurred by AIG's subsidiary, AIG Markets. In August 2022, while preparing for its bankruptcy filing, FP sent evidence of the overpayment claim to AIG and requested that AIG reimburse FP for those expenses by offsetting them against the FP Revolver.[358] AIG did not.[359] In fact, AIG did no investigation of FP's claim, did not engage with FP to try to resolve the claim, and appears

---

[358] See CCPX-754 at 1 (08/24/2022 email from Allison to Carbone, AIG's Chief Accounting Officer) (asserting that FP covered expenses for [Markets] totaling $253 million for which it had not been reimbursed); JX-59 at 8 (August 2022 FP presentation) ("[FP] covered certain expenses incurred by AIG Markets for the period 2012 to 2019 which were never reimbursed. During this time period, AIG Markets and AIGFP were under common management and were part of the same corporate reporting segment[.] AIG Markets provides derivative and other services to AIG and its subsidiaries. Since 2020, AIG Markets has been billing AIG and its subsidiaries for its costs to provide these services[.] It is estimated that the expenses covered by AIGFP that are not related to derivatives or services provided by AIG Markets to [FP] is approximately $253mm. Factoring the cost of [FP]'s funding, its [sic] estimated that the amount of $285,791,130 would be due to [FP] on 31 August 2022[.] It is recommended that AIG Markets settle this amount with [FP]. Since this money is owed to AIG Markets by AIG and its subsidiaries, the simplest way to achieve this is for AIG to make this settlement by applying this amount to reduce the balance of the loan that AIG has made to [FP][.]").

[359] 04/22/2025 Tr. (Allison) at 106:7-18 ("Q. And then Ms. Carbone denied the request in 2022 to give back the $250 million that FP paid on behalf of Markets, right? A. Yes. May not have been directly her, may have been others. But we did not get paid - FP did not get paid. Q. FP was never given the $250 million? A. That's right. FP was not repaid the $250 million. Q. And in 2023, you said you were still investigating this transaction, right? A. Uh-huh. Q. Is that investigation is [sic] still ongoing? A. There's been no progress on the investigation.").

to have simply ignored it.[360]

The Court concludes that the evidence presented on this point by the Former Executives is insufficient for the Court to conclude that AIG acted inequitably. The Former Executives presented no evidence that AIG had a legal obligation to pay for AIG Market's debts or even to engage with FP on its allegation of overpayment. Therefore, the Court cannot conclude that AIG's actions with respect to that claim constituted inequitable

[360] 02/16/2024 Carbone Dep. at 182:21-183:3 ("If an entity was performing services and not getting paid for it, jeez, they should have raised it at that point in time, so which – you know again, going back to, I'm not going to go back to AIG, Inc. and look back at 2012 on the allocations."), 185:21-186:25 ("Q. And if I understand you correctly, this was not looked into further? A. Correct. Q. And because it wasn't looked into further, you don't know what was agreed to by the entities at issue between 2012 and 2019, but you're looking at how it was booked at that time period, correct? A. No. Q. Okay. A. I did not look at how it was booked at that time period. A. So you didn't look at how it was booked at that time period either. A. Don't say 'either.' Like, just again, we did not – this was a reallocation based on the spreadsheet here. And we did not change the allocation – we did not pursue this further. This was [Allison's] calculation, et cetera. This is again, where – where it started and where it ended. Q. Okay. A. There was no further quote/unquote, your words, 'investigation.' There was no further work done for all the reasons I previously mentioned."), 199:24-200:7 ("Q. So if this – if [Allison] had raised this concern and it wasn't about 2012 to 2019, but it was about 2021, would you have inquired further? A. Likely not. Q. Why not? A. Because, again, the allocation process agreed upon by the subsidiaries."), 201:21-202:2 ("Q. And did you need anybody else's approval to make [the reallocation] decision? A. No."), 190:14-17 ("Q. So you did not believe a correction was warranted, so no correction was made? A. That's right."), 191:8-17 ("Q. To your knowledge, has there been any discussion with the special committee or anyone at FP regarding how your decision might impact the availability of this $250 million for the estate of the bankruptcy? A. I'm not aware of any discussion with the special committee. Q. Or anyone at FP? A. Or anyone at FP."), 173:10-13 ("A. . . . So I disagree with the fact that now [Allison] is recalculating what the allocation he thinks it should have been at that point in time.").

conduct supporting a decision to equitably subordinate AIG's claim.

vi. $154 Million Deferred Tax Asset

FP was part of AIG's consolidated tax group, which meant that AIG used FP's losses to shelter income and FP had a right to receive its share of any tax attributes resulting therefrom.[361] The Former Executives contend that as of 2022, AIG owed FP a $154 million tax receivable.[362] However, AIG apparently placed a reserve against that asset, in anticipation of FP's bankruptcy filing and possible deconsolidation from the AIG group.[363] If FP

[361] 04/22/2025 Tr. (Allison) at 25:23-26:4 ("Q. And to be clear, was there a tax-sharing agreement between AIG, Inc. and FP? A. There was. Q. What did it provide about whether AIG, Inc. had to pay for using FP's tax assets? A. It generally provided that [AIG] would pay for using the tax attributes of its subsidiaries."); CCPX-823 at 8-9 (Accounting Policy Memorandum dated 12/6/2022) ("As noted above, FP remains a member of AIG's consolidated U.S. federal tax return group. Therefore, AIG retains the ability to benefit and use the [deferred tax assets] in the future to offset future taxable income of the group.").

[362] CCPX-829 at 12 (12/07/2022 email from Dailey attaching hypothetical liquidation analysis) ("[FP] has a tax receivable of $154MM from its parent on account of its Tax Sharing Agreement, which is fully reserved on its balance sheet in anticipation of a de-consolidation."); DX-522 ¶ 187 (Avery Report) ("Rather, the asset of [FP] is an intercompany receivable from [AIG] resulting from the provisions of its tax sharing agreement with AIG, Inc., not a deferred tax asset itself. [AIG] retains the value of future tax deductions generated by [FP] . . . .").

[363] CCPX-829 at 12 ([FP] Hypothetical Liquidation Analysis 12072022) ("[FP] has a tax receivable of $154MM from its parent on account of its Tax Sharing Agreement, which is fully reserved on its balance sheet in anticipation of a deconsolidation. In the event of an [FP] emergence with [AIG] as the equity holder (and re-consolidation of [FP] in [AIG]'s books) it is anticipated that this reserve will be pulled out[.]").

emerged from bankruptcy under AIG's control, however, it was expected that the reserve would be released.[364]

The Court concludes that the action of AIG in placing a reserve against the tax asset was not inequitable conduct. The asset remains on FP's books and may be pursued by FP (or another party with standing) subject to any defenses AIG may have.[365]

2. Injury or Unfair Advantage

The Former Executives need only show an injury or unfair advantage, not both.[366] The Court concludes that the Former Executives have met that burden. For the reasons stated above,

---

[364] CCPX-823 at 3 ("AIG is expected to re-gain control and 're-consolidate' FP once the bankruptcy process has been completed. It is expected that the majority of the loss recognized at de-consolidation will be reversed as a gain in the income statement upon re-consolidation of FP and subs.").

[365] 04/28/2025 Tr. (Avery) at 202:5-25 ("Q. But the receivable itself is still in FP's books, right? A. It's been completely reserved against. There's a valuation allowance against it for the total value. Q. The receivable is still on the books, but there's an allowance against it, right? A. That is true. Q. Okay. And booking an allowance doesn't stop FP from collecting on the receivable; does it? A. It's something that's been excluded from the bankruptcy for consideration of what the total assets are, that for some reason there's been a determination that requires an evaluation allowance about something that is pertaining to a services agreement where the tax shared services agreement should benefit [FP] but, rather, it's being valued against. Q. Let me try that again. FP booking an allowance doesn't stop FP from collecting on the receivable; does it? A. It doesn't, but it reduces the overall position of that asset on its books at that point in time. That asset is valued at zero right now.").

[366] Mid-Am. Waste, 284 B.R. at 71 (holding that an insider creditor need not have engaged in the inequitable conduct for personal benefit if its conduct injured creditors) (citing Citicorp Venture Cap., 160 F.3d at 986 (stating that claimant's misconduct must have resulted in injury to other creditors or conferred an unfair advantage on the claimant) (emphasis added)).

the Court finds that AIG injured the Former Executives by (1) preventing FP from implementing a plan to restore the Former Executives' account balances in the Compensation Plans, (2) misleading the Former Executives into remaining with FP during the winddown by suggesting that a restoration plan could be implemented, (3) aborting its plan to recapitalize FP in 2010 in order to prevent the Former Executives from recovering under the Compensation Plans, (4) delaying the setoff of a tax receivable owed to FP which caused FP to incur additional interest expense on the FP Revolver, and (5) retaining $127 million in funds belonging to FP. By each of those actions, AIG favored itself and caused harm to FP and the Former Executives. Therefore, the Court concludes that the Former Executives have carried their burden of proving an injury or unfair advantage.

3. Whether Equitable Subordination Is Inconsistent with the Bankruptcy Code

The Court cannot subordinate debt in violation of the Bankruptcy Code's rules of priority.[367] However, section 510(c) of the Bankruptcy Code expressly provides that the "court may . . . under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed

[367] Winstar, 554 F.3d at 414 (holding that a creditor's claims can only be subordinated to other creditors and not below equity interests); Nu Ride, 2024 WL 4376130 at *25 (holding that plaintiffs' equitable subordination claims would not be dismissed because they did not seek to subordinate the creditors' claims below equity).

interest to all or part of another allowed interest."[368]

The Former Executives' deferred compensation claims and AIG's claim under the FP Revolver are both unsecured debts. Under the terms of the Compensation Plans, however, the Former Executives' claims are subordinated to all other creditors' claims, including AIG's claim under the FP Revolver.[369]

Nonetheless, no provision of the Bankruptcy Code prohibits subordinating the FP Revolver to the Former Executives' claims under equitable principles and section 510(c) of the Bankruptcy Code expressly preserves the right to do so.[370] Therefore, the Court concludes that equitably subordinating AIG's unsecured claim to the Former Executives' unsecured claims does not offend the Bankruptcy Code's repayment priority.

4. Conclusion

For the reasons stated above, the Court finds that AIG acted inequitably, caused injury to FP and the Former Executives, and subordination of AIG's claim is not inconsistent with the Bankruptcy Code. Consequently, the Court will equitably subordinate AIG's claim to the Former Executives' claims under the Compensation Plans, in such amounts as may be determined are due after phase two of this proceeding.

---

368 11 U.S.C. § 510(c).

369 JX-2 § 4.01(a); CCPX-2 at 4.01(a).

370 11 U.S.C. § 510(c)(1).

C. Successor Liability

The Former Executives argue that AIG is liable as a successor to FP under the terms of the Compensation Plans and under the continuity of enterprise doctrine.[371] FP asserts that the Former Executives have not carried their burden of proving either.[372]

1. Contractual Successor Liability

The DCP and SIP both provide that "if AIG Financial Products Corp. consolidates or amalgamates with, or merges with or into, or transfers all or substantially all of its assets to, another entity, then the resulting, surviving or transferee entity shall assume all of the obligations of AIG Financial Products Corp. hereunder."[373] Both agreements provide that Connecticut law applies.[374]

---

[371] Maltese v. Hvolbeck, No. FSTCV226056880S, 2023 WL 4446652, at *2 (Conn. Super. Ct. July 7, 2023) (holding that the purpose of successor liability is "to provide contract and tort creditors with an avenue for recovery in appropriate cases against successor entities, when the predecessor that contracted with them or committed the tort . . . had sold substantially all of its assets and [is] no longer a viable source of recovery.") (citations omitted).

[372] See Chamlink Corp. v. Merritt Extruder Corp., 899 A.2d 90, 93 (Conn. App. Ct. 2006) (affirming judgment against the plaintiff on its successor liability claim because the evidence presented was not sufficient to support a finding that the successor corporation was a mere continuation of the prior corporation).

[373] JX-2 § 4.01(b); CCPX-2 § 4.01(b).

[374] JX-2 § 4.05; CCPX-2 § 4.05.

To determine whether FP transferred all or substantially all of its assets to another entity, the Court must first determine what "all" of FP's assets were. To do so, the Court must take a snapshot of FP's assets on the date FP adopted a plan of liquidation.[375]

a. Date by Which to Measure FP's Assets

The parties preliminarily dispute the date that the Court should use to measure FP's total assets in order to determine if FP transferred substantially all of them to AIG. FP argues that the Court should take the snapshot in 2008 when FP began to wind down its operations and sell its assets, which ultimately resulted in its bankruptcy filing. The Former Executives argue that the Court should take the snapshot in 2022, because that year's transactions were qualitatively different from the transactions that began in 2008 at the time of the financial crisis.

While it may be appropriate to consider multiple transfers as one integrated transaction when assets are transferred in stages (or piecemeal),[376] the Court finds that all of the

---

[375] See, e.g., Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1051 (2d Cir. 1982) (holding, for purposes of a boilerplate successor liability clause in a debenture, that the date for evaluating all of the transferor's assets was the date its shareholders adopted a plan of liquidation).

[376] See, e.g., Int'l Specialty Prods., Inc. v. Dexter Corp., No. 3:00-CV-157 JBA, 2000 WL 35453111, at *6 (D. Conn. July 27, 2000) (acknowledging that a corporation is not free to sell all its assets in separate transactions or steps in order to avoid shareholder

transactions from 2008 through 2022 should not be treated as one transaction for several reasons.

First, FP completed numerous transactions between 2008 and 2021. No evidence was presented about those transactions, including to whom the derivative contracts were sold or what consideration was given to FP for the transfers. Nor was any evidence presented that those transactions were part of "one unified agreement" or had any causal connection to each other or to those that occurred in 2022.[377] As noted above, in 2008 FP was not even considering a bankruptcy filing because that was not a viable option.[378] Instead, for more than a decade, FP sought to wind down its business simply to extricate itself from its derivative contracts and reduce its risk of loss.[379]

---

approval but declining to require shareholder approval for the sale sub judice because there was no evidence that it was part of a plan to dispose of all of the company's assets). See also Sharon Steel Corp., 691 F.2d at 1051 (successor obligor provisions may be implicated when a company engages in a piecemeal sale of all of its assets); Coughlan v. NXP B.V., No. CIV. A. 5110-VCG, 2011 WL 5299491, at *7 (Del. Ch. Nov. 4, 2011) (in order to determine the substance of what truly occurred courts should treat "the 'steps' in a series of formally separate but related transactions involving the transfer of property as a single transaction if all the steps are substantially linked. Rather than viewing each step as an isolated incident, the steps are viewed together as components of an overall plan.") (citations omitted).

[377] Int'l Specialty Prods., 2000 WL 35453111, at *6.

[378] See supra notes 35-36 and accompanying text.

[379] 04/21/2025 Tr. (Habayeb) at 87:22-88:2 ("Q. Are you aware of when FP began its wind-down process? A. From my recollection, somewhere around October of 2008. Q. And were you involved in any way in the wind-down process? A. I was, as I participated in the steering committee that oversaw the wind-down.), 156:21-25 ("Q. And

The Court finds that FP changed its plans beginning in 2022. FP installed a Special Committee in January 2022 to consider "strategic alternatives," including a bankruptcy filing.[380] In contrast to prior transactions, FP novated the derivative contracts to its affiliates, rather than to third parties.[381] Furthermore, the purpose of the 2022 transactions was not to derisk the company as it was in 2008; instead, it was to continue the winddown of the derivatives without the negative consequences

---

the wind-down involved derisking FP; right? A. That's correct. Q. Either by exiting existing trading positions or by letting them run their course? A. That's correct.").

[380] JX-40 at 1-2 (Unanimous Written Consent giving Special Committee power to "recommend to [FP's] Board that [FP] enter into a Potential Strategic Transaction" that was defined as "certain potential liability management transactions and other strategic alternatives."); CCPX-709 at 3 (describing bankruptcy as a potential option for winding down FP's business).

[381] 04/23/2025 Tr. (Stubbs) at 153:18–23 ("Q. Now, but the novations in 2008 and thereafter were done to third parties, not to AIG affiliates; correct? A. So there was a mixture. I think 2008, most of the novations are, if not all of them - again, I have limited memory of that - were with third parties. But there were instances where they were with internal affiliates."), 158:6-8 ("Q. And novating to affiliates in 2022 was a strategy for the bankruptcy of FP; correct, sir? A. It was an option."), 123:9-14 ("Q. And why were most of the derivatives novated to Matched [Funding]? A. That was a logical place to put the remaining FP derivatives. Matched Funding had liabilities that go out to 2040 - plus as a portfolio that's a, you know, established portfolio in the company."); 04/28/2025 Tr. (Avery) at 66:12-23 ("I did review Mr. Stubbs' testimony. And Mr. Stubbs indicated . . . . instead of novating with third parties, which had been the conduct in the past, that - that there was a change in strategy to begin to novate to affiliates."); 02/06/2025 Friedland Dep. at 253:23–254:3 ("Q. You're not aware of novations that went to other AIG entities prior to 2022? A. That's right.").

of a bankruptcy filing by FP.[382] That same year, and apparently for the first time, FP set off large balances owed by it to its subsidiaries against its equity in those subsidiaries to simplify its balance sheet.[383]

Therefore, the Court cannot conclude that the series of transactions from 2008 through 2022 were part of one integrated transaction. In 2022, however, the Court finds that all the

---

382 04/24/2025 Tr. (Kosturos) at 20:23-21:4 ("Well, when we reviewed the transactions it became obvious that if the company - if FP did file Chapter 11, that under the safe harbor rules, the counterparties would be able to declare an event of default and then exercise their termination rights, which would result in a sizable loss to FP. So that was our primary reason to novate those to a subsidiary."); 11 U.S.C. §§ 362(b)(7), 546(e), & 560. See supra note 35 and accompanying text. See also JX-53 at 4 (06/15/2022 A&M Presentation to the Special Committee) ("These novations are being conducted to prevent a potentially large value loss (previous estimates show potential losses of up to $510 million) resulting from counterparty terminations upon an event-of-default (bankruptcy)"); 02/06/2025 Friedland Dep. at 181:8-21 ("Well, with the examples of the derivatives, we had previously discussed how without novation, if FP went into bankruptcy, it would give rise to a default event under the ISDA, subject to the International Swap Dealer Association agreements between the counterparties and FP, which would give the counterparties unilateral rights to reprice and collect on their – and it would be a substantial loss to FP. But additionally, any harm to FP would also harm AIG both as parent and also as guarantor.").

383 See, e.g., JX-50 at 2 (03/14/2021 Transaction summary memo) ("[Matched Funding] proposes to settle its intercompany liability to [Pinestead] by transferring to [Pinestead] $21bn of its intercompany receivable from FP. This will reduce both the assets and liabilities of [Matched Funding], but there will be no change to the net equity of [Matched Funding]. Note that [Pinestead] and [Matched Funding] are both 100% owned subsidiaries of FP. FP, [Matched Funding], and [Pinestead] are all US entities. There will be no income generated or other change in net equity in any entity from this proposed transaction."). See also 04/22/2025 Tr. (Allison) at 85:2-23 ("Q. [Y]ou were trying to do the cleanup transactions for years, is that right? A. A number of years, yes. . . . Q. But then when the bankruptcy planning started, then people focused on them? A. People focused on these at that time.").

transactions appear to have one purpose and were largely transfers to one entity, Matched Funding. Consequently, the Court concludes that the transactions in 2022 were an integrated transaction and, therefore, it should take the snapshot of FP's assets as of January 1, 2022.

b. Effect of the Transfers

To determine if the 2022 transfers triggered the successor liability provisions in the Compensation Plans, the Court must determine if FP transferred all or substantially all of the $35.3 billion in assets it held on January 1, 2022,[384] to AIG.[385] Courts typically employ a two-part test to determine whether a business has transferred substantially all of its assets to one entity: (1) the value of the assets transferred compared with the transferor's total assets (the quantitative analysis) and (2) the transfer's impact on the transferor's business and its very "existence and purpose" (the qualitative analysis).[386]

---

[384] JX-45 (FP's 2021 unaudited balance sheet).

[385] See, e.g., Int'l Specialty Prods., 2000 WL 35453111, at *1 (concluding that "although Dexter developed the ultimate objective of selling off 'all or substantially all' its assets through a series of transactions, in the absence of any showing that the transactions were interrelated or interdependent such that one prearranged plan could be inferred, Dexter is not required to submit the first transaction in the series to a shareholder vote" under state statute requiring shareholder approval for a sale of all or substantially all of the assets of a company).

[386] See id. at *3 (concluding that a quantitative analysis alone is not mandated and that qualitative factors are also typically used). See also Hollinger Inc. v. Hollinger Int'l, Inc., 858 A.2d 342, 378 (Del. Ch. 2004) (holding that a shareholder vote is required only when

i. Quantitative Analysis

As the Court found above,[387] FP undertook the following transactions in 2022: (1) FP offset amounts it owed to its subsidiaries against its equity in those subsidiaries totaling approximately $33.9 billion,[388] (2) FP transferred its remaining derivative contracts and related bonds and cash, to Matched Funding,[389] which were valued at approximately $1.1 billion.[390] In addition, on the day before FP filed its bankruptcy petition, AIG swept $127 million of FP's cash from the shared cash pool.[391] At the time of its bankruptcy filing, FP only had $10 million in cash and $152 million in total assets.[392]

As the Court concluded above, the offsets did not constitute a transfer of property of FP to anyone.[393] Therefore, they do not form part of the quantitative analysis. Removing the offsetting

---

the assets to be sold, when considered quantitatively and qualitatively, amount to "substantially all" of the corporation's assets); Gimbel v. Signal Cos., Inc., 316 A.2d 599, 606 (Del. Ch. Jan. 10, 1974), aff'd 316 A.2d 619 (Del. 1974) (holding that transferred assets must be "quantitatively vital to the operation of the corporation" as well as "substantially affect[] the existence and purpose of the corporation.").

[387] See supra notes 70-76 and accompanying text.

[388] See supra notes 71-72, 329-36 and accompanying text.

[389] See supra notes 73-74, 337-47 and accompanying text.

[390] See supra note 76 and accompanying text.

[391] See supra notes 77-80, 353-57 and accompanying text.

[392] See supra notes 82, 84 and accompanying text.

[393] See supra notes 332-36 and accompanying text.

transactions ($33.9 billion) from FP's balance sheet as of January 1, 2022 ($35.3 billion), left FP with approximately $1.4 billion in assets.[394] The transfers to Matched Funding of $1.1 billion therefore constituted approximately 79% of FP's assets. The $127 million cash sweep by AIG constituted approximately 9%. Thus, the Court concludes that the transfers to Matched Funding meet the quantitative test but that the transfers to AIG do not.[395]

ii. Qualitative Analysis

Under the qualitative test, the Court must determine whether the transfers substantially affected FP's ability to continue to operate its business.[396]

---

394 See supra note 71 and accompanying text. See also JX-45.

395 See Sharon Steel, 691 F.2d at 1051-52 (holding that a transfer of only 51% of the total book value of the transferor's assets was not a transfer of substantially all of its assets); Jaskiewicz v. ITG Commc'ns, LLC, No. 3:21-00912, 2023 WL 417694, at *14 (M.D. Tenn. Jan. 25, 2023) (compiling cases and stating that "the substantial body of caselaw from numerous jurisdictions and myriad contexts construing the phrase 'all or substantially all' of an entity's assets or equity to mean, at a minimum, substantially more than two-thirds or even three-quarters of such assets or equity."); In re BankAtlantic Bancorp, Inc. Litig., 39 A.3d 824, 843 (Del. Ch. 2012) (finding that a sale of 85-90% of the company's assets was a sale of "substantially all" of the company's assets). But see Katz v. Bregman, 431 A.2d 1274, 1276 (Del. Ch. 1981) (finding that a sale of 51% of the company's assets constituted "substantially all" of the company's assets).

396 See, e.g., Int'l Specialty Prods., 2000 WL 35453111, at *3 (stating in dicta that courts have considered the quantitative test because "even when [the] dollar amount of assets retained by [a] corporation is substantial, [a] sale can still be 'substantially all' if 'the sale changes the nature of the corporate activity' because 'shareholder notification and participation in the corporate decision to abandon the corporate enterprise may be as, or more, important to certain shareholders than the dollar value of assets conveyed or

FP contends that the asset transfers from FP to Matched Funding do not meet the qualitative test. It argues that transfers from parents to solvent wholly-owned subsidiaries are generally outside the scope of successor obligor clauses because no value left the parent-transferor.[397] The Court finds that the cases on which FP relies for that proposition are distinguishable. Those cases held that there was no transfer of all or substantially all of a parent holding company's assets where assets were transferred between subsidiaries owned by the parent holding company.[398] In this case, FP was not a holding company transferring assets between its subsidiaries; instead, FP had operations and assets which it transferred to a subsidiary. While FP indirectly owned those assets after the transfer to Matched Funding, the rights the Former Executives (the only

---

retained.'") (citations omitted). See also Gimbel, 316 A.2d at 606 (stating that a transaction that "substantially affects the existence and purpose of the corporation" requires shareholder approval).

[397] See Whitebox Relative Value Partners, LP v. Transocean, Ltd., 20 Civ. 7143 (GBD), 2020 WL 7406063, at *5 (S.D.N.Y. Dec. 16, 2020), vacated as moot, 2022 WL 288183 (2d Cir. Feb. 1, 2022); Roseton OL, LLC v. Dynegy Holdings Inc., C.A. No. 6689-VCP, 2011 WL 3275965, at *13 (Del. Ch. July 29, 2011).

[398] Whitebox, 2020 WL 7406063 at *3 (holding that addition of layer of intermediate companies between holding companies and operating companies did not constitute transfer of "substantially all" of the assets of the holding companies because the holding companies continued to indirectly own the operating assets); Roseton, 2011 WL 3275965, at *13 (holding that transaction proposing to transfer assets from some of its subsidiaries to new subsidiaries owned by it did not affect the holding company's "corporate purpose and existence"). In addition, the Whitebox decision was vacated on appeal as moot when the transaction was modified so that the intervening subsidiaries were eliminated resulting in no transfer. Whitebox, 2022 WL 288183 at *2.

creditors of FP who were not guaranteed to be paid by AIG) were qualitatively different: they were subordinate to the rights of creditors of the subsidiary.[399]

At the time of the transfers, FP's only operations were winding down its remaining derivative contracts.[400] After those contracts (and their related assets) were novated, Matched Funding was responsible for winding them down.[401] Those transfers

---

[399] See Roseton, 2011 WL 3275965, at *15 n. 110 (acknowledging that "parent and subsidiary corporations are separate entities, having separate assets and liabilities . . . the parent's ownership of all of the shares of the subsidiary does not make the subsidiary's assets the parent's. . . . Hence, the parent's creditors have no claim to the subsidiary's assets, and vice versa.") (quoting Regency Holdings (Cayman), Inc. v. Microcap Fund Inc. (In re Regency Holdings (Cayman), Inc.), 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998)). See also Campbell v. Vose, 515 F.2d 256, 259-60 (10th Cir. 1975) (holding that transfer from parent to subsidiary was a transfer of substantially all of the assets of the parent, requiring shareholder approval under Oklahoma law).

[400] DX-345 ¶ 6 (Declaration of William Kosturos dated December 14, 2022) ("Following the Financial Crisis, AIG FP predominantly operated to manage and wind down the remaining transactions in its portfolio."); CCPX-189 at 2 (letter to from Bill Dooley dated December 23, 2008) ("As I look back on 2008 we have restructured Financial Products from an ongoing operation to an organization that supports the wind down of our business . . . .").

[401] 04/23/2025 Tr. (Stubbs) at 202:25-203:24 ("Q. And so once FP was placed in bankruptcy, Matched Funding took over what FP had been doing with respect to cash management? A. Well, Matched Funding . . . was doing [a] similar role to what FP had been doing. . . . Q. And the wind-down business that had been at FP, Matched [Funding] is now running that wind-down business; correct? A. Correct. Q. Right. It's actively managing the obligations on those derivatives contracts; correct? A. Correct."); 04/23/2025 Tr. (Avery) at 87:5–88:17 ("Q. So, to sum up, what was your opinion on what happened to the business functions FP had been performing before the 2022 transactions? A. So now the functions have moved from FP to Matched. Matched [Funding] is now winding the derivative portfolio. It is now managing the portfolio of derivatives and then the associated bond collateral needs with regard to fluctuation in value and collateral calls. And it's also performing the cash management function at Matched Funding to

foreclosed FP's ability to continue operations, and "substantially affect[ed] the existence and purpose of the corporation."[402] Therefore, the Court concludes that the novation of FP's derivative contracts (and their related cash and bonds) to Matched Funding meets the qualitative test of a transfer of substantially all of FP's assets and business operations.

In contrast to the transfer to Matched Funding, the Court concludes that the transfer of $127 million in cash to AIG did not constitute a transfer of substantially all of FP's business operations to AIG because it was just a transfer of cash. Consequently, the Court concludes that the transfer to AIG does not meet the qualitative test.

Because the Former Executives have met both prongs of the successor liability test with respect to the transfer of the derivatives, bonds, and cash to Matched Funding, the Court concludes that the transfer was of substantially all of FP's assets and business. Therefore, the Court concludes that Matched Funding is a successor to FP under the terms of the Compensation Plans.[403]

---

manage the liquidity needs of the subsidiaries, and doing so through the use of the cash management – the cash pool agreement that was put in place and the revolver that was put in place with [AIG].").

402 Gimbel, 316 A.2d at 606.

403 See JX-2 § 4.01(b); CCPX-2 § 4.01(b). The Court makes no findings as to the amount of any liability Matched Funding may have under the Compensation Plans. That determination will await the second phase of the trial. See also Robbins v. Physicians for Women's

However, the Court concludes that the Former Executives have not established that FP's transfers to AIG in 2022 constituted a transfer of substantially all of the assets or business operations of FP under either the quantitative or the qualitative tests for successor liability. Therefore, the Court concludes that AIG is not a successor under the terms of the Compensation Plans.

The Former Executives argue, nonetheless, that the Court must conclude that AIG is a successor under the Compensation Plans because it indirectly received, and benfited from, the transfer of FP's business and assets to Matched Funding. They assert that the evidence shows that AIG enabled Matched Funding to continue FP's business by (i) allowing FP to transfer $35 million from the cash pool to Matched Funding,[404] (ii) entering into a cash pooling agreement with Matched Funding directly on

Health, LLC, 90 A.3d 925, 930-31 (Conn. 2014) (holding that rights of preceding corporation vested in succeeding corporation) (citing Herbolsheimer v. SMS Holding Co., 608 N.W.2d 487, 496 (Mich. Ct. App. 2000) ("Simply being a successor in liability does not make a company liable — there must be an allegedly viable legal claim against the predecessor. . . .").

[404] 04/23/2025 Tr. (Stubbs) at 183:3–14 ("Q. FP had 35 million and then Matched [Funding] had that 35 million? A. Yes. Q. And this move was part of the bankruptcy planning process; right, sir? A. Correct. Q. Right. First, you moved the derivatives to Matched Funding; right? A. Yes. Q. And then Matched [Funding] needed to be able to manage those derivatives and needed the cash to do that. A. Correct. Cash and unencumbered securities.").

October 5, 2022,[405] (iii) providing a revolving credit line to Matched Funding,[406] (iv) continuing to guarantee the obligations to the counterparties to the derivative contracts,[407] and (v) assigning the same employees of AIG who had managed FP to Matched Funding to manage FP's former business.[408] The Former Executives

---

405 Id. at 186:21–25 ("Q. So is it fair to say you wanted to be – you wanted to make sure Matched [Funding] had the same cash pool agreement as AIG FP had? A. I wanted to make sure that Matched Funding had the same liquidity sources available to it that FP had."). See also JX-72 (10/18/22 email from Stubbs to Hirsch) ("If we have the same cash pool arrangement at Matched Funding as we have at FP then it is 'business as usual' in terms of operational liquidity needs."); JX-075 (10/29/22 email from Stubbs to Cosgrove attaching Cash Pool Agreement between AIG and Matched Funding).

406 04/23/2025 Tr. (Stubbs) at 187:12–14 ("Q. And you were also adamant that Matched [Funding] have a revolver before FP entered bankruptcy; right, sir? A. Correct."); CCPX-838 at 1 (12/13/2022 Revolving Loan Agreement between AIG and Matched Funding).

407 04/22/2025 Tr. (Allison) at 103:21–24 ("Q. And if Matched [Funding] had an event of default, then AIG would have to pay any obligations that Matched [Funding] can't pay, right? A. Yes. There's a general guarantee of AIG Matched Funding as well."); 04/23/2025 Tr. (Stubbs) at 172:1–4 ("Q. Right. And you understood counterparties wanted a representation that the AIG guarantee would remain in place when you novated the contracts to Matched [Funding]; right, sir? A. Yes."). See also JX-81 at 3 (AIG Guarantee Valuation) (stating that "AIG has guaranteed the obligation of all the FP subsidiaries that have exposures with 3rd parties" including Matched Funding).

408 04/23/2025 Tr. (Stubbs) at 113:4-114:2 ("Q. And so just to be clear, when did you kind of rejoin the FP family? A. So 2018, around that time; but it wasn't until, I think, end of June 2022 that I became the CEO, president and joined the board. . . . Q. And do you have a role at Matched [Funding]? A. President and CEO of Matched [Funding]. Q. And just to be clear, are you employed by FP? A. I work for FP in my role, but it's under a service-level agreement between AIG Markets and the FP entities. Q. And AIG Markets - there's been testimony about that. That's a subsidiary of [AIG] Inc., not FP; right? A. Yeah. AIG Markets is 100-percent-owned subsidiary of AIG."); 04/22/2025 Tr. (Allison) at 5:9–12 ("Q. Mr. Allison, what is your current role at [FP]? A. Currently, I'm the chief accounting officer and the chief financial officer of [FP]."), 9:2–19 ("Q. And

contend that once FP exits bankruptcy, FP's business functions will return to FP.[409] Consequently, the Former Executives argue that because AIG orchestrated and supported the 2022 transactions, retained indirect control of the assets in Matched Funding, and indirectly benefited from the transfers, AIG must be considered the successor to FP.

Although AIG controlled FP, the Court concludes that AIG is not FP's contractual successor. Under the express language of the Compensation Plans, only an entity to whom FP transfers all or substantially all of its assets is a successor of FP and liable for the obligations owed to the Former Executives.[410] The provision at issue does not say one who "orchestrates" a transfer

---

just to be clear, what role do you have at Matched [Funding]? A. I'm the chief accounting officer, chief financial officer and I'm the board of directors."). Stubbs and Allison also have similar roles at AIG's subsidiary, Markets. Id. at 9:17-19 ("Q. And just to be clear, what are the role or roles you have at Markets? A. Chief accounting officer, chief financial officer."), 54:5-9 ("Q. And you mentioned Mr. Stubbs on your direct. He's the CEO of AIG Markets and AIG Matched [Funding]? A. And [FP]. Q. So he's the CEO of AIG Markets, Matched [Funding] and FP? A. Yes."); 02/06/2025 Friedland Dep. at 235:15-22 ("Q. Post-bankruptcy, do you have any knowledge of who is running the operations of the subsidiaries? A. The day-to-day activities of winding down the book, the portfolio, yes. Q. What's your understanding? A. It's the same people that were doing it before. So it's Mr. Stubbs."). See also JX-81 at 3 ("While FP may be placed into bankruptcy, its subsidiaries will continue to operate as if nothing has changed. The activities of these entities will continue to be managed by AIG. . . .").

409 JX-77 at 10 ("AIG will then re-consolidate [FP] and subsidiaries once the bankruptcy process is complete."); CCPX-823 ("AIG is expected to re-gain control and 're-consolidate' FP once the bankruptcy process has been completed.").

410 JX-2 § 4.01(b); CCPX-2 § 4.01(b).

or who "supports" a transfer or even one who indirectly "benefits" from a transfer has successor liability. The Court cannot interpret the language of the contract to give the Former Executives rights that the contract did not give them.[411] In this case, the Court has found that AIG was not the transferee of substantially all of FP's assets. Therefore, AIG is not liable as a successor to FP under the express language of the Compensation Plans.

Finally, the Former Executives contend that AIG has ratified the Compensation Plans by accepting payments over the years of its share of the profits and by orchestrating the transfer of substantially all of FP's assets to Matched Funding. The Court rejects this argument. Being a party to the Compensation Plans and accepting its benefits does not mean that AIG has assumed obligations that it did not have under those agreements.

Under the express terms of the Compensation Plans, only a party to whom all or substantially all of FP's assets have been transferred is obligated to make the payments that FP may owe to the Former Executives.[412] As the Court found above, AIG was not the transferee of substantially all of FP's assets. Therefore,

---

[411] See Levine v. Massey, 654 A.2d 737, 740-41 (Conn. 1995) ("A court cannot import into an agreement a different provision nor can the construction of the agreement be changed to vary the express limitations of its terms.") (citations omitted); Heyman v. CBS, Inc., 423 A.2d 887, 894 (Conn. 1979) ("It is hornbook law that courts do not rewrite contracts for the parties.").

[412] JX-2 § 4.01(b); CCPX-2 § 4.01(b).

the Court concludes that under the provisions of the Compensation Plans, AIG is not a successor to FP and is not liable for any of FP's obligations to the Former Executives under those Plans.

2. Continuity of Enterprise Doctrine

The Former Executives also assert that AIG is liable for their deferred compensation claims under the continuity of enterprise doctrine.

FP asserts preliminarily that the Former Executives do not have standing to bring a successor liability claim under the continuity of enterprise theory, arguing that the claim belongs exclusively to the bankruptcy estate.[413] However, the Third Circuit has acknowledged that individual creditors may have standing to prosecute a successor liability claim if they can show that they hold "individualized claims" caused by direct action of the defendant.[414] The Court finds it unnecessary to decide this issue, however, because it finds that the Former Executives have not met their burden of proof on this theory.

Under Connecticut law, "the general rule is that where a corporation sells or otherwise transfers all of its assets, its transferee is not liable for the debts and liabilities of the

---

[413] See In re Emoral, Inc., 740 F.3d 875, 881 (3d Cir. 2014) (holding that successor liability claims under mere continuation theory are property of the estate because recovery would serve to increase the pool of assets available to all creditors).

[414] Id. at 879-80 (distinguishing generalized harm incurred by all creditors from claims assertable by individual creditors for harm specific to them).

transferor."[415] There are exceptions to the general rule, however, including, as the Former Executives argue, if there was a "mere continuation" of the transferor or there is a "de facto merger" of two companies.[416] Connecticut law examines four factors to determine whether there has been a de facto merger or mere continuation: "(1) continuation of the enterprise of the seller corporation so that there is a continuity of management, personnel, physical location, assets and general business operations; (2) continuity of shareholders; (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; (4) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation."[417] The plaintiff need not establish every one of these factors, and the Court should apply a balancing test

---

[415] Robbins, 90 A.3d at 929 (stating that "[T]he general rule is that where a corporation sells or otherwise transfers all of its assets, its transferee is not liable for the debts and liabilities of the transferor, and that [the] liability of a new corporation for the debts of another corporation does not result from the mere fact that the former is organized to succeed the latter.") (citations omitted).

[416] Kuhns Bros., Inc. v. Fushi Int'l, Inc., No. 3:06cv1917, 2008 WL 2167091, at *4 (D. Conn. May 21, 2008).

[417] Peglar & Assocs., Inc. v. Pro. Indem. Underwriters Corp., No. X05CV970160824S, 2002 WL 1610037, at *7 (Conn. Super. Ct. June 19, 2002) (finding plaintiff failed to prove any of the four factors necessary to support successor liability) (citation omitted).

that focuses on intent.[418]

a. Continuity of Business

In this case, FP's winddown of the derivative contracts continues, but it is Matched Funding, not AIG, that is conducting that business now. The Former Executives contend that AIG is controlling and operating Matched Funding's business. However, the evidence establishes that Matched Funding's employees are conducting the day-to-day operations that FP used to conduct.[419] Even though some of those employees may have dual roles at AIG,[420] the Court finds that the evidence presented was insufficient to support a conclusion that AIG, rather than Matched Funding, is continuing FP's business.[421]

---

[418] Id. See also Collins v. Olin Corp., 434 F. Supp. 2d 97, 103 (D. Conn. 2006) (noting that the court should analyze the factors "in a flexible, realistic manner, focusing on intent") (citation omitted).

[419] See 02/06/2025 Friedland Dep. at 235:15–22 ("Q. Post-bankruptcy, do you have any knowledge of who is running the operations of the subsidiaries? A. The day-to-day activities of winding down the book, the portfolio, yes. Q. What's your understanding? A. It's the same people that were doing it before. So it's Mr. Stubbs.").

[420] See, e.g., 04/23/2025 Tr. (Stubbs) at 113:12-20 ("Q. [D]o you have any functional roles in the AIG corporate family besides your officer positions? A Yes. I head up now the global capital markets group for AIG. Yeah. Q. Okay. And are you familiar with an entity called AIG Matched Funding Corp.? A. Yes. Q. And do you have a role at Matched [Funding]? A. President and CEO of Matched [Funding]."); 04/24/2025 Tr. (Kosturos) at 27:4-7 ("Q. And was it Mr. Stubbs who was responsible for negotiating with the counterparties and documenting the novations? A. Yes.").

[421] AIG, FP, and Matched Funding are separate legal entities. The theory that the Former Executives are espousing is akin to piercing the corporate veil of not one but two corporations. Only FP, not the Former Executives, has standing to pursue such an action. See, e.g., Harrison, 320 F. Supp. 3d at 614-27; Maxus Energy Corp., 571 B.R. at

b. Continuity of Shareholders

This factor considers whether the shareholders of the predecessor business own the operator of the successor business or the transferred assets. In this case, AIG is the sole shareholder of FP, which was the original owner of the business and assets. AIG is not, however, the shareholder of Matched Funding which now owns the assets and manages the business of FP. Rather, FP is Matched Funding's sole shareholder.

Therefore, the Court concludes that there is no continuity of shareholders.

c. Cessation of Business by Seller

FP has effectively ceased its business operations: it is not winding down any derivatives, it is no longer originating any derivatives, and it is not engaging in any profit-seeking activity.[422] The Former Executives contend that FP transferred

660; OODC, 321 B.R. at 136.

[422] 04/21/2025 Tr. (Habayeb) at 93:14-19 ("Q. In terms of reducing risk, did FP continue originating or selling complex derivative products? A. FP stopped doing any third-party business. The transactions they did were either to - as part of the unwind and derisking the FP balance sheet or helping with some of the insurance companies at the time."), 94:6-9 ("Q. After FP entered wind-down in late 2008, are you aware of any plan to return FP to profitability? A. There was no feasible plan at that point to bring it back to profitability."); 04/23/2025 Tr. (Stubbs) at 148:14–16 ("Q. So I said FP's current operations have very little operational activity. And you agree with that; right, sir? A. Yes."); JX-109 at 146, 268 (AIG's 2022 10-K) ("[FP] has no material operations or businesses and no employees."); 04/22/2025 Tr. (Allison) at 53:5–15 ("Q. And if you go four lines down, you see it says, '[FP] has no material operations or business and no employees.' Do you see that? A. I see that. Q. And you believe that's truthful and correct? A. That's right. We've got a very small amount of business remaining and, you know, no

all of its assets except sufficient funds to prosecute its bankruptcy case,[423] a classic sign that its business has ceased.[424]

However, those assets were transferred to its subsidiary so that FP still retains the ultimate benefit of those assets. Furthermore, the Bankruptcy Plan contemplates that FP will continue to exist post-petition.[425] Therefore, the Court concludes that FP has not ceased its existence, liquidated, or dissolved for the purposes of this factor.

d. Assumption of Liabilities by Successor

The Former Executives argue that AIG was a party to the Compensation Plans and well aware that it would succeed to FP's liabilities if it received FP's assets.[426] The Court concludes,

---

employees. I believe this section is not related to the consolidated financial statements of [AIG] but is part of a different section in the 10-K where the standalone financial information of [AIG] is reported.").

423 JX-77 at 7 ("[FP's] Current cash pool balance of $179M will be reduced to $10M prior to filing."). See supra notes 353-57 and accompanying text.

424 See, e.g., Philadelphia Elec. Co. v. Hercules, Inc., 762 F.2d 303, 311–12, 318-19 (3d Cir. 1985) (agreeing that successor liability may arise all assets are transferred and predecessor is left with a nominal amount of money to dispose of its expenses in connection with the transaction but reversing the District Court's ultimate conclusion of liability); Knapp v. N. Am. Rockwell Corp., 506 F.2d 361, 369-70 (3d Cir. 1974)) (reversing summary judgment denying successor liability when seller "disposed of all the assets it originally held, exclusive of the cash necessary to consummate the transaction").

425 See supra note 86 and accompanying text.

426 JX-27 at 2 (09/07/2010 summary of 09/03/2010 call between Reilly, Habayeb, Blake, Button, and Shea) ("There is also a clause in the plan agreement that if at some point AIG were to 'transfer all or substantially all assets' to another entity then the contract would be

however, that this does not make AIG liable as a successor to FP, particularly since the Court has found that FP transferred only de minimis assets to AIG.

The Former Executives assert nonetheless that AIG has agreed to assume FP's liabilities. However, the Court finds that AIG has only agreed to guarantee obligations owed to the derivative contracts counterparties.[427] That agreement is insufficient to establish that AIG has agreed to assume FP's obligations under the Compensation Plans, particularly where the language of those Plans expressly provide that AIG is not assuming FP's obligations under the Compensation Plans.[428]

Consequently, considering the relevant factors, the Court concludes that the Former Executives have not presented

---

legally binding for the new entity and could potentially re-establish the liability. It is important to make sure participants in the [FP] 'transition' are aware of this fact and that no actions trigger the re-establishment of the DCP/SIP plan liability."); CCPX-660 at (10/21/2015 email from Reilly to McIntyre) (stating that prohibition on intercompany transfers of FP's assets was likely due to the successor liability clause in the Compensation Plans and attaching the 09/07/2010 summary); 04/22/2025 Tr. (Allison) at 97:11-16 ("Q. Well, you spoke to Mr. Shea in connection with the DCP litigation? A. I did speak with him, yes. Q. And you knew by 2014 Mr. Shea provided this advice [from JX-27]? A. Mr. Shea provided advice that we should be careful with sales of AIG FP assets.").

[427] See supra note 407 and accompanying text. See also JX-81 at 3 (stating that "AIG has guaranteed the obligation of all the FP subsidiaries that have exposures with 3rd parties" including Matched Funding).

[428] JX-2 § 4.01(a) ("The benefits payable hereunder shall constitute an unsecured debt of AIG Financial Products Corp. to the Participants and their Beneficiaries and to AIG and shall not have the benefit of any guarantee by AIG of payment obligations of AIG Financial Products Corp.") (emphasis added); CCPX-2 § 4.01(a) (same).

sufficient evidence to establish that AIG is a mere continuation of FP or that there was a de facto merger between AIG and FP. Therefore, the general rule that successor corporations are not liable for their predecessor's debt applies.[429]

The Former Executives contend, nonetheless, that AIG's control of FP and Matched Funding mandates that it be considered a successor to FP. However, the Court finds that under Connecticut law, "control" is not an exception to the general rule that successor corporations are not liable for the debts and liabilities of their predecessor.[430] Further, "a prerequisite to the imposition of liability against a corporation under any of the exceptions to the nonliability of successors is a transfer or sale of all, or substantially all, the assets of the predecessor to the successor."[431] As found above, FP did not transfer all or substantially all of its assets to AIG.[432]

3. Conclusion

For all of the above reasons, the Court concludes that AIG is not the contractual successor to FP under the Compensation

---

429 See, e.g., Kuhns Bros, 2008 WL 2167091, at *4; Peglar, 2002 WL 1610037, at *7.

430 Id.

431 See FCI USA, LLC v. Wampus Milford Assocs., LLC, No. X07-HHD-CV-23-6179725-S, 2024 WL 3873431, at *3 (Conn. Super. Ct. Aug. 13, 2024) (emphasis added) (quoting 15 Fletcher Cyclopedia of the Law of Corporations (2023) § 7122).

432 See supra note 403 and accompanying text.

Plans and that AIG is not a successor to FP under the continuity of enterprise doctrine. As a result, the Court will grant judgment in favor of AIG on Count Four of the claims asserted against it by the Former Executives.

D. Tort Claims

The Former Executives assert two tort claims against AIG: (1) tortiously interfering with the Compensation Plans by preventing FP from restoring the Former Executives' accounts and (2) a prima facie tort for the 2022 transfers that left FP bereft of assets, culminating in a bankruptcy filing meant to subordinate and discharge their claims.

FP disputes the allegations but argues preliminarily that both claims are barred by the statute of limitations.

1. Statute of Limitations

FP contends that, as the forum, Delaware's statute of limitations applies.[433] Under Delaware law, a tort claim, including one for tortious interference with contract, is subject to a three-year statute of limitations.[434] Therefore, FP argues that the Former Executives were required to file suit within three years after the Compensation Plans were breached or no

[433] See, e.g., Winstar Holdings, LLC v. Blackstone Group, LP (In re Winstar), 435 B.R. 33, 44 (the law of the forum determines whether an action is barred by the statute of limitations).

[434] Del. Code Ann. tit. 10, § 8106(a). Even if Connecticut law applied, its statute of limitations for tort claims is also three years. Conn. Gen. Stat. Ann. § 52-577.

later than December 31, 2016.[435] FP asserts that the Former Executives first asserted the tort claims when they filed their Answer, Affirmative Defenses, Counterclaim, and Third Party-Claims in this adversary proceeding on July 5, 2023.[436]

The Former Executives contend that the statute of limitations has not expired under the continuing tort doctrine.[437] They argue that the evidence established that AIG has been engaged in a continuous course of conduct from 2008 through 2022 to deprive the Former Executives of their rights under the Compensation Plans.

The Court concludes that the continuing tort doctrine does not apply to extend the statute of limitations for the tortious interference with contract claim. Under Delaware law, a tortious interference claim arises, and the limitation period begins to run, when the alleged injury occurs.[438] In this case, the injury

---

[435] For purposes of the Initial Issues only, FP did not contest that the Compensation Plans were breached. See supra note 271 and accompanying text.

[436] Adv. D.I. 11. While the Former Executives filed suit in Connecticut State Court in 2019, they did not assert any of the instant tort claims in that case. Arthurs et al. v. AIG Fin. Prods. Corp., No. X08-FST-CV-19-6046057-S (Conn. Super. Ct.).

[437] See, e.g., Frederick Hsu Living Tr. v. ODN Holding Corp., C.A. No. 12108, 2017 WL 1437308, at *43 (Del. Ch. Apr. 25, 2017) ("If there is a continuing wrong, the cause of action is timely so long as the last act evidencing the continuing wrong falls within the limitation period.") (quoting Kerns v. Dukes, No. Civ. A. 1999-S, 2004 WL 766529, at *4 (Del. Ch. Apr. 2, 2004)).

[438] Kaufman v. C.L. McCabe & Sons, Inc., 603 A.2d 831, 834-35 (Del. 1992) (barring the plaintiffs from recovering damages for their tort claims because they failed to bring those claims within three years of

to the Former Executives occurred when FP failed to restore their account balances by the December 31, 2013, deadline because if their balances were not restored by that date, their right to them lapsed.[439]

A necessary element of a claim for tortious interference with contract is "an intentional act that is a significant factor in causing the breach of such contract."[440] Only actions which occur before the breach can be a significant factor in causing the breach. Therefore, any claim the Former Executives have for tortious interference with their right to restoration of their accounts had to have been brought within three years of the breach, namely by December 31, 2016.[441]

The Court rejects the Former Executives' contention that the continuing wrong doctrine excuses their failure to file their claim within the statute of limitations. In the breach of contract context, the doctrine only applies

---

the alleged injury).

[439] JX-2 § 4.01(b) ("to the extent amounts have not been restored by December 31, 2013, all restoration rights shall permanently lapse except to the extent AIG Financial Products Corp. determines that it may amend the Plan to provide for payment of restored amounts without violating Internal Revenue Code Section 409A."); CCPX-2 § 4.01(b) (same). The Former Executives have presented no evidence or argument that the balances could have been restored without violating the Internal Revenue Code.

[440] See, e.g., Bhole, Inc. v. Shore Inv., Inc., 67 A.3d 444, 453 (Del. 2013).

[441] Del. Code Ann. tit. 10, § 8106(a).

> in the limited circumstances in which a breach of contract claim cannot be alleged at the time of breach because damages cannot be ascertained at that time. . . . If a plaintiff could allege a prima facie case for breach of contract after a single incident, the doctrine does not apply, even if a defendant engages in "numerous repeated wrongs of similar, if not same, character over an extended period."[442]

The Court concludes that the same limitation applies to a tort claim for tortious interference with contract. Because the Compensation Plans were breached and damages were ascertainable on January 1, 2014, the continuing tort doctrine is not applicable.[443]

However, the Court concludes that the prima facie tort claim of the Former Executives is not barred by the statute of limitations, because as the Court finds below, AIG took specific actions which harmed FP and its creditors in 2022.[444]

---

[442] See, e.g., Ocimum Biosolutions (India) Ltd. v. AstraZeneca UK Ltd., C.A. No. N15C-08-168, 2019 WL 6726836, at *14 (Del. Super. Ct. Dec. 4, 2019) (concluding that continuing wrong doctrine did not apply because court found that the breach of contract occurred when the trade secrets were improperly retained at the conclusion of the contract not with each continuing improper use).

[443] See, e.g., Kerns, 2004 WL 766529, at *4 (holding that the statute of limitations had run because the last act causing the injury occurred when the City Council passed a resolution expanding the sewer system, not when the plaintiffs were assessed for the costs of the expansion); Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., No. 94C-03-189-WTQ, 1997 WL 529587, at *8 (Del. Super. Ct. Jan. 29, 1997) (holding that the last wrongful act occurred at the time the franchise agreement was renewed at an excessive rate, not each month that the excessive rent was charged thereafter).

[444] This claim was brought on June 7, 2023, within the three-year statute of limitations for any wrongful act that occurred in 2022. Del. Code Ann. tit. 10, § 8106(a).

2. Prima Facie Tort

The Former Executives assert that AIG is guilty of a prima facie tort because its actions between 2008 and 2022 were intentional and caused them damage by denying them any recovery on their claims.

FP preliminarily argues that the doctrine may no longer be available under Connecticut law.[445] The Court concludes, however, that the doctrine does remain viable under Connecticut caselaw.[446] Even the Deutsch Court, on which FP relies, analyzed the facts of that case to determine whether the plaintiff stated a claim for a prima facie tort.[447] The Deutsch Court also noted that the Connecticut Supreme Court, in Connor v. Connelly, had applied the standard for a prima facie tort without naming it.[448] That

---

445 See Deutsch v. Backus Corp., No. X07CV106022074S, 2012 WL 1871398, at *10 (Conn. Super. Ct. May 2, 2012) (stating that "[i]t is not entirely clear whether the appellate courts of this state would recognize prima facie tort as a viable cause of action.").

446 See, e.g., Perry v. Perry, No. UWYCV126022945, 2015 WL 5981005, at *4-6 (Conn. Super. Ct. Sept. 15, 2015) (acknowledging the existence of the prima facie tort doctrine but concluding plaintiff had failed to establish that the defendants' conduct amounted to a prima facie tort); McGuire v. Hudson Valley Bank, N.A., No. FSTCV136018303S, 2013 WL 6671307, at *4 (Conn. Super. Ct. Nov. 20, 2013) (holding that the plaintiff had failed to state a claim for prima facie tort because the plaintiff did not allege that the defendants acted with intent to cause harm to the plaintiff) (citing Deutsch, 2012 WL 1871398).

447 Deutsch, 2012 WL 1871398, at *10-11.

448 Id. ("[P]rima facie tort first appears in Connecticut in Connors v. Connolly, 86 Conn. 641, 647, 86 A. 600 (1913). The court did not expressly use the term 'prima facie tort,' but stated, '[t]hese facts shown [that the plaintiff suffered damage in the loss of his employment, and that this damage was intentionally caused], a prima facie cause of action was made out against those who, thus acting with

seminal case has not been reversed and remains good law.[449]

FP asserts nonetheless that no prima facie tort has been established because AIG acted justifiably and appropriately in protecting its economic interests vis a vis FP and had neither an improper motive nor used improper means.

The doctrine of prima facie tort imposes liability for a "harm that was intentionally inflicted, even though the conduct does not come within the requirements of one of the well-established and named intentional torts."[450] Some courts have stricken prima facie tort claims if other traditional tort claims are available to the plaintiff.[451] Because no other tort claim

---

intent, caused the damage. Recovery, however, might be defeated by the establishment by these persons of a justification, the burden being upon them to do so.'").

[449] See Brandt v. Walker Digit., LLC, No. X08CV0194566, 2004 WL 2757440, at *6 (Conn. Super. Ct. Nov. 1, 2004) ("[T]he Connecticut Supreme Court recognized a cause of action [for prima facie tort] 'against those who, . . . acting with intent, caused . . . damage. Recovery, however, might be defeated by the establishment by these persons of a justification, the burden being upon them to do so.' . . . There is no case that overrules or diminishes this authority, and it remains good law in Connecticut.") (quoting Connors v. Connolly, 86 A. 600 (Conn. 1913)).

[450] Restatement (Second) of Torts § 870 (1979). See also Ballard v. Hartford Life Ins. Co., No. CV095031857S, 2011 WL 522793, at *5 (Conn. Super. Ct. Jan. 18, 2011) (recognizing the prima facie tort doctrine); Choy v. Boyne, No. CV065005693, 2006 WL 3692067, at *1 (Conn. Super. Ct. Nov. 30, 2006) (same).

[451] Stevens v. Kahlily, HHDCV176082965S, 2019 WL 4668156, at *3 (Conn. Super. Ct. Aug. 21, 2019) (dismissing prima facie tort claims because other tort claims were pled, noting it "was never intended to be used to evade the elements or defenses required of traditional torts") (citation omitted). See also Deutsch, 2012 WL 1871398, at *12-13 (recognizing that there is a split of authority on the issue but striking the prima facie tort count in that case because several

remains, the Court addresses the merits of the Former Executives' claim.

The Former Executives contend that all of the actions taken by AIG vis a vis FP form the basis of a prima facie tort. As the Court has found above, AIG controlled FP's board and its top employees (several of whom were also AIG employees).[452] AIG used that control to cause FP to enter into the FP Revolver and to pay billions in interest on what the Court has concluded was really an equity investment.[453] AIG further caused FP to wind down its business operations in a manner designed to reduce losses and generate cash to repay AIG, but not to generate any new business.[454]

The Former Executives also presented evidence that AIG continued its control over FP in January 2022, by suggesting the two persons who were to serve as independent directors and members of FP's Special Committee to consider its strategic

---

other torts survived the motion to strike); Ballard, 2011 WL 522793, at *5 (dismissing prima facie tort claim because a negligence claim was pled); Choy, 2006 WL 3692067, at *1 (dismissing prima facie tort claim because a tort claim for defamation was also alleged). But see Brandt, 2004 WL 2757440, at *7 (denying motion to strike prima facie tort claim even though a claim for tortious interference with contract was also pled).

[452] See supra notes 29-33 and accompanying text.

[453] See supra notes 26, 151, 154, 315-17 and accompanying text. See also JX-1, JX-86.

[454] See supra notes 27-28 and accompanying text.

alternatives.[455] AIG's counsel also told the Special Committee its preferred course of action: a bankruptcy filing by FP in which "any DCP claims would be expressly non-guaranteed, unsecured, and subordinated."[456] During 2022, the Special Committee authorized several transactions (offsetting intercompany balances, transferring assets to Matched Funding, and several transfers to AIG) which the Former Executives contend were done to benefit AIG and caused harm to FP and them.[457]

AIG is liable for a prima facie tort if it acted intentionally, without justification, and caused damage to the Former Executives with respect to those transactions.[458]

---

455 See supra note 68 and accompanying text.

456 See supra note 67 and accompanying text. See also CCPX-709 at 3 (Weil FP Contingency Planning: Discussion Materials).

457 See, e.g., 01/31/2024 Allison Dep. at 202:2-5 ("A. Was there any other reason to do the novations? Best reason was for the bankruptcy planning."). See also CCPX-836 at 2 (12/13/2022 email from Hirsch to Fitzsimons) ("Transferring these transactions to an FP sub [Matched Funding] and a sister company, [Markets], minimizes disruption to our counterparties and AIG. These actions coupled with the bankruptcy filing likely gives us credibility and leverage in going back to our counterparties to negotiate terminations on the best possible terms available.").

458 Restatement (Second) of Torts § 870 (1979). See also Connors v. Connolly, 86 A. 600, 602 (Conn. 1913) (concluding that "a prima facie cause of action was made out against those who, thus acting with intent, caused the damage. Recovery, however, might be defeated by the establishment by these persons of a justification"); Brandt, 2004 WL 2757440 at *6 (same and rejecting contention that the tortious act must also be against public policy).

a. Offset Transactions

The Court concludes that the offsetting transactions, described more fully in Part B above, do not constitute a prima facie tort for the following reasons.

First, the Special Committee authorized FP to perform the offsetting transactions; AIG did not.[459] As the Court found above, the offsets did not remove any assets from FP but were simply a means to simplify FP's balance sheet.[460] Therefore, the Court concludes that the offsets did not injure FP or its creditors. Nor were the offsets done by improper means; many companies do such offsets frequently to reflect more accurately their financial condition.[461] Because the offsetting transactions

---

[459] See supra note 71 and accompanying text. See also 04/24/2025 Tr. (Kosturos) at 20:1-3 ("Q. Did AIG direct FP to engage in these intercompany offset transactions? A. No.").

[460] See supra notes 71-72, 332-35 and accompanying text. See also 04/24/2025 Tr. (Kosturos) at 20:4-15 ("Q. Did FP transfer away any assets or value in any intercompany offset transaction? A. No, they didn't. Q. Did any of the transactions change the net equity of FP on either a standalone or consolidated basis? A. No. Q. Was there a benefit to FP from doing these intercompany offset transactions? A. Yes. Q. And what was it? A. First of all, to clean up its balance sheet and to make a more fair representation of its balance sheet.").

[461] 04/24/2025 Tr. (Dubel) at 106:14-20 ("Q. And why did the Special Committee approve those intercompany offset transactions? A. Well, there was several reasons. Number one, it was something that I find not uncommon to do before a company goes into Chapter 11 is you want to simplify your balance sheet. A lot of these were just situations that were easy to offset, and so that was important."), 112:19-23 ("Q. And based on your years of restructuring experience, is this kind of intercompany offset transactions [sic] rare or uncommon in a company that's restructuring? A. No, it's not uncommon at all. Some companies deal with these every year, every quarter, what have you. . . . And it's something I've done in the past, in my past deals to, in essence, simplify the balance sheet to avoid the extensive costs

were not wrongful or harmful, the Court concludes that they do not provide a basis for the Former Executives' prima facie tort claim against AIG.[462]

b. Transfers to Matched Funding

The Special Committee of FP also authorized the transfer of 94 derivative contracts (and related cash and bonds) to FP's subsidiary, Matched Funding.[463] The Court finds that FP transferred these assets to Matched Funding to shelter their value from the losses that would occur in the event of a bankruptcy filing.[464] Because the transfers were to a subsidiary

---

involved in a Chapter 11 process."). See also 04/24/2025 Tr. (Kosturos) at 17:8-10 ("Pinestead had finished its operations and effectively needed to be consolidated into FP via these offset transactions."), 19:7-13 ("Q. In addition to this Pinestead transaction, did FP engage in other offset transactions with other subsidiaries? A. Yes. Q. And were those offset transactions structured in a substantially similar manner to the Pinestead transaction we just talked about? A. Yes, they were.").

[462] See, e.g., Perry, 2015 WL 5981005, at *4-6; McGuire, 2013 WL 6671307, at *4. See also Restatement (Second) of Torts § 870 (1979); Connors, 86 A. at 602.

[463] See supra note 73 and accompanying text. See also (04/24/2025 Tr. (Kosturos) at 27:4-11 ("Q. And was it Mr. Stubbs who was responsible for negotiating with the counterparties and documenting the novations? A. Yes. Q. Under whose direction was Mr. Stubbs acting? A. The Special Committee of FP. Q. Did AIG direct FP to novate any of these derivatives? A. No."); JX-78 (10/31/2022 Unanimous Written Consent in Lieu of Meeting of Directors of [FP] approving $35 million cash transfer to Matched Funding). FP's professionals advised the Special Committee regularly on the status of the novations. See generally JX-64, JX-67, JX-70, JX-71, JX-73 (minutes of Special Committee meetings throughout the second half of 2022).

[464] See supra notes 343-47 and accompanying text. See also JX-51 at 13 (04/13/2022 A&M Update to the Special Committee of the Board presentation) (showing potential losses of $163 to $510 million if FP

of FP, the Court concludes that the value was preserved for FP's benefit.[465] Thus, the Court concludes that the transfers to Matched Funding were not done with an improper motive or by improper means and did not cause any injury to FP or its creditors and can form no basis for the Former Executives' prima facie tort claim.[466]

c. $127 Million Transfer to AIG

On the eve of FP's bankruptcy filing, AIG removed $127 million of FP's cash in the intercompany cash pool and offset it against the FP Revolver's balance.[467]

The Court concludes that AIG used improper means to remove the $127 million from the intercompany cash pool. As discussed above, AIG took cash that belonged to FP, contrary to the terms of the cash pool sharing agreement and the specific requests of FP.[468] Doing so left just $10 million for FP to operate in

---

retained the derivatives and filed for bankruptcy versus losses of only $6 million if FP novated the derivatives). See also 11 U.S.C. §§ 362(b)(7), 546(e) & 560.

465 See supra note 346 and accompanying text.

466 See, e.g., Perry, 2015 WL 5981005, at *4-6; McGuire, 2013 WL 6671307, at *4. See also Restatement (Second) of Torts § 870 (1979); Connors, 86 A. at 602.

467 See supra notes 353-54 and accompanying text.

468 See supra notes 77-81, 353-54, 356 and accompanying text. See also JX-84 at 1 (12/14/2022 email from Carbone to Allison) ("This email will confirm that [AIG] has offset the full amount of the intercompany cash pool receivable owed by [AIG] to FP against the amount of the intercompany payable owed by FP to [AIG] The balance in this account as of Dec 13, 2022 was $126,877,725.25.").

bankruptcy.[469] The Court finds that this harmed FP and its creditors by depriving FP of funds it owned. The Court also finds sufficient evidence that AIG took these actions for an improper motive: to strip FP of assets before its bankruptcy filing so that there would be no possibility of a recovery for the Former Executives.[470] Therefore, the Court concludes that AIG's action in setting off $127 million of FP's cash against the FP Revolver was a prima facie tort.[471]

FP contends, however, that it has obtained the agreement of AIG for a tolling of the statute of limitations for FP to recover any claims that it may have against AIG, including any claim for recovery of FP's assets that may have been transferred to AIG.

The Court rejects FP's argument. The Court has determined above that AIG's claim must be recharacterized as equity and equitably subordinated to the claims of the Former Executives.

---

[469] See supra note 82 and accompanying text. CCPX-819 (12/4/22 email from Carbone attaching draft powerpoint on FP update) at 4-5 ("$10M for FP related expenses while in bankruptcy. . . . Current AIG cash pool balance of $179M will be reduced to $10M prior to filing.").

[470] CCPX-709 at 3 ("At present, a chapter 11 bankruptcy filing by FP is a viable strategy for resolving [the Compensation Plan litigation]. In an FP bankruptcy, any DCP claims would be expressly non-guaranteed, unsecured, and subordinated"). CCPX-819 at 4-5; CCPX-827 at 1 (12/07/2022 email from Hirsch to Allison and others referring to FP's funds in the cash pool) ("We should [discuss] timing of the 35M move [of FP's funds in cash pool to Matched Funding]. . . . In other words it's not FP's money to spend it's AIG's"); D.I. 6 at 17 (giving the Former Executives $1 million dollars if they accept the plan that would discharge their deferred compensation claims, and nothing if they reject the plan).

[471] Connors, 86 A. at 602. See also Restatement (Second) of Torts § 870 (1979).

Therefore, the prima facie tort claim may inure to the benefit of the Former Executives and other creditors of the estate. At any rate, the agreement reached between FP and AIG does not justify AIG's actions or create a defense to the Former Executive's prima facie tort claim.

d. $253 Million Overpayment to Markets

The Former Executives also contend that AIG's refusal to compensate FP for its prior payment of $253 million in costs incurred by AIG's subsidiary, AIG Markets, is a prima facie tort.[472]

The Court concluded above that AIG's action with respect to this claim by FP was not inequitable conduct because the Former Executives presented no evidence that AIG had a legal obligation to pay FP for AIG Market's debts or even to engage with FP on its allegation of overpayment.[473] For the same reasons, the Court concludes that the Former Executives have failed to establish that AIG's actions support their prima facie tort claim.[474]

e. $154 Million Deferred Tax Asset

The Former Executives also contend that AIG's actions in placing a reserve on FP's $154 million tax asset supports their

---

[472] See supra note 358 and accompanying text.

[473] See supra notes 358-60 and accompanying text.

[474] See, e.g., Perry, 2015 WL 5981005, at *4-6; McGuire, 2013 WL 6671307, at *4. See also Restatement (Second) of Torts § 870 (1979); Connors, 86 A. at 602.

prima facie tort claim.[475]

The Court has already concluded that the reserve placed on FP's tax asset did not cause any harm to FP or its creditors.[476] Therefore, the Court concludes that AIG's action in placing a reserve on the FP tax asset does not provide any support for the Former Executives' prima facie tort claim.[477]

3. Conclusion

For the reasons stated above, the Court concludes that the claim of the Former Executives against AIG for tortious interference with contract is barred by the statute of limitations. However, the Court concludes that the Former Executives have proven a claim for a prima facie tort against AIG for its actions in taking $127 million of FP's funds from the intercompany cash pool. Accordingly, the Court will grant judgment in favor of the Former Executives on Count Two of their claim against AIG for such damages that may be proven were caused by that transfer.

---

475 See supra notes 361-64 and accompanying text.

476 See supra note 365 and accompanying text.

477 See, e.g., Perry, 2015 WL 5981005, at *4-6; McGuire, 2013 WL 6671307, at *4. See also Restatement (Second) of Torts § 870 (1979); Connors, 86 A. at 602.

## IV. CONCLUSION

For the foregoing reasons, the Court will enter judgment (1) against FP and AIG on Count One of the Complaint, and in favor of the Former Executives on their Counterclaim against FP and AIG, declaring that the advances made by AIG under the FP Revolver are equity, not debt (Recharacterization) and (2) in favor of the Former Executives and against AIG on Counts One (Equitable Subordination) and Two (Prima Facie Tort) of their Claims against AIG. The Court will grant judgment in favor of AIG on Counts Three (Tortious Interference with Contractual Relations) and Four (Successor Liability).

The Court will issue an Order consistent with this Opinion.

Dated: August 14, 2026

BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge